## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

———————————————————
                                            )
**SETH CHARLES BEN HAIM**, *et al.*,        )
                                            )
         **Plaintiffs,**                    )
                                            )
         **v.**                             )        **Civil Action No. 02-1811 (RCL)**
                                            )
**THE ISLAMIC REPUBLIC**                    )
**OF IRAN**, *et al.*,                      )
                                            )
         **Defendants.**                    )
———————————————————)

### FINDINGS OF FACT AND CONCLUSIONS OF LAW

This case arises from a terrorist attack on a passenger bus traveling to the Gaza strip on

April 9, 1995.  Plaintiffs allege that defendants are liable for damages resulting therefrom

because defendants provided material support and assistance to the terrorist organization that

orchestrated the bombing, Palestine Islamic Jihad ("PIJ").  As such, defendants are subject to suit

under the terrorism exception to the Foreign Sovereign Immunities Act ("FSIA"), 28 U.S.C. §

1605(a)(7).  Plaintiffs, who include a bombing victim and two immediate family members,

initially named a number of defendants, but later withdrew their complaint as to all defendants

except for the Islamic Republic of Iran ("Iran") and the Ministry of Information and Security

("MOIS").  Although defendants were served with process via diplomatic means pursuant to 28

U.S.C. § 1608, they failed to respond or enter an appearance.  Accordingly, default [8] was

entered against defendants on February 13, 2003.

An evidentiary hearing was initially scheduled for November 1, 2005, but was canceled

upon plaintiffs' request, and plaintiffs submitted their evidence and Proposed Findings of Fact &

Conclusions of Law [23] on January 3, 2006.[1]  Plaintiffs also filed, at this Court's direction, a

Memorandum of Law [22] addressing the impact of relevant cases decided in this Circuit since

plaintiffs filed their complaint.

Plaintiffs support their liability claims with reference to several sources: (1) the findings

made by this Court in a prior case arising from the same attack, *Flatow v. Islamic Republic of

Iran*, 999 F. Supp. 1 (D.D.C. 1998) (Lamberth, J.); (2) affidavit testimony by an expert witness;

and (3) documentary evidence.  Plaintiffs support their damages claims by affidavit and

deposition testimony.  Based on all of the evidence presented, the Court makes the following

findings of fact and conclusions of law and will, consistent with them, enter default judgment in

favor of plaintiffs and against defendants Iran and the MOIS.

## <u>FINDINGS OF FACT</u>

The following findings of fact are based upon affidavit testimony and documents

submitted in accordance with the Federal Rules of Evidence.  Plaintiffs have "establishe[d]

[their] claim or right to relief by evidence that is satisfactory to the Court," as required by 28

U.S.C. § 1608(e).  This Court finds the following facts to be established by clear and convincing

evidence, which would have been sufficient to establish a *prima facie* case in a contested

proceeding:

## I.    <u>Generally</u>

1.       Plaintiff Seth Klein Ben Haim ("Seth") was born on October 9, 1975 in the United States.

---

[1] While the decision to submit evidence via affidavit and deposition rather than live testimony was primarily motivated by developments unrelated to the lawsuit, it should be noted that live testimony also would have been inappropriate given the fragile mental status of plaintiff Seth Klein Ben Haim.  Recounting the events still causes him significant distress, and might even have lead him to clinically regress.  (Dr. Strous' Rep. at 7.)

(Seth Klein Ben Haim Aff. (Ex. C) ¶ 1.)  He has lived both in Israel and the United States since he was very young, but he maintained his United States citizenship throughout his life, and was a United States citizen at the time of the attack.  (*Id.* ¶ 2.)

2.     Plaintiff Lavi Klein Ben Haim ("Lavi") was born April 17, 1980 in Israel.  (Lavi Klein Ben Haim Dep. at 5.)  He is an American citizen, and the younger brother of plaintiff Seth.  (*Id.*)

3.     Plaintiff Bernard Klein Ben Haim ("Bernard") was born on January 10, 1947 in the United States.  (Bernard Klein Ben Haim Dep. 5.)  He is an American citizen who lives in Israel.  (*Id.*)  He is the father of plaintiffs Seth and Lavi.  (*Id.* at 5-6)

4.     As a high school student, Seth performed well academically, participated competitively and recreationally in a number of extracurricular activities, and enjoyed a very active social life.  (Dr. Strous' Report at 4; Bernard Klein Ben Haim Dep. at 32; Lavi Klein Ben Haim Dep. at 17-18; Seth Klein Ben Haim Aff. ¶¶ 4-6.)  He considered himself to be scholarly and he enjoyed reading.  (Seth Klein Ben Haim Aff. ¶ 27.)  He was living a very full and engaged life.  (*Id.* ¶ 21.)  He had no symptoms of mood disorder or behavior problems, and he reports no family history of psychiatric illness.  (Dr. Strous' Report at 4.)

5.     As a teenager, Seth had high hopes for the future: he dreamed of eventually attending medical school in the United States and becoming a doctor.  (Seth Klein Ben Haim Aff. ¶¶ 7, 33.)  He was particularly interested in psychiatry.  (*Id.* ¶ 7.)

**II.**    **The Attack**

This Court takes judicial notice of its findings in *Flatow*, in which Iran and the MOIS

were determined to have been liable for the bombing of the Number 36 Egged bus. These findings as to defendant's liability are also supported by plaintiffs' additional evidence in this case. (Ronni Shaked Aff. (Ex. B) ¶¶ 26-53.)

6.      On April 9, 1995, Seth was a passenger on the number 36 Egged bus (Seth Klein Ben Haim Aff. ¶ 8), which was traveling from Ashkelon, Israel to a Mediterranean resort in the Gush Katif community. *Flatow*, 999 F. Supp. at 9, ¶ 5.

7.      "At or about 12:05 p.m. local time, near Kfar Darom in the Gaza Strip, a suicide bomber drove a van loaded with explosives into the number 36 Egged bus, causing an explosion that destroyed the bus." *Flatow*, 999 F. Supp. at 9, ¶ 6.

8.      "The Shaqaqi faction of PIJ claimed responsibility for and in fact perpetrated the terrorist act which caused" Seth Klein Ben Haim's injuries. *Id.* at 10-11, ¶¶ 16-18. Defendant Iran "provided approximately two million dollars to PIJ annually in support of its terrorist activities." *Id.* at 10-11, ¶ 18.

9.      Defendant Iran "is a foreign state and has been designated a state sponsor of terrorism pursuant to section 6(j) of the Export Administration Act of 1979 (50 U.S.C.A. § 2405(j)) continuously since January 19, 1984." *Id.* at 11, ¶ 19. "Defendant provides material support and resources to PIJ by supplying funds and training for the Shaqaqi faction's terrorist activities in the Gaza Strip region." *Id.* at 11, ¶ 19.

10.     Defendant Iran "sponsors the Shaqaqi faction's terrorist activities within the meaning of 28 U.S.C. § 1605(a)(7)" by providing it with all of its funding." *Id.* at 11, ¶ 20.

11.     "Defendant the Iranian Ministry of Information and Security is the Iranian intelligence service, functioning both within and beyond Iranian territory." *Flatow*, 999 F. Supp. at

11, ¶ 21.  "Specifically, the Iranian Ministry of Information and Security acted as a conduit for the Islamic Republic of Iran's provision of funds and training to the Shaqaqi faction for its terrorist activities in the Gaza Strip region."  *Id.*

12.   Defendants Iran and the MOIS "conspired to provide material support and resources to the Shaqaqi faction of PIJ, a terrorist organization, within the meaning of 28 U.S.C. § 1605(a)(7)," "which caused" the injuries to Seth.  *Id.* at 11, ¶ 25.

13.   Seth Klein Ben Haim's injuries were "caused by a willful and deliberate act of extrajudicial killing because the explosion was caused by a bomb that was deliberately driven into the bus by a member of the Shaqaqi faction of the PIJ acting under the direction of defendants the Islamic Republic of Iran and the Iranian Ministry of Information and Security."  *Id.* at 11, ¶ 26.

### III.   Seth's Injuries

14.   At the time of the explosion, Seth recalled being forcefully thrown into the air.  (Seth Klein Ben Haim Aff. ¶ 9.)  As a result of the explosion, shrapnel punctured Seth's body and skull in several locations, and other parts of his body were wounded and bleeding. (*Id.* ¶ 13.)  Seth suffered from tremendous pain and a loss of vision.  (*Id.* ¶¶ 13-14.)  He was treated at the scene and then transported by ambulance to Barzilai Hospital in Ashkelon.  (Dr. Friedman Aff. ¶ 12.)

15.   Bernard heard about the attack while driving in his car, and suspected that Seth might have been on the bus.  He immediately returned home to his younger son, Lavi.  (Bernard Klein Ben Haim Dep. 9-10.)  Upon calling the bus station, Bernard confirmed that the bus that had been attacked was the same one Seth had told his father he would be taking.  (*Id.*

at 10-11, 13.)  Bernard and Lavi then went to Barzilai Hospital, in the hope that they would find Seth or information about him.  (*Id.* at 11.)

16.     At Barzilai Hospital, Bernard and Lavi were first told that Seth had not been brought to any hospital.  (*Id.* at 11-12; Lavi Klein Ben Haim Dep. at 6-7.)  Bernard understood that to mean that Seth had been killed, and he became hysterical.  (Bernard Klein Ben Haim Dep. at 11-13.)  Soon thereafter, however, a doctor informed them that Seth was indeed a patient in the hospital's emergency room.  (*Id.* at 12-13.)  The doctor also told them that Seth's injuries were not serious, and took them to the emergency room where Seth was being treated.  (*Id.*)

17.     When Bernard and Lavi saw Seth, he was covered in blood and screaming.  (Bernard Klein Ben Haim Dep. at 13-14; Lavi Klein Ben Haim Dep. at 7, 9.)  At this point, Bernard believed that Seth was more seriously injured than was previously indicated.  (Bernard Klein Ben Haim Dep. at 13-14.)  This belief was confirmed a little later by a doctor, who admitted that they had been mistaken in their initial assessment of Seth's injuries.  (Bernard Klein Ben Haim Dep. at 14; Lavi Klein Ben Haim Dep. at 10.)

18.     A CT scan was performed at Barzilai Hospital, and revealed that Seth was in critical condition.  (Bernard Klein Ben Haim Dep. at 15-16.)  His primary injuries were a large right Occipital lobe brain hematoma and a tear in the neck affecting the thyroid cartilage, Piriformis sinus, and pharynx.  (Dr. Friedman Aff. ¶ 12.)  Bernard was told that Seth's brain had been seriously damaged by broken bones and a great deal of shrapnel.  (Bernard Klein Ben Haim Dep. at 16.)  The doctors indicated that Seth's condition was so critical that he had to be transported by helicopter to Hadassah University Hospital in Jerusalem,

about one and a half hours away by car.  (*Id.*)

19.     Seth's condition was so severe, in fact, that he could not be transported safely.  (*Id.*)
        Doctors were concerned that he was losing so much blood from the wound in his neck,
        and that he might die en route.  (*Id.*)  Thus, they performed surgery to close up the wound
        before placing him in the helicopter.  (*Id.*)

20.     Bernard and Lavi traveled to Hadassah University Hospital in a cab.  (Bernard Klein Ben
        Haim Dep. at 16-17.)  After they arrived, they were told that Seth had arrived in very
        unstable condition, and that doctors had stabilized his condition before taking him into
        emergency surgery that lasted many hours.  (*Id.* at 18.)  The operations performed at that
        time were a repair of the neck lacerations, a right Occipital craniectomy, craniotomy, and
        partial right Occipital lobectomy to remove the hematoma and edematous brain tissue.
        (Dr. Friedman Aff. ¶ 13.)

21.     Bernard and Lavi waited, having been told that it was not likely that Seth would survive
        the surgery.  (Bernard Klein Ben Haim Dep. at 18-19.)  Eventually, they were told that
        Seth would live.  (*Id.* at 19.)  The neurosurgeon informed them that it is very rare for a
        patient in Seth's condition to survive, due to the quantity of shrapnel in the brain and the
        fact that the brain had been crushed and a major bone had been broken.  (Bernard Klein
        Ben Haim Dep. at 21-22; Lavi Klein Ben Haim Dep. at 12.)  They were also told that
        Seth might be blind or partially blind.  (Lavi Klein Ben Haim Dep. at 13.)

22.     As a result of the operation, part of Seth's skull was removed, leaving his brain exposed
        and very vulnerable.  (Seth Klein Ben Haim Aff. ¶ 16.)  In November of 1995, doctors
        performed a cranioplasty in an attempt to place surgical cement over this exposed area.

(Dr. Friedman Aff. ¶ 15; Seth Klein Ben Haim Aff. ¶ 17.)  The surgery was not successful in fully covering the area, partly because Seth suffered a post-operative seizure.  (Dr. Friedman Aff. ¶ 15; Bernard Klein Ben Haim Dep. at 29.)

23.     Seth was heavily sedated and unconscious for several days following the attack.  (Bernard Klein Ben Haim Dep. at 25; Lavi Klein Ben Haim Dep. at 13.)  He continued to suffer from a complete loss of vision on his left side (Dr. Friedman Aff. ¶14; Bernard Klein Ben Haim Dep. at 24-25), which caused him a great deal of stress (Psychological Evaluation of Dr. Strous (attached to Ex. G) [hereinafter "Dr. Strous' Report"] at 1-2.).  He remained in the hospital for several weeks.  (Bernard Klein Ben Haim Dep. at 25.)  During this period, Bernard and Lavi lived at a hotel in Jerusalem, spending their days at the hospital.  (*Id.*)

24.     After Seth was discharged from the hospital, he moved back into his father's home.  (*Id.* at 26-27.)  Bernard was hopeful that Seth's discharge signaled the beginning of his recovery.  (*Id.* at 26-27, 30.)  He found, however, that Seth's recovery would be far more challenging than he initially realized.  (*Id.* at 30.)  Over the course of the next year, Seth continued to visit the hospital regularly for follow-up evaluations and treatments.  (*Id.* at 27-30.)

25.     Seth was determined to have 77% permanent disability based on his vision and head injuries resulting from the bombing.  (Dr. Strous' Report at 2; Seth Klein Ben Haim Aff. ¶ 19.)  The effects of the disabilities are both physical and psychological.

## IV.     Seth's Current Condition

26.     Seth's physical impairments are many.  They limit all facets of his life, from his

professional goals to his ability to simply getting ready in the morning.

a.     He has complete left-sided visual loss (left homonomous hemianopsia), *i.e.*, he cannot see anything on the left side of his body.  (Dr. Friedman Aff. ¶¶ 20, 26; Dr. Strous' Report at 3; Bernard Klein Ben Haim Dep. at 32; Seth Klein Ben Haim Aff. ¶ 24.)  He is able to compensate while performing other tasks by turning his head to the left (which then decreases his right visual field).  (Dr. Friedman Aff. ¶ 20.)  As a result, he tries to sit or stand with his left side against a wall to alleviate his fear of being attacked from his blind side.  (*Id.*)  The visual impairments also affect Seth's mobility, in that he experiences what he calls "equilibrium loss" but is more accurately described as a listing to the right in compensation for the left-sided blindness.  (*Id.* ¶ 21.)  Seth must compensate for the left-sided peripheral blindness by positioning himself so that everything is oriented on his right side.  (Seth Klein Ben Haim Aff. ¶ 25.)  This affects activities as simple as viewing a movie or a lecture, where he must sit on the extreme left side in order to view the entire screen or stage.  (*Id.* ¶ 25.)  This makes it difficult for him to attend such presentations with others, and thus he usually goes alone.  (*Id.*)

b.     The blindness, along with right cerebellar and thalamic damage, produce decreased coordination and spacial coordination (Dr. Friedman Aff. ¶ 28.), with the result that Seth often bumps into objects and people.  (Bernard Klein Ben Haim Dep. at 33; Seth Klein Ben Haim Aff. ¶ 26.)  This causes him tremendous fear and anxiety.  (*Id.*)  To compensate, Seth walks slowly, constantly moving his head from side to side, which he finds to be awkward and uncomfortable.  (Seth

Klein Ben Haim at ¶ 26.)  Additionally, the visual impairment means that Seth will never be able to operate a vehicle.  (Dr. Friedman Aff. ¶ 30; Seth Klein Ben Haim Aff. ¶ 24.)  Recreational activities that he used to enjoy, such as athletics and chess, are impossible now.  (Dr. Friedman Aff. ¶ 30; Seth Klein Ben Haim Aff. ¶ 25.)

c.  Related to the visual deficits and partial lobectomy is a loss of visual memory and spatial recognition.  (Dr. Friedman Aff. ¶¶ 20, 29.)  Seth cannot remember how to travel short distances (*e.g.*, less than 500 meters) or access areas that are familiar and repeatedly accessed, and thus must carry written directions and attempt to learn verbal clues in order to avoid getting lost on the simplest of errands.  (Dr. Friedman Aff. ¶¶ 20, 32; Bernard Klein Ben Haim Dep. at 32-33; Seth Klein Ben Haim Aff. ¶ 29.)  Similarly, Seth has difficulty recognizing peers, family and friends, even those he knows well.  (Dr. Friedman Aff. ¶¶ 20, 32; Seth Klein Ben Haim Aff. ¶ 29.)  He keeps a log of frequently encountered people with descriptions of their physical characteristics.  (Dr. Friedman Aff. ¶ 20.)

d.  Seth also suffers from frequent, severe headaches.  (*Id.* ¶ 19; Bernard Klein Ben Haim Dep. at 34, 42.)  Sometimes they result from being exposed to constant or flickering light, such as when watching television or looking at a computer screen. (Dr. Friedman Aff. ¶ 30.)  Other times he simply develops a throbbing headache. (*Id.* ¶ 22.)  One reason for Seth's inability to look at a computer monitor or television screen for prolonged periods of time may be that the left pupil constantly dilated (although it does contract partially to direct light).  (*Id.* ¶ 26.)

Seth describes feeling tension and pressure in his head, feelings that cause him great fear and pain, and leave him feeling weak, emotionally upset and vulnerable. (Seth Klein Ben Haim Aff. ¶ 23.)

e.     Seth's scars remain visible and tender to even light palpation.  (Dr. Friedman Aff. ¶ 25; Bernard Klein Ben Haim Dep. at 42.)  Additionally, he has been diagnosed with bilateral L5 clinical radiculopathy, or weakness in his spine, and right occipital lobe deficits (Dr. Friedman Aff. ¶¶ 27, 34.)  As Seth gets older, he will be at greater risk of developing chronic back pain and will likely be unable to perform at the level of others his age.  (*Id.* ¶ 33.)  Similarly, he cannot participate in sports or any even mildly strenuous activities, both because of the sharp pain that he experiences and because of the risk of further injury.  (Dr. Strous' Report at 4; Seth Klein Ben Haim Aff. ¶ 22.)

f.     Seth's ability to concentrate is limited.  (Dr. Friedman Aff. ¶¶ 29, 31; Dr. Strous' Report at 3, 5.)  This is attributed to both his visual impairment and the residua of Traumatic Brain Injury.  (Dr. Friedman Aff. ¶ 31.)  His inability to maintain concentration, along with his reading impairments, are the major factors behind his slow pace in his university studies.  (*Id.* ¶ 31.)  Seth must read very slowly under very bright lights and take long breaks after reading for even five minutes. (Dr. Strous' Report at 5; Seth Klein Ben Haim Aff. ¶ 27.)  He also finds himself reading the same material over and over again.  (Seth Klein Ben Haim Aff. ¶ 27.)

g.     Seth has suffered from insomnia for many years.  (Bernard Klein Ben Haim Dep. at 31.)  He also experiences sensory overload (Dr. Strous' Report at 2-3), and

finds it difficult to perform simple visual tasks or those relating to organizing and scheduling (Seth Klein Ben Haim Aff. ¶ 29).

27.   Seth feels that the terrorist attack negatively changed his life.  (*Id.* ¶ 21.)  He feels as though all his future plans, dreams and aspirations were suddenly and painfully halted. (*Id.*)  He feels as though he lost part of himself in the attack: as though he is no longer the same whole individual who entered the bus that morning.  (*Id.*)  He describes his life as being divided into two distinct parts: the part prior to April 9, 1995, and that which came after.  (*Id.*)

28.   Seth sometimes experiences flashbacks of the attack, often accompanied by heart palpitations, sweating and irritability.  (Dr. Friedman Aff. ¶ 23; Dr. Strous' Report at 2-3.)  Seth reports an increased "startle response" and trepidation when the car in which he's riding passes another car parked along the side of the road (as he fears that a terrorist may be waiting to "finish the job"), fear of developing relationships and nightmares.  (Dr. Friedman Aff. ¶ 24; Dr. Strous' Report at 2; Bernard Klein Ben Haim Dep. at 42-43.)  He feels the need to be constantly alert and aware, and ends up feeling intensely exhausted. (Dr. Strous' Report at 3; Seth Klein Ben Haim Aff. ¶ 30.)  There are periods in which Seth feels extreme nervousness and impatience, and sudden noises cause him agitation and jumpiness.  (Seth Klein Ben Haim Aff. ¶ 30.)

29.   Even normal changes in Seth's life cause him a great deal of stress.  (Seth Klein Ben Haim Aff. ¶ 30.)  As a result of his injuries, Seth's self-esteem has decreased and he feels a large measure of personal insecurity.  (*Id.*)  He feels alone, even in the midst of people, especially relating to his feeling that no one understands him or the extent of his injuries.

12

(*Id.*)  He frequently thinks about death and injury, and has nightmares about the bombing.
(*Id.*; Dr. Strous' Report at 2-3.)

30.    Perhaps most prominent among the extreme psychological effects from the attack, Seth
suffers from severe chronic Post Traumatic Stress Disorder.  (*See generally* Dr. Strous
Aff.)  He feels constant and severe anxiety, fear of aggravating his head injury, paranoia,
extreme nervousness and agitation, sudden and debilitating flashbacks, irrational
irritability, survivor guilt, nightmares, and chronic depression, sometimes leading him to
lash out in violence or temper tantrums.  (Dr. Strous' Report at 3-4.)  His symptoms
worsen noticeably for an extended period surrounding each anniversary of the attack,
leaving him alone and frightened.  (Dr. Strous' Report at 2; Bernard Klein Ben Haim
Dep. at 43; Seth Klein Ben Haim Aff. ¶ 31.)  He finds it difficult to develop and maintain
relationships with his family and friends, and no longer enjoys or is able to participate in
former hobbies.  (Dr. Strous' Report at 3, 6.)  These effects represent a dramatic
personality shift since his injury.  (Bernard Klein Ben Haim Dep. at 32.)

31.    Seth continues to experience constant discomfort on the right side of his head, which is
worsened by touch and sudden movement.  This limits his physical activity dramatically.
(Dr. Strous' Report at 4.)

32.    A year and a half after the attack, Seth Klein Ben Haim returned to his studies on a part-
time basis.  (Seth Klein Ben Haim Aff. ¶¶ 20, 32.)  With accommodations, he was able to
complete high school, sit for college entrance exams, and enroll in some college classes.
(Bernard Klein Ben Haim Dep. at 36, 39.)  The disabilities caused by his injuries,
however, resulted in him performing poorly, ruling out the possibility of attending

13

medical school.  (*Id.* at 36.)  Furthermore, his inability to perform what were before normal, everyday functions has greatly reduced his independence and mobility, which in turn has left him with little enthusiasm for his professional prospects.  Even if Seth were to finish college eventually, it is highly unlikely that he will ever obtain a job or live independently.  (*Id.* at 37, 44; Seth Klein Ben Haim Aff. ¶¶ 32-35).  These are painful and constant reminders of his current limitations and disabilities.  (Dr. Strous' Report at 3.)

33.   Seth believes that his life would have been totally different had he not been injured in the attack.  (*Id.*; Seth Klein Ben Haim Aff. ¶ 33.)  As to his professional aspirations, his dreams of becoming a doctor have been obliterated by the physical and psychological limitations resulting from Seth's disabilities.  Seth also had personal aspirations, such as getting married and having children, that have been thrust into uncertainty because of the injuries resulting from the attack.  (Seth Klein Ben Haim Aff. ¶ 34.)  That the attack shattered these dreams is greatly distressing and frustrating to Seth.  (*Id.*; Dr. Strous' Report at 4; Bernard Klein Ben Haim Dep. at 43-44.)

34.   As a result of these impairments, Seth is unable to interact, both physically and socially, with his environment.  (Dr. Friedman Aff. ¶ 30; Bernard Klein Ben Haim Dep. at 45, 48-49.)  His inability to use computers hampers his educational development (Seth Klein Ben Haim Aff. ¶ 28) and also limits whatever professional options might have remained for him.  (Dr. Friedman Aff. ¶ 30.)  His symptoms will impact his ability to function in society, including the workplace.  (*Id.* ¶ 34.)  It is anticipated that these disabilities will be chronic in duration, and will not significantly improve in the future.  (Dr. Friedman Aff. ¶ 34; Dr. Strous' Report at 6.)  Seth has suffered irreparable physical and psychiatric harm:

his previous optimal level of functioning will never return, and his impaired functioning
will continue to affect his relationships and life path in the future.  (Dr. Strous' Report at
6.)

35.     The attack changed not only Seth's life, but Bernard's as well.  Bernard suffered extreme
emotional distress due to the uncertainty of Seth's condition throughout the period
immediately following the attack; the sheer trauma of seeing his son in a bloodied and
pained state; and the continued treatments culminating in a less complete recovery than
was previously anticipated.  (*See generally* Bernard Klein Ben Haim Dep.)

36.     Living with his son's injuries has not been easy either.  Bernard suffered a loss of
economic and professional opportunities, emotional distress, and has seen a dramatic
decline in the quality of his relationship with his son.  (*Id.* at 35-52.)

37.     Bernard effectively put his own life on hold in order to care for his son.  (*Id.* at 36-37, 49-
50, 53.)  Even now, Bernard is extremely disappointed and angry that his son has such a
poor quality of life.  (*Id.* at 47-48.)  On a personal level, Bernard is severely distressed by
his interactions with his son.  (*Id.*)  Seth's extreme sensitivity, violence, and dependence
preclude any normal father-son relationship.  (*Id.*)

38.     Lavi has also suffered emotional distress due to the attack and its effects on the family.
He suffered a great deal of mental anguish in the days surrounding the attack.  (Lavi Klein
Ben Haim Dep. 6-15.)  His relationship with his brother has changed dramatically.  (*Id.* at
15.)  The brothers' closeness has faded, as Lavi no longer feels like he can talk to Seth,
and they cannot engage in activities they used to enjoy together, such as sports.  (*Id.* at 15-
16.)  It was also very difficult for Lavi to see his brother as dependent and inactive, when

before the attack, Seth had been the opposite.  (*Id.* at 16.)  Lavi was in the position of

comforting his father after the attack, and also finds his own relationship with his father

to have changed as a result of Seth's demands on Bernard.  (*Id.* at 22.)

## CONCLUSIONS OF LAW

**I.**      **Legal Standard for FSIA Default Judgment**

Under the Foreign Sovereign Immunities Act, "[n]o judgment by default shall be entered

by a court of the United States or of a state against a foreign state . . . unless the claimant

establishes his claim or right to relief by evidence satisfactory to the court."  28 U.S.C. § 1608(e);

*Roeder v. Islamic Republic of Iran*, 333 F.3d 228, 232-33 (D.C. Cir. 2003), *cert. denied*, 542

U.S. 915 (2004).  "In evaluating plaintiffs' proof, the court may accept as true the plaintiffs'

uncontroverted evidence."  *Campuzano v. Islamic Republic of Iran*, 281 F. Supp. 2d 258, 268

(D.D.C. 2003) (Urbina, J.) (internal citations omitted).  Plaintiffs' evidence may take the form of

sworn affidavits.  *Id.* (citing *Weinstein v. Islamic Republic of Iran*, 184 F. Supp. 2d 13, 19

(D.D.C. 2002) (Lamberth, J.).

**II.**      **Jurisdiction**

The Foreign Sovereign Immunities Act provides the sole basis for asserting jurisdiction

over foreign sovereigns in the United States.  *See Argentine Republic v. Amerada Hess Shipping

Corp.*, 488 U.S. 428, 434-35 (1989).  The "state-sponsored terrorism" exception provides that a

foreign sovereign will not be immune to suit in U.S. courts where:

> money damages are sought against a foreign state for personal injury
> or death that was caused by an act of torture, extrajudicial killing,
> aircraft sabotage, hostage taking, or the provision of material support
> or resources (as defined in section 2339A of title 18) for such an act
> if such act or provision of material support is engaged in by an

> official, employee, or agent of such foreign state while acting within
> the scope of his or her office, employment, or agency.

28 U.S.C. § 1605(a)(7).  To subject a foreign sovereign to suit under section 1605(a)(7), a

plaintiff must demonstrate: (1) that the foreign sovereign was designated by the State Department

as a "state sponsor of terrorism"; (2) that the victim was a U.S. national at the time the acts took

place; and (3) that the foreign sovereign engaged in conduct that falls within the ambit of the

statute, in this case, providing material support or resources for an act of extrajudicial killing.

Each of the requirements has been satisfied in this case.  Defendant Iran has been

designated a state sponsor of terrorism.  *See* 31 C.F.R. § 596.201 (2001); *Flatow*, 999 F. Supp. at

11, ¶ 19.  The victim, Seth Klein Ben Haim, was a U.S. national at the time of the attack, and

remains so today (Seth Klein Ben Haim Aff. ¶ 2).  Iran's support of an entity that committed an

extrajudicial killing squarely falls within the ambit of the statute.  The MOIS is treated as the

state of Iran itself, *Roeder*, 333 F.3d at 234, and thus the same determinations apply to its

conduct.

Personal jurisdiction over a non-immune foreign sovereign exists so long as service of

process has been made under Section 1608 of the FSIA.  *Stern v. Islamic Republic of Iran*, 271 F.

Supp. 2d 286, 298 (D.D.C. 2003).  Such service has been made, and this Court has *in personam*

jurisdiction over Iran and the MOIS.

## III.  Liability

### A.  Proper Causes of Action Under the FSIA

Once a foreign state's immunity has been lifted under Section 1605 and jurisdiction is

proper, Section 1606 provides that "the foreign state shall be liable in the same manner and to the

same extent as a private individual under like circumstances." 28 U.S.C. § 1606.  Section 1606

acts as a "pass-through" to substantive causes of action against private individuals that may exist

in federal, state or international law.  *Dammarell v. Islamic Republic of Iran*, Civ. A. No. 01-

2224, 2005 WL 756090, at *8-10, 2005 U.S. Dist. LEXIS 5343, at *27-32 (D.D.C. Mar. 29,

2005) (Bates, J.).

In this case, state law provides a basis for liability.  First, the law of the United States

applies rather than the law of the place of the tort or any other foreign law.  This is because the

United States has a "unique interest" in having its domestic law apply in cases involving terrorist

attacks on United States citizens.  *Dammarell*, 2005 WL 756090, at *20, 2005 U.S. Dist. LEXIS

5343, at *63.

Second, the applicable state law is that of the District of Columbia.  As the forum state,

its choice of law rules apply to determine which state law shall apply.  Under District of

Columbia choice of law rules, courts employ a refined government interest analysis under which

courts "evaluate the governmental policies underlying the applicable laws and determine which

jurisdiction's policy would be most advanced by having its law applied to the facts of the case

under review."  *Hercules & Co. v. Shama Rest. Corp.*, 566 A.2d 31, 41 (D.C. 1989) (citations

and internal quotations omitted).  This test typically leads to the application of the law of

plaintiff's domicile, as the state with the greatest interest in providing redress to its citizens.

*Dammarell*, 2005 WL 756090, at * 20-21, 2005 U.S. Dist. LEXIS 5343, at *66-67 (citing REST.

(3D) FOREIGN RELATIONS LAW § 402(3) (1987)).  Here, however, since plaintiffs have no United

States domicile, the forum is the state with the greatest interest, and thus the application of its

law is proper.

Third, as required by 28 U.S.C. § 1606, District of Columbia law provides a cause of action against private individuals for the kind of acts that defendants allegedly committed. Plaintiffs each allege common law assault, battery, and intentional infliction of emotional distress, each of which is a tort for which private individuals may face liability.  The Court's next task is to determine whether plaintiffs have shown liability and damages for these claims under the laws of the District of Columbia.

### B.   Vicarious Liability

The basis of defendants' liability is that they provided material support and resources to PIJ, which personally completed the attack.  One party may be liable for the acts of another under theories of vicarious liability, such as conspiracy, aiding and abetting and inducement.  This Court finds that civil conspiracy provides a basis of liability for Iran and the MOIS and thus declines to reach the issue of whether they might also be liable on the basis of aiding and abetting and/or inducement.

A civil conspiracy exists under District of Columbia law where there is "(1) an agreement between two or more persons; (2) to participate in an unlawful act, or in a lawful act in an unlawful manner; and (3) an injury caused by an unlawful overt act performed by one of the parties to the agreement (4) pursuant to, and in furtherance of, the common scheme."  *Griva v. Davison*, 637 A.2d 830, 848 (D.C. 1994) (citing *Halberstam v. Welch*, 705 F.2d 472, 477 (1983)).

The agreement may be inferred from conduct.  *Weishapl v. Sowers,* 771 A.2d 1014, 1023 (D.C. 2001) ("Where there is no direct evidence of an agreement between the alleged co-conspirators, there must be circumstantial evidence from which a common intent can be

19

inferred." (citing *Halberstam*, 705 F.2d at 480)).  Here, it has been established that Iran, the

MOIS and PIJ had agreed to commit terrorist activities to further the goals of eradicating the

Jewish state of Israel and promoting Islamic ideology.  *See Flatow*, 999 F. Supp. at 10-11, ¶¶ 16-

25; Shaked Aff. ¶¶ 15-25.  This agreement can be inferred from the comprehensive financial

support and training that Iran and the MOIS provide to PIJ.  *See Flatow*, 999 F. Supp. at 11, ¶ 20-

21; Shaked Aff. ¶¶ 25, 34, 37-38.

It is undisputed that PIJ committed the attack that injured Seth.  *See Flatow*, 999 F. Supp.

at 10, ¶¶ 16-18; Shaked Aff. ¶¶ 39-46.  It is also established that the attack was committed in

furtherance of their broad common scheme.  PIJ operated primarily in the Gaza strip, and Iran

viewed its relationship with PIJ "as a means of establishing its political influence and

disseminating its radical ideology amongst the Palestinian population of the West Bank and Gaza

Strip."  (Shaked Aff. ¶¶ 22, 25-26.)  Therefore, the elements of civil conspiracy are established

between the defendants in this case and the actual perpetrators of the attack.

### C.    Battery

Plaintiffs assert that defendants are vicariously liable for battery of Seth.  Under District

of Columbia law, a battery is "an intentional, unpermitted, harmful or offensive contact with his

person or something attached to it."  *Marshall v. District of Columbia*, 391 A.2d 1374, 1380

(D.C. 1978).  Here, the attack was intentionally perpetrated and unpermitted.  Colliding an

explosive-laden vehicle with the bus was undoubtedly harmful, and constitutes a contact with

something attached to Seth, a passenger on that bus.  Accordingly, defendants Iran and the MOIS

are liable for battery under the theory of vicarious liability.

### D.    Assault

Plaintiffs also allege that defendants are vicariously liable for assault of Seth.  Under

District of Columbia law, an assault is "an intentional and unlawful attempt or threat, either by

words or acts, to do physical harm."  *District of Columbia v. Chinn*, 839 A.2d 701, 705 (D.C.

2003) (citing *Holder v. District of Columbia*, 700 A.2d 738, 741 (D.C. 1997)).  Here, the PIJ

suicide bomber intentionally, by his physical act of colliding with the bus, attempted to do

physical harm to those on the bus.  Thus, defendants Iran and the MOIS are liable for assault

under the theory of vicarious liability.

### E.    Intentional Infliction of Emotional Distress

Finally, plaintiffs claim that defendants are vicariously liable for intentional infliction of

emotional distress of each plaintiff.  Under District of Columbia law, the elements of intentional

infliction of emotional distress are (1) extreme and outrageous conduct on the part of the

defendant which (2) intentionally or recklessly (3) causes the plaintiff severe emotional distress.

*Howard Univ. v. Best*, 484 A.2d 958, 985 (D.C. 1984) (citations and internal quotations omitted).

The elements are satisfied in this case.

First, a terrorist attack constitutes extreme and outrageous conduct.  *Cf. id.* at 986

("Actions which violate public policy may constitute outrageous conduct sufficient to state a

cause of action for infliction of emotional distress.") (citations omitted); *see also Stethem v.

Islamic Republic of Iran*, 201 F. Supp. 2d 78, 89 (D.D.C. 2002) (Jackson, J.) ("[A]cts of

terrorism are by their very definition extreme and outrageous and intended to cause the highest

degree of emotional distress, literally, terror.").  A suicide bombing constitutes an act of such

extreme and outrageous conduct that the second element is satisfied as well.  That is, the

21

emotional distress caused to plaintiffs was intentionally or recklessly caused by the suicide

bomber by virtue of the act itself.  *Id.* ("[T]he intent or recklessness can be inferred from the

outrageousness of the acts.") (citations omitted).  As to the third element, all three plaintiffs in

this case have established in great detail the emotional disturbance that resulted from the attack.

It should be noted that, under District of Columbia law, actual physical injury is not

necessary to establish the elements of intentional infliction of emotional distress.  *Howard Univ.*,

484 A.2d at 985 (citing *Waldon v. Covington*, 415 A.2d 1070, 1076 (D.C. 1980) (noting that "an

action for intentional infliction may be made out even in the absence of physical injury or

impact")).

IV.   **Damages**

As a result of the wrongful conduct of defendants Iran and the MOIS, plaintiffs have

suffered, and will continue to suffer, pain and mental anguish.  Since a "foreign state shall be

liable in the same manner and to the same extent as a private individual under like

circumstances," 28 U.S.C. § 1606, plaintiffs are entitled to the typical array of compensatory

damages that may be awarded against tortfeasors in the District of Columbia.  Punitive damages

are not available against foreign states.[2]  Accordingly, plaintiffs' claim for punitive damages is

denied.

In determining the appropriate compensatory damages for each plaintiff's pain and

---

[2] In *Flatow*, this Court awarded significant punitive damages to the plaintiffs based on § 1605(a)(7) and the Flatow Amendment.  999 F. Supp. at 32-34.  Plaintiffs in this case similarly requested punitive damages in their complaint.  In the intervening years, however, the law has dramatically changed.  *See Roeder*, 333 F.3d at 234; *Holland, et al. v. Islamic Republic of Iran, et al.*, Civ. A. No. 01-1924 (CKK) (D.D.C. Oct. 31, 2005) (Kotelly, J.); *Dammarell*, 2005 WL 3418304, at *5, 2005 U.S. Dist. LEXIS 32618, at *14-15; *Collett v. Socialist Peoples' Libyan Arab Jamahiriya*, 362 F. Supp. 2d 230, 243 (D.D.C. Mar. 24, 2005) (Urbina, J.); *Kapar v. Islamic Republic of Iran*, Civ. A. No. 02-78 (HHK), at 19 n.3 (D.D.C. Sept. 22, 2004) (Kennedy, J.).  Punitive damages are thus not available in this action against either Iran or the MOIS.

suffering, this Court is guided not only by prior decisions awarding damages for pain and suffering, but also by those which awarded damages for solatium. *Cf. Wagner v. Islamic Republic of Iran*, 172 F. Supp. 2d 128, 135 n.11 (D.D.C. 2001) (Jackson, J.) (noting that, in an intentional homicide case, "solatium appears in any event to be indistinguishable from the intentional infliction of emotional distress"); *see also Surette v. Islamic Republic of Iran*, 231 F. Supp. 2d 260, 267 n.5 (D.D.C. 2002) (Friedman, J.) ("In the context of FSIA cases, this Court has recognized the claim of solatium as . . . indistinguishable from the claim of intentional infliction of emotional distress.").  While intervening changes in law have ruled many cases' reliance on federal common law improper, such findings need not disturb the accuracy of the analogy between solatium and intentional infliction of emotional distress.

Case law does not indicate a formula for calculating damages in a case such as this.  Prior cases in which the court awarded compensatory damages for pain and suffering to the victim of a terrorist act typically fall into three categories: (1) those in which the victim died, and the pain and suffering is awarded for that endured between the attack and the victim's death; (2) those in which the victim was held in captivity; and (3) those in which the victim was severely injured but survived, and is awarded pain and suffering both for that endured between the attack and the time of the court's decision as well as that reasonably expected to be endured throughout the rest of the victim's life.  Clearly, cases in the third category are most appropriate to consider in the context of this case.  In light of the fact-specific nature of compensatory damage awards, however, this Court shall also discuss the relevance of cases arising under the circumstances described in the first and second categories.

**A.**      **Awards for Pain and Suffering Prior to Death**

First, several cases have awarded damages for the victim's pain and suffering that occurred between the attack and the victim's death shortly thereafter.  When the victim endured extreme pain and suffering for a period of several hours or less, courts in these cases have rather uniformly awarded $1 million.  *See Eisenfeld v. Islamic Republic of Iran*, 172 F. Supp. 2d 1, 8 (D.D.C. 2000) (Lamberth, J.) (awarding $1 million for pain and suffering endured in the several minutes between the suicide bombing of a passenger bus and the victim's death); *Elahi v. Islamic Republic of Iran*, 124 F. Supp. 2d 97, 112-13 (D.D.C. 2000) (Green, J.) (awarding $1 million for pain and suffering endured while victim of assassination fought with his attacker, a period of less than four minutes); *Flatow*, 999 F. Supp. at 28 (awarding $1 million for pain and suffering endured for three to five hours between the suicide bombing of a bus and the victim's death).

When the period of the victim's pain was longer than a few hours, the awards are increased.  *See Stethem*, 201 F. Supp. 2d at 91-92 (awarding $1.5 million for pain and suffering endured over a 15-hour period in which the victim was repeatedly beaten before eventually being shot); *Weinstein*, 184 F. Supp. 2d at 23 (awarding $10 million for pain and suffering endured during the seven weeks following a suicide bombing attack on a passenger bus, during which the victim remained hospitalized and in extreme pain, at the conclusion of which the victim died).  In these cases, courts were influenced not only by the length of time that the victim endured physical suffering, but also by the victim's mental anguish from the knowledge that death was imminent.  *Id.*

**B.**      **Awards for Pain and Suffering of Kidnaping Victims**

In cases falling in the second category, courts awarded pain and suffering damages to

24

victims who were held captive and/or tortured for their pain and suffering during and after captivity.  In these cases, courts typically determine the pain and suffering award by multiplying a per diem amount – usually $10,000 – by the number of days in captivity.  *See Daliberti v. Republic of Iraq*, 146 F. Supp. 2d 19, 25-26 (D.D.C. 2001) (Oberdorfer, J.) (awarding damages for pain and suffering both during and after captivity at $10,000 per day of captivity); *Jenco v. Islamic Republic of Iran*, 154 F. Supp. 2d 27, 37 (D.D.C. 2001) (Lamberth, J.) (awarding damages for pain and suffering both during and after captivity at $10,000 per day of captivity).

Most commonly, however, in cases involving brutal acts, courts find that the per diem amount will not adequately compensate victims for the pain and suffering endured both during and after their captivity.  In these cases, courts may supplement the product of the per diem formula with a lump sum in order to reach the final damage award.  *See Price v. Socialist People's Libyan Arab Jamahiriya*, 384 F. Supp. 2d 120, 135-36 (D.D.C. 2005) (Lamberth, J.) (awarding damages to victims of long-term brutal kidnaping and torture for pain and suffering both during and after captivity by adding lump sum of $7 million to product of $10,000 per diem formula); *Surette*, 231 F. Supp. 2d at 269 (awarding damages to victim of kidnaping for pain and suffering by adding lump sum of $1 million for the time that victim faced certain death alone to product of $10,000 per diem formula); *Hill v. Republic of Iraq*, 175 F. Supp. 2d 36, 47-48 (D.D.C. 2001) (Jackson, J.), *rev'd on other grounds*, 328 F.3d 680 (D.C. Cir. 2003), (awarding damages to "constructive hostages" by adding lump sum of between $100,000 and $500,000 to product of $3,000 to $5,000 per diem formula).

An alternative manner of dealing with the inadequacy of per diem awards is to simply grant a lump sum award in lieu of any per diem damages.  *See Acree v. Republic of Iraq*, 271 F.

25

Supp. 2d 179, 219-220 (D.D.C. 2003) (Roberts, J.), *vacated on other grounds*, 370 F.3d 41 (D.C.

Cir. 2004), (awarding damages for pain and suffering to victims of torture while POWs by

adding lump sum of between $10-20 million for period of captivity to lump sum of between $2-5

million for the period after captivity, depending on length of confinement, brutality of treatment,

and severity of remaining psychological injuries); *Cronin v. Islamic Republic of Iran*, 238 F.

Supp. 222, 235 (D.D.C. 2002) (Lamberth, J.), *abrogated on other grounds by Cicippio-Puleo v.

Islamic Republic of Iran*, 353 F.3d 1024 (D.C. Cir. 2004), (awarding lump sum of $1.2 million in

damages for pain and suffering to victim of kidnaping and torture); *Cicippio v. Islamic Republic

of Iran*, 18 F. Supp. 2d 62, 69-70 (D.D.C. 1998) (Jackson, J.) (awarding lump sum of

approximately $3-19 million in damages for pain and suffering to victims of kidnaping and

torture).

### C.     <u>Awards for Pain and Suffering for a Surviving Victim</u>

Finally, the cases that provide the most guidance here are those in the third category:

those that involved an attack that the victim survived, and where captivity did not occur.  These

victims endured pain and suffering during and immediately following the attack, and will live

with the pain and suffering of their remaining injuries for the rest of their lives.  Courts typically

award a lump sum, and in so doing, articulate several factors as relevant: the severity of the pain

immediately following the injury, the length of hospitalization, and the extent of the impairment

that will remain with the victim for the rest of his or her life.

One of the earliest cases, *Mousa v. Islamic Republic of Iran*, 238 F. Supp. 2d 1 (D.D.C.

2001) (Bryant, J.), awarded a survivor of a passenger bus bombing with severe injuries $12

million for past and future pain and suffering.  Ms. Mousa spent about four weeks in the hospital,

nine more days in a rehabilitation center, and received continuous treatment for approximately

three months thereafter.  *Id.* at 5-6.  In setting the award, the Court relied upon cases dealing with

pain and suffering to victims who were killed in an attack as well as the captivity cases.  *Id.* at

12-13.  Since Ms. Mousa was injured to make a political statement, the Court found that she had

been, and would continue to be "held hostage in mind and body."  *Id.* at 13.  The Court did not

indicate, however, whether it arrived at the $12 million figure by a per diem calculation or by

some other method.

In *Campuzano*, a subsequent case arising from a passenger bus bombing, the Court

followed *Mousa*, granting similar compensatory damage awards to victims whose pain and

suffering was of similar duration and extent.  The Court justified an award exceeding *Mousa's* by

$5 million on the basis of the plaintiff's "slightly more serious" injuries and two-week longer

hospital stay.  281 F. Supp. 2d at 274.

### D.  Award for Pain and Suffering for Seth

Applying this persuasive precedent to this case provides some guidance for the

determination of a compensatory damages award.  Fortunately, Seth was not killed by the attack.

There is no indication that he suffered mental anguish from the knowledge that he was about to

die, and even if there were, damages are typically awarded specifically for such suffering only

when death was in fact imminent.  Nor was Seth ever held captive or physically or mentally

tortured.  Given these factual distinctions, this Court finds that a per diem formula, such as that

applied in some of the captivity cases, is inappropriate here.

Rather, this Court is more persuaded by the reasoning in cases in which the plaintiff was

severely injured by an attack, such as *Mousa* and *Campuzano*.  Those plaintiffs, like Seth,

27

suffered greatly in the attack's immediate aftermath and spent the following months receiving

continued painful and frightening treatments.  By the time the cases were adjudged, those

plaintiffs, like Seth, had settled into a relatively stable physical and mental condition which likely

would endure for the rest of their lives.  These factual similarities dictate a similar approach in

this case.  Therefore, this Court must compare the severity and duration of Seth's injuries to

those in *Mousa* and *Campuzano* in order to determine an appropriate compensatory damages

award.[3]

      One factor that may indicate severity of injury is the duration of hospitalization and

subsequent treatment, a factor explicitly relied upon in *Campuzano,* 281 F. Supp. 2d at 274.

While the record in this case fails to specify the number of days for which Seth was hospitalized,

it appears to have been fewer than the four weeks Ms. Mousa initially spent.  (Seth Klein Ben

Haim Aff. ¶¶ 14-15, reporting that Seth was discharged after spending a "few days" in the

intensive care unit, "several more days" in the intensive care unit, and ten days in the regular

neurosurgical unit.)

      Comparison can also be made by reference to the injuries sustained.  Since both *Mousa*

and this case arose from terrorist bombings, it is not surprising that the type of injuries are

similar.  Most prominently, both plaintiffs suffer from vision impairments, inability to

concentrate, coordination problems, a range of symptoms caused by severe PTSD, and

disfiguring scarring.  In determining compensatory damages for pain and suffering, however, it is

clear that more relevant than *type* of injury is the *extent* of the injury.

---

[3] It bears noting that this Court is cognizant of the difficulty of quantifying pain and suffering, and does not
by the ensuing discussion intend to diminish the effects of the brutal attack on Seth.  Irrespective of its compassion
for Seth, this Court is bound to determine his compensatory damage award by reference to neutral legal principles.

There is some indication that Seth's injuries are not as severe as Ms. Mousa's.  Ms.

Mousa's eye injury, for example, was more severe: she was completely blind in one eye, whereas

Seth has retained some, albeit limited, vision.  Unlike Seth, Ms. Mousa was unable to walk for

some time after the attack, and remained in more extensive treatment after discharge from the

hospital than Seth.  She spent over a week in a rehabilitation center immediately following her

discharge, and later spent another week in the hospital, having been rushed back after only a

week at home.  *Mousa*, 238 F. Supp. 2d at 5-6.  By contrast, while Seth continued to endure

outpatient treatments for some time after his discharge, he was never re-hospitalized for an

extended period of time, nor does the record indicate he was ever resident in a rehabilitation

center.  Ms. Mousa also suffered more prominent and severe disfigurement from scarring, but

there is no indication that, like Seth, her scars remained sensitive to touch or vulnerable to re-

injury, or that she suffered recurring headaches.

The impairment each suffers from neurological deficits, such as lack of concentration,

memory loss and coordination problems appear to be roughly equal: each remains functional to a

limited degree, but the ability to participate in professional and personal activities has been

severely curtailed.  Similarly, their psychological injuries appear to be very similar: both Seth and

Ms. Mousa suffer from the debilitating effects of PTSD, which impair the ability of each to

develop and maintain relationships.  Both have difficulty merely speaking about the attack, even

many years later. As noted *supra* note 1, Seth's mental condition is so fragile that even testifying

in this case would likely have caused him severe anguish.  This Court noted in *Flatow*, 999 F.

Supp. at 30, that this factor is applicable to the determination of damages.

The analysis thus far would indicate that Seth would be compensated by an award slightly

less than the $12 million granted to Ms. Mousa.  This conclusion is supported by comparison to

Ms. Campuzano.  As previously noted, Ms. Campuzano was hospitalized for 50% longer than

Ms. Mousa.  *Campuzano*, 281 F. Supp. 2d at 263.  While her brain injury was similar to Seth's,

she suffered in addition multiple wounds and severe burns.  *Id.*  She has impaired vision, no

ability to taste and smell, and her left eardrum and upper sinus cavity were destroyed.  *Id.*  Like

Ms. Mousa, Ms. Campuzano suffered "startling" disfigurement.  *Id.*  Her psychological injuries

also prevent her from engaging in healthy human relationships or pursuing former professional

and personal interests.  *Id.*  These factors indicate that Ms. Campuzano was more severely

injured than both Seth and Ms. Mousa.

Having taken all of the above factors into account, this Court finds that Seth is entitled to

an award of compensatory damages for past and future pain and suffering in the amount of

$11,000,000.  This amount reflects the fact that his injuries are slightly less severe than those

suffered by Ms. Mousa.

### E.   Awards for Pain and Suffering for Bernard and Lavi

*Mousa* provides little guidance for awards to family members, as no such claim was made

in that case.  238 F. Supp. 2d at 1.  Similarly, no claim was made by Ms. Campuzano's family.

However, the Court in *Campuzano* did award compensatory damages for mental grief and

anguish suffered by the family members of other victim plaintiffs.  281 F. Supp. 2d at 276-77.

Taking guidance from the captivity cases, the Court awarded three parents of victims $2.5

million each, and one spouse was awarded $6 million.  *Id.*

This Court agrees with the approach in *Campuzano*: compensatory damages awards to

family members for their pain and suffering must be determined by the nature of the relationship

and the severity and duration of the pain suffered by the family member.  Three general

considerations are discernible from the case law.  First, spouses typically receive greater damage

awards than parents, who, in turn, receive greater awards than siblings.  *Compare, e.g., Anderson*

*v. Islamic Republic of Iran,* 90 F. Supp. 2d 107, 113 (D.D.C. 2000) (Jackson, J.) (awarding $10

million to the wife of a hostage and torture victim); *Cicippio*, 18 F. Supp. 2d at 70 (same), *with*

*Eisenfeld*, 172 F. Supp. 2d at 8 (awarding $5 million each to the parents and $2.5 million each to

the siblings of victims of a suicide bombing on a passenger bus); *see also Flatow*, 999 F. Supp. at

31 (awarding parents each $5 million and siblings each $2.5 million of victim who was killed in

the same passenger bus bombing in which Seth was injured).

Second, families of hostage or captivity victims are also typically awarded greater

damages than are the families of victims of a single attack.  *Compare, e.g., Anderson,* 90 F.

Supp. 2d at 113 (awarding $10 million to the wife of a hostage and torture victim) *with*

*Campuzano,* 281 F. Supp. 2d at 277 (awarding to the wife of a bombing victim compensatory

damages for solatium in the amount of $6 million).  Third, families of victims who have died are

typically awarded greater damages than families of victims who remain alive.  *See, e.g., Jenco*,

154 F. Supp. 2d at 38 (relying on this distinction in granting awards of $1.5 million to siblings of

a kidnaping victim who was eventually safely returned).

Applying these considerations to the facts of this case, this Court finds that Bernard

suffered a great deal of mental anguish in the days surrounding the attacks.  (Bernard Klein Ben

Haim Dep. 9-30.)  Since then, his relationship with his eldest son has changed dramatically, and

his own life has been irrevocably affected.  (*Id.* at 35-53.)  He suffers greatly from seeing his son

in a helpless and dependent state, and from the difficulty of interacting with Seth.  (*Id.*)  This

31

Court is influenced, however, by the fortunate fact that Seth remains alive.  Taking all of the relevant factors into account, this Court finds that Bernard is entitled to an award for pain and suffering in the amount of $3,500,000.

Lavi also suffered a great deal in the days surrounding the attack.  (Lavi Klein Ben Haim Dep. 6-15.)  As the youngest member of the immediate family, he spoke of being overwhelmed by the aftermath of his brother's severe injuries and feeling the need to comfort his father.  (*Id.*) His relationship with his brother has been permanently changed, and he continues to suffer anguish over how to deal with his brother, his father and his own life.  (*Id.* at 22-25.)  Again, however, the fact that Seth remains alive is a key factor.  Taking all of the relevant factors into account, this Court finds that Lavi is entitled to an award for pain and suffering in the amount of $1,500,000.

## **CONCLUSION**

This Court takes note of plaintiffs' courage and steadfastness in pursuing this litigation and their efforts to take action to deter more tragic suffering of innocent Americans at the hands of terrorists.  Their efforts are to be commended.


A judgment consistent with these findings shall issue this date.

Signed by Royce C. Lamberth, United States District Judge, March 24, 2006.

32