**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| Seth Charles Ben Haim, et al.,      ) | |
|      ) | |
|          Plaintiffs,      ) | |
|      ) | |
|        v.      ) | CIVIL ACTION NO. 02-1811-RCL |
|      ) | |
| The Islamic Republic of Iran, et al.,      ) | |
|      ) | |
|          Defendants.      ) | |
|      ) | |

**DECLARATION OF ERIC P. ENSON IN SUPPORT OF NON-PARTY ICANN'S**
**MOTION TO QUASH PLAINTIFFS' WRITS OF ATTACHMENT**

I, Eric P. Enson, declare and affirm as follows:

1. I am a partner with the law firm of Jones Day, and am a member of the California Bar. Jones Day is counsel of record to the Internet Corporation for Assigned Names and Numbers ("ICANN") in this action. I have personal knowledge of the matters set forth herein and am competent to testify to those matters. I make this declaration in support of ICANN's Motion to Quash Plaintiffs' Writs of Attachment.

2. Attached hereto as Exhibit A is a true and correct copy of ICANN's Bylaws, which is also publicly available at https://www.icann.org/resources/pages/bylaws-2012-02-25-en.

3. Attached hereto as Exhibit B is a true and correct copy of the IANA Functions Contract, which is also publicly available at http://www.ntia.doc.gov/files/ntia/publications/sf_26_pg_1-2-final_award_and_sacs.pdf.

4. Attached hereto as Exhibit C is a true and correct copy of RFC 1591, which is also publicly available at http://www.ietf.org/rfc/rfc1591.txt.

5.      Attached hereto as Exhibit D is a true and correct copy of ICANN's Delegating and Redelegating a Country-Code Top-level Domain (ccTLD) publication, which is also publicly available at http://www.iana.org/help/cctld-delegation.

6.      Attached hereto as Exhibit E is a true and correct copy of ICANN's Common Questions on Delegating and Redelegating Country-Code Top-level Domain (ccTLDs) publication, which is also publicly available at http://www.iana.org/help/cctld-delegation-answers.

7.      Attached hereto as Exhibit F is a true and correct copy of the ICP-1 publication, which is also publicly available at https://www.icann.org/resources/pages/delegation-2012-02-25-en.

8.      Attached hereto as Exhibit G is a true and correct copy of ICANN's Report on the Delegation of the .("Iran") domain representing the Islamic Republic of Iran in Arabic, which is also publicly available at http://www.iana.org/reports/2013/iran-report-20130913.html.

9.      Attached hereto as Exhibit H is a true and correct copy of the Delegation Record for .IR, which is also publicly available at http://www.iana.org/domains/root/db/ir.html.

10.     Attached hereto as Exhibit I is a true and correct copy of the IDN ccTLD Fast Track String Evaluation Completion, which is also publicly available at https://www.icann.org/resources/pages/string-evaluation-completion-2014-02-19-en.

11.     Attached hereto as Exhibit J is a true and correct copy of the Delegation Record for .SY, which is also publicly available at http://www.iana.org/domains/root/db/sy.html.

12.     Attached hereto as Exhibit K is a true and correct copy of the Delegation Record for .KP, which is also publicly available at http://www.iana.org/domains/root/db/kp.html.

13.     Attached hereto as Exhibit L is a true and correct copy of the Governmental Advisory Committee's Principles for Delegation and Administration of ccTLDs, which is also publicly available at http://archive.icann.org/en/committees/gac/gac-cctldprinciples-23feb00.htm.

14.     Attached hereto as Exhibit M is a true and correct copy of the Governmental Advisory

Committee's Principles and Guidelines for the Delegation and Administration of Country Code

Top Level Domains, which is also publicly available at

https://archive.icann.org/en/committees/gac/gac-cctld-principles.htm.

15.     Attached hereto as Exhibit N is a true and correct copy of a Letter from Drafting

Committee, Alternate ccTLD Best Practices Draft, which is also publicly available at

https://archive.icann.org/en/meetings/cairo2000/altbestpracdraft-letter-03mar00.htm.

I declare under penalty of perjury, under the laws of the United States, that the foregoing

is true and correct.

This declaration was signed on July 29, 2014 at Los Angeles, California.

_____

Eric P. Enson

## <u>CERTIFICATE OF SERVICE</u>

I certify that on July 29, 2014, I served one copy of the foregoing: **Declaration of Eric P. Enson In Support of Non-Party ICANN's Motion to Quash Plaintiffs' Writs of Attachment** with the Clerk of the Court for the U.S. District Court for the District of Columbia using its CM/ECF System.

I further certify that I caused to be served one copy by First Class Mail, postage prepaid, on the following:

> Robert J. Tolchin
> Berkman Law Office, LLC
> 111 Livingston Street, Suite 1928
> Brooklyn, NY 11201
>
> *Counsel for Plaintiffs*

Dated: July 29, 2014

*/s/ Tara Lynn R. Zurawski*
‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾

Tara Lynn R. Zurawski (DC Bar No. 980960)

# **Exhibit A**

Haim v. The Islamic Republic of Iran,
Civil Action No. 02-1811-RCL

anslations at ICANN    Français    Español    العربية    русский    中文              Log In | Sign Up

**ICANN**

GET STARTED          NEWS & MEDIA          POLICY          PUBLIC COMMENT          **RESOURCES**

COMMUNITY          IANA STEWARDSHIP

Resources

About ICANN

Board

Accountability & Transparency

Governance

Governance Documents

Guidelines

Articles of Incorporation

Bylaws

Board Code of Conduct

Board Conflicts of Interest Policy

Board Statements of Interest

Summary of Conflicts of Interest and Ethics Practices Review

Agreements

# BYLAWS FOR INTERNET CORPORATION FOR ASSIGNED NAMES AND NUMBERS | A California Nonprofit Public-Benefit Corporation

This page is available in: العربية | Deutsch | English | Español | Français | Italiano | 日本語 | 한국어 | Português | русский | 中文
As amended 7 February 2014

## TABLE OF CONTENTS

ARTICLE I: MISSION AND CORE VALUES
ARTICLE II: POWERS
ARTICLE III: TRANSPARENCY
ARTICLE IV: ACCOUNTABILITY AND REVIEW
ARTICLE V: OMBUDSMAN
ARTICLE VI: BOARD OF DIRECTORS
ARTICLE VII: NOMINATING COMMITTEE
ARTICLE VIII: ADDRESS SUPPORTING ORGANIZATION
ARTICLE IX: COUNTRY-CODE NAMES SUPPORTING ORGANIZATION
ARTICLE X: GENERIC NAMES SUPPORTING ORGANIZATION
ARTICLE XI: ADVISORY COMMITTEES
ARTICLE XI-A: OTHER ADVISORY MECHANISMS
ARTICLE XII: BOARD AND TEMPORARY COMMITTEES
ARTICLE XIII: OFFICERS
ARTICLE XIV: INDEMNIFICATION OF DIRECTORS, OFFICERS, EMPLOYEES, AND OTHER AGENTS
ARTICLE XV: GENERAL PROVISIONS
ARTICLE XVI: FISCAL MATTERS
ARTICLE XVII: MEMBERS

AOC Review

Annual
Report

Financials

Document
Disclosure

Planning

Presentations

RFPs

Litigation

Newsletter

Correspondence

Groups

Contractual
Compliance

Registrars

Registries

ccTLDs

Internationalized
Domain
Names

TLD
Acceptance

Policy

Public
Comment

Contact

Help

ARTICLE XVIII: OFFICES AND SEAL
ARTICLE XIX: AMENDMENTS
ARTICLE XX: TRANSITION ARTICLE
ANNEX A: GNSO POLICY DEVELOPMENT PROCESS
ANNEX B: ccNSO POLICY-DEVELOPMENT PROCESS
(ccPDP)
ANNEX C: THE SCOPE OF THE ccNSO

# ARTICLE I: MISSION AND CORE VALUES

### Section 1. MISSION

The mission of The Internet Corporation for Assigned Names and
Numbers ("ICANN") is to coordinate, at the overall level, the global
Internet's systems of unique identifiers, and in particular to ensure the
stable and secure operation of the Internet's unique identifier systems.
In particular, ICANN:

> 1. Coordinates the allocation and assignment of the three
> sets of unique identifiers for the Internet, which are

>> a. Domain names (forming a system referred to
>> as "DNS");

>> b. Internet protocol ("IP") addresses and
>> autonomous system ("AS") numbers; and

>> c. Protocol port and parameter numbers.

> 2. Coordinates the operation and evolution of the DNS root
> name server system.

> 3. Coordinates policy development reasonably and
> appropriately related to these technical functions.

### Section 2. CORE VALUES

In performing its mission, the following core values should guide the
decisions and actions of ICANN:

> 1. Preserving and enhancing the operational stability,
> reliability, security, and global interoperability of the
> Internet.

> 2. Respecting the creativity, innovation, and flow of
> information made possible by the Internet by limiting

ICANN's activities to those matters within ICANN's mission requiring or significantly benefiting from global coordination.

3. To the extent feasible and appropriate, delegating coordination functions to or recognizing the policy role of other responsible entities that reflect the interests of affected parties.

4. Seeking and supporting broad, informed participation reflecting the functional, geographic, and cultural diversity of the Internet at all levels of policy development and decision-making.

5. Where feasible and appropriate, depending on market mechanisms to promote and sustain a competitive environment.

6. Introducing and promoting competition in the registration of domain names where practicable and beneficial in the public interest.

7. Employing open and transparent policy development mechanisms that (i) promote well-informed decisions based on expert advice, and (ii) ensure that those entities most affected can assist in the policy development process.

8. Making decisions by applying documented policies neutrally and objectively, with integrity and fairness.

9. Acting with a speed that is responsive to the needs of the Internet while, as part of the decision-making process, obtaining informed input from those entities most affected.

10. Remaining accountable to the Internet community through mechanisms that enhance ICANN's effectiveness.

11. While remaining rooted in the private sector, recognizing that governments and public authorities are responsible for public policy and duly taking into account governments' or public authorities' recommendations.

These core values are deliberately expressed in very general terms, so that they may provide useful and relevant guidance in the broadest possible range of circumstances. Because they are not narrowly prescriptive, the specific way in which they apply, individually and collectively, to each new situation will necessarily depend on many

factors that cannot be fully anticipated or enumerated; and because they are statements of principle rather than practice, situations will inevitably arise in which perfect fidelity to all eleven core values simultaneously is not possible. Any ICANN body making a recommendation or decision shall exercise its judgment to determine which core values are most relevant and how they apply to the specific circumstances of the case at hand, and to determine, if necessary, an appropriate and defensible balance among competing values.

## ARTICLE II: POWERS

### Section 1. GENERAL POWERS

Except as otherwise provided in the Articles of Incorporation or these Bylaws, the powers of ICANN shall be exercised by, and its property controlled and its business and affairs conducted by or under the direction of, the Board. With respect to any matters that would fall within the provisions of Article III, Section 6, the Board may act only by a majority vote of all members of the Board. In all other matters, except as otherwise provided in these Bylaws or by law, the Board may act by majority vote of those present at any annual, regular, or special meeting of the Board. Any references in these Bylaws to a vote of the Board shall mean the vote of only those members present at the meeting where a quorum is present unless otherwise specifically provided in these Bylaws by reference to "all of the members of the Board."

### Section 2. RESTRICTIONS

ICANN shall not act as a Domain Name System Registry or Registrar or Internet Protocol Address Registry in competition with entities affected by the policies of ICANN. Nothing in this Section is intended to prevent ICANN from taking whatever steps are necessary to protect the operational stability of the Internet in the event of financial failure of a Registry or Registrar or other emergency.

### Section 3. NON-DISCRIMINATORY TREATMENT

ICANN shall not apply its standards, policies, procedures, or practices inequitably or single out any particular party for disparate treatment unless justified by substantial and reasonable cause, such as the promotion of effective competition.

## ARTICLE III: TRANSPARENCY

### Section 1. PURPOSE

ICANN and its constituent bodies shall operate to the maximum extent feasible in an open and transparent manner and consistent with procedures designed to ensure fairness.

## Section 2. WEBSITE

ICANN shall maintain a publicly-accessible Internet World Wide Web site (the "Website"), which may include, among other things, (i) a calendar of scheduled meetings of the Board, Supporting Organizations, and Advisory Committees; (ii) a docket of all pending policy development matters, including their schedule and current status; (iii) specific meeting notices and agendas as described below; (iv) information on ICANN's budget, annual audit, financial contributors and the amount of their contributions, and related matters; (v) information about the availability of accountability mechanisms, including reconsideration, independent review, and Ombudsman activities, as well as information about the outcome of specific requests and complaints invoking these mechanisms; (vi) announcements about ICANN activities of interest to significant segments of the ICANN community; (vii) comments received from the community on policies being developed and other matters; (viii) information about ICANN's physical meetings and public forums; and (ix) other information of interest to the ICANN community.

## Section 3. MANAGER OF PUBLIC PARTICIPATION

There shall be a staff position designated as Manager of Public Participation, or such other title as shall be determined by the President, that shall be responsible, under the direction of the President, for coordinating the various aspects of public participation in ICANN, including the Website and various other means of communicating with and receiving input from the general community of Internet users.

## Section 4. MEETING NOTICES AND AGENDAS

At least seven days in advance of each Board meeting (or if not practicable, as far in advance as is practicable), a notice of such meeting and, to the extent known, an agenda for the meeting shall be posted.

## Section 5. MINUTES AND PRELIMINARY REPORTS

1. All minutes of meetings of the Board and Supporting Organizations (and any councils thereof) shall be approved

promptly by the originating body and provided to the ICANN Secretary for posting on the Website.

2. No later than 11:59 p.m. on the second business days after the conclusion of each meeting (as calculated by local time at the location of ICANN's principal office), any resolutions passed by the Board of Directors at that meeting shall be made publicly available on the Website; provided, however, that any actions relating to personnel or employment matters, legal matters (to the extent the Board determines it is necessary or appropriate to protect the interests of ICANN), matters that ICANN is prohibited by law or contract from disclosing publicly, and other matters that the Board determines, by a three-quarters (3/4) vote of Directors present at the meeting and voting, are not appropriate for public distribution, shall not be included in the preliminary report made publicly available. The Secretary shall send notice to the Board of Directors and the Chairs of the Supporting Organizations (as set forth in Articles VIII - X of these Bylaws) and Advisory Committees (as set forth in Article XI of these Bylaws) informing them that the resolutions have been posted.

3. No later than 11:59 p.m. on the seventh business days after the conclusion of each meeting (as calculated by local time at the location of ICANN's principal office), any actions taken by the Board shall be made publicly available in a preliminary report on the Website, subject to the limitations on disclosure set forth in Section 5.2 above. For any matters that the Board determines not to disclose, the Board shall describe in general terms in the relevant preliminary report the reason for such nondisclosure.

4. No later than the day after the date on which they are formally approved by the Board (or, if such day is not a business day, as calculated by local time at the location of ICANN's principal office, then the next immediately following business day), the minutes shall be made publicly available on the Website; provided, however, that any minutes relating to personnel or employment matters, legal matters (to the extent the Board determines it is necessary or appropriate to protect the interests of ICANN), matters that ICANN is prohibited by law or contract from disclosing publicly, and other matters that the Board determines, by a three-quarters (3/4) vote of Directors present at the meeting and voting, are not appropriate for public distribution, shall

not be included in the minutes made publicly available. For any matters that the Board determines not to disclose, the Board shall describe in general terms in the relevant minutes the reason for such nondisclosure.

## Section 6. NOTICE AND COMMENT ON POLICY ACTIONS

1. With respect to any policies that are being considered by the Board for adoption that substantially affect the operation of the Internet or third parties, including the imposition of any fees or charges, ICANN shall:

> a. provide public notice on the Website explaining what policies are being considered for adoption and why, at least twenty-one days (and if practical, earlier) prior to any action by the Board;

> b. provide a reasonable opportunity for parties to comment on the adoption of the proposed policies, to see the comments of others, and to reply to those comments, prior to any action by the Board; and

> c. in those cases where the policy action affects public policy concerns, to request the opinion of the Governmental Advisory Committee and take duly into account any advice timely presented by the Governmental Advisory Committee on its own initiative or at the Board's request.

2. Where both practically feasible and consistent with the relevant policy development process, an in-person public forum shall also be held for discussion of any proposed policies as described in Section 6(1)(b) of this Article, prior to any final Board action.

3. After taking action on any policy subject to this Section, the Board shall publish in the meeting minutes the reasons for any action taken, the vote of each Director voting on the action, and the separate statement of any Director desiring publication of such a statement.

## Section 7. TRANSLATION OF DOCUMENTS

As appropriate and to the extent provided in the ICANN budget, ICANN shall facilitate the translation of final published documents into various appropriate languages.

## ARTICLE IV: ACCOUNTABILITY AND REVIEW

### Section 1. PURPOSE

In carrying out its mission as set out in these Bylaws, ICANN should be accountable to the community for operating in a manner that is consistent with these Bylaws, and with due regard for the core values set forth in Article I of these Bylaws. The provisions of this Article, creating processes for reconsideration and independent review of ICANN actions and periodic review of ICANN's structure and procedures, are intended to reinforce the various accountability mechanisms otherwise set forth in these Bylaws, including the transparency provisions of Article III and the Board and other selection mechanisms set forth throughout these Bylaws.

### Section 2. RECONSIDERATION

1. ICANN shall have in place a process by which any person or entity materially affected by an action of ICANN may request review or reconsideration of that action by the Board.
2. Any person or entity may submit a request for reconsideration or review of an ICANN action or inaction ("Reconsideration Request") to the extent that he, she, or it have been adversely affected by:

   a. one or more staff actions or inactions that contradict established ICANN policy(ies); or
   b. one or more actions or inactions of the ICANN Board that have been taken or refused to be taken without consideration of material information, except where the party submitting the request could have submitted, but did not submit, the information for the Board's consideration at the time of action or refusal to act; or
   c. one or more actions or inactions of the ICANN Board that are taken as a result of the Board's reliance on false or inaccurate material information.

3. The Board has designated the Board Governance Committee to review and consider any such

Reconsideration Requests. The Board Governance Committee shall have the authority to:

    a. evaluate requests for review or reconsideration;
    b. summarily dismiss insufficient requests;
    c. evaluate requests for urgent consideration;
    d. conduct whatever factual investigation is deemed appropriate;
    e. request additional written submissions from the affected party, or from other parties;
    f. make a final determination on Reconsideration Requests regarding staff action or inaction, without reference to the Board of Directors; and
    g. make a recommendation to the Board of Directors on the merits of the request, as necessary.

4. ICANN shall absorb the normal administrative costs of the reconsideration process. It reserves the right to recover from a party requesting review or reconsideration any costs that are deemed to be extraordinary in nature. When such extraordinary costs can be foreseen, that fact and the reasons why such costs are necessary and appropriate to evaluating the Reconsideration Request shall be communicated to the party seeking reconsideration, who shall then have the option of withdrawing the request or agreeing to bear such costs.

5. All Reconsideration Requests must be submitted to an e-mail address designated by the Board Governance Committee within fifteen days after:

    a. for requests challenging Board actions, the date on which information about the challenged Board action is first published in a resolution, unless the posting of the resolution is not accompanied by a rationale. In that instance, the request must be submitted within 15 days from the initial posting of the rationale; or
    b. for requests challenging staff actions, the date on which the party submitting the request became aware of, or reasonably

should have become aware of, the
challenged staff action; or

c.  for requests challenging either Board or staff
inaction, the date on which the affected
person reasonably concluded, or reasonably
should have concluded, that action would not
be taken in a timely manner.

6.  To properly initiate a Reconsideration process, all
requestors must review and follow the
Reconsideration Request form posted on the ICANN
website. at
http://www.icann.org/en/groups/board/governance/reconsideration
Requestors must also acknowledge and agree to
the terms and conditions set forth in the form when
filing.

7.  Requestors shall not provide more than 25 pages
(double-spaced, 12-point font) of argument in
support of a Reconsideration Request. Requestors
may submit all documentary evidence necessary to
demonstrate why the action or inaction should be
reconsidered, without limitation.

8.  The Board Governance Committee shall have
authority to consider Reconsideration Requests
from different parties in the same proceeding so
long as: (i) the requests involve the same general
action or inaction; and (ii) the parties submitting
Reconsideration Requests are similarly affected by
such action or inaction. In addition, consolidated
filings may be appropriate if the alleged causal
connection and the resulting harm is the same for all
of the requestors. Every requestor must be able to
demonstrate that it has been materially harmed and
adversely impacted by the action or inaction giving
rise to the request.

9.  The Board Governance Committee shall review
each Reconsideration Request upon its receipt to
determine if it is sufficiently stated. The Board
Governance Committee may summarily dismiss a
Reconsideration Request if: (i) the requestor fails to
meet the requirements for bringing a
Reconsideration Request; (ii) it is frivolous,
querulous or vexatious; or (iii) the requestor had
notice and opportunity to, but did not, participate in
the public comment period relating to the contested
action, if applicable. The Board Governance

Committee's summary dismissal of a Reconsideration Request shall be posted on the Website.

10. For all Reconsideration Requests that are not summarily dismissed, the Board Governance Committee shall promptly proceed to review and consideration.

11. The Board Governance Committee may ask the ICANN staff for its views on the matter, which comments shall be made publicly available on the Website.

12. The Board Governance Committee may request additional information or clarifications from the requestor, and may elect to conduct a meeting with the requestor by telephone, email or, if acceptable to the party requesting reconsideration, in person. A requestor may ask for an opportunity to be heard; the Board Governance Committee's decision on any such request is final. To the extent any information gathered in such a meeting is relevant to any recommendation by the Board Governance Committee, it shall so state in its recommendation.

13. The Board Governance Committee may also request information relevant to the request from third parties. To the extent any information gathered is relevant to any recommendation by the Board Governance Committee, it shall so state in its recommendation. Any information collected from third parties shall be provided to the requestor.

14. The Board Governance Committee shall act on a Reconsideration Request on the basis of the public written record, including information submitted by the party seeking reconsideration or review, by the ICANN staff, and by any third party.

15. For all Reconsideration Requests brought regarding staff action or inaction, the Board Governance Committee shall be delegated the authority by the Board of Directors to make a final determination and recommendation on the matter. Board consideration of the recommendation is not required. As the Board Governance Committee deems necessary, it may make recommendation to the Board for consideration and action. The Board Governance Committee's determination on staff action or inaction shall be posted on the Website. The Board

Governance Committee's determination is final and establishes precedential value.

16. The Board Governance Committee shall make a final determination or a recommendation to the Board with respect to a Reconsideration Request within thirty days following its receipt of the request, unless impractical, in which case it shall report to the Board the circumstances that prevented it from making a final recommendation and its best estimate of the time required to produce such a final determination or recommendation. The final recommendation shall be posted on ICANN's website.

17. The Board shall not be bound to follow the recommendations of the Board Governance Committee. The final decision of the Board shall be made public as part of the preliminary report and minutes of the Board meeting at which action is taken. The Board shall issue its decision on the recommendation of the Board Governance Committee within 60 days of receipt of the Reconsideration Request or as soon thereafter as feasible. Any circumstances that delay the Board from acting within this timeframe must be identified and posted on ICANN's website. The Board's decision on the recommendation is final.

18. If the requestor believes that the Board action or inaction posed for Reconsideration is so urgent that the timing requirements of the Reconsideration process are too long, the requestor may apply to the Board Governance Committee for urgent consideration. Any request for urgent consideration must be made within two business days (calculated at ICANN's headquarters in Los Angeles, California) of the posting of the resolution at issue. A request for urgent consideration must include a discussion of why the matter is urgent for reconsideration and must demonstrate a likelihood of success with the Reconsideration Request.

19. The Board Governance Committee shall respond to the request for urgent consideration within two business days after receipt of such request. If the Board Governance Committee agrees to consider the matter with urgency, it will cause notice to be provided to the requestor, who will have two

business days after notification to complete the Reconsideration Request. The Board Governance Committee shall issue a recommendation on the urgent Reconsideration Request within seven days of the completion of the filing of the Request, or as soon thereafter as feasible. If the Board Governance Committee does not agree to consider the matter with urgency, the requestor may still file a Reconsideration Request within the regular time frame set forth within these Bylaws.

20. The Board Governance Committee shall submit a report to the Board on an annual basis containing at least the following information for the preceding calendar year:

   a. the number and general nature of Reconsideration Requests received, including an identification if the requests were acted upon, summarily dismissed, or remain pending;

   b. for any Reconsideration Requests that remained pending at the end of the calendar year, the average length of time for which such Reconsideration Requests have been pending, and a description of the reasons for any request pending for more than ninety (90) days;

   c. an explanation of any other mechanisms available to ensure that ICANN is accountable to persons materially affected by its decisions; and

   d. whether or not, in the Board Governance Committee's view, the criteria for which reconsideration may be requested should be revised, or another process should be adopted or modified, to ensure that all persons materially affected by ICANN decisions have meaningful access to a review process that ensures fairness while limiting frivolous claims.

### Section 3. INDEPENDENT REVIEW OF BOARD ACTIONS

1. In addition to the reconsideration process described in Section 2 of this Article, ICANN shall have in place a separate process for independent third-party

review of Board actions alleged by an affected party to be inconsistent with the Articles of Incorporation or Bylaws.

2. Any person materially affected by a decision or action by the Board that he or she asserts is inconsistent with the Articles of Incorporation or Bylaws may submit a request for independent review of that decision or action. In order to be materially affected, the person must suffer injury or harm that is directly and causally connected to the Board's alleged violation of the Bylaws or the Articles of Incorporation, and not as a result of third parties acting in line with the Board's action.

3. A request for independent review must be filed within thirty days of the posting of the minutes of the Board meeting (and the accompanying Board Briefing Materials, if available) that the requesting party contends demonstrates that ICANN violated its Bylaws or Articles of Incorporation. Consolidated requests may be appropriate when the causal connection between the circumstances of the requests and the harm is the same for each of the requesting parties.

4. Requests for such independent review shall be referred to an Independent Review Process Panel ("IRP Panel"), which shall be charged with comparing contested actions of the Board to the Articles of Incorporation and Bylaws, and with declaring whether the Board has acted consistently with the provisions of those Articles of Incorporation and Bylaws. The IRP Panel must apply a defined standard of review to the IRP request, focusing on:

   a. did the Board act without conflict of interest in taking its decision?;
   b. did the Board exercise due diligence and care in having a reasonable amount of facts in front of them?; and
   c. did the Board members exercise independent judgment in taking the decision, believed to be in the best interests of the company?

5. Requests for independent review shall not exceed 25 pages (double-spaced, 12-point font) of argument. ICANN's response shall not exceed that

same length. Parties may submit documentary evidence supporting their positions without limitation. In the event that parties submit expert evidence, such evidence must be provided in writing and there will be a right of reply to the expert evidence.

6. There shall be an omnibus standing panel of between six and nine members with a variety of expertise, including jurisprudence, judicial experience, alternative dispute resolution and knowledge of ICANN's mission and work from which each specific IRP Panel shall be selected. The panelists shall serve for terms that are staggered to allow for continued review of the size of the panel and the range of expertise. A Chair of the standing panel shall be appointed for a term not to exceed three years. Individuals holding an official position or office within the ICANN structure are not eligible to serve on the standing panel. In the event that an omnibus standing panel: (i) is not in place when an IRP Panel must be convened for a given proceeding, the IRP proceeding will be considered by a one- or three-member panel comprised in accordance with the rules of the IRP Provider; or (ii) is in place but does not have the requisite diversity of skill and experience needed for a particular proceeding, the IRP Provider shall identify one or more panelists, as required, from outside the omnibus standing panel to augment the panel members for that proceeding.

7. All IRP proceedings shall be administered by an international dispute resolution provider appointed from time to time by ICANN ("the IRP Provider"). The membership of the standing panel shall be coordinated by the IRP Provider subject to approval by ICANN.

8. Subject to the approval of the Board, the IRP Provider shall establish operating rules and procedures, which shall implement and be consistent with this Section 3.

9. Either party may request that the IRP be considered by a one- or three-member panel; the Chair of the standing panel shall make the final determination of the size of each IRP panel, taking into account the

wishes of the parties and the complexity of the issues presented.

10. The IRP Provider shall determine a procedure for assigning members from the standing panel to individual IRP panels.

11. The IRP Panel shall have the authority to:

    a. summarily dismiss requests brought without standing, lacking in substance, or that are frivolous or vexatious;

    b. request additional written submissions from the party seeking review, the Board, the Supporting Organizations, or from other parties;

    c. declare whether an action or inaction of the Board was inconsistent with the Articles of Incorporation or Bylaws; and

    d. recommend that the Board stay any action or decision, or that the Board take any interim action, until such time as the Board reviews and acts upon the opinion of the IRP;

    e. consolidate requests for independent review if the facts and circumstances are sufficiently similar; and

    f. determine the timing for each proceeding.

12. In order to keep the costs and burdens of independent review as low as possible, the IRP Panel should conduct its proceedings by email and otherwise via the Internet to the maximum extent feasible. Where necessary, the IRP Panel may hold meetings by telephone. In the unlikely event that a telephonic or in-person hearing is convened, the hearing shall be limited to argument only; all evidence, including witness statements, must be submitted in writing in advance.

13. All panel members shall adhere to conflicts-of-interest policy stated in the IRP Provider's operating rules and procedures, as approved by the Board.

14. Prior to initiating a request for independent review, the complainant is urged to enter into a period of cooperative engagement with ICANN for the purpose of resolving or narrowing the issues that are contemplated to be brought to the IRP. The cooperative engagement process is published on

ICANN.org and is incorporated into this Section 3 of the Bylaws.

15. Upon the filing of a request for an independent review, the parties are urged to participate in a conciliation period for the purpose of narrowing the issues that are stated within the request for independent review. A conciliator will be appointed from the members of the omnibus standing panel by the Chair of that panel. The conciliator shall not be eligible to serve as one of the panelists presiding over that particular IRP. The Chair of the standing panel may deem conciliation unnecessary if cooperative engagement sufficiently narrowed the issues remaining in the independent review.

16. Cooperative engagement and conciliation are both voluntary. However, if the party requesting the independent review does not participate in good faith in the cooperative engagement and the conciliation processes, if applicable, and ICANN is the prevailing party in the request for independent review, the IRP Panel must award to ICANN all reasonable fees and costs incurred by ICANN in the proceeding, including legal fees.

17. All matters discussed during the cooperative engagement and conciliation phases are to remain confidential and not subject to discovery or as evidence for any purpose within the IRP, and are without prejudice to either party.

18. The IRP Panel should strive to issue its written declaration no later than six months after the filing of the request for independent review. The IRP Panel shall make its declaration based solely on the documentation, supporting materials, and arguments submitted by the parties, and in its declaration shall specifically designate the prevailing party. The party not prevailing shall ordinarily be responsible for bearing all costs of the IRP Provider, but in an extraordinary case the IRP Panel may in its declaration allocate up to half of the costs of the IRP Provider to the prevailing party based upon the circumstances, including a consideration of the reasonableness of the parties' positions and their contribution to the public interest. Each party to the IRP proceedings shall bear its own expenses.

19. The IRP operating procedures, and all petitions, claims, and declarations, shall be posted on ICANN's website when they become available.
20. The IRP Panel may, in its discretion, grant a party's request to keep certain information confidential, such as trade secrets.
21. Where feasible, the Board shall consider the IRP Panel declaration at the Board's next meeting. The declarations of the IRP Panel, and the Board's subsequent action on those declarations, are final and have precedential value.

**Section 4. PERIODIC REVIEW OF ICANN STRUCTURE AND OPERATIONS**

1. The Board shall cause a periodic review of the performance and operation of each Supporting Organization, each Supporting Organization Council, each Advisory Committee (other than the Governmental Advisory Committee), and the Nominating Committee by an entity or entities independent of the organization under review. The goal of the review, to be undertaken pursuant to such criteria and standards as the Board shall direct, shall be to determine (i) whether that organization has a continuing purpose in the ICANN structure, and (ii) if so, whether any change in structure or operations is desirable to improve its effectiveness.

These periodic reviews shall be conducted no less frequently than every five years, based on feasibility as determined by the Board. Each five-year cycle will be computed from the moment of the reception by the Board of the final report of the relevant review Working Group.

The results of such reviews shall be posted on the Website for public review and comment, and shall be considered by the Board no later than the second scheduled meeting of the Board after such results have been posted for 30 days. The consideration by the Board includes the ability to revise the structure or operation of the parts of ICANN being reviewed by a two-thirds vote of all members of the Board.

2. The Governmental Advisory Committee shall provide its own review mechanisms.

## ARTICLE V: OMBUDSMAN

### Section 1. OFFICE OF OMBUDSMAN

1. There shall be an Office of Ombudsman, to be managed by an Ombudsman and to include such staff support as the Board determines is appropriate and feasible. The Ombudsman shall be a full-time position, with salary and benefits appropriate to the function, as determined by the Board.

2. The Ombudsman shall be appointed by the Board for an initial term of two years, subject to renewal by the Board.

3. The Ombudsman shall be subject to dismissal by the Board only upon a three-fourths (3/4) vote of the entire Board.

4. The annual budget for the Office of Ombudsman shall be established by the Board as part of the annual ICANN budget process. The Ombudsman shall submit a proposed budget to the President, and the President shall include that budget submission in its entirety and without change in the general ICANN budget recommended by the ICANN President to the Board. Nothing in this Article shall prevent the President from offering separate views on the substance, size, or other features of the Ombudsman's proposed budget to the Board.

### Section 2. CHARTER

The charter of the Ombudsman shall be to act as a neutral dispute resolution practitioner for those matters for which the provisions of the Reconsideration Policy set forth in Section 2 of Article IV or the Independent Review Policy set forth in Section 3 of Article IV have not been invoked. The principal function of the Ombudsman shall be to provide an independent internal evaluation of complaints by members of the ICANN community who believe that the ICANN staff, Board or an ICANN constituent body has treated them unfairly. The Ombudsman shall serve as an objective advocate for fairness, and shall seek to evaluate and where possible resolve complaints about unfair or inappropriate treatment by ICANN staff, the Board, or ICANN constituent bodies, clarifying the issues and using conflict resolution tools such as negotiation, facilitation, and "shuttle diplomacy" to achieve these results.

### Section 3. OPERATIONS

The Office of Ombudsman shall:

1. facilitate the fair, impartial, and timely resolution of problems and complaints that affected members of the ICANN community (excluding employees and vendors/suppliers of ICANN) may have with specific actions or failures to act by the Board or ICANN staff which have not otherwise become the subject of either the Reconsideration or Independent Review Policies;

2. exercise discretion to accept or decline to act on a complaint or question, including by the development of procedures to dispose of complaints that are insufficiently concrete, substantive, or related to ICANN's interactions with the community so as to be inappropriate subject matters for the Ombudsman to act on. In addition, and without limiting the foregoing, the Ombudsman shall have no authority to act in any way with respect to internal administrative matters, personnel matters, issues relating to membership on the Board, or issues related to vendor/supplier relations;

3. have the right to have access to (but not to publish if otherwise confidential) all necessary information and records from ICANN staff and constituent bodies to enable an informed evaluation of the complaint and to assist in dispute resolution where feasible (subject only to such confidentiality obligations as are imposed by the complainant or any generally applicable confidentiality policies adopted by ICANN);

4. heighten awareness of the Ombudsman program and functions through routine interaction with the ICANN community and online availability;

5. maintain neutrality and independence, and have no bias or personal stake in an outcome; and

6. comply with all ICANN conflicts-of-interest and confidentiality policies.

### Section 4. INTERACTION WITH ICANN AND OUTSIDE ENTITIES

1. No ICANN employee, Board member, or other participant in Supporting Organizations or Advisory Committees shall prevent or impede the Ombudsman's

contact with the ICANN community (including employees of ICANN). ICANN employees and Board members shall direct members of the ICANN community who voice problems, concerns, or complaints about ICANN to the Ombudsman, who shall advise complainants about the various options available for review of such problems, concerns, or complaints.

2. ICANN staff and other ICANN participants shall observe and respect determinations made by the Office of Ombudsman concerning confidentiality of any complaints received by that Office.

3. Contact with the Ombudsman shall not constitute notice to ICANN of any particular action or cause of action.

4. The Ombudsman shall be specifically authorized to make such reports to the Board as he or she deems appropriate with respect to any particular matter and its resolution or the inability to resolve it. Absent a determination by the Ombudsman, in his or her sole discretion, that it would be inappropriate, such reports shall be posted on the Website.

5. The Ombudsman shall not take any actions not authorized in these Bylaws, and in particular shall not institute, join, or support in any way any legal actions challenging ICANN structure, procedures, processes, or any conduct by the ICANN Board, staff, or constituent bodies.

### Section 5. ANNUAL REPORT

The Office of Ombudsman shall publish on an annual basis a consolidated analysis of the year's complaints and resolutions, appropriately dealing with confidentiality obligations and concerns. Such annual report should include a description of any trends or common elements of complaints received during the period in question, as well as recommendations for steps that could be taken to minimize future complaints. The annual report shall be posted on the Website.

## ARTICLE VI: BOARD OF DIRECTORS

### Section 1. COMPOSITION OF THE BOARD

The ICANN Board of Directors ("Board") shall consist of sixteen voting members ("Directors"). In addition, five non-voting liaisons ("Liaisons") shall be designated for the purposes set forth in Section 9 of this Article. Only Directors shall be included in determining the existence of quorums, and in establishing the validity of votes taken by the ICANN Board.

**Section 2. DIRECTORS AND THEIR SELECTION; ELECTION OF CHAIRMAN AND VICE-CHAIRMAN**

1. The Directors shall consist of:

a. Eight voting members selected by the Nominating Committee established by Article VII of these Bylaws. These seats on the Board of Directors are referred to in these Bylaws as Seats 1 through 8.

b. Two voting members selected by the Address Supporting Organization according to the provisions of Article VIII of these Bylaws. These seats on the Board of Directors are referred to in these Bylaws as Seat 9 and Seat 10.

c. Two voting members selected by the Country-Code Names Supporting Organization according to the provisions of Article IX of these Bylaws. These seats on the Board of Directors are referred to in these Bylaws as Seat 11 and Seat 12.

d. Two voting members selected by the Generic Names Supporting Organization according to the provisions of Article X of these Bylaws. These seats on the Board of Directors are referred to in these Bylaws as Seat 13 and Seat 14.

e. One voting member selected by the At-Large Community according to the provisions of Article XI of these Bylaws. This seat on the Board of Directors is referred to in these Bylaws as Seat 15.

f. The President ex officio, who shall be a voting member.

2. In carrying out its responsibilities to fill Seats 1 through 8, the Nominating Committee shall seek to ensure that the ICANN Board is composed of members who in the aggregate display diversity in geography, culture, skills, experience, and perspective, by applying the criteria set forth in Section 3 of this Article. At no time when it makes its selection shall the Nominating Committee select a Director to fill any vacancy or expired term whose selection would cause the total number of Directors (not including the President) from countries in any one Geographic Region (as defined in Section 5 of this Article) to exceed five; and the Nominating Committee shall ensure when it makes its selections that the Board includes at least one Director who is from a country in each ICANN Geographic Region ("Diversity Calculation").

For purposes of this sub-section 2 of Article VI, Section 2 of the ICANN Bylaws, if any candidate for director maintains citizenship of more than one country, or has been domiciled for more than five years in a country of which the candidate does not maintain citizenship ("Domicile"), that candidate may be deemed to be from either country and must select in his/her Statement of Interest the country of citizenship or Domicile that he/she wants the Nominating Committee to use for Diversity Calculation purposes. For purposes of this sub- section 2 of Article VI, Section 2 of the ICANN Bylaws, a person can only have one "Domicile," which shall be determined by where the candidate has a permanent residence and place of habitation.

3. In carrying out their responsibilities to fill Seats 9 through 15, the Supporting Organizations and the At-Large Community shall seek to ensure that the ICANN Board is composed of members that in the aggregate display diversity in geography, culture, skills, experience, and perspective, by applying the criteria set forth in Section 3 of this Article. At any given time, no two Directors selected by a Supporting Organization shall be citizens from the same country or of countries located in the same Geographic Region.

For purposes of this sub-section 3 of Article VI, Section 2 of the ICANN Bylaws, if any candidate for director maintains citizenship of more than one country, or has been domiciled for more than five years in a country of which the candidate does not maintain citizenship ("Domicile"), that candidate

may be deemed to be from either country and must select in his/her Statement of Interest the country of citizenship or Domicile that he/she wants the Supporting Organization or the At-Large Community to use for selection purposes. For purposes of this sub-section 3 of Article VI, Section 2 of the ICANN Bylaws, a person can only have one "Domicile," which shall be determined by where the candidate has a permanent residence and place of habitation.

4. The Board shall annually elect a Chairman and a Vice-Chairman from among the Directors, not including the President.

**Section 3. CRITERIA FOR SELECTION OF DIRECTORS**

ICANN Directors shall be:

1. Accomplished persons of integrity, objectivity, and intelligence, with reputations for sound judgment and open minds, and a demonstrated capacity for thoughtful group decision-making;

2. Persons with an understanding of ICANN's mission and the potential impact of ICANN decisions on the global Internet community, and committed to the success of ICANN;

3. Persons who will produce the broadest cultural and geographic diversity on the Board consistent with meeting the other criteria set forth in this Section;

4. Persons who, in the aggregate, have personal familiarity with the operation of gTLD registries and registrars; with ccTLD registries; with IP address registries; with Internet technical standards and protocols; with policy-development procedures, legal traditions, and the public interest; and with the broad range of business, individual, academic, and non-commercial users of the Internet;

5. Persons who are willing to serve as volunteers, without compensation other than the reimbursement of certain expenses; and

6. Persons who are able to work and communicate in written and spoken English.

## Section 4. ADDITIONAL QUALIFICATIONS

1. Notwithstanding anything herein to the contrary, no official of a national government or a multinational entity established by treaty or other agreement between national governments may serve as a Director. As used herein, the term "official" means a person (i) who holds an elective governmental office or (ii) who is employed by such government or multinational entity and whose primary function with such government or entity is to develop or influence governmental or public policies.

2. No person who serves in any capacity (including as a liaison) on any Supporting Organization Council shall simultaneously serve as a Director or liaison to the Board. If such a person accepts a nomination to be considered for selection by the Supporting Organization Council or the At-Large Community to be a Director, the person shall not, following such nomination, participate in any discussion of, or vote by, the Supporting Organization Council or the committee designated by the At-Large Community relating to the selection of Directors by the Council or Community, until the Council or committee(s) designated by the At-Large Community has selected the full complement of Directors it is responsible for selecting. In the event that a person serving in any capacity on a Supporting Organization Council accepts a nomination to be considered for selection as a Director, the constituency group or other group or entity that selected the person may select a replacement for purposes of the Council's selection process. In the event that a person serving in any capacity on the At-Large Advisory Committee accepts a nomination to be considered for selection by the At-Large Community as a Director, the Regional At-Large Organization or other group or entity that selected the person may select a replacement for purposes of the Community's selection process.

3. Persons serving in any capacity on the Nominating Committee shall be ineligible for selection to positions on the Board as provided by Article VII, Section 8.

## Section 5. INTERNATIONAL REPRESENTATION

In order to ensure broad international representation on the Board, the selection of Directors by the Nominating Committee, each Supporting

Organization and the At-Large Community shall comply with all applicable diversity provisions of these Bylaws or of any Memorandum of Understanding referred to in these Bylaws concerning the Supporting Organization. One intent of these diversity provisions is to ensure that at all times each Geographic Region shall have at least one Director, and at all times no region shall have more than five Directors on the Board (not including the President). As used in these Bylaws, each of the following is considered to be a "Geographic Region": Europe; Asia/Australia/Pacific; Latin America/Caribbean islands; Africa; and North America. The specific countries included in each Geographic Region shall be determined by the Board, and this Section shall be reviewed by the Board from time to time (but at least every three years) to determine whether any change is appropriate, taking account of the evolution of the Internet.

### Section 6. DIRECTORS' CONFLICTS OF INTEREST

The Board, through the Board Governance Committee, shall require a statement from each Director not less frequently than once a year setting forth all business and other affiliations that relate in any way to the business and other affiliations of ICANN. Each Director shall be responsible for disclosing to ICANN any matter that could reasonably be considered to make such Director an "interested director" within the meaning of Section 5233 of the California Nonprofit Public Benefit Corporation Law ("CNPBCL"). In addition, each Director shall disclose to ICANN any relationship or other factor that could reasonably be considered to cause the Director to be considered to be an "interested person" within the meaning of Section 5227 of the CNPBCL. The Board shall adopt policies specifically addressing Director, Officer, and Supporting Organization conflicts of interest. No Director shall vote on any matter in which he or she has a material and direct financial interest that would be affected by the outcome of the vote.

### Section 7. DUTIES OF DIRECTORS

Directors shall serve as individuals who have the duty to act in what they reasonably believe are the best interests of ICANN and not as representatives of the entity that selected them, their employers, or any other organizations or constituencies.

### Section 8. TERMS OF DIRECTORS

1. The regular term of office of Director Seats 1 through 15 shall begin as follows:

a. The regular terms of Seats 1 through 3 shall begin at the conclusion of ICANN's annual meeting in 2003 and each ICANN annual meeting every third year after 2003;

b. The regular terms of Seats 4 through 6 shall begin at the conclusion of ICANN's annual meeting in 2004 and each ICANN annual meeting every third year after 2004;

c. The regular terms of Seats 7 and 8 shall begin at the conclusion of ICANN's annual meeting in 2005 and each ICANN annual meeting every third year after 2005;

d. The terms of Seats 9 and 12 shall continue until the conclusion of ICANN's ICANN's annual meeting in 2015. The next terms of Seats 9 and 12 shall begin at the conclusion of ICANN's annual meeting in 2015 and each ICANN annual meeting every third year after 2015;

e. The terms of Seats 10 and 13 shall continue until the conclusion of ICANN's annual meeting in 2013. The next terms of Seats 10 and 13 shall begin at the conclusion of ICANN's annual meeting in 2013 and each ICANN annual meeting every third year after 2013; and

f. The terms of Seats 11, 14 and 15 shall continue until the conclusion of ICANN's annual meeting in 2014. The next terms of Seats 11, 14 and 15 shall begin at the conclusion of ICANN's annual meeting in 2014 and each ICANN annual meeting every third year after 2014.

2. Each Director holding any of Seats 1 through 15, including a Director selected to fill a vacancy, shall hold office for a term that lasts until the next term for that Seat commences and until a successor has been selected and qualified or until that Director resigns or is removed in accordance with these Bylaws.

3. At least two months before the commencement of each annual meeting, the Nominating Committee shall give the Secretary of ICANN written notice of its selection of

Directors for seats with terms beginning at the conclusion of the annual meeting.

4. At least six months before the date specified for the commencement of the term as specified in paragraphs 1.d-f above, any Supporting Organization or the At-Large community entitled to select a Director for a Seat with a term beginning that year shall give the Secretary of ICANN written notice of its selection.

5. Subject to the provisions of the Transition Article of these Bylaws, no Director may serve more than three consecutive terms. For these purposes, a person selected to fill a vacancy in a term shall not be deemed to have served that term. (Note: In the period prior to the beginning of the first regular term of Seat 15 in 2010, Seat 15 was deemed vacant for the purposes of calculation of terms of service.)

6. The term as Director of the person holding the office of President shall be for as long as, and only for as long as, such person holds the office of President.

### Section 9. NON-VOTING LIAISONS

1. The non-voting liaisons shall include:

   a. One appointed by the Governmental Advisory Committee;

   b. One appointed by the Root Server System Advisory Committee established by Article XI of these Bylaws;

   c. One appointed by the Security and Stability Advisory Committee established by Article XI of these Bylaws;

   d. One appointed by the Internet Engineering Task Force.

2. Subject to the provisions of the Transition Article of these Bylaws, the non-voting liaisons shall serve terms that begin at the conclusion of each annual meeting. At least one month before the commencement of each annual meeting, each body entitled to appoint a non-voting liaison shall give the Secretary of ICANN written notice of its appointment.

3. Non-voting liaisons shall serve as volunteers, without compensation other than the reimbursement of certain expenses.

4. Each non-voting liaison may be reappointed, and shall remain in that position until a successor has been appointed or until the liaison resigns or is removed in accordance with these Bylaws.

5. The non-voting liaisons shall be entitled to attend Board meetings, participate in Board discussions and deliberations, and have access (under conditions established by the Board) to materials provided to Directors for use in Board discussions, deliberations and meetings, but shall otherwise not have any of the rights and privileges of Directors. Non-voting liaisons shall be entitled (under conditions established by the Board) to use any materials provided to them pursuant to this Section for the purpose of consulting with their respective committee or organization.

## Section 10. RESIGNATION OF A DIRECTOR OR NON-VOTING LIAISON

Subject to Section 5226 of the CNPBCL, any Director or non-voting liaison may resign at any time, either by oral tender of resignation at any meeting of the Board (followed by prompt written notice to the Secretary of ICANN) or by giving written notice thereof to the President or the Secretary of ICANN. Such resignation shall take effect at the time specified, and, unless otherwise specified, the acceptance of such resignation shall not be necessary to make it effective. The successor shall be selected pursuant to Section 12 of this Article.

## Section 11. REMOVAL OF A DIRECTOR OR NON-VOTING LIAISON

1. Any Director may be removed, following notice to that Director, by a three-fourths (3/4) majority vote of all Directors; provided, however, that the Director who is the subject of the removal action shall not be entitled to vote on such an action or be counted as a voting member of the Board when calculating the required three-fourths (3/4) vote; and provided further, that each vote to remove a Director shall be a separate vote on the sole question of the removal of that particular Director. If the Director was selected by a Supporting Organization, notice must be provided to that Supporting Organization at the same time

notice is provided to the Director. If the Director was selected by the At-Large Community, notice must be provided to the At-Large Advisory Committee at the same time notice is provided to the Director.

2. With the exception of the non-voting liaison appointed by the Governmental Advisory Committee, any non-voting liaison may be removed, following notice to that liaison and to the organization by which that liaison was selected, by a three-fourths (3/4) majority vote of all Directors if the selecting organization fails to promptly remove that liaison following such notice. The Board may request the Governmental Advisory Committee to consider the replacement of the non-voting liaison appointed by that Committee if the Board, by a three-fourths (3/4) majority vote of all Directors, determines that such an action is appropriate.

### Section 12. VACANCIES

1. A vacancy or vacancies in the Board of Directors shall be deemed to exist in the case of the death, resignation, or removal of any Director; if the authorized number of Directors is increased; or if a Director has been declared of unsound mind by a final order of court or convicted of a felony or incarcerated for more than 90 days as a result of a criminal conviction or has been found by final order or judgment of any court to have breached a duty under Sections 5230 et seq. of the CNPBCL. Any vacancy occurring on the Board of Directors shall be filled by the Nominating Committee, unless (a) that Director was selected by a Supporting Organization, in which case that vacancy shall be filled by that Supporting Organization, or (b) that Director was the President, in which case the vacancy shall be filled in accordance with the provisions of Article XIII of these Bylaws. The selecting body shall give written notice to the Secretary of ICANN of their appointments to fill vacancies. A Director selected to fill a vacancy on the Board shall serve for the unexpired term of his or her predecessor in office and until a successor has been selected and qualified. No reduction of the authorized number of Directors shall have the effect of removing a Director prior to the expiration of the Director's term of office.

2. The organizations selecting the non-voting liaisons identified in Section 9 of this Article are responsible for determining the existence of, and filling, any vacancies in those positions. They shall give the Secretary of ICANN written notice of their appointments to fill vacancies.

## Section 13. ANNUAL MEETINGS

Annual meetings of ICANN shall be held for the purpose of electing Officers and for the transaction of such other business as may come before the meeting. Each annual meeting for ICANN shall be held at the principal office of ICANN, or any other appropriate place of the Board's time and choosing, provided such annual meeting is held within 14 months of the immediately preceding annual meeting. If the Board determines that it is practical, the annual meeting should be distributed in real-time and archived video and audio formats on the Internet.

## Section 14. REGULAR MEETINGS

Regular meetings of the Board shall be held on dates to be determined by the Board. In the absence of other designation, regular meetings shall be held at the principal office of ICANN.

## Section 15. SPECIAL MEETINGS

Special meetings of the Board may be called by or at the request of one-quarter (1/4) of the members of the Board or by the Chairman of the Board or the President. A call for a special meeting shall be made by the Secretary of ICANN. In the absence of designation, special meetings shall be held at the principal office of ICANN.

## Section 16. NOTICE OF MEETINGS

Notice of time and place of all meetings shall be delivered personally or by telephone or by electronic mail to each Director and non-voting liaison, or sent by first-class mail (air mail for addresses outside the United States) or facsimile, charges prepaid, addressed to each Director and non-voting liaison at the Director's or non-voting liaison's address as it is shown on the records of ICANN. In case the notice is mailed, it shall be deposited in the United States mail at least fourteen (14) days before the time of the holding of the meeting. In case the notice is delivered personally or by telephone or facsimile or electronic mail it shall be delivered personally or by telephone or facsimile or electronic mail at least forty-eight (48) hours before the time of the holding of the meeting. Notwithstanding anything in this Section to the

contrary, notice of a meeting need not be given to any Director who signed a waiver of notice or a written consent to holding the meeting or an approval of the minutes thereof, whether before or after the meeting, or who attends the meeting without protesting, prior thereto or at its commencement, the lack of notice to such Director. All such waivers, consents and approvals shall be filed with the corporate records or made a part of the minutes of the meetings.

### Section 17. QUORUM

At all annual, regular, and special meetings of the Board, a majority of the total number of Directors then in office shall constitute a quorum for the transaction of business, and the act of a majority of the Directors present at any meeting at which there is a quorum shall be the act of the Board, unless otherwise provided herein or by law. If a quorum shall not be present at any meeting of the Board, the Directors present thereat may adjourn the meeting from time to time to another place, time, or date. If the meeting is adjourned for more than twenty-four (24) hours, notice shall be given to those Directors not at the meeting at the time of the adjournment.

### Section 18. ACTION BY TELEPHONE MEETING OR BY OTHER COMMUNICATIONS EQUIPMENT

Members of the Board or any Committee of the Board may participate in a meeting of the Board or Committee of the Board through use of (i) conference telephone or similar communications equipment, provided that all Directors participating in such a meeting can speak to and hear one another or (ii) electronic video screen communication or other communication equipment; provided that (a) all Directors participating in such a meeting can speak to and hear one another, (b) all Directors are provided the means of fully participating in all matters before the Board or Committee of the Board, and (c) ICANN adopts and implements means of verifying that (x) a person participating in such a meeting is a Director or other person entitled to participate in the meeting and (y) all actions of, or votes by, the Board or Committee of the Board are taken or cast only by the members of the Board or Committee and not persons who are not members. Participation in a meeting pursuant to this Section constitutes presence in person at such meeting. ICANN shall make available at the place of any meeting of the Board the telecommunications equipment necessary to permit members of the Board to participate by telephone.

### Section 19. ACTION WITHOUT MEETING

Any action required or permitted to be taken by the Board or a
Committee of the Board may be taken without a meeting if all of the
Directors entitled to vote thereat shall individually or collectively
consent in writing to such action. Such written consent shall have the
same force and effect as the unanimous vote of such Directors. Such
written consent or consents shall be filed with the minutes of the
proceedings of the Board.

## Section 20. ELECTRONIC MAIL

If permitted under applicable law, communication by electronic mail
shall be considered equivalent to any communication otherwise
required to be in writing. ICANN shall take such steps as it deems
appropriate under the circumstances to assure itself that
communications by electronic mail are authentic.

## Section 21. RIGHTS OF INSPECTION

Every Director shall have the right at any reasonable time to inspect
and copy all books, records and documents of every kind, and to
inspect the physical properties of ICANN. ICANN shall establish
reasonable procedures to protect against the inappropriate disclosure
of confidential information.

## Section 22. COMPENSATION

1. Except for the President of ICANN, who serves ex officio
as a voting member of the Board, each of the Directors
shall be entitled to receive compensation for his/her
services as a Director. The President shall receive only
his/her compensation for service as President and shall not
receive additional compensation for service as a Director.

2. If the Board determines to offer a compensation
arrangement to one or more Directors other than the
President of ICANN for services to ICANN as Directors, the
Board shall follow a process that is calculated to pay an
amount for service as a Director that is in its entirety
Reasonable Compensation for such service under the
standards set forth in §53.4958-4(b) of the Treasury
Regulations.

3. As part of the process, the Board shall retain an
Independent Valuation Expert to consult with and to advise
the Board regarding Director compensation arrangements
and to issue to the Board a Reasoned Written Opinion from

such expert regarding the ranges of Reasonable Compensation for any such services by a Director. The expert's opinion shall address all relevant factors affecting the level of compensation to be paid a Director, including offices held on the Board, attendance at Board and Committee meetings, the nature of service on the Board and on Board Committees, and appropriate data as to comparability regarding director compensation arrangements for U.S.-based, nonprofit, tax-exempt organizations possessing a global employee base.

4. After having reviewed the expert's written opinion, the Board shall meet with the expert to discuss the expert's opinion and to ask questions of the expert regarding the expert's opinion, the comparability data obtained and relied upon, and the conclusions reached by the expert.

5. The Board shall adequately document the basis for any determination the Board makes regarding a Director compensation arrangement concurrently with making that determination.

6. In addition to authorizing payment of compensation for services as Directors as set forth in this Section 22, the Board may also authorize the reimbursement of actual and necessary reasonable expenses incurred by any Director and by non-voting liaisons performing their duties as Directors or non-voting liaisons.

7. As used in this Section 22, the following terms shall have the following meanings:

(a) An "Independent Valuation Expert" means a person retained by ICANN to value compensation arrangements that: (i) holds itself out to the public as a compensation consultant; (ii) performs valuations regarding compensation arrangements on a regular basis, with a majority of its compensation consulting services performed for persons other than ICANN; (iii) is qualified to make valuations of the type of services involved in any engagement by and for ICANN; (iv) issues to ICANN a Reasoned Written Opinion regarding a particular compensation arrangement; and (v) includes in its Reasoned Written Opinion a certification that

it meets the requirements set forth in (i) through (iv) of this definition.

(b) A "Reasoned Written Opinion" means a written opinion of a valuation expert who meets the requirements of subparagraph 7(a) (i) through (iv) of this Section. To be reasoned, the opinion must be based upon a full disclosure by ICANN to the valuation expert of the factual situation regarding the compensation arrangement that is the subject of the opinion, the opinion must articulate the applicable valuation standards relevant in valuing such compensation arrangement, and the opinion must apply those standards to such compensation arrangement, and the opinion must arrive at a conclusion regarding the whether the compensation arrangement is within the range of Reasonable Compensation for the services covered by the arrangement. A written opinion is reasoned even though it reaches a conclusion that is subsequently determined to be incorrect so long as the opinion addresses itself to the facts and the applicable standards. However, a written opinion is not reasoned if it does nothing more than recite the facts and express a conclusion.

(c) "Reasonable Compensation" shall have the meaning set forth in §53.4958-4(b)(1)(ii) of the Regulations issued under §4958 of the Code.

### Section 23. PRESUMPTION OF ASSENT

A Director present at a Board meeting at which action on any corporate matter is taken shall be presumed to have assented to the action taken unless his or her dissent or abstention is entered in the minutes of the meeting, or unless such Director files a written dissent or abstention to such action with the person acting as the secretary of the meeting before the adjournment thereof, or forwards such dissent or abstention by registered mail to the Secretary of ICANN immediately after the adjournment of the meeting. Such right to dissent or abstain shall not apply to a Director who voted in favor of such action.

## ARTICLE VII: NOMINATING COMMITTEE

**Section 1. DESCRIPTION**

There shall be a Nominating Committee of ICANN, responsible for the selection of all ICANN Directors except the President and those Directors selected by ICANN's Supporting Organizations, and for such other selections as are set forth in these Bylaws.

**Section 2. COMPOSITION**

The Nominating Committee shall be composed of the following persons:

>    1. A non-voting Chair, appointed by the ICANN Board;

>    2. A non-voting Chair-Elect, appointed by the ICANN Board as a non-voting advisor;

>    3. A non-voting liaison appointed by the ICANN Root Server System Advisory Committee established by Article XI of these Bylaws;

>    4. A non-voting liaison appointed by the ICANN Security and Stability Advisory Committee established by Article XI of these Bylaws;

>    5. A non-voting liaison appointed by the Governmental Advisory Committee;

>    6. Subject to the provisions of the Transition Article of these Bylaws, five voting delegates selected by the At-Large Advisory Committee established by Article XI of these Bylaws;

>    7. Voting delegates to the Nominating Committee shall be selected from the Generic Names Supporting Organization, established by Article X of these Bylaws, as follows:

>>        a. One delegate from the Registries Stakeholder Group;

>>        b. One delegate from the Registrars Stakeholder Group;

>>        c. Two delegates from the Business Constituency, one representing small business users and one representing large business users;

d. One delegate from the Internet Service Providers Constituency;

e. One delegate from the Intellectual Property Constituency; and

f. One delegate from consumer and civil society groups, selected by the Non-Commercial Users Constituency.

8. One voting delegate each selected by the following entities:

a. The Council of the Country Code Names Supporting Organization established by Article IX of these Bylaws;

b. The Council of the Address Supporting Organization established by Article VIII of these Bylaws; and

c. The Internet Engineering Task Force.

9. A non-voting Associate Chair, who may be appointed by the Chair, at his or her sole discretion, to serve during all or part of the term of the Chair. The Associate Chair may not be a person who is otherwise a member of the same Nominating Committee. The Associate Chair shall assist the Chair in carrying out the duties of the Chair, but shall not serve, temporarily or otherwise, in the place of the Chair.

**Section 3. TERMS**

Subject to the provisions of the Transition Article of these Bylaws:

1. Each voting delegate shall serve a one-year term. A delegate may serve at most two successive one-year terms, after which at least two years must elapse before the individual is eligible to serve another term.

2. The regular term of each voting delegate shall begin at the conclusion of an ICANN annual meeting and shall end at the conclusion of the immediately following ICANN annual meeting.

3. Non-voting liaisons shall serve during the term designated by the entity that appoints them. The Chair, the Chair-Elect, and any Associate Chair shall serve as such until the conclusion of the next ICANN annual meeting.

4. It is anticipated that upon the conclusion of the term of the Chair-Elect, the Chair-Elect will be appointed by the Board to the position of Chair. However, the Board retains the discretion to appoint any other person to the position of Chair. At the time of appointing a Chair-Elect, if the Board determines that the person identified to serve as Chair shall be appointed as Chair for a successive term, the Chair-Elect position shall remain vacant for the term designated by the Board.

5. Vacancies in the positions of delegate, non-voting liaison, Chair or Chair-Elect shall be filled by the entity entitled to select the delegate, non-voting liaison, Chair or Chair-Elect involved. For any term that the Chair-Elect position is vacant pursuant to paragraph 4 of this Article, or until any other vacancy in the position of Chair-Elect can be filled, a non-voting advisor to the Chair may be appointed by the Board from among persons with prior service on the Board or a Nominating Committee, including the immediately previous Chair of the Nominating Committee. A vacancy in the position of Associate Chair may be filled by the Chair in accordance with the criteria established by Section 2(9) of this Article.

6. The existence of any vacancies shall not affect the obligation of the Nominating Committee to carry out the responsibilities assigned to it in these Bylaws.

## Section 4. CRITERIA FOR SELECTION OF NOMINATING COMMITTEE DELEGATES

Delegates to the ICANN Nominating Committee shall be:

1. Accomplished persons of integrity, objectivity, and intelligence, with reputations for sound judgment and open minds, and with experience and competence with collegial large group decision-making;

2. Persons with wide contacts, broad experience in the Internet community, and a commitment to the success of ICANN;

3. Persons whom the selecting body is confident will consult widely and accept input in carrying out their responsibilities;

4. Persons who are neutral and objective, without any fixed personal commitments to particular individuals, organizations, or commercial objectives in carrying out their Nominating Committee responsibilities;

5. Persons with an understanding of ICANN's mission and the potential impact of ICANN's activities on the broader Internet community who are willing to serve as volunteers, without compensation other than the reimbursement of certain expenses; and

6. Persons who are able to work and communicate in written and spoken English.

## Section 5. DIVERSITY

In carrying out its responsibilities to select members of the ICANN Board (and selections to any other ICANN bodies as the Nominating Committee is responsible for under these Bylaws), the Nominating Committee shall take into account the continuing membership of the ICANN Board (and such other bodies), and seek to ensure that the persons selected to fill vacancies on the ICANN Board (and each such other body) shall, to the extent feasible and consistent with the other criteria required to be applied by Section 4 of this Article, make selections guided by Core Value 4 in Article I, Section 2 .

## Section 6. ADMINISTRATIVE AND OPERATIONAL SUPPORT

ICANN shall provide administrative and operational support necessary for the Nominating Committee to carry out its responsibilities.

## Section 7. PROCEDURES

The Nominating Committee shall adopt such operating procedures as it deems necessary, which shall be published on the Website.

## Section 8. INELIGIBILITY FOR SELECTION BY NOMINATING COMMITTEE

No person who serves on the Nominating Committee in any capacity shall be eligible for selection by any means to any position on the Board or any other ICANN body having one or more membership

positions that the Nominating Committee is responsible for filling, until the conclusion of an ICANN annual meeting that coincides with, or is after, the conclusion of that person's service on the Nominating Committee.

**Section 9. INELIGIBILITY FOR SERVICE ON NOMINATING COMMITTEE**

No person who is an employee of or paid consultant to ICANN (including the Ombudsman) shall simultaneously serve in any of the Nominating Committee positions described in Section 2 of this Article.

# ARTICLE VIII: ADDRESS SUPPORTING ORGANIZATION

**Section 1. DESCRIPTION**

1. The Address Supporting Organization (ASO) shall advise the Board with respect to policy issues relating to the operation, assignment, and management of Internet addresses.

2. The ASO shall be the entity established by the Memorandum of Understanding entered on 21 October 2004 between ICANN and the Number Resource Organization (NRO), an organization of the existing regional Internet registries (RIRs).

**Section 2. ADDRESS COUNCIL**

1. The ASO shall have an Address Council, consisting of the members of the NRO Number Council.

2. The Address Council shall select Directors to those seats on the Board designated to be filled by the ASO.

# ARTICLE IX: COUNTRY-CODE NAMES SUPPORTING ORGANIZATION

**Section 1. DESCRIPTION**

There shall be a policy-development body known as the Country-Code Names Supporting Organization (ccNSO), which shall be responsible for:

1. developing and recommending to the Board global policies relating to country-code top-level domains;

2. Nurturing consensus across the ccNSO's community, including the name-related activities of ccTLDs; and

3. Coordinating with other ICANN Supporting Organizations, committees, and constituencies under ICANN.

Policies that apply to ccNSO members by virtue of their membership are only those policies developed according to section 4.10 and 4.11 of this Article. However, the ccNSO may also engage in other activities authorized by its members. Adherence to the results of these activities will be voluntary and such activities may include: seeking to develop voluntary best practices for ccTLD managers, assisting in skills building within the global community of ccTLD managers, and enhancing operational and technical cooperation among ccTLD managers.

## Section 2. ORGANIZATION

The ccNSO shall consist of (i) ccTLD managers that have agreed in writing to be members of the ccNSO (see Section 4(2) of this Article) and (ii) a ccNSO Council responsible for managing the policy-development process of the ccNSO.

## Section 3. ccNSO COUNCIL

1. The ccNSO Council shall consist of (a) three ccNSO Council members selected by the ccNSO members within each of ICANN's Geographic Regions in the manner described in Section 4(7) through (9) of this Article; (b) three ccNSO Council members selected by the ICANN Nominating Committee; (c) liaisons as described in paragraph 2 of this Section; and (iv) observers as described in paragraph 3 of this Section.

2. There shall also be one liaison to the ccNSO Council from each of the following organizations, to the extent they choose to appoint such a liaison: (a) the Governmental Advisory Committee; (b) the At-Large Advisory Committee; and (c) each of the Regional Organizations described in Section 5 of this Article. These liaisons shall not be members of or entitled to vote on the ccNSO Council, but otherwise shall be entitled to participate on equal footing

with members of the ccNSO Council. Appointments of liaisons shall be made by providing written notice to the ICANN Secretary, with a notification copy to the ccNSO Council Chair, and shall be for the term designated by the appointing organization as stated in the written notice. The appointing organization may recall from office or replace its liaison at any time by providing written notice of the recall or replacement to the ICANN Secretary, with a notification copy to the ccNSO Council Chair.

3. The ccNSO Council may agree with the Council of any other ICANN Supporting Organization to exchange observers. Such observers shall not be members of or entitled to vote on the ccNSO Council, but otherwise shall be entitled to participate on equal footing with members of the ccNSO Council. The appointing Council may designate its observer (or revoke or change the designation of its observer) on the ccNSO Council at any time by providing written notice to the ICANN Secretary, with a notification copy to the ccNSO Council Chair.

4. Subject to the provisions of the Transition Article of these Bylaws: (a) the regular term of each ccNSO Council member shall begin at the conclusion of an ICANN annual meeting and shall end at the conclusion of the third ICANN annual meeting thereafter; (b) the regular terms of the three ccNSO Council members selected by the ccNSO members within each ICANN Geographic Region shall be staggered so that one member's term begins in a year divisible by three, a second member's term begins in the first year following a year divisible by three, and the third member's term begins in the second year following a year divisible by three; and (c) the regular terms of the three ccNSO Council members selected by the Nominating Committee shall be staggered in the same manner. Each ccNSO Council member shall hold office during his or her regular term and until a successor has been selected and qualified or until that member resigns or is removed in accordance with these Bylaws.

5. A ccNSO Council member may resign at any time by giving written notice to the ICANN Secretary, with a notification copy to the ccNSO Council Chair.

6. ccNSO Council members may be removed for not attending three consecutive meetings of the ccNSO Council

without sufficient cause or for grossly inappropriate behavior, both as determined by at least a 66% vote of all of the members of the ccNSO Council.

7. A vacancy on the ccNSO Council shall be deemed to exist in the case of the death, resignation, or removal of any ccNSO Council member. Vacancies in the positions of the three members selected by the Nominating Committee shall be filled for the unexpired term involved by the Nominating Committee giving the ICANN Secretary written notice of its selection, with a notification copy to the ccNSO Council Chair. Vacancies in the positions of the ccNSO Council members selected by ccNSO members shall be filled for the unexpired term by the procedure described in Section 4(7) through (9) of this Article.

8. The role of the ccNSO Council is to administer and coordinate the affairs of the ccNSO (including coordinating meetings, including an annual meeting, of ccNSO members as described in Section 4(6) of this Article) and to manage the development of policy recommendations in accordance with Section 6 of this Article. The ccNSO Council shall also undertake such other roles as the members of the ccNSO shall decide from time to time.

9. The ccNSO Council shall make selections to fill Seats 11 and 12 on the Board by written ballot or by action at a meeting; any such selection must have affirmative votes of a majority of all the members of the ccNSO Council then in office. Notification of the ccNSO Council's selections shall be given by the ccNSO Council Chair in writing to the ICANN Secretary, consistent with Article VI, Sections 8(4) and 12(1).

10. The ccNSO Council shall select from among its members the ccNSO Council Chair and such Vice Chair(s) as it deems appropriate. Selections of the ccNSO Council Chair and Vice Chair(s) shall be by written ballot or by action at a meeting; any such selection must have affirmative votes of a majority of all the members of the ccNSO Council then in office. The term of office of the ccNSO Council Chair and any Vice Chair(s) shall be as specified by the ccNSO Council at or before the time the selection is made. The ccNSO Council Chair or any Vice Chair(s) may be recalled from office by the same procedure as used for selection.

11. The ccNSO Council, subject to direction by the ccNSO members, shall adopt such rules and procedures for the ccNSO as it deems necessary, provided they are consistent with these Bylaws. Rules for ccNSO membership and operating procedures adopted by the ccNSO Council shall be published on the Website.

12. Except as provided by paragraphs 9 and 10 of this Section, the ccNSO Council shall act at meetings. The ccNSO Council shall meet regularly on a schedule it determines, but not fewer than four times each calendar year. At the discretion of the ccNSO Council, meetings may be held in person or by other means, provided that all ccNSO Council members are permitted to participate by at least one means described in paragraph 14 of this Section. Except where determined by a majority vote of the members of the ccNSO Council present that a closed session is appropriate, physical meetings shall be open to attendance by all interested persons. To the extent practicable, ccNSO Council meetings should be held in conjunction with meetings of the Board, or of one or more of ICANN's other Supporting Organizations.

13. Notice of time and place (and information about means of participation other than personal attendance) of all meetings of the ccNSO Council shall be provided to each ccNSO Council member, liaison, and observer by e-mail, telephone, facsimile, or a paper notice delivered personally or by postal mail. In case the notice is sent by postal mail, it shall be sent at least 21 days before the day of the meeting. In case the notice is delivered personally or by telephone, facsimile, or e-mail it shall be provided at least seven days before the day of the meeting. At least seven days in advance of each ccNSO Council meeting (or if not practicable, as far in advance as is practicable), a notice of such meeting and, to the extent known, an agenda for the meeting shall be posted.

14. Members of the ccNSO Council may participate in a meeting of the ccNSO Council through personal attendance or use of electronic communication (such as telephone or video conference), provided that (a) all ccNSO Council members participating in the meeting can speak to and hear one another, (b) all ccNSO Council members participating in the meeting are provided the means of fully participating in all matters before the ccNSO Council, and

(c) there is a reasonable means of verifying the identity of ccNSO Council members participating in the meeting and their votes. A majority of the ccNSO Council members (i.e. those entitled to vote) then in office shall constitute a quorum for the transaction of business, and actions by a majority vote of the ccNSO Council members present at any meeting at which there is a quorum shall be actions of the ccNSO Council, unless otherwise provided in these Bylaws. The ccNSO Council shall transmit minutes of its meetings to the ICANN Secretary, who shall cause those minutes to be posted to the Website as soon as practicable following the meeting, and no later than 21 days following the meeting.

## Section 4. MEMBERSHIP

1. The ccNSO shall have a membership consisting of ccTLD managers. Any ccTLD manager that meets the membership qualifications stated in paragraph 2 of this Section shall be entitled to be members of the ccNSO. For purposes of this Article, a ccTLD manager is the organization or entity responsible for managing an ISO 3166 country-code top-level domain and referred to in the IANA database under the current heading of "Sponsoring Organization", or under any later variant, for that country-code top-level domain.

2. Any ccTLD manager may become a ccNSO member by submitting an application to a person designated by the ccNSO Council to receive applications. Subject to the provisions of the Transition Article of these Bylaws, the application shall be in writing in a form designated by the ccNSO Council. The application shall include the ccTLD manager's recognition of the role of the ccNSO within the ICANN structure as well as the ccTLD manager's agreement, for the duration of its membership in the ccNSO, (a) to adhere to rules of the ccNSO, including membership rules, (b) to abide by policies developed and recommended by the ccNSO and adopted by the Board in the manner described by paragraphs 10 and 11 of this Section, and (c) to pay ccNSO membership fees established by the ccNSO Council under Section 7(3) of this Article. A ccNSO member may resign from membership at any time by giving written notice to a person designated by the ccNSO Council to receive notices of resignation. Upon resignation the ccTLD manager ceases

to agree to (a) adhere to rules of the ccNSO, including membership rules, (b) to abide by policies developed and recommended by the ccNSO and adopted by the Board in the manner described by paragraphs 10 and 11 of this Section, and (c) to pay ccNSO membership fees established by the ccNSO Council under Section 7(3) of this Article. In the absence of designation by the ccNSO Council of a person to receive applications and notices of resignation, they shall be sent to the ICANN Secretary, who shall notify the ccNSO Council of receipt of any such applications and notices.

3. Neither membership in the ccNSO nor membership in any Regional Organization described in Section 5 of this Article shall be a condition for access to or registration in the IANA database. Any individual relationship a ccTLD manager has with ICANN or the ccTLD manager's receipt of IANA services is not in any way contingent upon membership in the ccNSO.

4. The Geographic Regions of ccTLDs shall be as described in Article VI, Section 5 of these Bylaws. For purposes of this Article, managers of ccTLDs within a Geographic Region that are members of the ccNSO are referred to as ccNSO members "within" the Geographic Region, regardless of the physical location of the ccTLD manager. In cases where the Geographic Region of a ccNSO member is unclear, the ccTLD member should self-select according to procedures adopted by the ccNSO Council.

5. Each ccTLD manager may designate in writing a person, organization, or entity to represent the ccTLD manager. In the absence of such a designation, the ccTLD manager shall be represented by the person, organization, or entity listed as the administrative contact in the IANA database.

6. There shall be an annual meeting of ccNSO members, which shall be coordinated by the ccNSO Council. Annual meetings should be open for all to attend, and a reasonable opportunity shall be provided for ccTLD managers that are not members of the ccNSO as well as other non-members of the ccNSO to address the meeting. To the extent practicable, annual meetings of the ccNSO members shall be held in person and should be held in conjunction with

meetings of the Board, or of one or more of ICANN's other Supporting Organizations.

7. The ccNSO Council members selected by the ccNSO members from each Geographic Region (see Section 3(1) (a) of this Article) shall be selected through nomination, and if necessary election, by the ccNSO members within that Geographic Region. At least 90 days before the end of the regular term of any ccNSO-member-selected member of the ccNSO Council, or upon the occurrence of a vacancy in the seat of such a ccNSO Council member, the ccNSO Council shall establish a nomination and election schedule, which shall be sent to all ccNSO members within the Geographic Region and posted on the Website.

8. Any ccNSO member may nominate an individual to serve as a ccNSO Council member representing the ccNSO member's Geographic Region. Nominations must be seconded by another ccNSO member from the same Geographic Region. By accepting their nomination, individuals nominated to the ccNSO Council agree to support the policies committed to by ccNSO members.

9. If at the close of nominations there are no more candidates nominated (with seconds and acceptances) in a particular Geographic Region than there are seats on the ccNSO Council available for that Geographic Region, then the nominated candidates shall be selected to serve on the ccNSO Council. Otherwise, an election by written ballot (which may be by e-mail) shall be held to select the ccNSO Council members from among those nominated (with seconds and acceptances), with ccNSO members from the Geographic Region being entitled to vote in the election through their designated representatives. In such an election, a majority of all ccNSO members in the Geographic Region entitled to vote shall constitute a quorum, and the selected candidate must receive the votes of a majority of those cast by ccNSO members within the Geographic Region. The ccNSO Council Chair shall provide the ICANN Secretary prompt written notice of the selection of ccNSO Council members under this paragraph.

10. Subject to clause 4(11), ICANN policies shall apply to ccNSO members by virtue of their membership to the extent, and only to the extent, that the policies (a) only address issues that are within scope of the ccNSO

according to Article IX, Section 6 and Annex C; (b) have been developed through the ccPDP as described in Section 6 of this Article, and (c) have been recommended as such by the ccNSO to the Board, and (d) are adopted by the Board as policies, provided that such policies do not conflict with the law applicable to the ccTLD manager which shall, at all times, remain paramount. In addition, such policies shall apply to ICANN in its activities concerning ccTLDs.

11. A ccNSO member shall not be bound if it provides a declaration to the ccNSO Council stating that (a) implementation of the policy would require the member to breach custom, religion, or public policy (not embodied in the applicable law described in paragraph 10 of this Section), and (b) failure to implement the policy would not impair DNS operations or interoperability, giving detailed reasons supporting its statements. After investigation, the ccNSO Council will provide a response to the ccNSO member's declaration. If there is a ccNSO Council consensus disagreeing with the declaration, which may be demonstrated by a vote of 14 or more members of the ccNSO Council, the response shall state the ccNSO Council's disagreement with the declaration and the reasons for disagreement. Otherwise, the response shall state the ccNSO Council's agreement with the declaration. If the ccNSO Council disagrees, the ccNSO Council shall review the situation after a six-month period. At the end of that period, the ccNSO Council shall make findings as to (a) whether the ccNSO members' implementation of the policy would require the member to breach custom, religion, or public policy (not embodied in the applicable law described in paragraph 10 of this Section) and (b) whether failure to implement the policy would impair DNS operations or interoperability. In making any findings disagreeing with the declaration, the ccNSO Council shall proceed by consensus, which may be demonstrated by a vote of 14 or more members of the ccNSO Council.

## Section 5. REGIONAL ORGANIZATIONS

The ccNSO Council may designate a Regional Organization for each ICANN Geographic Region, provided that the Regional Organization is open to full membership by all ccNSO members within the Geographic Region. Decisions to designate or de-designate a Regional Organization shall require a 66% vote of all of the members of the

ccNSO Council and shall be subject to review according to procedures established by the Board.

**Section 6. ccNSO POLICY-DEVELOPMENT PROCESS AND SCOPE**

1. The scope of the ccNSO's policy-development role shall be as stated in Annex C to these Bylaws; any modifications to the scope shall be recommended to the Board by the ccNSO by use of the procedures of the ccPDP, and shall be subject to approval by the Board.

2. In developing global policies within the scope of the ccNSO and recommending them to the Board, the ccNSO shall follow the ccNSO Policy-Development Process (ccPDP). The ccPDP shall be as stated in Annex B to these Bylaws; modifications shall be recommended to the Board by the ccNSO by use of the procedures of the ccPDP, and shall be subject to approval by the Board.

**Section 7. STAFF SUPPORT AND FUNDING**

1. Upon request of the ccNSO Council, a member of the ICANN staff may be assigned to support the ccNSO and shall be designated as the ccNSO Staff Manager. Alternatively, the ccNSO Council may designate, at ccNSO expense, another person to serve as ccNSO Staff Manager. The work of the ccNSO Staff Manager on substantive matters shall be assigned by the Chair of the ccNSO Council, and may include the duties of ccPDP Issue Manager.

2. Upon request of the ccNSO Council, ICANN shall provide administrative and operational support necessary for the ccNSO to carry out its responsibilities. Such support shall not include an obligation for ICANN to fund travel expenses incurred by ccNSO participants for travel to any meeting of the ccNSO or for any other purpose. The ccNSO Council may make provision, at ccNSO expense, for administrative and operational support in addition or as an alternative to support provided by ICANN.

3. The ccNSO Council shall establish fees to be paid by ccNSO members to defray ccNSO expenses as described in paragraphs 1 and 2 of this Section, as approved by the ccNSO members.

4. Written notices given to the ICANN Secretary under this Article shall be permanently retained, and shall be made available for review by the ccNSO Council on request. The ICANN Secretary shall also maintain the roll of members of the ccNSO, which shall include the name of each ccTLD manager's designated representative, and which shall be posted on the Website.

## ARTICLE X: GENERIC NAMES SUPPORTING ORGANIZATION

### Section 1. DESCRIPTION

There shall be a policy-development body known as the Generic Names Supporting Organization (GNSO), which shall be responsible for developing and recommending to the ICANN Board substantive policies relating to generic top-level domains.

### Section 2. ORGANIZATION

The GNSO shall consist of:

(i) A number of Constituencies, where applicable, organized within the Stakeholder Groups as described in Section 5 of this Article;

(ii) Four Stakeholder Groups organized within Houses as described in Section 5 of this Article;

(iii) Two Houses within the GNSO Council as described in Section 3(8) of this Article; and

(iv) a GNSO Council responsible for managing the policy development process of the GNSO, as described in Section 3 of this Article.

Except as otherwise defined in these Bylaws, the four Stakeholder Groups and the Constituencies will be responsible for defining their own charters with the approval of their members and of the ICANN Board of Directors.

### Section 3. GNSO COUNCIL

1. Subject to the provisions of Transition Article XX, Section 5 of these Bylaws and as described in Section 5 of Article X, the GNSO Council shall consist of:

a. three representatives selected from the Registries Stakeholder Group;

b. three representatives selected from the Registrars Stakeholder Group;

c. six representatives selected from the Commercial Stakeholder Group;

d. six representatives selected from the Non-Commercial Stakeholder Group; and

e. three representatives selected by the ICANN Nominating Committee, one of which shall be non-voting, but otherwise entitled to participate on equal footing with other members of the GNSO Council including, e.g. the making and seconding of motions and of serving as Chair if elected. One Nominating Committee Appointee voting representative shall be assigned to each House (as described in Section 3(8) of this Article) by the Nominating Committee.

No individual representative may hold more than one seat on the GNSO Council at the same time.

Stakeholder Groups should, in their charters, ensure their representation on the GNSO Council is as diverse as possible and practicable, including considerations of geography, GNSO Constituency, sector, ability and gender.

There may also be liaisons to the GNSO Council from other ICANN Supporting Organizations and/or Advisory Committees, from time to time. The appointing organization shall designate, revoke, or change its liaison on the GNSO Council by providing written notice to the Chair of the GNSO Council and to the ICANN Secretary. Liaisons shall not be members of or entitled to vote, to make or second motions, or to serve as an officer on the GNSO Council, but otherwise liaisons shall be entitled to participate on equal footing with members of the GNSO Council.

2. Subject to the provisions of the Transition Article XX, and Section 5 of these Bylaws, the regular term of each GNSO Council member shall begin at the conclusion of an ICANN

annual meeting and shall end at the conclusion of the second ICANN annual meeting thereafter. The regular term of two representatives selected from Stakeholder Groups with three Council seats shall begin in even-numbered years and the regular term of the other representative selected from that Stakeholder Group shall begin in odd-numbered years. The regular term of three representatives selected from Stakeholder Groups with six Council seats shall begin in even-numbered years and the regular term of the other three representatives selected from that Stakeholder Group shall begin in odd-numbered years. The regular term of one of the three members selected by the Nominating Committee shall begin in even-numbered years and the regular term of the other two of the three members selected by the Nominating Committee shall begin in odd-numbered years. Each GNSO Council member shall hold office during his or her regular term and until a successor has been selected and qualified or until that member resigns or is removed in accordance with these Bylaws.

Except in a "special circumstance," such as, but not limited to, meeting geographic or other diversity requirements defined in the Stakeholder Group charters, where no alternative representative is available to serve, no Council member may be selected to serve more than two consecutive terms, in such a special circumstance a Council member may serve one additional term. For these purposes, a person selected to fill a vacancy in a term shall not be deemed to have served that term. A former Council member who has served two consecutive terms must remain out of office for one full term prior to serving any subsequent term as Council member. A "special circumstance" is defined in the GNSO Operating Procedures.

3. A vacancy on the GNSO Council shall be deemed to exist in the case of the death, resignation, or removal of any member. Vacancies shall be filled for the unexpired term by the appropriate Nominating Committee or Stakeholder Group that selected the member holding the position before the vacancy occurred by giving the GNSO Secretariat written notice of its selection. Procedures for handling Stakeholder Group-appointed GNSO Council member vacancies, resignations, and removals are prescribed in the applicable Stakeholder Group Charter.

A GNSO Council member selected by the Nominating Committee may be removed for cause: i) stated by a three-fourths (3/4) vote of all members of the applicable House to which the Nominating Committee appointee is assigned; or ii) stated by a three-fourths (3/4) vote of all members of each House in the case of the non-voting Nominating Committee appointee (see Section 3(8) of this Article). Such removal shall be subject to reversal by the ICANN Board on appeal by the affected GNSO Council member. 4. The GNSO Council is responsible for managing the policy development process of the GNSO. It shall adopt such procedures (the "GNSO Operating Procedures") as it sees fit to carry out that responsibility, provided that such procedures are approved by a majority vote of each House. The GNSO Operating Procedures shall be effective upon the expiration of a twenty-one (21) day public comment period, and shall be subject to Board oversight and review. Until any modifications are recommended by the GNSO Council, the applicable procedures shall be as set forth in Section 6 of this Article.

5. No more than one officer, director or employee of any particular corporation or other organization (including its subsidiaries and affiliates) shall serve on the GNSO Council at any given time.

6. The GNSO shall make selections to fill Seats 13 and 14 on the ICANN Board by written ballot or by action at a meeting. Each of the two voting Houses of the GNSO, as described in Section 3(8) of this Article, shall make a selection to fill one of two ICANN Board seats, as outlined below; any such selection must have affirmative votes compromising sixty percent (60%) of all the respective voting House members:

> a. the Contracted Party House shall select a representative to fill Seat 13; and

> b. the Non-Contracted Party House shall select a representative to fill Seat 14

Election procedures are defined in the GNSO Operating Procedures.

Notification of the Board seat selections shall be given by the GNSO Chair in writing to the ICANN Secretary, consistent with Article VI, Sections 8(4) and 12(1).

7. The GNSO Council shall select the GNSO Chair for a term the GNSO Council specifies, but not longer than one year. Each House (as described in Section 3.8 of this Article) shall select a Vice-Chair, who will be a Vice-Chair of the whole of the GNSO Council, for a term the GNSO Council specifies, but not longer than one year. The procedures for selecting the Chair and any other officers are contained in the GNSO Operating Procedures. In the event that the GNSO Council has not elected a GNSO Chair by the end of the previous Chair's term, the Vice-Chairs will serve as Interim GNSO Co-Chairs until a successful election can be held.

8. Except as otherwise required in these Bylaws, for voting purposes, the GNSO Council (see Section 3(1) of this Article) shall be organized into a bicameral House structure as described below:

> a. the Contracted Parties House includes the Registries Stakeholder Group (three members), the Registrars Stakeholder Group (three members), and one voting member appointed by the ICANN Nominating Committee for a total of seven voting members; and

> b. the Non Contracted Parties House includes the Commercial Stakeholder Group (six members), the Non-Commercial Stakeholder Group (six members), and one voting member appointed by the ICANN Nominating Committee to that House for a total of thirteen voting members.

Except as otherwise specified in these Bylaws, each member of a voting House is entitled to cast one vote in each separate matter before the GNSO Council.

9. Except as otherwise specified in these Bylaws, Annex A hereto, or the GNSO Operating Procedures, the default threshold to pass a GNSO Council motion or other voting action requires a simple majority vote of each House. The voting thresholds described below shall apply to the following GNSO actions:

a. Create an Issues Report: requires an affirmative vote of more than one-fourth (1/4) vote of each House or majority of one House.

b. Initiate a Policy Development Process ("PDP") Within Scope (as described in Annex A): requires an affirmative vote of more than one-third (1/3) of each House or more than two-thirds (2/3) of one House.

c. Initiate a PDP Not Within Scope: requires an affirmative vote of GNSO Supermajority.

d. Approve a PDP Team Charter for a PDP Within Scope: requires an affirmative vote of more than one-third (1/3) of each House or more than two-thirds (2/3) of one House.

e. Approve a PDP Team Charter for a PDP Not Within Scope: requires an affirmative vote of a GNSO Supermajority.

f. Changes to an Approved PDP Team Charter: For any PDP Team Charter approved under d. or e. above, the GNSO Council may approve an amendment to the Charter through a simple majority vote of each House.

g. Terminate a PDP: Once initiated, and prior to the publication of a Final Report, the GNSO Council may terminate a PDP only for significant cause, upon a motion that passes with a GNSO Supermajority Vote in favor of termination.

h. Approve a PDP Recommendation Without a GNSO Supermajority: requires an affirmative vote of a majority of each House and further requires that one GNSO Council member representative of at least 3 of the 4 Stakeholder Groups supports the Recommendation.

i. Approve a PDP Recommendation With a GNSO Supermajority: requires an affirmative vote of a GNSO Supermajority,

j. Approve a PDP Recommendation Imposing New Obligations on Certain Contracting Parties: where an ICANN contract provision specifies that "a two-thirds vote of the council" demonstrates the presence of a consensus, the GNSO Supermajority vote threshold will have to be met or exceeded.

k. Modification of Approved PDP Recommendation: Prior to Final Approval by the ICANN Board, an Approved PDP Recommendation may be modified or amended by the GNSO Council with a GNSO Supermajority vote.

l. A "GNSO Supermajority" shall mean: (a) two-thirds (2/3) of the Council members of each House, or (b) three-fourths (3/4) of one House and a majority of the other House."

## Section 4. STAFF SUPPORT AND FUNDING

1. A member of the ICANN staff shall be assigned to support the GNSO, whose work on substantive matters shall be assigned by the Chair of the GNSO Council, and shall be designated as the GNSO Staff Manager (Staff Manager).

2. ICANN shall provide administrative and operational support necessary for the GNSO to carry out its responsibilities. Such support shall not include an obligation for ICANN to fund travel expenses incurred by GNSO participants for travel to any meeting of the GNSO or for any other purpose. ICANN may, at its discretion, fund travel expenses for GNSO participants under any travel support procedures or guidelines that it may adopt from time to time.

## Section 5. STAKEHOLDER GROUPS

1. The following Stakeholder Groups are hereby recognized as representative of a specific group of one or more Constituencies or interest groups and subject to the provisions of the Transition Article XX, Section 5 of these Bylaws:

a. Registries Stakeholder Group representing all gTLD registries under contract to ICANN;

b. Registrars Stakeholder Group representing all registrars accredited by and under contract to ICANN;

c. Commercial Stakeholder Group representing the full range of large and small commercial entities of the Internet; and

d. Non-Commercial Stakeholder Group representing the full range of non-commercial entities of the Internet.

2. Each Stakeholder Group is assigned a specific number of Council seats in accordance with Section 3(1) of this Article.

3. Each Stakeholder Group identified in paragraph 1 of this Section and each of its associated Constituencies, where applicable, shall maintain recognition with the ICANN Board. Recognition is granted by the Board based upon the extent to which, in fact, the entity represents the global interests of the stakeholder communities it purports to represent and operates to the maximum extent feasible in an open and transparent manner consistent with procedures designed to ensure fairness. Stakeholder Group and Constituency Charters may be reviewed periodically as prescribed by the Board.

4. Any group of individuals or entities may petition the Board for recognition as a new or separate Constituency in the Non-Contracted Parties House. Any such petition shall contain:

a. A detailed explanation of why the addition of such a Constituency will improve the ability of the GNSO to carry out its policy-development responsibilities;

b. A detailed explanation of why the proposed new Constituency adequately represents, on a global basis, the stakeholders it seeks to represent;

c. A recommendation for organizational placement within a particular Stakeholder Group; and

d. A proposed charter that adheres to the principles and procedures contained in these Bylaws.

Any petition for the recognition of a new Constituency and the associated charter shall be posted for public comment.

5. The Board may create new Constituencies as described in Section 5(3) in response to such a petition, or on its own motion, if the Board determines that such action would serve the purposes of ICANN. In the event the Board is considering acting on its own motion it shall post a detailed explanation of why such action is necessary or desirable, set a reasonable time for public comment, and not make a final decision on whether to create such new Constituency until after reviewing all comments received. Whenever the Board posts a petition or recommendation for a new Constituency for public comment, the Board shall notify the GNSO Council and the appropriate Stakeholder Group affected and shall consider any response to that notification prior to taking action.

### Section 6. POLICY DEVELOPMENT PROCESS

The policy-development procedures to be followed by the GNSO shall be as stated in Annex A to these Bylaws. These procedures may be supplemented or revised in the manner stated in Section 3(4) of this Article.

## ARTICLE XI: ADVISORY COMMITTEES

### Section 1. GENERAL

The Board may create one or more Advisory Committees in addition to those set forth in this Article. Advisory Committee membership may consist of Directors only, Directors and non-directors, or non-directors only, and may also include non-voting or alternate members. Advisory Committees shall have no legal authority to act for ICANN, but shall report their findings and recommendations to the Board.

### Section 2. SPECIFIC ADVISORY COMMITTEES

There shall be at least the following Advisory Committees:

1. Governmental Advisory Committee

   a. The Governmental Advisory Committee should consider and provide advice on the activities of ICANN as they relate to concerns of governments, particularly matters where there may be an interaction between ICANN's policies and various laws and international agreements or where they may affect public policy issues.

   b. Membership in the Governmental Advisory Committee shall be open to all national governments. Membership shall also be open to Distinct Economies as recognized in international fora, and multinational governmental organizations and treaty organizations, on the invitation of the Governmental Advisory Committee through its Chair.

   c. The Governmental Advisory Committee may adopt its own charter and internal operating principles or procedures to guide its operations, to be published on the Website.

   d. The chair of the Governmental Advisory Committee shall be elected by the members of the Governmental Advisory Committee pursuant to procedures adopted by such members.

   e. Each member of the Governmental Advisory Committee shall appoint one accredited representative to the Committee. The accredited representative of a member must hold a formal official position with the member's public administration. The term "official" includes a holder of an elected governmental office, or a person who is employed by such government, public authority, or multinational governmental or treaty organization and whose primary function with such government, public authority, or organization is to develop or influence governmental or public policies.

f. The Governmental Advisory Committee shall annually appoint one non-voting liaison to the ICANN Board of Directors, without limitation on reappointment, and shall annually appoint one non-voting liaison to the ICANN Nominating Committee.

g. The Governmental Advisory Committee may designate a non-voting liaison to each of the Supporting Organization Councils and Advisory Committees, to the extent the Governmental Advisory Committee deems it appropriate and useful to do so.

h. The Board shall notify the Chair of the Governmental Advisory Committee in a timely manner of any proposal raising public policy issues on which it or any of ICANN's supporting organizations or advisory committees seeks public comment, and shall take duly into account any timely response to that notification prior to taking action.

i. The Governmental Advisory Committee may put issues to the Board directly, either by way of comment or prior advice, or by way of specifically recommending action or new policy development or revision to existing policies.

j. The advice of the Governmental Advisory Committee on public policy matters shall be duly taken into account, both in the formulation and adoption of policies. In the event that the ICANN Board determines to take an action that is not consistent with the Governmental Advisory Committee advice, it shall so inform the Committee and state the reasons why it decided not to follow that advice. The Governmental Advisory Committee and the ICANN Board will then try, in good faith and in a timely and efficient manner, to find a mutually acceptable solution.

k. If no such solution can be found, the ICANN Board will state in its final decision the reasons why the Governmental Advisory Committee

advice was not followed, and such statement will be without prejudice to the rights or obligations of Governmental Advisory Committee members with regard to public policy issues falling within their responsibilities.

2. Security and Stability Advisory Committee

a. The role of the Security and Stability Advisory Committee ("SSAC") is to advise the ICANN community and Board on matters relating to the security and integrity of the Internet's naming and address allocation systems. It shall have the following responsibilities:

1. To communicate on security matters with the Internet technical community and the operators and managers of critical DNS infrastructure services, to include the root name server operator community, the top-level domain registries and registrars, the operators of the reverse delegation trees such as in-addr.arpa and ip6.arpa, and others as events and developments dictate. The Committee shall gather and articulate requirements to offer to those engaged in technical revision of the protocols related to DNS and address allocation and those engaged in operations planning.

2. To engage in ongoing threat assessment and risk analysis of the Internet naming and address allocation services to assess where the principal threats to stability and security lie, and to advise the ICANN community accordingly. The Committee shall recommend any necessary audit activity to assess the current status of DNS and address allocation security in relation to identified risks and threats.

3. To communicate with those who
have direct responsibility for Internet
naming and address allocation
security matters (IETF, RSSAC,
RIRs, name registries, etc.), to
ensure that its advice on security
risks, issues, and priorities is
properly synchronized with existing
standardization, deployment,
operational, and coordination
activities. The Committee shall
monitor these activities and inform
the ICANN community and Board on
their progress, as appropriate.

4. To report periodically to the Board
on its activities.

5. To make policy recommendations
to the ICANN community and Board.

b. The SSAC's chair and members shall be
appointed by the Board. SSAC membership
appointment shall be for a three-year term,
commencing on 1 January and ending the
second year thereafter on 31 December. The
chair and members may be re-appointed, and
there are no limits to the number of terms the
chair or members may serve. The SSAC chair
may provide recommendations to the Board
regarding appointments to the SSAC. The
SSAC chair shall stagger appointment
recommendations so that approximately one-
third (1/3) of the membership of the SSAC is
considered for appointment or re-appointment
each year. The Board shall also have to power
to remove SSAC appointees as recommended
by or in consultation with the SSAC. (Note: The
first full term under this paragraph shall
commence on 1 January 2011 and end on 31
December 2013. Prior to 1 January 2011, the
SSAC shall be comprised as stated in the
Bylaws as amended 25 June 2010, and the
SSAC chair shall recommend the re-
appointment of all current SSAC members to full

or partial terms as appropriate to implement the provisions of this paragraph.)

c. The SSAC shall annually appoint a non-voting liaison to the ICANN Board according to Section 9 of Article VI.

3. Root Server System Advisory Committee

a. The role of the Root Server System Advisory Committee ("RSSAC") is to advise the ICANN community and Board on matters relating to the operation, administration, security, and integrity of the Internet's Root Server System. It shall have the following responsibilities:

1. Communicate on matters relating to the operation of the Root Servers and their multiple instances with the Internet technical community and the ICANN community. The Committee shall gather and articulate requirements to offer to those engaged in technical revision of the protocols and best common practices related to the operation of DNS servers.

2. Communicate on matters relating to the administration of the Root Zone with those who have direct responsibility for that administration. These matters include the processes and procedures for the production of the Root Zone File.

3. Engage in ongoing threat assessment and risk analysis of the Root Server System and recommend any necessary audit activity to assess the current status of root servers and the root zone.

4. Respond to requests for information or opinions from the ICANN Board of Directors.

5. Report periodically to the Board on its activities.

6. Make policy recommendations to the ICANN community and Board.

b. The RSSAC shall be led by two co-chairs. The RSSAC's chairs and members shall be appointed by the Board.

1. RSSAC membership appointment shall be for a three-year term, commencing on 1 January and ending the second year thereafter on 31 December. Members may be re-appointed, and there are no limits to the number of terms the members may serve. The RSSAC chairs shall provide recommendations to the Board regarding appointments to the RSSAC. If the board declines to appoint a person nominated by the RSSAC then it will provide the rationale for its decision. The RSSAC chairs shall stagger appointment recommendations so that approximately one-third (1/3) of the membership of the RSSAC is considered for appointment or re-appointment each year. The Board shall also have to power to remove RSSAC appointees as recommended by or in consultation with the RSSAC. (Note: The first term under this paragraph shall commence on 1 July 2013 and end on 31 December 2015, and shall be considered a full term for all purposes. All other full terms under this paragraph shall begin on 1 January of the corresponding year. Prior to 1 July 2013, the RSSAC shall be comprised as stated in the Bylaws as amended 16 March 2012, and the RSSAC chairs shall recommend the re-appointment of all

current RSSAC members to full or partial terms as appropriate to implement the provisions of this paragraph.)

2. The RSSAC shall recommend the appointment of the chairs to the board following a nomination process that it devises and documents.

c. The RSSAC shall annually appoint a non-voting liaison to the ICANN Board according to Section 9 of Article VI.

4. At-Large Advisory Committee

a. The At-Large Advisory Committee (ALAC) is the primary organizational home within ICANN for individual Internet users. The role of the ALAC shall be to consider and provide advice on the activities of ICANN, insofar as they relate to the interests of individual Internet users. This includes policies created through ICANN's Supporting Organizations, as well as the many other issues for which community input and advice is appropriate. The ALAC, which plays an important role in ICANN's accountability mechanisms, also coordinates some of ICANN's outreach to individual Internet users.

b. The ALAC shall consist of (i) two members selected by each of the Regional At-Large Organizations ("RALOs") established according to paragraph 4(g) of this Section, and (ii) five members selected by the Nominating Committee. The five members selected by the Nominating Committee shall include one citizen of a country within each of the five Geographic Regions established according to Section 5 of Article VI.

c. Subject to the provisions of the Transition Article of these Bylaws, the regular terms of members of the ALAC shall be as follows:

1. The term of one member selected by each RALO shall begin at the conclusion of an ICANN annual meeting in an even-numbered year.

2. The term of the other member selected by each RALO shall begin at the conclusion of an ICANN annual meeting in an odd-numbered year.

3. The terms of three of the members selected by the Nominating Committee shall begin at the conclusion of an annual meeting in an odd-numbered year and the terms of the other two members selected by the Nominating Committee shall begin at the conclusion of an annual meeting in an even-numbered year.

4. The regular term of each member shall end at the conclusion of the second ICANN annual meeting after the term began.

d. The Chair of the ALAC shall be elected by the members of the ALAC pursuant to procedures adopted by the Committee.

e. The ALAC shall, after consultation with each RALO, annually appoint five voting delegates (no two of whom shall be citizens of countries in the same Geographic Region, as defined according to Section 5 of Article VI) to the Nominating Committee.

f. Subject to the provisions of the Transition Article of these Bylaws, the At-Large Advisory Committee may designate non-voting liaisons to each of the ccNSO Council and the GNSO Council.

g. There shall be one RALO for each Geographic Region established according to

Section 5 of Article VI. Each RALO shall serve as the main forum and coordination point for public input to ICANN in its Geographic Region and shall be a non-profit organization certified by ICANN according to criteria and standards established by the Board based on recommendations of the At-Large Advisory Committee. An organization shall become the recognized RALO for its Geographic Region upon entering a Memorandum of Understanding with ICANN addressing the respective roles and responsibilities of ICANN and the RALO regarding the process for selecting ALAC members and requirements of openness, participatory opportunities, transparency, accountability, and diversity in the RALO's structure and procedures, as well as criteria and standards for the RALO's constituent At-Large Structures.

h. Each RALO shall be comprised of self-supporting At-Large Structures within its Geographic Region that have been certified to meet the requirements of the RALO's Memorandum of Understanding with ICANN according to paragraph 4(i) of this Section. If so provided by its Memorandum of Understanding with ICANN, a RALO may also include individual Internet users who are citizens or residents of countries within the RALO's Geographic Region.

i. Membership in the At-Large Community

1. The criteria and standards for the certification of At-Large Structures within each Geographic Region shall be established by the Board based on recommendations from the ALAC and shall be stated in the Memorandum of Understanding between ICANN and the RALO for each Geographic Region.
2. The criteria and standards for the certification of At-Large Structures shall be established in such a way that participation by individual Internet users

who are citizens or residents of countries within the Geographic Region (as defined in Section 5 of Article VI) of the RALO will predominate in the operation of each At-Large Structure within the RALO, while not necessarily excluding additional participation, compatible with the interests of the individual Internet users within the region, by others.

3. Each RALO's Memorandum of Understanding shall also include provisions designed to allow, to the greatest extent possible, every individual Internet user who is a citizen of a country within the RALO's Geographic Region to participate in at least one of the RALO's At-Large Structures.

4. To the extent compatible with these objectives, the criteria and standards should also afford to each RALO the type of structure that best fits the customs and character of its Geographic Region.

5. Once the criteria and standards have been established as provided in this Clause i, the ALAC, with the advice and participation of the RALO where the applicant is based, shall be responsible for certifying organizations as meeting the criteria and standards for At-Large Structure accreditation.

6. Decisions to certify or decertify an At-Large Structure shall be made as decided by the ALAC in its Rules of Procedure, save always that any changes made to the Rules of Procedure in respect of ALS applications shall be subject to review by the RALOs and by the ICANN Board.

7. Decisions as to whether to accredit, not to accredit, or disaccredit an At-Large Structure shall be subject to review according to procedures established by the Board.

8. On an ongoing basis, the ALAC may also give advice as to whether a prospective At-Large Structure meets the applicable criteria and standards.

j. The ALAC is also responsible, working in conjunction with the RALOs, for coordinating the following activities:

1. Making a selection by the At-Large Community to fill Seat 15 on the Board. Notification of the At-Large Community's selection shall be given by the ALAC Chair in writing to the ICANN Secretary, consistent with Article VI, Sections 8 (4) and 12(1).

2. Keeping the community of individual Internet users informed about the significant news from ICANN;

3. Distributing (through posting or otherwise) an updated agenda, news about ICANN, and information about items in the ICANN policy-development process;

4. Promoting outreach activities in the community of individual Internet users;

5. Developing and maintaining on-going information and education programs, regarding ICANN and its work;

6. Establishing an outreach strategy about ICANN issues in each RALO's Region;

7. Participating in the ICANN policy development processes and providing input and advice that accurately reflects the views of individual Internet users;

8. Making public, and analyzing, ICANN's proposed policies and its decisions and their (potential) regional impact and (potential) effect on individuals in the region;

9. Offering Internet-based mechanisms that enable discussions among members of At-Large structures; and

10. Establishing mechanisms and processes that enable two-way communication between members of At-Large Structures and those involved in ICANN decision-making, so interested individuals can share their views on pending ICANN issues.

## Section 3. PROCEDURES

Each Advisory Committee shall determine its own rules of procedure and quorum requirements.

## Section 4. TERM OF OFFICE

The chair and each member of a committee shall serve until his or her successor is appointed, or until such committee is sooner terminated, or until he or she is removed, resigns, or otherwise ceases to qualify as a member of the committee.

## Section 5. VACANCIES

Vacancies on any committee shall be filled in the same manner as provided in the case of original appointments.

## Section 6. COMPENSATION

Committee members shall receive no compensation for their services as a member of a committee. The Board may, however, authorize the reimbursement of actual and necessary expenses incurred by committee members, including Directors, performing their duties as committee members.

# ARTICLE XI-A: OTHER ADVISORY MECHANISMS

## Section 1. EXTERNAL EXPERT ADVICE

1. Purpose. The purpose of seeking external expert advice is to allow the policy-development process within ICANN to take advantage of existing expertise that resides in the public or private sector but outside of ICANN. In those cases where there are relevant public bodies with expertise, or where access to private expertise could be helpful, the Board and constituent bodies should be encouraged to seek advice from such expert bodies or individuals.

2. Types of Expert Advisory Panels.

a. On its own initiative or at the suggestion of any ICANN body, the Board may appoint, or authorize the President to appoint, Expert Advisory Panels consisting of public or private sector individuals or entities. If the advice sought from such Panels concerns issues of public policy, the provisions of Section 1(3)(b) of this Article shall apply.

b. In addition, in accordance with Section 1(3) of this Article, the Board may refer issues of public policy pertinent to matters within ICANN's mission to a multinational governmental or treaty organization.

3. Process for Seeking Advice-Public Policy Matters.

a. The Governmental Advisory Committee may at any time recommend that the Board seek advice concerning one or more issues of public policy from an external source, as set out above.

b. In the event that the Board determines, upon such a recommendation or otherwise, that external advice should be sought concerning one or more issues of public policy, the Board shall, as appropriate, consult with the Governmental Advisory Committee regarding the appropriate source from which to seek the advice and the arrangements, including

definition of scope and process, for requesting and obtaining that advice.

c. The Board shall, as appropriate, transmit any request for advice from a multinational governmental or treaty organization, including specific terms of reference, to the Governmental Advisory Committee, with the suggestion that the request be transmitted by the Governmental Advisory Committee to the multinational governmental or treaty organization.

4. Process for Seeking and Advice-Other Matters. Any reference of issues not concerning public policy to an Expert Advisory Panel by the Board or President in accordance with Section 1(2)(a) of this Article shall be made pursuant to terms of reference describing the issues on which input and advice is sought and the procedures and schedule to be followed.

5. Receipt of Expert Advice and its Effect. External advice pursuant to this Section shall be provided in written form. Such advice is advisory and not binding, and is intended to augment the information available to the Board or other ICANN body in carrying out its responsibilities.

6. Opportunity to Comment. The Governmental Advisory Committee, in addition to the Supporting Organizations and other Advisory Committees, shall have an opportunity to comment upon any external advice received prior to any decision by the Board.

## Section 2. TECHNICAL LIAISON GROUP

1. Purpose. The quality of ICANN's work depends on access to complete and authoritative information concerning the technical standards that underlie ICANN's activities. ICANN's relationship to the organizations that produce these standards is therefore particularly important. The Technical Liaison Group (TLG) shall connect the Board with appropriate sources of technical advice on specific matters pertinent to ICANN's activities.

2. TLG Organizations. The TLG shall consist of four organizations: the European Telecommunications Standards Institute (ETSI), the International

Telecommunications Union's Telecommunication Standardization Sector (ITU-T), the World Wide Web Consortium (W3C), and the Internet Architecture Board (IAB).

3. Role. The role of the TLG organizations shall be to channel technical information and guidance to the Board and to other ICANN entities. This role has both a responsive component and an active "watchdog" component, which involve the following responsibilities:

a. In response to a request for information, to connect the Board or other ICANN body with appropriate sources of technical expertise. This component of the TLG role covers circumstances in which ICANN seeks an authoritative answer to a specific technical question. Where information is requested regarding a particular technical standard for which a TLG organization is responsible, that request shall be directed to that TLG organization.

b. As an ongoing "watchdog" activity, to advise the Board of the relevance and progress of technical developments in the areas covered by each organization's scope that could affect Board decisions or other ICANN actions, and to draw attention to global technical standards issues that affect policy development within the scope of ICANN's mission. This component of the TLG role covers circumstances in which ICANN is unaware of a new development, and would therefore otherwise not realize that a question should be asked.

4. TLG Procedures. The TLG shall not have officers or hold meetings, nor shall it provide policy advice to the Board as a committee (although TLG organizations may individually be asked by the Board to do so as the need arises in areas relevant to their individual charters). Neither shall the TLG debate or otherwise coordinate technical issues across the TLG organizations; establish or attempt to establish unified positions; or create or attempt to create additional layers or structures within the TLG for the development of technical standards or for any other purpose.

5. Technical Work with the IETF. The TLG shall have no involvement with the ICANN's work for the Internet Engineering Task Force (IETF), Internet Research Task Force, or the Internet Architecture Board (IAB), as described in the IETF-ICANN Memorandum of Understanding Concerning the Technical Work of the Internet Assigned Numbers Authority ratified by the Board on 10 March 2000.

6. Individual Technical Experts. Each TLG organization shall designate two individual technical experts who are familiar with the technical standards issues that are relevant to ICANN's activities. These 8 experts shall be available as necessary to determine, through an exchange of e-mail messages, where to direct a technical question from ICANN when ICANN does not ask a specific TLG organization directly.

## ARTICLE XII: BOARD AND TEMPORARY COMMITTEES

### Section 1. BOARD COMMITTEES

The Board may establish one or more committees of the Board, which shall continue to exist until otherwise determined by the Board. Only Directors may be appointed to a Committee of the Board. If a person appointed to a Committee of the Board ceases to be a Director, such person shall also cease to be a member of any Committee of the Board. Each Committee of the Board shall consist of two or more Directors. The Board may designate one or more Directors as alternate members of any such committee, who may replace any absent member at any meeting of the committee. Committee members may be removed from a committee at any time by a two-thirds (2/3) majority vote of all members of the Board; provided, however, that any Director or Directors which are the subject of the removal action shall not be entitled to vote on such an action or be counted as a member of the Board when calculating the required two-thirds (2/3) vote; and, provided further, however, that in no event shall a Director be removed from a committee unless such removal is approved by not less than a majority of all members of the Board.

### Section 2. POWERS OF BOARD COMMITTEES

1. The Board may delegate to Committees of the Board all legal authority of the Board except with respect to:

a. The filling of vacancies on the Board or on any committee;

b. The amendment or repeal of Bylaws or the Articles of Incorporation or the adoption of new Bylaws or Articles of Incorporation;

c. The amendment or repeal of any resolution of the Board which by its express terms is not so amendable or repealable;

d. The appointment of committees of the Board or the members thereof;

e. The approval of any self-dealing transaction, as such transactions are defined in Section 5233(a) of the CNPBCL;

f. The approval of the annual budget required by Article XVI; or

g. The compensation of any officer described in Article XIII.

2. The Board shall have the power to prescribe the manner in which proceedings of any Committee of the Board shall be conducted. In the absence of any such prescription, such committee shall have the power to prescribe the manner in which its proceedings shall be conducted. Unless these Bylaws, the Board or such committee shall otherwise provide, the regular and special meetings shall be governed by the provisions of Article VI applicable to meetings and actions of the Board. Each committee shall keep regular minutes of its proceedings and shall report the same to the Board from time to time, as the Board may require.

**Section 3. TEMPORARY COMMITTEES**

The Board may establish such temporary committees as it sees fit, with membership, duties, and responsibilities as set forth in the resolutions or charters adopted by the Board in establishing such committees.

## ARTICLE XIII: OFFICERS

## Section 1. OFFICERS

The officers of ICANN shall be a President (who shall serve as Chief Executive Officer), a Secretary, and a Chief Financial Officer. ICANN may also have, at the discretion of the Board, any additional officers that it deems appropriate. Any person, other than the President, may hold more than one office, except that no member of the Board (other than the President) shall simultaneously serve as an officer of ICANN.

## Section 2. ELECTION OF OFFICERS

The officers of ICANN shall be elected annually by the Board, pursuant to the recommendation of the President or, in the case of the President, of the Chairman of the ICANN Board. Each such officer shall hold his or her office until he or she resigns, is removed, is otherwise disqualified to serve, or his or her successor is elected.

## Section 3. REMOVAL OF OFFICERS

Any Officer may be removed, either with or without cause, by a two-thirds (2/3) majority vote of all the members of the Board. Should any vacancy occur in any office as a result of death, resignation, removal, disqualification, or any other cause, the Board may delegate the powers and duties of such office to any Officer or to any Director until such time as a successor for the office has been elected.

## Section 4. PRESIDENT

The President shall be the Chief Executive Officer (CEO) of ICANN in charge of all of its activities and business. All other officers and staff shall report to the President or his or her delegate, unless stated otherwise in these Bylaws. The President shall serve as an ex officio member of the Board, and shall have all the same rights and privileges of any Board member. The President shall be empowered to call special meetings of the Board as set forth herein, and shall discharge all other duties as may be required by these Bylaws and from time to time may be assigned by the Board.

## Section 5. SECRETARY

The Secretary shall keep or cause to be kept the minutes of the Board in one or more books provided for that purpose, shall see that all notices are duly given in accordance with the provisions of these Bylaws or as required by law, and in general shall perform all duties as from time to time may be prescribed by the President or the Board.

## Section 6. CHIEF FINANCIAL OFFICER

The Chief Financial Officer ("CFO") shall be the chief financial officer of ICANN. If required by the Board, the CFO shall give a bond for the faithful discharge of his or her duties in such form and with such surety or sureties as the Board shall determine. The CFO shall have charge and custody of all the funds of ICANN and shall keep or cause to be kept, in books belonging to ICANN, full and accurate amounts of all receipts and disbursements, and shall deposit all money and other valuable effects in the name of ICANN in such depositories as may be designated for that purpose by the Board. The CFO shall disburse the funds of ICANN as may be ordered by the Board or the President and, whenever requested by them, shall deliver to the Board and the President an account of all his or her transactions as CFO and of the financial condition of ICANN. The CFO shall be responsible for ICANN's financial planning and forecasting and shall assist the President in the preparation of ICANN's annual budget. The CFO shall coordinate and oversee ICANN's funding, including any audits or other reviews of ICANN or its Supporting Organizations. The CFO shall be responsible for all other matters relating to the financial operation of ICANN.

## Section 7. ADDITIONAL OFFICERS

In addition to the officers described above, any additional or assistant officers who are elected or appointed by the Board shall perform such duties as may be assigned to them by the President or the Board.

## Section 8. COMPENSATION AND EXPENSES

The compensation of any Officer of ICANN shall be approved by the Board. Expenses incurred in connection with performance of their officer duties may be reimbursed to Officers upon approval of the President (in the case of Officers other than the President), by another Officer designated by the Board (in the case of the President), or the Board.

## Section 9. CONFLICTS OF INTEREST

The Board, through the Board Governance Committee, shall establish a policy requiring a statement from each Officer not less frequently than once a year setting forth all business and other affiliations that relate in any way to the business and other affiliations of ICANN.

## ARTICLE XIV: INDEMNIFICATION OF DIRECTORS, OFFICERS, EMPLOYEES, AND OTHER AGENTS

ICANN shall, to maximum extent permitted by the CNPBCL, indemnify each of its agents against expenses, judgments, fines, settlements, and other amounts actually and reasonably incurred in connection with any proceeding arising by reason of the fact that any such person is or was an agent of ICANN, provided that the indemnified person's acts were done in good faith and in a manner that the indemnified person reasonably believed to be in ICANN's best interests and not criminal. For purposes of this Article, an "agent" of ICANN includes any person who is or was a Director, Officer, employee, or any other agent of ICANN (including a member of any Supporting Organization, any Advisory Committee, the Nominating Committee, any other ICANN committee, or the Technical Liaison Group) acting within the scope of his or her responsibility; or is or was serving at the request of ICANN as a Director, Officer, employee, or agent of another corporation, partnership, joint venture, trust, or other enterprise. The Board may adopt a resolution authorizing the purchase and maintenance of insurance on behalf of any agent of ICANN against any liability asserted against or incurred by the agent in such capacity or arising out of the agent's status as such, whether or not ICANN would have the power to indemnify the agent against that liability under the provisions of this Article.

## ARTICLE XV: GENERAL PROVISIONS

### Section 1. CONTRACTS

The Board may authorize any Officer or Officers, agent or agents, to enter into any contract or execute or deliver any instrument in the name of and on behalf of ICANN, and such authority may be general or confined to specific instances. In the absence of a contrary Board authorization, contracts and instruments may only be executed by the following Officers: President, any Vice President, or the CFO. Unless authorized or ratified by the Board, no other Officer, agent, or employee shall have any power or authority to bind ICANN or to render it liable for any debts or obligations.

### Section 2. DEPOSITS

All funds of ICANN not otherwise employed shall be deposited from time to time to the credit of ICANN in such banks, trust companies, or other depositories as the Board, or the President under its delegation, may select.

### Section 3. CHECKS

All checks, drafts, or other orders for the payment of money, notes, or other evidences of indebtedness issued in the name of ICANN shall be signed by such Officer or Officers, agent or agents, of ICANN and in such a manner as shall from time to time be determined by resolution of the Board.

### Section 4. LOANS

No loans shall be made by or to ICANN and no evidences of indebtedness shall be issued in its name unless authorized by a resolution of the Board. Such authority may be general or confined to specific instances; provided, however, that no loans shall be made by ICANN to its Directors or Officers.

## ARTICLE XVI: FISCAL MATTERS

### Section 1. ACCOUNTING

The fiscal year end of ICANN shall be determined by the Board.

### Section 2. AUDIT

At the end of the fiscal year, the books of ICANN shall be closed and audited by certified public accountants. The appointment of the fiscal auditors shall be the responsibility of the Board.

### Section 3. ANNUAL REPORT AND ANNUAL STATEMENT

The Board shall publish, at least annually, a report describing its activities, including an audited financial statement and a description of any payments made by ICANN to Directors (including reimbursements of expenses). ICANN shall cause the annual report and the annual statement of certain transactions as required by the CNPBCL to be prepared and sent to each member of the Board and to such other persons as the Board may designate, no later than one hundred twenty (120) days after the close of ICANN's fiscal year.

### Section 4. ANNUAL BUDGET

At least forty-five (45) days prior to the commencement of each fiscal year, the President shall prepare and submit to the Board, a proposed annual budget of ICANN for the next fiscal year, which shall be posted on the Website. The proposed budget shall identify anticipated revenue sources and levels and shall, to the extent practical, identify

anticipated material expense items by line item. The Board shall adopt an annual budget and shall publish the adopted Budget on the Website.

**Section 5. FEES AND CHARGES**

The Board may set fees and charges for the services and benefits provided by ICANN, with the goal of fully recovering the reasonable costs of the operation of ICANN and establishing reasonable reserves for future expenses and contingencies reasonably related to the legitimate activities of ICANN. Such fees and charges shall be fair and equitable, shall be published for public comment prior to adoption, and once adopted shall be published on the Website in a sufficiently detailed manner so as to be readily accessible.

## ARTICLE XVII: MEMBERS

ICANN shall not have members, as defined in the California Nonprofit Public Benefit Corporation Law ("CNPBCL"), notwithstanding the use of the term "Member" in these Bylaws, in any ICANN document, or in any action of the ICANN Board or staff.

## ARTICLE XVIII: OFFICES AND SEAL

### Section 1. OFFICES

The principal office for the transaction of the business of ICANN shall be in the County of Los Angeles, State of California, United States of America. ICANN may also have an additional office or offices within or outside the United States of America as it may from time to time establish.

### Section 2. SEAL

The Board may adopt a corporate seal and use the same by causing it or a facsimile thereof to be impressed or affixed or reproduced or otherwise.

## ARTICLE XIX: AMENDMENTS

Except as otherwise provided in the Articles of Incorporation or these Bylaws, the Articles of Incorporation or Bylaws of ICANN may be altered, amended, or repealed and new Articles of Incorporation or Bylaws adopted only upon action by a two-thirds (2/3) vote of all members of the Board.

## ARTICLE XX: TRANSITION ARTICLE

### Section 1. PURPOSE

This Transition Article sets forth the provisions for the transition from the processes and structures defined by the ICANN Bylaws, as amended and restated on 29 October 1999 and amended through 12 February 2002 (the "Old Bylaws"), to the processes and structures defined by the Bylaws of which this Article is a part (the "New Bylaws"). [Explanatory Note (dated 10 December 2009): For Section 5 (3) of this Article, reference to the Old Bylaws refers to the Bylaws as amended and restated through to 20 March 2009.]

### Section 2. BOARD OF DIRECTORS

1. For the period beginning on the adoption of this Transition Article and ending on the Effective Date and Time of the New Board, as defined in paragraph 5 of this Section 2, the Board of Directors of the Corporation ("Transition Board") shall consist of the members of the Board who would have been Directors under the Old Bylaws immediately after the conclusion of the annual meeting in 2002, except that those At-Large members of the Board under the Old Bylaws who elect to do so by notifying the Secretary of the Board on 15 December 2002 or in writing or by e-mail no later than 23 December 2002 shall also serve as members of the Transition Board. Notwithstanding the provisions of Article VI, Section 12 of the New Bylaws, vacancies on the Transition Board shall not be filled. The Transition Board shall not have liaisons as provided by Article VI, Section 9 of the New Bylaws. The Board Committees existing on the date of adoption of this Transition Article shall continue in existence, subject to any change in Board Committees or their membership that the Transition Board may adopt by resolution.

2. The Transition Board shall elect a Chair and Vice-Chair to serve until the Effective Date and Time of the New Board.

3. The "New Board" is that Board described in Article VI, Section 2(1) of the New Bylaws.

4. Promptly after the adoption of this Transition Article, a Nominating Committee shall be formed including, to the extent feasible, the delegates and liaisons described in

Article VII, Section 2 of the New Bylaws, with terms to end at the conclusion of the ICANN annual meeting in 2003. The Nominating Committee shall proceed without delay to select Directors to fill Seats 1 through 8 on the New Board, with terms to conclude upon the commencement of the first regular terms specified for those Seats in Article VI, Section 8(1)(a)-(c) of the New Bylaws, and shall give the ICANN Secretary written notice of that selection.

5. The Effective Date and Time of the New Board shall be a time, as designated by the Transition Board, during the first regular meeting of ICANN in 2003 that begins not less than seven calendar days after the ICANN Secretary has received written notice of the selection of Directors to fill at least ten of Seats 1 through 14 on the New Board. As of the Effective Date and Time of the New Board, it shall assume from the Transition Board all the rights, duties, and obligations of the ICANN Board of Directors. Subject to Section 4 of this Article, the Directors (Article VI, Section 2 (1)(a)-(d)) and non-voting liaisons (Article VI, Section 9) as to which the ICANN Secretary has received notice of selection shall, along with the President (Article VI, Section 2(1)(e)), be seated upon the Effective Date and Time of the New Board, and thereafter any additional Directors and non -voting liaisons shall be seated upon the ICANN Secretary's receipt of notice of their selection.

6. The New Board shall elect a Chairman and Vice-Chairman as its first order of business. The terms of those Board offices shall expire at the end of the annual meeting in 2003.

7. Committees of the Board in existence as of the Effective Date and Time of the New Board shall continue in existence according to their existing charters, but the terms of all members of those committees shall conclude at the Effective Date and Time of the New Board. Temporary committees in existence as of the Effective Date and Time of the New Board shall continue in existence with their existing charters and membership, subject to any change the New Board may adopt by resolution.

8. In applying the term-limitation provision of Section 8(5) of Article VI, a Director's service on the Board before the Effective Date and Time of the New Board shall count as one term.

## Section 3. ADDRESS SUPPORTING ORGANIZATION

The Address Supporting Organization shall continue in operation according to the provisions of the Memorandum of Understanding originally entered on 18 October 1999 between ICANN and a group of regional Internet registries (RIRs), and amended in October 2000, until a replacement Memorandum of Understanding becomes effective. Promptly after the adoption of this Transition Article, the Address Supporting Organization shall make selections, and give the ICANN Secretary written notice of those selections, of:

> 1. Directors to fill Seats 9 and 10 on the New Board, with terms to conclude upon the commencement of the first regular terms specified for each of those Seats in Article VI, Section 8(1)(d) and (e) of the New Bylaws; and

> 2. the delegate to the Nominating Committee selected by the Council of the Address Supporting Organization, as called for in Article VII, Section 2(8)(f) of the New Bylaws.

With respect to the ICANN Directors that it is entitled to select, and taking into account the need for rapid selection to ensure that the New Board becomes effective as soon as possible, the Address Supporting Organization may select those Directors from among the persons it previously selected as ICANN Directors pursuant to the Old Bylaws. To the extent the Address Supporting Organization does not provide the ICANN Secretary written notice, on or before 31 March 2003, of its selections for Seat 9 and Seat 10, the Address Supporting Organization shall be deemed to have selected for Seat 9 the person it selected as an ICANN Director pursuant to the Old Bylaws for a term beginning in 2001 and for Seat 10 the person it selected as an ICANN Director pursuant to the Old Bylaws for a term beginning in 2002.

## Section 4. COUNTRY-CODE NAMES SUPPORTING ORGANIZATION

> 1. Upon the enrollment of thirty ccTLD managers (with at least four within each Geographic Region) as members of the ccNSO, written notice shall be posted on the Website. As soon as feasible after that notice, the members of the initial ccNSO Council to be selected by the ccNSO members shall be selected according to the procedures stated in Article IX, Section 4(8) and (9). Upon the completion of that selection process, a written notice that the ccNSO Council has been constituted shall be posted on the Website. Three ccNSO Council members shall be

selected by the ccNSO members within each Geographic Region, with one upon to serve a term that ends upon the conclusion of the first ICANN annual meeting after the ccNSO Council is constituted, a second member to serve a term that ends upon the conclusion of the second ICANN annual meeting after the ccNSO Council is constituted, and the third member to serve a term that ends upon the conclusion of the third ICANN annual meeting after the ccNSO Council is constituted. (The definition of "ccTLD manager" stated in Article IX, Section 4(1) and the definitions stated in Article IX, Section 4(4) shall apply within this Section 4 of Article XX.)

2. After the adoption of Article IX of these Bylaws, the Nominating Committee shall select the three members of the ccNSO Council described in Article IX, Section 3(1)(b). In selecting three individuals to serve on the ccNSO Council, the Nominating Committee shall designate one to serve a term that ends upon the conclusion of the first ICANN annual meeting after the ccNSO Council is constituted, a second member to serve a term that ends upon the conclusion of the second ICANN annual meeting after the ccNSO Council is constituted, and the third member to serve a term that ends upon the conclusion of the third ICANN annual meeting after the ccNSO Council is constituted. The three members of the ccNSO Council selected by the Nominating Committee shall not take their seats before the ccNSO Council is constituted.

3. Upon the ccNSO Council being constituted, the At-Large Advisory Committee and the Governmental Advisory Committee may designate one liaison each to the ccNSO Council, as provided by Article IX, Section 3(2)(a) and (b).

4. Upon the ccNSO Council being constituted, the Council may designate Regional Organizations as provided in Article IX, Section 5. Upon its designation, a Regional Organization may appoint a liaison to the ccNSO Council.

5. Until the ccNSO Council is constituted, Seats 11 and 12 on the New Board shall remain vacant. Promptly after the ccNSO Council is constituted, the ccNSO shall, through the ccNSO Council, make selections of Directors to fill Seats 11 and 12 on the New Board, with terms to conclude upon the commencement of the next regular term specified for each of those Seats in Article VI, Section 8(1)(d) and (f) of

the New Bylaws, and shall give the ICANN Secretary written notice of its selections.

6. Until the ccNSO Council is constituted, the delegate to the Nominating Committee established by the New Bylaws designated to be selected by the ccNSO shall be appointed by the Transition Board or New Board, depending on which is in existence at the time any particular appointment is required, after due consultation with members of the ccTLD community. Upon the ccNSO Council being constituted, the delegate to the Nominating Committee appointed by the Transition Board or New Board according to this Section 4 (9) then serving shall remain in office, except that the ccNSO Council may replace that delegate with one of its choosing within three months after the conclusion of ICANN's annual meeting, or in the event of a vacancy. Subsequent appointments of the Nominating Committee delegate described in Article VII, Section 2(8)(c) shall be made by the ccNSO Council.

### Section 5. GENERIC NAMES SUPPORTING ORGANIZATION

1. The Generic Names Supporting Organization ("GNSO"), upon the adoption of this Transition Article, shall continue its operations; however, it shall be restructured into four new Stakeholder Groups which shall represent, organizationally, the former Constituencies of the GNSO, subject to ICANN Board approval of each individual Stakeholder Group Charter:

    a. The gTLD Registries Constituency shall be assigned to the Registries Stakeholder Group;

    b. The Registrars Constituency shall be assigned to the Registrars Stakeholder Group;

    c. The Business Constituency shall be assigned to the Commercial Stakeholder Group;

    d. The Intellectual Property Constituency shall be assigned to the Commercial Stakeholder Group;

    e. The Internet Services Providers Constituency shall be assigned to the Commercial Stakeholder Group; and

f. The Non-Commercial Users Constituency shall be assigned to the Non-Commercial Stakeholder Group.

2. Each GNSO Constituency described in paragraph 1 of this subsection shall continue operating substantially as before and no Constituency official, working group, or other activity shall be changed until further action of the Constituency, provided that each GNSO Constituency described in paragraph 1 (c-f) shall submit to the ICANN Secretary a new or revised Charter inclusive of its operating procedures, adopted according to the Constituency's processes and consistent with these Bylaws Amendments, no later than the ICANN meeting in October 2009, or another date as the Board may designate by resolution.

3. Prior to the commencement of the ICANN meeting in October 2009, or another date the Board may designate by resolution, the GNSO Council shall consist of its current Constituency structure and officers as described in Article X, Section 3(1) of the Bylaws (as amended and restated on 29 October 1999 and amended through 20 March 2009 (the "Old Bylaws")). Thereafter, the composition of the GNSO Council shall be as provided in these Bylaws, as they may be amended from time to time. All committees, task forces, working groups, drafting committees, and similar groups established by the GNSO Council and in existence immediately before the adoption of this Transition Article shall continue in existence with the same charters, membership, and activities, subject to any change by action of the GNSO Council or ICANN Board.

4. Beginning with the commencement of the ICANN Meeting in October 2009, or another date the Board may designate by resolution (the "Effective Date of the Transition"), the GNSO Council seats shall be assigned as follows:

a. The three seats currently assigned to the Registry Constituency shall be reassigned as three seats of the Registries Stakeholder Group;

b. The three seats currently assigned to the Registrar Constituency shall be reassigned as

three seats of the Registrars Stakeholder Group;

c. The three seats currently assigned to each of the Business Constituency, the Intellectual Property Constituency, and the Internet Services Provider Constituency (nine total) shall be decreased to be six seats of the Commercial Stakeholder Group;

d. The three seats currently assigned to the Non-Commercial Users Constituency shall be increased to be six seats of the Non-Commercial Stakeholder Group;

e. The three seats currently selected by the Nominating Committee shall be assigned by the Nominating Committee as follows: one voting member to the Contracted Party House, one voting member to the Non-Contracted Party House, and one non-voting member assigned to the GNSO Council at large.

Representatives on the GNSO Council shall be appointed or elected consistent with the provisions in each applicable Stakeholder Group Charter, approved by the Board, and sufficiently in advance of the October 2009 ICANN Meeting that will permit those representatives to act in their official capacities at the start of said meeting.

5. The GNSO Council, as part of its Restructure Implementation Plan, will document: (a) how vacancies, if any, will be handled during the transition period; (b) for each Stakeholder Group, how each assigned Council seat to take effect at the 2009 ICANN annual meeting will be filled, whether through a continuation of an existing term or a new election or appointment; (c) how it plans to address staggered terms such that the new GNSO Council preserves as much continuity as reasonably possible; and (d) the effect of Bylaws term limits on each Council member.

6. As soon as practical after the commencement of the ICANN meeting in October 2009, or another date the Board may designate by resolution, the GNSO Council shall, in accordance with Article X, Section 3(7) and its GNSO

Operating Procedures, elect officers and give the ICANN Secretary written notice of its selections.

**Section 6. PROTOCOL SUPPORTING ORGANIZATION**

The Protocol Supporting Organization referred to in the Old Bylaws is discontinued.

**Section 7. ADVISORY COMMITTEES AND TECHNICAL LIAISON GROUP**

1. Upon the adoption of the New Bylaws, the Governmental Advisory Committee shall continue in operation according to its existing operating principles and practices, until further action of the committee. The Governmental Advisory Committee may designate liaisons to serve with other ICANN bodies as contemplated by the New Bylaws by providing written notice to the ICANN Secretary. Promptly upon the adoption of this Transition Article, the Governmental Advisory Committee shall notify the ICANN Secretary of the person selected as its delegate to the Nominating Committee, as set forth in Article VII, Section 2 of the New Bylaws.

2. The organizations designated as members of the Technical Liaison Group under Article XI-A, Section 2(2) of the New Bylaws shall each designate the two individual technical experts described in Article XI-A, Section 2(6) of the New Bylaws, by providing written notice to the ICANN Secretary. As soon as feasible, the delegate from the Technical Liaison Group to the Nominating Committee shall be selected according to Article XI-A, Section 2(7) of the New Bylaws.

3. Upon the adoption of the New Bylaws, the Security and Stability Advisory Committee shall continue in operation according to its existing operating principles and practices, until further action of the committee. Promptly upon the adoption of this Transition Article, the Security and Stability Advisory Committee shall notify the ICANN Secretary of the person selected as its delegate to the Nominating Committee, as set forth in Article VII, Section 2(4) of the New Bylaws.

4. Upon the adoption of the New Bylaws, the Root Server System Advisory Committee shall continue in operation

according to its existing operating principles and practices, until further action of the committee. Promptly upon the adoption of this Transition Article, the Root Server Advisory Committee shall notify the ICANN Secretary of the person selected as its delegate to the Nominating Committee, as set forth in Article VII, Section 2(3) of the New Bylaws.

5. At-Large Advisory Committee

a. There shall exist an Interim At-Large Advisory Committee until such time as ICANN recognizes, through the entry of a Memorandum of Understanding, all of the Regional At-Large Organizations (RALOs) identified in Article XI, Section 2(4) of the New Bylaws. The Interim At-Large Advisory Committee shall be composed of (i) ten individuals (two from each ICANN region) selected by the ICANN Board following nominations by the At-Large Organizing Committee and (ii) five additional individuals (one from each ICANN region) selected by the initial Nominating Committee as soon as feasible in accordance with the principles established in Article VII, Section 5 of the New Bylaws. The initial Nominating Committee shall designate two of these individuals to serve terms until the conclusion of the ICANN annual meeting in 2004 and three of these individuals to serve terms until the conclusion of the ICANN annual meeting in 2005.

b. Upon the entry of each RALO into such a Memorandum of Understanding, that entity shall be entitled to select two persons who are citizens and residents of that Region to be members of the At-Large Advisory Committee established by Article XI, Section 2(4) of the New Bylaws. Upon the entity's written notification to the ICANN Secretary of such selections, those persons shall immediately assume the seats held until that notification by the Interim At-Large Advisory Committee members previously selected by the Board from the RALO's region.

c. Upon the seating of persons selected by all five RALOs, the Interim At-Large Advisory Committee shall become the At-Large Advisory Committee, as established by Article XI, Section 2(4) of the New Bylaws. The five individuals selected to the Interim At-Large Advisory Committee by the Nominating Committee shall become members of the At-Large Advisory Committee for the remainder of the terms for which they were selected.

d. Promptly upon its creation, the Interim At-Large Advisory Committee shall notify the ICANN Secretary of the persons selected as its delegates to the Nominating Committee, as set forth in Article VII, Section 2(6) of the New Bylaws.

### Section 8. OFFICERS

ICANN officers (as defined in Article XIII of the New Bylaws) shall be elected by the then-existing Board of ICANN at the annual meeting in 2002 to serve until the annual meeting in 2003.

### Section 9. GROUPS APPOINTED BY THE PRESIDENT

Notwithstanding the adoption or effectiveness of the New Bylaws, task forces and other groups appointed by the ICANN President shall continue unchanged in membership, scope, and operation until changes are made by the President.

### Section 10. CONTRACTS WITH ICANN

Notwithstanding the adoption or effectiveness of the New Bylaws, all agreements, including employment and consulting agreements, entered by ICANN shall continue in effect according to their terms.

---

## Annex A: GNSO Policy Development Process

The following process shall govern the GNSO policy development process ("PDP") until such time as modifications are recommended to and approved by the ICANN Board of Directors ("Board"). The role of the GNSO is outlined in Article X of these Bylaws. If the GNSO is conducting activities that are not intended to result in a Consensus Policy, the Council may act through other processes.

Section 1. **Required Elements of a Policy Development Process**

The following elements are required at a minimum to form Consensus Policies as defined within ICANN contracts, and any other policies for which the GNSO Council requests application of this Annex A:

a. Final Issue Report requested by the Board, the GNSO Council ("Council") or Advisory Committee, which should include at a minimum a) the proposed issue raised for consideration, b) the identity of the party submitting the issue, and c) how that party Is affected by the issue;

b. Formal initiation of the Policy Development Process by the Council;

c. Formation of a Working Group or other designated work method;

d. Initial Report produced by a Working Group or other designated work method;

e. Final Report produced by a Working Group, or other designated work method, and forwarded to the Council for deliberation;

f. Council approval of PDP Recommendations contained in the Final Report, by the required thresholds;

g. PDP Recommendations and Final Report shall be forwarded to the Board through a Recommendations Report approved by the Council]; and

h. Board approval of PDP Recommendations.

Section 2. **Policy Development Process Manual**

The GNSO shall maintain a Policy Development Process Manual (PDP Manual) within the operating procedures of the GNSO maintained by the GNSO Council. The PDP Manual shall contain specific additional guidance on completion of all elements of a PDP, including those elements that are not otherwise defined in these Bylaws. The PDP Manual and any amendments thereto are subject to a twenty-one (21) day public comment period at minimum, as well as Board oversight and review, as specified at Article X, Section 3.6.

Section 3. **Requesting an Issue Report**

*Board Request.* The Board may request an Issue Report by instructing the GNSO Council ("Council") to begin the process outlined the PDP Manual. In the event the Board makes a request for an Issue Report, the Board should provide a mechanism by which the GNSO Council can consult with the Board to provide information on the scope, timing, and priority of the request for an Issue Report.

*Council Request.* The GNSO Council may request an Issue Report by a vote of at least one-fourth (1/4) of the members of the Council of each House or a majority of one House.

*Advisory Committee Request.* An Advisory Committee may raise an issue for policy development by action of such committee to request an Issue Report, and transmission of that request to the Staff Manager and GNSO Council.

Section 4. **Creation of an Issue Report**

Within forty-five (45) calendar days after receipt of either (i) an instruction from the Board; (ii) a properly supported motion from the GNSO Council; or (iii) a properly supported motion from an Advisory Committee, the Staff Manager will create a report (a "Preliminary Issue Report"). In the event the Staff Manager determines that more time is necessary to create the Preliminary Issue Report, the Staff Manager may request an extension of time for completion of the Preliminary Issue Report.

The following elements should be considered in the Issue Report:

     a) The proposed issue raised for consideration;

     b) The identity of the party submitting the request for the Issue Report;

     c) How that party is affected by the issue, if known;

     d) Support for the issue to initiate the PDP, if known;

     e) The opinion of the ICANN General Counsel regarding whether the issue proposed for consideration within the Policy Development Process is properly within the scope of the ICANN's mission, policy process and more specifically the role of the GNSO as set forth in the Bylaws.

     f) The opinion of ICANN Staff as to whether the Council should initiate the PDP on the issue

Upon completion of the Preliminary Issue Report, the Preliminary Issue Report shall be posted on the ICANN website for a public comment period that complies with the designated practice for public comment periods within ICANN.

The Staff Manager is responsible for drafting a summary and analysis of the public comments received on the Preliminary Issue Report and producing a Final Issue Report based upon the comments received. The Staff Manager should forward the Final Issue Report, along with any summary and analysis of the public comments received, to the Chair of the GNSO Council for consideration for initiation of a PDP.

Section 5. **Initiation of the PDP**

The Council may initiate the PDP as follows:

*Board Request*: If the Board requested an Issue Report, the Council, within the timeframe set forth in the PDP Manual, shall initiate a PDP. No vote is required for such action.

*GNSO Council or Advisory Committee Requests*: The Council may only initiate the PDP by a vote of the Council. Initiation of a PDP requires a vote as set forth in Article X, Section 3, paragraph 9(b) and (c) in favor of initiating the PDP.

Section 6. **Reports**

An Initial Report should be delivered to the GNSO Council and posted for a public comment period that complies with the designated practice for public comment periods within ICANN, which time may be extended in accordance with the PDP Manual. Following the review of the comments received and, if required, additional deliberations, a Final Report shall be produced for transmission to the Council.

Section 7. **Council Deliberation**

Upon receipt of a Final Report, whether as the result of a working group or otherwise, the Council chair will (i) distribute the Final Report to all Council members; and (ii) call for Council deliberation on the matter in accordance with the PDP Manual.

The Council approval process is set forth in Article X, Section 3, paragraph 9(d) through (g), as supplemented by the PDP Manual.

Section 8. **Preparation of the Board Report**

If the PDP recommendations contained in the Final Report are approved by the GNSO Council, a Recommendations Report shall be approved by the GNSO Council for delivery to the ICANN Board.

Section 9. **Board Approval Processes**

The Board will meet to discuss the GNSO Council recommendation as soon as feasible, but preferably not later than the second meeting after receipt of the Board Report from the Staff Manager. Board deliberation on the PDP Recommendations contained within the Recommendations Report shall proceed as follows:

> a. Any PDP Recommendations approved by a GNSO Supermajority Vote shall be adopted by the Board unless, by a vote of more than two-thirds (2/3) of the Board, the Board determines that such policy is not in the best interests of the ICANN community or ICANN. If the GNSO Council recommendation was approved by less than a GNSO Supermajority Vote, a majority vote of the Board will be sufficient to determine that such policy is not in the best interests of the ICANN community or ICANN.

> b. In the event that the Board determines, in accordance with paragraph a above, that the policy recommended by a GNSO Supermajority Vote or less than a GNSO Supermajority vote is not in the best interests of the ICANN community or ICANN (the Corporation), the Board shall (i) articulate the reasons for its determination in a report to the Council (the "Board Statement"); and (ii) submit the Board Statement to the Council.

> c. The Council shall review the Board Statement for discussion with the Board as soon as feasible after the Council's receipt of the Board Statement. The Board shall determine the method (e.g., by teleconference, e-mail, or otherwise) by which the Council and Board will discuss the Board Statement.

> d. At the conclusion of the Council and Board discussions, the Council shall meet to affirm or modify its recommendation, and communicate that conclusion (the "Supplemental Recommendation") to the Board, including an explanation for the then-current recommendation. In the event that the Council is able to reach a GNSO Supermajority Vote on the Supplemental Recommendation, the Board shall adopt the recommendation unless more

than two-thirds (2/3) of the Board determines that such policy is not in the interests of the ICANN community or ICANN. For any Supplemental Recommendation approved by less than a GNSO Supermajority Vote, a majority vote of the Board shall be sufficient to determine that the policy in the Supplemental Recommendation is not in the best interest of the ICANN community or ICANN.

Section 10. **Implementation of Approved Policies**

Upon a final decision of the Board adopting the policy, the Board shall, as appropriate, give authorization or direction to ICANN staff to work with the GNSO Council to create an implementation plan based upon the implementation recommendations identified in the Final Report, and to implement the policy. The GNSO Council may, but is not required to, direct the creation of an implementation review team to assist in implementation of the policy.

Section 11. **Maintenance of Records**

Throughout the PDP, from policy suggestion to a final decision by the Board, ICANN will maintain on the Website, a status web page detailing the progress of each PDP issue. Such status page will outline the completed and upcoming steps in the PDP process, and contain links to key resources (e.g. Reports, Comments Fora, WG Discussions, etc.).

Section 12. **Additional Definitions**

"Comment Site", "Comment Forum", "Comments For a" and "Website" refer to one or more websites designated by ICANN on which notifications and comments regarding the PDP will be posted.

"Supermajority Vote" means a vote of more than sixty-six (66) percent of the members present at a meeting of the applicable body, with the exception of the GNSO Council.

"Staff Manager" means an ICANN staff person(s) who manages the PDP.

"GNSO Supermajority Vote" shall have the meaning set forth in the Bylaws.

Section 13. **Applicability**

The procedures of this Annex A shall be applicable to all requests for Issue Reports and PDPs initiated after 8 December 2011. For all ongoing PDPs initiated prior to 8 December 2011, the Council shall determine the feasibility of transitioning to the procedures set forth in this Annex A for all remaining steps within the PDP. If the Council determines that any ongoing PDP cannot be feasibly transitioned to these updated procedures, the PDP shall be concluded according to the procedures set forth in Annex A in force on 7 December 2011.

---

## Annex B: ccNSO Policy-Development Process (ccPDP)

The following process shall govern the ccNSO policy-development process ("PDP").

### 1. Request for an Issue Report

An Issue Report may be requested by any of the following:

a. *Council.* The ccNSO Council (in this Annex B, the "Council") may call for the creation of an Issue Report by an affirmative vote of at least seven of the members of the Council present at any meeting or voting by e-mail.

b. *Board.* The ICANN Board may call for the creation of an Issue Report by requesting the Council to begin the policy-development process.

c. *Regional Organization.* One or more of the Regional Organizations representing ccTLDs in the ICANN recognized Regions may call for creation of an Issue Report by requesting the Council to begin the policy-development process.

d. *ICANN Supporting Organization or Advisory Committee.* An ICANN Supporting Organization or an ICANN Advisory Committee may call for creation of an Issue Report by requesting the Council to begin the policy-development process.

e. *Members of the ccNSO.* The members of the ccNSO may call for the creation of an Issue Report by an affirmative vote of at least ten members of the ccNSO present at any meeting or voting by e-mail.

Any request for an Issue Report must be in writing and must set out the issue upon which an Issue Report is requested in sufficient detail to enable the Issue Report to be prepared. It shall be open to the Council to request further information or undertake further research or investigation for the purpose of determining whether or not the requested Issue Report should be created.

**2. Creation of the Issue Report and Initiation Threshold**

Within seven days after an affirmative vote as outlined in Item 1(a) above or the receipt of a request as outlined in Items 1 (b), (c), or (d) above the Council shall appoint an Issue Manager. The Issue Manager may be a staff member of ICANN (in which case the costs of the Issue Manager shall be borne by ICANN) or such other person or persons selected by the Council (in which case the ccNSO shall be responsible for the costs of the Issue Manager).

Within fifteen (15) calendar days after appointment (or such other time as the Council shall, in consultation with the Issue Manager, deem to be appropriate), the Issue Manager shall create an Issue Report. Each Issue Report shall contain at least the following:

a. The proposed issue raised for consideration;

b. The identity of the party submitting the issue;

c. How that party is affected by the issue;

d. Support for the issue to initiate the PDP;

e. A recommendation from the Issue Manager as to whether the Council should move to initiate the PDP for this issue (the "Manager Recommendation"). Each Manager Recommendation shall include, and be supported by, an opinion of the ICANN General Counsel regarding whether the issue is properly within the scope of the ICANN policy process and within the scope of the ccNSO. In coming to his or her opinion, the General Counsel shall examine whether:

1) The issue is within the scope of ICANN's mission statement;

2) Analysis of the relevant factors according to Article IX, Section 6(2) and Annex C

affirmatively demonstrates that the issue is
within the scope of the ccNSO;

In the event that the General Counsel reaches an opinion
in the affirmative with respect to points 1 and 2 above then
the General Counsel shall also consider whether the issue:

3) Implicates or affects an existing ICANN
policy;

4) Is likely to have lasting value or applicability,
albeit with the need for occasional updates, and
to establish a guide or framework for future
decision-making.

In all events, consideration of revisions to the ccPDP (this
Annex B) or to the scope of the ccNSO (Annex C) shall be
within the scope of ICANN and the ccNSO.

In the event that General Counsel is of the opinion the
issue is not properly within the scope of the ccNSO Scope,
the Issue Manager shall inform the Council of this opinion.
If after an analysis of the relevant factors according to
Article IX, Section 6 and Annex C a majority of 10 or more
Council members is of the opinion the issue is within scope
the Chair of the ccNSO shall inform the Issue Manager
accordingly. General Counsel and the ccNSO Council shall
engage in a dialogue according to agreed rules and
procedures to resolve the matter. In the event no
agreement is reached between General Counsel and the
Council as to whether the issue is within or outside Scope
of the ccNSO then by a vote of 15 or more members the
Council may decide the issue is within scope. The Chair of
the ccNSO shall inform General Counsel and the Issue
Manager accordingly. The Issue Manager shall then
proceed with a recommendation whether or not the Council
should move to initiate the PDP including both the opinion
and analysis of General Counsel and Council in the Issues
Report.

f. In the event that the Manager Recommendation is in
favor of initiating the PDP, a proposed time line for
conducting each of the stages of PDP outlined herein (PDP
Time Line).

g. If possible, the issue report shall indicate whether the resulting output is likely to result in a policy to be approved by the ICANN Board. In some circumstances, it will not be possible to do this until substantive discussions on the issue have taken place. In these cases, the issue report should indicate this uncertainty.Upon completion of the Issue Report, the Issue Manager shall distribute it to the full Council for a vote on whether to initiate the PDP.

### 3. Initiation of PDP

The Council shall decide whether to initiate the PDP as follows:

a. Within 21 days after receipt of an Issue Report from the Issue Manager, the Council shall vote on whether to initiate the PDP. Such vote should be taken at a meeting held in any manner deemed appropriate by the Council, including in person or by conference call, but if a meeting is not feasible the vote may occur by e-mail.

b. A vote of ten or more Council members in favor of initiating the PDP shall be required to initiate the PDP provided that the Issue Report states that the issue is properly within the scope of the ICANN mission statement and the ccNSO Scope.

### 4. Decision Whether to Appoint Task Force; Establishment of Time Line

At the meeting of the Council where the PDP has been initiated (or, where the Council employs a vote by e-mail, in that vote) pursuant to Item 3 above, the Council shall decide, by a majority vote of members present at the meeting (or voting by e-mail), whether or not to appoint a task force to address the issue. If the Council votes:

a. In favor of convening a task force, it shall do so in accordance with Item 7 below.

b. Against convening a task force, then it shall collect information on the policy issue in accordance with Item 8 below.

The Council shall also, by a majority vote of members present at the meeting or voting by e-mail, approve or amend and approve the PDP Time Lineset out in the Issue Report.

**5. Composition and Selection of Task Forces**

a. Upon voting to appoint a task force, the Council shall invite each of the Regional Organizations (see Article IX, Section 6) to appoint two individuals to participate in the task force (the "Representatives"). Additionally, the Council may appoint up to three advisors (the "Advisors") from outside the ccNSO and, following formal request for GAC participation in the Task Force, accept up to two Representatives from the Governmental Advisory Committee to sit on the task force. The Council may increase the number of Representatives that may sit on a task force in its discretion in circumstances that it deems necessary or appropriate.

b. Any Regional Organization wishing to appoint Representatives to the task force must provide the names of the Representatives to the Issue Manager within ten (10) calendar days after such request so that they are included on the task force. Such Representatives need not be members of the Council, but each must be an individual who has an interest, and ideally knowledge and expertise, in the subject matter, coupled with the ability to devote a substantial amount of time to the task force's activities.

c. The Council may also pursue other actions that it deems appropriate to assist in the PDP, including appointing a particular individual or organization to gather information on the issue or scheduling meetings for deliberation or briefing. All such information shall be submitted to the Issue Manager in accordance with the PDP Time Line.

**6. Public Notification of Initiation of the PDP and Comment Period**

After initiation of the PDP, ICANN shall post a notification of such action to the Website and to the other ICANN Supporting Organizations and Advisory Committees. A comment period (in accordance with the PDP Time Line, and ordinarily at least 21 days long) shall be commenced for the issue. Comments shall be accepted from ccTLD managers, other Supporting Organizations, Advisory Committees, and from the public. The Issue Manager, or some other designated Council representative shall review the comments and incorporate them into a report (the "Comment Report") to be included in either the Preliminary Task Force Report or the Initial Report, as applicable.

**7. Task Forces**

a. *Role of Task Force.* If a task force is created, its role shall be responsible for (i) gathering information documenting the positions of the ccNSO members within the Geographic Regions and other parties and groups; and (ii) otherwise obtaining relevant information that shall enable the Task Force Report to be as complete and informative as possible to facilitate the Council's meaningful and informed deliberation.

The task force shall not have any formal decision-making authority. Rather, the role of the task force shall be to gather information that shall document the positions of various parties or groups as specifically and comprehensively as possible, thereby enabling the Council to have a meaningful and informed deliberation on the issue.

b. *Task Force Charter or Terms of Reference.* The Council, with the assistance of the Issue Manager, shall develop a charter or terms of reference for the task force (the "Charter") within the time designated in the PDP Time Line. Such Charter shall include:

1. The issue to be addressed by the task force, as such issue was articulated for the vote before the Council that initiated the PDP;

2. The specific time line that the task force must adhere to, as set forth below, unless the Council determines that there is a compelling reason to extend the timeline; and

3. Any specific instructions from the Council for the task force, including whether or not the task force should solicit the advice of outside advisors on the issue.

The task force shall prepare its report and otherwise conduct its activities in accordance with the Charter. Any request to deviate from the Charter must be formally presented to the Council and may only be undertaken by the task force upon a vote of a majority of the Council members present at a meeting or voting by e-mail. The

quorum requirements of Article IX, Section 3(14) shall apply to Council actions under this Item 7(b).

c. *Appointment of Task Force Chair.* The Issue Manager shall convene the first meeting of the task force within the time designated in the PDP Time Line. At the initial meeting, the task force members shall, among other things, vote to appoint a task force chair. The chair shall be responsible for organizing the activities of the task force, including compiling the Task Force Report. The chair of a task force need not be a member of the Council.

d. *Collection of Information.*

> 1. *Regional Organization Statements.* The Representatives shall each be responsible for soliciting the position of the Regional Organization for their Geographic Region, at a minimum, and may solicit other comments, as each Representative deems appropriate, including the comments of the ccNSO members in that region that are not members of the Regional Organization, regarding the issue under consideration. The position of the Regional Organization and any other comments gathered by the Representatives should be submitted in a formal statement to the task force chair (each, a "Regional Statement") within the time designated in the PDP Time Line. Every Regional Statement shall include at least the following:
>
> > (i) If a Supermajority Vote (as defined by the Regional Organization) was reached, a clear statement of the Regional Organization's position on the issue;
> >
> > (ii) If a Supermajority Vote was not reached, a clear statement of all positions espoused by the members of the Regional Organization;
> >
> > (iii) A clear statement of how the Regional Organization arrived at its position(s). Specifically, the

statement should detail specific meetings, teleconferences, or other means of deliberating an issue, and a list of all members who participated or otherwise submitted their views;

(iv) A statement of the position on the issue of any ccNSO members that are not members of the Regional Organization;

(v) An analysis of how the issue would affect the Region, including any financial impact on the Region; and

(vi) An analysis of the period of time that would likely be necessary to implement the policy.

2. *Outside Advisors.* The task force may, in its discretion, solicit the opinions of outside advisors, experts, or other members of the public. Such opinions should be set forth in a report prepared by such outside advisors, and (i) clearly labeled as coming from outside advisors; (ii) accompanied by a detailed statement of the advisors' (a) qualifications and relevant experience and (b) potential conflicts of interest. These reports should be submitted in a formal statement to the task force chair within the time designated in the PDP Time Line.

e. *Task Force Report.* The chair of the task force, working with the Issue Manager, shall compile the Regional Statements, the Comment Report, and other information or reports, as applicable, into a single document ("Preliminary Task Force Report") and distribute the Preliminary Task Force Report to the full task force within the time designated in the PDP Time Line. The task force shall have a final task force meeting to consider the issues and try and reach a Supermajority Vote. After the final task force meeting, the chair of the task force and the Issue Manager shall create the final task force report (the "Task Force Report") and post it on the Website and to the other ICANN

Supporting Organizations and Advisory Committees. Each Task Force Report must include:

> 1. A clear statement of any Supermajority Vote (being 66% of the task force) position of the task force on the issue;

> 2. If a Supermajority Vote was not reached, a clear statement of all positions espoused by task force members submitted within the time line for submission of constituency reports. Each statement should clearly indicate (i) the reasons underlying the position and (ii) the Regional Organizations that held the position;

> 3. An analysis of how the issue would affect each Region, including any financial impact on the Region;

> 4. An analysis of the period of time that would likely be necessary to implement the policy; and

> 5. The advice of any outside advisors appointed to the task force by the Council, accompanied by a detailed statement of the advisors' (i) qualifications and relevant experience and (ii) potential conflicts of interest.

## 8. Procedure if No Task Force is Formed

a. If the Council decides not to convene a task force, each Regional Organization shall, within the time designated in the PDP Time Line, appoint a representative to solicit the Region's views on the issue. Each such representative shall be asked to submit a Regional Statement to the Issue Manager within the time designated in the PDP Time Line.

b. The Council may, in its discretion, take other steps to assist in the PDP, including, for example, appointing a particular individual or organization, to gather information on the issue or scheduling meetings for deliberation or briefing. All such information shall be submitted to the Issue Manager within the time designated in the PDP Time Line.

c. The Council shall formally request the Chair of the GAC to offer opinion or advice.

d. The Issue Manager shall take all Regional Statements,
the Comment Report, and other information and compile
(and post on the Website) an Initial Report within the time
designated in the PDP Time Line. Thereafter, the Issue
Manager shall, in accordance with Item 9 below, create a
Final Report.

**9. Comments to the Task Force Report or Initial Report**

a. A comment period (in accordance with the PDP Time
Line, and ordinarily at least 21 days long) shall be opened
for comments on the Task Force Report or Initial Report.
Comments shall be accepted from ccTLD managers, other
Supporting Organizations, Advisory Committees, and from
the public. All comments shall include the author's name,
relevant experience, and interest in the issue.

b. At the end of the comment period, the Issue Manager
shall review the comments received and may, in the Issue
Manager's reasonable discretion, add appropriate
comments to the Task Force Report or Initial Report, to
prepare the "Final Report". The Issue Manager shall not be
obligated to include all comments made during the
comment period, nor shall the Issue Manager be obligated
to include all comments submitted by any one individual or
organization.

c. The Issue Manager shall prepare the Final Report and
submit it to the Council chair within the time designated in
the PDP Time Line.

**10. Council Deliberation**

a. Upon receipt of a Final Report, whether as the result of a
task force or otherwise, the Council chair shall (i) distribute
the Final Report to all Council members; (ii) call for a
Council meeting within the time designated in the PDP
Time Line wherein the Council shall work towards
achieving a recommendation to present to the Board; and
(iii) formally send to the GAC Chair an invitation to the GAC
to offer opinion or advice. Such meeting may be held in any
manner deemed appropriate by the Council, including in
person or by conference call. The Issue Manager shall be
present at the meeting.

b. The Council may commence its deliberation on the issue prior to the formal meeting, including via in-person meetings, conference calls, e-mail discussions, or any other means the Council may choose.

c. The Council may, if it so chooses, solicit the opinions of outside advisors at its final meeting. The opinions of these advisors, if relied upon by the Council, shall be (i) embodied in the Council's report to the Board, (ii) specifically identified as coming from an outside advisor; and (iii) accompanied by a detailed statement of the advisor's (a) qualifications and relevant experience and (b) potential conflicts of interest.

## 11. Recommendation of the Council

In considering whether to make a recommendation on the issue (a "Council Recommendation"), the Council shall seek to act by consensus. If a minority opposes a consensus position, that minority shall prepare and circulate to the Council a statement explaining its reasons for opposition. If the Council's discussion of the statement does not result in consensus, then a recommendation supported by 14 or more of the Council members shall be deemed to reflect the view of the Council, and shall be conveyed to the Members as the Council's Recommendation. Notwithstanding the foregoing, as outlined below, all viewpoints expressed by Council members during the PDP must be included in the Members Report.

## 12. Council Report to the Members

In the event that a Council Recommendation is adopted pursuant to Item 11 then the Issue Manager shall, within seven days after the Council meeting, incorporate the Council's Recommendation together with any other viewpoints of the Council members into a Members Report to be approved by the Council and then to be submitted to the Members (the "Members Report"). The Members Report must contain at least the following:

a. A clear statement of the Council's recommendation;

b. The Final Report submitted to the Council; and

c. A copy of the minutes of the Council's deliberation on the policy issue (see Item 10), including all the opinions expressed during such deliberation, accompanied by a description of who expressed such opinions.

### 13. Members Vote

Following the submission of the Members Report and within the time designated by the PDP Time Line, the ccNSO members shall be given an opportunity to vote on the Council Recommendation. The vote of members shall be electronic and members' votes shall be lodged over such a period of time as designated in the PDP Time Line (at least 21 days long).

In the event that at least 50% of the ccNSO members lodge votes within the voting period, the resulting vote will be be employed without further process. In the event that fewer than 50% of the ccNSO members lodge votes in the first round of voting, the first round will not be employed and the results of a final, second round of voting, conducted after at least thirty days notice to the ccNSO members, will be employed if at least 50% of the ccNSO members lodge votes. In the event that more than 66% of the votes received at the end of the voting period shall be in favor of the Council Recommendation, then the recommendation shall be conveyed to the Board in accordance with Item 14 below as the ccNSO Recommendation.

### 14. Board Report

The Issue Manager shall within seven days after a ccNSO Recommendation being made in accordance with Item 13 incorporate the ccNSO Recommendation into a report to be approved by the Council and then to be submitted to the Board (the "Board Report"). The Board Report must contain at least the following:

   a. A clear statement of the ccNSO recommendation;

   b. The Final Report submitted to the Council; and

   c. the Members' Report.

### 15. Board Vote

   a. The Board shall meet to discuss the ccNSO Recommendation as soon as feasible after receipt of the Board Report from the Issue Manager, taking into account procedures for Board consideration.

   b. The Board shall adopt the ccNSO Recommendation unless by a vote of more than 66% the Board determines that such policy is not in the best interest of the ICANN community or of ICANN.

1. In the event that the Board determines not to act in accordance with the ccNSO Recommendation, the Board shall (i) state its reasons for its determination not to act in accordance with the ccNSO Recommendation in a report to the Council (the "Board Statement"); and (ii) submit the Board Statement to the Council.

2. The Council shall discuss the Board Statement with the Board within thirty days after the Board Statement is submitted to the Council. The Board shall determine the method (e.g., by teleconference, e-mail, or otherwise) by which the Council and Board shall discuss the Board Statement. The discussions shall be held in good faith and in a timely and efficient manner, to find a mutually acceptable solution.

3. At the conclusion of the Council and Board discussions, the Council shall meet to affirm or modify its Council Recommendation. A recommendation supported by 14 or more of the Council members shall be deemed to reflect the view of the Council (the Council's "Supplemental Recommendation"). That Supplemental Recommendation shall be conveyed to the Members in a Supplemental Members Report, including an explanation for the Supplemental Recommendation. Members shall be given an opportunity to vote on the Supplemental Recommendation under the same conditions outlined in Item 13. In the event that more than 66% of the votes cast by ccNSO Members during the voting period are in favor of the Supplemental Recommendation then that recommendation shall be conveyed to Board as the ccNSO Supplemental Recommendation and the Board shall adopt the recommendation unless by a vote of more than 66% of the Board determines that acceptance of such policy would constitute a breach of the fiduciary duties of the Board to the Company.

4. In the event that the Board does not accept the ccNSO Supplemental Recommendation, it shall state its reasons for doing so in its final decision ("Supplemental Board Statement").

5. In the event the Board determines not to accept a ccNSO Supplemental Recommendation, then the Board shall not be entitled to set policy on the issue addressed by the recommendation and the status quo shall be preserved until such time as the ccNSO shall, under the ccPDP, make a recommendation on the issue that is deemed acceptable by the Board.

## 16. Implementation of the Policy

Upon adoption by the Board of a ccNSO Recommendation or ccNSO Supplemental Recommendation, the Board shall, as appropriate, direct or authorize ICANN staff to implement the policy.

## 17. Maintenance of Records

With respect to each ccPDP for which an Issue Report is requested (see Item 1), ICANN shall maintain on the Website a status web page detailing the progress of each ccPDP, which shall provide a list of relevant dates for the ccPDP and shall also link to the following documents, to the extent they have been prepared pursuant to the ccPDP:

a. Issue Report;

b. PDP Time Line;

c. Comment Report;

d. Regional Statement(s);

e. Preliminary Task Force Report;

f. Task Force Report;

g. Initial Report;

h. Final Report;

i. Members' Report;

j. Board Report;

k. Board Statement;

l. Supplemental Members' Report; and

m. Supplemental Board Statement.

In addition, ICANN shall post on the Website comments received in electronic written form specifically suggesting that a ccPDP be initiated.

---

## Annex C: The Scope of the ccNSO

This annex describes the scope and the principles and method of analysis to be used in any further development of the scope of the ccNSO's policy-development role. As provided in Article IX, Section 6 (2) of the Bylaws, that scope shall be defined according to the procedures of the ccPDP.

The scope of the ccNSO's authority and responsibilities must recognize the complex relation between ICANN and ccTLD managers/registries with regard to policy issues. This annex shall assist the ccNSO, the ccNSO Council, and the ICANN Board and staff in delineating relevant global policy issues.

*Policy areas*

The ccNSO's policy role should be based on an analysis of the following functional model of the DNS:

1. Data is registered/maintained to generate a zone file,

2. A zone file is in turn used in TLD name servers.

Within a TLD two functions have to be performed (these are addressed in greater detail below):

1. Entering data into a database (Data Entry Function) and

2. Maintaining and ensuring upkeep of name-servers for the TLD (Name Server Function).

These two core functions must be performed at the ccTLD registry level as well as at a higher level (IANA function and root servers) and

at lower levels of the DNS hierarchy. This mechanism, as RFC 1591 points out, is recursive:

There are no requirements on sub domains of top-level domains beyond the requirements on higher-level domains themselves. That is, the requirements in this memo are applied recursively. In particular, all sub domains shall be allowed to operate their own domain name servers, providing in them whatever information the sub domain manager sees fit (as long as it is true and correct).

*The Core Functions*

1. Data Entry Function (DEF):

Looking at a more detailed level, the first function (entering and maintaining data in a database) should be fully defined by a naming policy. This naming policy must specify the rules and conditions:

> (a) under which data will be collected and entered into a database or data changed (at the TLD level among others, data to reflect a transfer from registrant to registrant or changing registrar) in the database.

> (b) for making certain data generally and publicly available (be it, for example, through Whois or nameservers).

2. The Name-Server Function (NSF)

The name-server function involves essential interoperability and stability issues at the heart of the domain name system. The importance of this function extends to nameservers at the ccTLD level, but also to the root servers (and root-server system) and nameservers at lower levels.

On its own merit and because of interoperability and stability considerations, properly functioning nameservers are of utmost importance to the individual, as well as to the local and the global Internet communities.

With regard to the nameserver function, therefore, policies need to be defined and established. Most parties involved, including the majority of ccTLD registries, have accepted the need for common policies in this area by adhering to the relevant RFCs, among others RFC 1591.

*Respective Roles with Regard to Policy, Responsibilities, and Accountabilities*

It is in the interest of ICANN and ccTLD managers to ensure the stable and proper functioning of the domain name system. ICANN and the ccTLD registries each have a distinctive role to play in this regard that can be defined by the relevant policies. The scope of the ccNSO cannot be established without reaching a common understanding of the allocation of authority between ICANN and ccTLD registries.

Three roles can be distinguished as to which responsibility must be assigned on any given issue:

- Policy role: i.e. the ability and power to define a policy;
- Executive role: i.e. the ability and power to act upon and implement the policy; and
- Accountability role: i.e. the ability and power to hold the responsible entity accountable for exercising its power.

Firstly, responsibility presupposes a policy and this delineates the policy role. Depending on the issue that needs to be addressed those who are involved in defining and setting the policy need to be determined and defined. Secondly, this presupposes an executive role defining the power to implement and act within the boundaries of a policy. Finally, as a counter-balance to the executive role, the accountability role needs to defined and determined.

The information below offers an aid to:

1. delineate and identify specific policy areas;

2. define and determine roles with regard to these specific policy areas.

This annex defines the scope of the ccNSO with regard to developing policies. The scope is limited to the policy role of the ccNSO policy-development process for functions and levels explicitly stated below. It is anticipated that the accuracy of the assignments of policy, executive, and accountability roles shown below will be considered during a scope-definition ccPDP process.

*Name Server Function (as to ccTLDs)*

Level 1: Root Name Servers
Policy role: IETF, RSSAC (ICANN)
Executive role: Root Server System Operators
Accountability role: RSSAC (ICANN), (US DoC-ICANN MoU)

Level 2: ccTLD Registry Name Servers in respect to
interoperability
Policy role: ccNSO Policy Development Process (ICANN),
for best practices a ccNSO process can be organized
Executive role: ccTLD Manager
Accountability role: part ICANN (IANA), part Local Internet
Community, including local government

Level 3: User's Name Servers
Policy role: ccTLD Manager, IETF (RFC)
Executive role: Registrant
Accountability role: ccTLD Manager

*Data Entry Function (as to ccTLDs)*

Level 1: Root Level Registry
Policy role: ccNSO Policy Development Process (ICANN)
Executive role: ICANN (IANA)
Accountability role: ICANN community, ccTLD Managers,
US DoC, (national authorities in some cases)

Level 2: ccTLD Registry
Policy role: Local Internet Community, including local
government, and/or ccTLD Manager according to local
structure
Executive role: ccTLD Manager
Accountability role: Local Internet Community, including
national authorities in some cases

Level 3: Second and Lower Levels
Policy role: Registrant
Executive role: Registrant
Accountability role: Registrant, users of lower-level domain
names

You Tube          Twitter          LinkedIn          Flickr          Facebook

RSS Feeds        Community Wiki        ICANN Blog

## Who We Are

Get Started

Learning

Participate

Board

CEO

Staff

Careers

Newsletter

## Contact Us

Security Team

PGP Keys

Certificate
Authority

Registry
Liaison

AOC Review

Organizational
Reviews

Request a
Speaker

Offices

For Journalists

## Accountability & Transparency

Governance

Agreements

Accountability Mechanisms

Independent Review Process

Request for Reconsideration

Ombudsman

AOC Review

Annual Report

## Help

Dispute
Resolution

Domain Name
Dispute
Resolution

Name Collision

Registrar
Problems

WHOIS

Financials

Document
Disclosure

Planning

Correspondence

Dashboard

RFPs

Litigation

© 2014 Internet Corporation For Assigned Names and Numbers.      Privacy Policy      Terms of Service      Cookie Policy

## Domain Name System

Internationalized Domain Name ,IDN,"IDNs are domain names that include characters used in the local representation of languages that are not written with the twenty-six letters of the basic Latin alphabet ""a-z"". An IDN can contain Latin letters with diacritical marks, as required by many European languages, or may consist of characters from non-Latin scripts such as Arabic or Chinese. Many languages also use other types of digits than the European ""0-9"". The basic Latin alphabet together with the European-Arabic digits are, for the purpose of domain names, termed ""ASCII characters"" (ASCII = American Standard Code for Information Interchange). These are also included in the broader range of ""Unicode characters"" that provides the basis for IDNs. The ""hostname rule"" requires that all domain names of the type under consideration here are stored in the DNS using only the ASCII characters listed above, with the one further addition of the hyphen ""-"". The Unicode form of an IDN therefore requires special encoding before it is entered into the DNS. The following terminology is used when distinguishing between these forms: A domain name consists of a series of ""labels"" (separated by ""dots""). The ASCII form of an IDN label is termed an ""A-label"". All operations defined in the DNS protocol use A-labels exclusively. The Unicode form, which a user expects to be displayed, is termed a ""U-label"". The difference may be illustrated with the Hindi word for ""test"" — परीका — appearing here as a U-label would (in the Devanagari script). A special form of ""ASCII compatible encoding"" (abbreviated ACE) is applied to this to produce the corresponding A-label: xn--11b5bs1di. A domain name that only includes ASCII letters, digits, and hyphens is termed an ""LDH label"". Although the definitions of A-labels and LDH-labels overlap, a name consisting exclusively of LDH labels, such as""icann.org"" is not an IDN."

# Exhibit B

Haim v. The Islamic Republic of Iran,
Civil Action No. 02-1811-RCL

| AWARD/CONTRACT | 1. THIS CONTRACT IS A RATED ORDER UNDER DPAS (15 CFR 700) | RATING | PAGE 1 | OF | PAGES 65 |
|---|---|---|---|---|---|

| 2. CONTRACT (Proc. Inst. Ident.) NO. SA1301-12-CN-0035 | 3. EFFECTIVE DATE 10/01/2012 | 4. REQUISITION/PURCHASE REQUEST/PROJECT NO. AA-OAM-??-?-12-00934 |
|---|---|---|

| 5. ISSUED BY                    CODE | 000SA | 6. ADMINISTERED BY (If other than Item 5)        CODE | 000SA |
|---|---|---|---|
| U.S. DEPARTMENT OF COMMERCE<br>14TH & CONSTITUTION AVE. NW<br>ACQUISITION SERVICES- ROOM 6520<br>WASHINGTON DC 20230 | | U.S. DEPARTMENT OF COMMERCE<br>14TH & CONSTITUTION AVE. NW<br>ACQUISITION SERVICES- ROOM 6520<br>WASHINGTON DC 20230 | |

7. NAME AND ADDRESS OF CONTRACTOR (No., street, county, State and ZIP Code)

INTERNET CORPORATION FOR ASSIGNED NAMES
AND NUMBERS
4676 ADMIRALTY WAY, SUITE #330
MARINA DEL REY CA 902926648
Vendor ID: 00000428
DUNS: 045511487
Cage Code: 4A4S9
CEC:

| CODE | | FACILITY CODE | |
|---|---|---|---|

8. DELIVERY
☐ FOB ORIGIN   ☐ OTHER (See below)

9. DISCOUNT FOR PROMPT PAYMENT

NET 30

10. SUBMIT INVOICES (4 copies unless otherwise specified) TO THE ADDRESS SHOWN IN    ITEM   NISTFSG

| 11. SHIP TO/MARK FOR                     CODE | NTIA-HCH | 12. PAYMENT WILL BE MADE BY              CODE | NISTFSG |
|---|---|---|---|
| NATIONAL TEL. AND INFO. ADMIN<br>1401 CONSTITUTION AVE. NW<br>ROOM 4888, HCHB | | NIST ACCOUNTS PAYABLE OFFICE<br>BLDG 101, ROOM A-836 MS 1621<br>100 BUREAU DRIVE | |

13. AUTHORITY FOR USING OTHER THAN FULL AND OPEN COMPETITION:

☐ 10 U.S.C. 2304(c)( )    ☐ 41 U.S.C. 253(c)( )

14. ACCOUNTING AND APPROPRIATION DATA

| 15A. ITEM NO. | 15B. SUPPLIES/SERVICES | 15C. QUANTITY | 15D. UNIT | 15E. UNIT PRICE | 15F. AMOUNT |
|---|---|---|---|---|---|
| | Please See Continuation Page for Line Items | | | | |

15G. TOTAL AMOUNT OF CONTRACT ▶ $ 0.00

### 16. TABLE OF CONTENTS

| (X) | SEC. | DESCRIPTION | PAGE(S) | (X) | SEC. | DESCRIPTION | PAGE(S) |
|---|---|---|---|---|---|---|---|
| | | PART I - THE SCHEDULE | | | | PART II - CONTRACT CLAUSES | |
| X | A | SOLICITATION/CONTRACT FORM | 1 | X | I | CONTRACT CLAUSES | 52-65 |
| X | B | SUPPLIES OR SERVICES AND PRICES/COSTS | 2-3 | | | PART III - LIST OF DOCUMENTS, EXHIBITS AND OTHER ATTACH. | |
| X | C | DESCRIPTION/SPECS./WORK STATEMENT | 4-25 | | J | LIST OF ATTACHMENTS | |
| X | D | PACKAGING AND MARKING | 26 | | | PART IV - REPRESENTATIONS AND INSTRUCTIONS | |
| X | E | INSPECTION AND ACCEPTANCE | 27-29 | | K | REPRESENTATIONS, CERTIFICATIONS AND OTHER STATEMENTS OF OFFERORS | |
| X | F | DELIVERIES OR PERFORMANCE | 30-32 | | | | |
| X | G | CONTRACT ADMINISTRATION DATA | 33-34 | | L | INSTRS., CONDS., AND NOTICES TO OFFERORS | |
| X | H | SPECIAL CONTRACT REQUIREMENTS | 35-51 | | M | EVALUATION FACTORS FOR AWARD | |

CONTRACTING OFFICER WILL COMPLETE ITEM 17 (SEALED-BID OR NEGOTIATED PROCUREMENT) OR 18 (SEALED-BID PROCUREMENT) AS APPLICABLE

| 17. ☒ CONTRACTOR'S NEGOTIATED AGREEMENT (Contractor is required to sign this document and return ___1___ copies to issuing office.) Contractor agrees to furnish and deliver all items or perform all the services set forth or otherwise identified above and on any continuation sheets for the consideration stated herein. The rights and obligations of the parties to this contract shall be subject to and governed by the following documents: (a) this award/contract, (b) the solicitation, if any, and (c) such provisions, representations, certifications, and specifications, as are attached or incorporated by reference herein. (Attachments are listed herein.) | 18. ☐ SEALED-BID AWARD (Contractor is not required to sign this document.)<br>Your bid on Solicitation Number _____ including the additions or changes made by you which additions or changes are set forth in full above, is hereby accepted as to the items listed above and on any continuation sheets. This award consummates the contract which consists of the following documents: (a) the Government's solicitation and your bid, and (b) this award/contract. No further contractual document is necessary. (Block 18 should be checked only when awarding a sealed-bid contract.) |
|---|---|
| 16A. NAME AND TITLE OF SIGNER (Type or Print)<br>ROD A. BECKSTROM<br>PRESIDENT & CEO, ICANN | 20A. NAME OF CONTRACTING OFFICER<br>KATHLEEN M. MCGRATH |
| 16B. NAME OF CONTRACTOR<br>BY ___(Signature of person authorized to sign)___ | 19C. DATE SIGNED<br>JUNE 29, 2012 | 20B. UNITED STATES OF AMERICA<br>BY ___(Signature of Contracting Officer)___ | 20C. DATE SIGNED<br>JUL 02, 2012 |

AUTHORIZED FOR LOCAL REPRODUCTION
Previous edition is NOT usable

STANDARD FORM 26 (REV. 5/2011)
Prescribed by GSA - FAR (48 CFR) 53.214(a)

| | SCHEDULE Continued | | | | |
|---|---|---|---|---|---|
| ITEM NO. | SUPPLIES/SERVICES | QUANTITY | UNIT | UNIT PRICE $ | AMOUNT $ |
| | Contracting Officer: Mona-Lisa Dunn, 202-482-1470<br><br>Primary Contracting Officer Representative: Vernita D. Harris, 202-482-4686, vharris@NTIA.doc.gov<br><br>Alternate Contracting Officer Representative(s):<br><br>Technical Point of Contact: Vernita D. Harris, 202-482-4686, vharris@NTIA.doc.gov<br><br>The Contractor shall provide the services in accordance with the terms, conditions, and prices described herein.<br><br>The Contractor's proposal dated May 31, 2012 and as amended through agreed terms and conditions dated June 23, 2012 and June 26, 2012 are hereby incorporated by reference. | | | | |
| 0001 | BASE YEAR - October 1, 2012 - September 30, 2015. The Contractor shall provide the services necessary for the operation of the Internet Assigned Numbers Authority (IANA) in accordance with the attached Statement of Work. The Contractor may not charge the United States Government for performance of the requirements of this contract.<br><br>Period of Performance: 10/01/2012 to 09/30/2015 | 0.00 | EA | 0.00 | 0.00 |
| 0002 | OPTION YEAR 1 - October 1, 2015 - September 30, 2017. The Contractor shall provide the services necessary for the operation of the Internet Assigned Numbers Authority (IANA) in accordance with the attached Statement of Work. The Contractor may not charge the United States Government for performance of the requirements of this contract.<br><br>Accounting and Appropriation Data:<br>61.12.1200012.100.0012.010102000.<br>0400000000000000.25970000.000000<br>$0.00<br>Period of Performance: 10/01/2015 to 09/30/2017<br>Pricing Option: Time and Material | 1.00 | JB | 0.00 | OPT<br>0.00 |
| 0003 | OPTION YEAR 2 - October 1, 2017 - September 30, 2019. The Contractor shall provide the services necessary for the operation of the Internet Assigned Numbers Authority (IANA) in accordance with the attached Statement of Work. The Contractor may not charge the United States Government for performance of the requirements of this contract.<br><br>Accounting and Appropriation Data:<br>61.12.1200012.100.0012.010102000.<br>0400000000000000.25970000.000000<br>$0.00<br>Period of Performance: 10/01/2017 to 09/30/2019<br>Pricing Option: Time and Material | 1.00 | JB | 0.00 | OPT<br>0.00 |

SA1301-12-CN-0035

**3SECTION B SUPPLIES OR SERVICES AND PRICES/COSTS**

This is a no cost, $0.00 time and material contract.

**B.2     COST/PRICE**

The Contractor may not charge the United States Government to perform the requirements of this Contract.  The Contractor may establish and collect fees from third parties provided the fee levels are approved by the Contracting Officer and are fair and reasonable.  If fees are charged, the Contractor shall base any proposed fee structure on the cost of providing the specific service for which the fee is charged and the resources necessary to monitor the fee driven requirements.  The Contractor may propose an interim fee for the first year of the contract, which will expire one year after the contract award.  If the Contractor intends to establish and collect fees from third parties beyond the first year of the Contract, the Contractor must collaborate with the interested and affected parties as enumerated in Section C.1.3 to develop a proposed fee structure based on a methodology that tracks the actual costs incurred for each discrete IANA function.  The Contractor must submit a copy of proposed fee structure, tracking methodology and description of the collaboration efforts and process to the Contracting Officer.

**B.3     PRE-AWARD SURVEY – FAR 9.106 and 9.106-4(a)**

At the discretion of the Contracting Officer, a site visit to the Offeror's facility (ies) may also be requested and conducted by the Department of Commerce (Commerce) or its designee.  The purpose of this visit will be to gather information relevant to the Offeror's responsibility and prospective capability to perform the requirements under any contract that may be awarded. The Contracting Officer will arrange such a visit at least seven (7) days in advance with the Offeror.

SA1301-12-CN-0035

## SECTION C – DESCRIPTION / SPECS / WORK STATEMENT

**STATEMENT OF WORK/SPECIFICATIONS**

The Contractor shall furnish the necessary personnel, materials, equipment, services and Facilities (except as otherwise specified) to perform the following Statement Work/Specifications.

## C.1 BACKGROUND

**C.1.1**    The U.S. Department of Commerce (DoC), National Telecommunications and Information Administration (NTIA) has initiated this contract to maintain the continuity and stability of services related to certain interdependent Internet technical management functions, known collectively as the Internet Assigned Numbers Authority (IANA).

**C.1.2**    Initially, these interdependent technical functions were performed on behalf of the Government under a contract between the Defense Advanced Research Projects Agency (DARPA) and the University of Southern California (USC), as part of a research project known as the Tera-node Network Technology (TNT).  As the TNT project neared completion and the DARPA/USC contract neared expiration in 1999, the Government recognized the need for the continued performance of the IANA functions as vital to the stability and correct functioning of the Internet.

**C.1.3**    The Contractor, in the performance of its duties, must have or develop a close constructive working relationship with all interested and affected parties  to ensure quality and satisfactory performance of the IANA functions.  The interested and affected parties include, but are not limited to, the multi-stakeholder, private sector led, bottom-up policy development model for the domain name system (DNS)  that the Internet Corporation for Assigned Names and Numbers (ICANN) represents; the Internet Engineering Task Force (IETF) and the Internet Architecture Board (IAB); Regional Internet Registries (RIRs); top-level domain (TLD) operators/managers (e.g., country codes and generic); governments; and the Internet user community.

**C.1.4**    The Government acknowledges that data submitted by applicants in connection with the IANA functions may be confidential information.  To the extent required by law, the Government shall accord any confidential data submitted by applicants in connection with the IANA functions with the same degree of care as it uses to protect its own confidential information, but not less than reasonable care, to prevent the unauthorized use, disclosure, or publication of confidential information.  In providing data that is subject to such a confidentiality obligation to the Government, the Contractor shall advise the Government of that obligation.

4

SA1301-12-CN-0035

## C.2    CONTRACTOR REQUIREMENTS

**C.2.1**    The Contractor must perform the required services for this contract as a prime Contractor, not as an agent or subcontractor.  The Contractor shall not enter into any subcontracts for the performance of the services, or assign or transfer any of its rights or obligations under this Contract, without the Government's prior written consent and any attempt to do so shall be void and without further effect.  The Contractor shall be a) a wholly U.S. owned and operated firm or fully accredited United States University or College operating in one of the 50 states of the United States or District of Columbia; b) incorporated within one of the fifty (50) states of the United States or District of Columbia; and c) organized under the laws of a state of the United States or District of Columbia.  The Contractor shall perform the primary IANA functions of the Contract in the United States and possess and maintain, throughout the performance of this Contract, a physical address within the United States. The Contractor must be able to demonstrate that all primary operations and systems will remain within the United States (including the District of Columbia).  The Government reserves the right to inspect the premises, systems, and processes of all security and operational components used for the performance of all Contract requirements and obligations.

**C.2.2**    The Contractor shall furnish the necessary personnel, material, equipment, services, and facilities, to perform the following requirements without any cost to the Government.  The Contractor shall conduct due diligence in hiring, including full background checks.

**C.2.3**    The Contractor may not charge the United States Government for performance of the requirements of this contract.  The Contractor may establish and collect fees from third parties provided the fee levels are approved by the Contracting Officer (CO) and are fair and reasonable.  If fees are charged, the Contractor shall base any proposed fee structure on the cost of providing the specific service for which the fee is charged.  The Contractor may propose an interim fee for the first year of the contract, which will expire one year after the contract award.  The documentation must be based upon the anticipated cost for providing the specific service for which the fee is charged, including start up costs, if any, equipment, personnel, software, etc.   If the Contractor intends to establish and collect fees from third parties beyond the first year of the contract, the Contractor must collaborate with the interested and affected parties as enumerated in Section C.1.3 to develop a proposed fee structure based on a methodology that tracks the actual costs incurred for each discrete IANA function enumerated and described in C.2.9.  The Contractor must submit a copy of any proposed fee structure including tracking methodology and description of the collaboration and process efforts for fees being proposed after the first year contract award to the Contracting Officer.  The performance exclusion C.8.3 shall apply to any fee proposed.

**C.2.4**    The Contractor is required to perform the IANA functions, which are critical for the operation of the Internet's core infrastructure, in a stable and secure manner.  The IANA functions are administrative and technical in nature based on established policies developed by

SA1301-12-CN-0035

interested and affected parties, as enumerated in Section C.1.3.  The Contractor shall treat each of the IANA functions with equal priority and process all requests promptly and efficiently.

**C.2.5    Separation of Policy Development and Operational Roles --** The Contractor shall ensure that designated IANA functions staff members will not initiate, advance, or advocate any policy development related to the IANA functions.  The Contractor's staff may respond to requests for information requested by interested and affected parties as enumerated in Section C.1.3 to inform ongoing policy discussions and may request guidance or clarification as necessary for the performance of the IANA functions.

**C.2.6    Transparency and Accountability --** Within six (6) months of award, the Contractor shall, in collaboration with all interested and affected parties as enumerated in Section C.1.3, develop user instructions including technical requirements for each corresponding IANA function and post via a website.

**C.2.7    Responsibility and Respect for Stakeholders –** Within six (6) months of award, the Contractor shall, in collaboration with all interested and affected parties as enumerated in Section C.1.3, develop for each of the IANA functions a process for documenting the source of the policies and procedures and how it will apply the relevant policies and procedures for the corresponding IANA function and post via a website.

**C.2.8    Performance Standards --** Within six (6) months of award, the Contractor shall develop performance standards, in collaboration with all interested and affected parties as enumerated in Section C.1.3, for each of the IANA functions as set forth at C.2.9 to C.2.9.4 and post via a website.

**C.2.9    Internet Assigned Numbers Authority (IANA) Functions --** include (1) the coordination of the assignment of technical Internet protocol parameters; (2) the administration of certain responsibilities associated with the Internet DNS root zone management; (3) the allocation of Internet numbering resources; and (4) other services related to the management of the ARPA and INT top-level domains (TLDs).

**C.2.9.1    Coordinate The Assignment Of Technical Protocol Parameters including the management of the Address and Routing Parameter Area (ARPA) TLD --** The Contractor shall review and assign unique values to various parameters (*e.g.,* operation codes, port numbers, object identifiers, protocol numbers) used in various Internet protocols based on established guidelines and policies as developed by interested and affected parties as enumerated in Section C.1.3.  The Contractor shall disseminate the listings of assigned parameters through various means (including on-line publication via a website) and shall review technical documents for consistency with assigned values.  The Contractor shall operate the ARPA TLD within the current registration policies for this TLD, as documented in RFC 3172-Management Guidelines & Operational Requirements for the Address and Routing Parameter Area Domain,

SA1301-12-CN-0035

and any further clarification of this RFC.  The Contractor shall also implement DNSSEC in the ARPA TLD.

**C.2.9.2    Perform Administrative Functions Associated With Root Zone Management --** The Contractor shall facilitate and coordinate the root zone of the domain name system, and maintain 24 hour-a-day/7 days-a-week operational coverage.  The process flow for root zone management involves three roles that are performed by three different entities through two separate legal agreements:  the Contractor as the IANA Functions Operator, NTIA as the Administrator, and VeriSign (or any successor entity as designated by the U.S. Department of Commerce) as articulated in Cooperative Agreement Amendment 11, as the Root Zone Maintainer.  The Requirements are detailed at Appendix 1 entitled Authoritative Root Zone Management Process that is incorporated by reference herein as if fully set forth.  The Contractor shall work collaboratively with NTIA and the Root Zone Maintainer, in the performance of this function.

**C.2.9.2.a    Root Zone File Change Request Management --** The Contractor shall receive and process root zone file change requests for TLDs.  These change requests include addition of new or updates to existing TLD name servers (NS) and delegation signer (DS) resource record (RR) information along with associated 'glue' (A and AAAA RRs).  A change request may also include new TLD entries to the root zone file.  The Contractor shall process root zone file changes as expeditiously as possible.

**C.2.9.2.b    Root Zone "WHOIS" Change Request and Database Management --** The Contractor shall maintain, update, and make publicly accessible a Root Zone "WHOIS" database with current and verified contact information for all TLD registry operators.  The Root Zone "WHOIS" database, at a minimum, shall consist of the TLD name; the IP address of the primary nameserver and secondary nameserver for the TLD; the corresponding names of such nameservers; the creation date of the TLD; the name, postal address, email address, and telephone and fax numbers of the TLD registry operator; the name, postal address, email address, and telephone and fax numbers of the technical contact for the TLD registry operator; and the name, postal address, email address, and telephone and fax numbers of the administrative contact for the TLD registry operator; reports; and date record last updated; and any other information relevant to the TLD requested by the TLD registry operator.  The Contractor shall receive and process root zone "WHOIS" change requests for TLDs.

**C.2.9.2.c    Delegation and Redelegation of a Country Code Top Level-Domain (ccTLD) --**The Contractor shall apply existing policy frameworks in processing requests related to the delegation and redelegation of a ccTLD, such as RFC 1591 Domain Name System Structure and Delegation, the Governmental Advisory Committee (GAC) Principles And Guidelines For The Delegation And Administration Of Country Code Top Level Domains, and any further clarification of these policies by interested and affected parties as enumerated in Section C.1.3. If a policy framework does not exist to cover a specific instance, the Contractor will consult with the interested and affected parties, as enumerated in Section C.1.3; relevant public authorities;

and governments on any recommendation that is not within or consistent with an existing policy framework.  In making its recommendations, the Contractor shall also take into account the relevant national frameworks and applicable laws of the jurisdiction that the TLD registry serves.  The Contractor shall submit its recommendations to the COR via a Delegation and Redelegation Report.

**C.2.9.2d    Delegation and Redelegation of a Generic Top Level Domain (gTLD)** -- The Contractor shall verify that all requests related to the delegation and redelegation of gTLDs are consistent with the procedures developed by ICANN.  In making a delegation or redelegation recommendation, the Contractor must provide documentation verifying that ICANN followed its own policy framework including specific documentation demonstrating how the process provided the opportunity for input from relevant stakeholders and was supportive of the global public interest.  The Contractor shall submit its recommendations to the COR via a Delegation and Redelegation Report.

**C.2.9.2.e    Root Zone Automation** -- The Contractor shall work with NTIA and the Root Zone Maintainer, and collaborate with all interested and affected parties as enumerated in Section C.1.3, to deploy a fully automated root zone management system within nine (9) months after date of contract award.  The fully automated system must, at a minimum, include a secure (encrypted) system for customer communications; an automated provisioning protocol allowing customers to manage their interactions with the root zone management system; an online database of change requests and subsequent actions whereby each customer can see a record of their historic requests and maintain visibility into the progress of their current requests; and a test system, which customers can use to meet the technical requirements for a change request ; an internal interface for secure communications between the IANA Functions Operator; the Administrator, and the Root Zone Maintainer.

**C.2.9.2.f    Root Domain Name System Security Extensions (DNSSEC) Key Management** --The Contractor shall be responsible for the management of the root zone Key Signing Key (KSK), including generation, publication, and use for signing the Root Keyset.  As delineated in the Requirements at Appendix 2 entitled Baseline Requirements for DNSSEC in the Authoritative Root Zone that is incorporated by reference herein as if fully set forth.  The Contractor shall work collaboratively with NTIA and the Root Zone Maintainer, in the performance of this function.

**C.2.9.2.g    Customer Service Complaint Resolution Process (CSCRP)** --The Contractor shall work with NTIA and collaborate with all interested and affected parties as enumerated in Section C.1.3 to establish and implement within six (6) months after date of contract award a process for IANA function customers to submit complaints for timely resolution that follows industry best practice and includes a reasonable timeframe for resolution.

**C.2.9.3    Allocate Internet Numbering Resources** --The Contractor shall have responsibility for allocated and unallocated IPv4 and IPv6 address space and Autonomous System Number (ASN)

space based on established guidelines and policies as developed by interested and affected parties as enumerated in Section C.1.3.  The Contractor shall delegate IP address blocks to Regional Internet Registries for routine allocation typically through downstream providers to Internet end-users within the regions served by those registries.  The Contractor shall also reserve and direct allocation of space for special purposes, such as multicast addressing, addresses for private networks as described in RFC 1918-Address Allocation for Private Internets, and globally specified applications.

**C.2.9.4    Other services --**   The Contractor shall operate the INT TLD within the current registration policies for the TLD.  Upon designation of a successor registry by the Government, if any, the Contractor shall cooperate with NTIA to facilitate the smooth transition of operation of the INT TLD.  Such cooperation shall, at a minimum, include timely transfer to the successor registry of the then-current top-level domain registration data.  The Contractor shall also implement modifications in performance of the IANA functions as needed upon mutual agreement of the parties.

**C.2.10**    The performance of the IANA functions as articulated in Section C.2 Contractor Requirements shall be in compliance with the performance exclusions enumerated in Section C. 8.

**C.2.11**    The Contracting Officer's Representative(COR) will perform final inspection and acceptance of all deliverables and reports articulated in Section C.2 Contractor Requirements. *Prior to publication/posting of reports the Contractor shall obtain approval from the COR.*  The COR shall not unreasonably withhold approval.

**C.2.12.a    Program Manager.**  The contractor shall provide trained, knowledgeable technical personnel according to the requirements of this contract.  All contractor personnel who interface with the CO and COR must have excellent oral and written communication skills. "Excellent oral and written communication skills" is defined as the capability to converse fluently, communicate effectively, and write intelligibly in the English language.  The IANA Functions Program Manager organizes, plans, directs, staffs, and coordinates the overall program effort; manages contract and subcontract activities as the authorized interface with the CO and COR and ensures compliance with Federal rules and regulations and responsible for the following:

- ➢ Shall be responsible for the overall contract performance and shall not serve in any other capacity under this contract.
- ➢ Shall have demonstrated communications skills with all levels of management.
- ➢ Shall meet and confer with COR and CO regarding the status of specific contractor activities and problems, issues, or conflicts requiring resolution.
- ➢ Shall be capable of negotiating and making binding decisions for the company.
- ➢ Shall have extensive experience and proven expertise in managing similar multi-task contracts of this type and complexity.

> ➢ Shall have extensive experience supervising personnel.
> ➢ Shall have a thorough understanding and knowledge of the principles and methodologies associated with program management and contract management.

**C.2.12.b**    The Contractor shall assign to this contract the following key personnel: IANA Functions Program Manager (C.2.9); IANA Function Liaison for Technical Protocol Parameters Assignment (C.2.9.1); IANA Function Liaison for Root Zone Management (C.2.9.2); IANA Function Liaison for Internet Number Resource Allocation (C.2.9.3).

## C.3    SECURITY REQUIREMENTS

**C.3.1    Secure Systems --** The Contractor shall install and operate all computing and communications systems in accordance with best business and security practices.  The Contractor shall implement a secure system for authenticated communications between it and its customers when carrying out all IANA function requirements.  The Contractor shall document practices and configuration of all systems.

**C.3.2    Secure Systems Notification --** The Contractor shall implement and thereafter operate and maintain a secure notification system at a minimum, capable of notifying all relevant stakeholders of the discrete IANA functions, of such events as outages, planned maintenance, and new developments.  In all cases, the Contractor shall notify the COR of any outages.

**C.3.3    Secure Data --** The Contractor shall ensure the authentication, integrity, and reliability of the data in performing each of the IANA functions.

**C.3.4    Security Plan --**The Contractor shall develop and execute a Security Plan that meets the requirements of this contract and Section C.3.  The Contractor shall document in the security plan the process used to ensure information systems including hardware, software, applications, and general support systems have effective security safeguards, which have been implemented, planned for, and documented.  The Contractor shall deliver the plan to the COR after each annual update.

**C.3.5    Director of Security --** The Contractor shall designate a Director of Security who shall be responsible for ensuring technical and physical security measures, such as personnel access controls.  The Contractor shall notify and consult in advance the COR when there are personnel changes in this position. The Director of Security shall be one of the key personnel assigned to this contract.

## C.4    PERFORMANCE METRIC REQUIREMENTS

**C.4.1    Meetings --** Program reviews and site visits shall occur annually.

**C.4.2   Monthly Performance Progress Report --** The Contractor shall prepare and submit to the COR a performance progress report every month (no later than 15 calendar days following the end of each month) that contains statistical and narrative information on the performance of the IANA functions (*i.e.*, assignment of technical protocol parameters; administrative functions associated with root zone management; and allocation of Internet numbering resources) during the previous calendar month.  The report shall include a narrative summary of the work performed for each of the functions with appropriate details and particularity.  The report shall also describe major events, problems encountered, and any projected significant changes, if any, related to the performance of requirements set forth in C.2.9 to C.2.9.4.

**C.4.3   Root Zone Management Dashboard --** The Contractor shall work collaboratively with NTIA and the Root Zone Maintainer, and all interested and affected parties as enumerated in Section C.1.3, to develop and make publicly available via a website, a dashboard to track the process flow for root zone management within nine (9) months after date of contract award.

**C.4.4   Performance Standards Reports --** The Contractor shall develop and publish reports for each discrete IANA function consistent with Section C.2.8.  The Performance Standards Metric Reports will be published via a website every month (no later than 15 calendar days following the end of each month) starting no later than six (6) months after date of contract award.

**C.4.5   Customer Service Survey (CSS) --** The Contractor shall collaborate with NTIA to develop and conduct an annual customer service survey consistent with the performance standards for each of the discrete IANA functions.  The survey shall include a feedback section for each discrete IANA function.  No later than 30 days after conducting the survey, the Contractor shall submit the CSS Report to the COR.

**C.4.6   Final Report --** The Contractor shall prepare and submit a final report on the performance of the IANA functions that documents standard operating procedures, including a description of the techniques, methods, software, and tools employed in the performance of the IANA functions.  The Contractor shall submit the report to the CO and the COR no later than 30 days after expiration of the contract.

**C.4.7   Inspection and Acceptance --** The COR will perform final inspection and acceptance of all deliverables and reports articulated in Section C.4.  *Prior to publication/posting of reports, the Contractor shall obtain approval from the COR*.  The COR shall not unreasonably withhold approval.

**C.5   AUDIT REQUIREMENTS**

**C.5.1   Audit Data --** The Contractor shall generate and retain security process audit record data for one year and provide an annual audit report to the CO and the COR. All root zone management operations shall be included in the audit, and records on change requests to the root zone file.  The Contractor shall retain these records in accordance with the clause at

SA1301-12-CN-0035

52.215-2. The Contractor shall provide specific audit record data to the CO and COR upon request.

**C.5.2   Root Zone Management Audit Data --** The Contractor shall generate and publish via a website a monthly audit report based on information in the performance of *Provision C.9.2(a-g) Perform Administrative Functions Associated With Root Zone Management*.  The audit report shall identify each root zone file and root zone "WHOIS" database change request and the relevant policy under which the change was made as well as identify change rejections and the relevant policy under which the change request was rejected.  The Report shall start no later than nine (9) months after date of contract award and thereafter is due to the COR no later than 15 calendar days following the end of each month.

**C.5.3   External Auditor - -** The Contractor shall have an external, independent, specialized compliance audit which shall be conducted annually and it shall be an audit of all the IANA functions security provisions against existing best practices and Section C.3 of this contract.

**C.5.4   Inspection and Acceptance --** The COR will perform final inspection and acceptance of all deliverables and reports articulated in Section C.5.  *Prior to publication/posting of reports, the Contractor shall obtain approval from the COR*.  The COR shall not unreasonably withhold approval.

**C. 6   CONFLICT OF INTEREST REQUIREMENTS**

**C.6.1** The Contractor shall take measures to avoid any activity or situation that could compromise, or give the appearance of compromising, the impartial and objective performance of the contract (e.g., a person has a conflict of interest if the person directly or indirectly appears to benefit from the performance of the contract).  The Contractor shall maintain a written, enforced conflict of interest policy that defines what constitutes a potential or actual conflict of interest for the Contractor.  At a minimum, this policy must address conflicts based on personal relationships or bias, financial conflicts of interest, possible direct or indirect financial gain from Contractor's policy decisions and employment and post-employment activities.   The conflict of interest policy must include appropriate sanctions in case of non-compliance, including suspension, dismissal and other penalties.

**C.6.2** The Contractor shall designate a senior staff member to serve as a Conflict of Interest Officer who shall be responsible for ensuring the Contractor is in compliance with the Contractor's internal and external conflict of interest rules and procedures. The Conflict of Interest Officer shall be one of the key personnel assigned to this contract.

**C.6.2.1** The Conflict of Interest Officer shall be responsible for distributing the Contractor's conflict of interest policy to all employees, directors, and subcontractors upon their election, re-election or appointment and annually thereafter.

**C.6.2.2**    The Conflict of Interest Officer shall be responsible for requiring that each of the Contractor's employees, directors and subcontractors complete a certification with disclosures of any known conflicts of interest upon their election, re-election or appointment, and annually thereafter.

**C.6.2.3**    The Conflict of Interest Officer shall require that each of the Contractor's employees, directors, and subcontractors promptly update the certification to disclose any interest, transaction, or opportunity covered by the conflict of interest policy that arises during the annual reporting period.

**C.6.2.4**    The Conflict of Interest Officer shall develop and publish subject to applicable laws and regulations, a Conflict Of Interest Enforcement and Compliance Report.  The report shall describe major events, problems encountered, and any changes, if any, related to Section C.6.

**C.6.2.5**    See also the clause at H.5. Organizational Conflict of Interest

## C. 7    CONTINUITY OF OPERATIONS

**C.7.1    Continuity of Operations (COP) –** The Contractor shall, at a minimum, maintain multiple redundant sites in at least 2, ideally 3 sites, geographically dispersed within the United States as well as multiple resilient communication paths between interested and affected parties as enumerated in Section C.1.3 to ensure continuation of the IANA functions in the event of cyber or physical attacks, emergencies, or natural disasters.

**C.7.2    Contingency and Continuity of Operations Plan  (The CCOP) –**  The Contractor shall collaborate with NTIA and the Root Zone Maintainer, and all interested and affected parties as enumerated in Section C.1.3, to develop and implement a CCOP for the IANA functions within nine (9) months after date of contract award.  The Contractor in collaboration with NTIA and the Root Zone Maintainer shall update and test the plan annually.  The CCOP shall include details on plans for continuation of each of the IANA functions in the event of cyber or physical attacks, emergencies, or natural disasters.  The Contractor shall submit the CCOP to the COR after each annual update.

**C.7.3    Transition to Successor Contractor –** In the event the Government selects a successor contractor, the Contractor shall have a plan in place for transitioning each of the IANA functions to ensure an orderly transition while maintaining continuity and security of operations.  The plan shall be submitted to the COR eighteen (18) months after date of contract award, reviewed annually, and updated as appropriate.

## C.8    PERFORMANCE EXCLUSIONS

**C.8.1**    This contract does not authorize the Contractor to make modifications, additions, or deletions to the root zone file or associated information.  (This contract does not alter the root

SA1301-12-CN-0035

zone file responsibilities as set forth in Amendment 11 of the Cooperative Agreement NCR-9218742 between the U.S. Department of Commerce and VeriSign, Inc. or any successor entity as designated by the U.S. Department of Commerce).  See Amendment 11 at http://ntia.doc.gov/files/ntia/publications/amend11_052206.pdf.

**C.8.2**   This contract does not authorize the Contractor to make material changes in the policies and procedures developed by the relevant entities associated with the performance of the IANA functions.  The Contractor shall not change or implement the established methods associated with the performance of the IANA functions without prior approval of the CO.

**C.8.3**   The performance of the functions under this contract, including the development of recommendations in connection with Section C.2.9.2, shall not be, in any manner, predicated or conditioned on the existence or entry into any contract, agreement or negotiation between the Contractor and any party requesting such changes or any other third-party.  Compliance with this Section must be consistent with C.2.9.2d.

SA1301-12-CN-0035

**Appendix 1:  Authoritative Root Zone Management Process** [1]



---

[1] The Root Zone management partners consist of the IANA Functions Operator (per the IANA functions contract), NTIA/Department of Commerce, and the Root Zone Maintainer (per the Cooperative Agreement with VeriSign (or any successor entity as designated by the U.S. Department of Commerce).

SA1301-12-CN-0035

**Appendix 2:  Baseline Requirements for DNSSEC in the Authoritative Root Zone**

DNSSEC at the authoritative Root Zone requires cooperation and collaboration between the root zone management partners and the Department.[2]  The baseline requirements encompass the responsibilities and requirements for both the IANA Functions Operator and the Root Zone Maintainer as described and delineated below.

**General Requirements**

The Root Zone system needs an overall security lifecycle, such as that described in ISO 27001, and any security policy for DNSSEC implementation must be validated against existing standards for security controls.

The remainder of this section highlights security requirements that must be considered in developing any solution. ISO 27002:2005 (formerly ISO 17799:2005) and NIST SP 800-53 are recognized sources for specific controls.  Note that reference to SP 800-53 is used as a convenient means of specifying a set of technical security requirements.[3]  It is expected that the systems referenced in this document will meet all the SP 800-53 technical security controls required by a HIGH IMPACT system.[4]

Whenever possible, references to NIST publications are given as a source for further information.  These Special Publications (SP) and FIPS documents are <u>not</u> intended as a future auditing checklist, but as non-binding guidelines and recommendations to establish a viable IT security policy.  Comparable security standards can be substituted where available and appropriate.  All of the NIST document references can be found on the NIST Computer Security Research Center webpage (http://www.csrc.nist.gov/).

**1) Security Authorization and Management Policy**

a) Each partner[5] in the Root Zone Signing process shall have a security policy in place; this security policy must be periodically reviewed and updated, as appropriate.

---

[2] The Root Zone management partners consist of the IANA Functions Operator (per the IANA functions contract), NTIA/Department of Commerce, and Root Zone Maintainer (per the Cooperative Agreement with VeriSign). This document outlines requirements for both the IANA Functions Operator and Root Zone Maintainer in the operation and maintenance of DNSSEC at the authoritative root zone.

[3] Note in particular that the use of the requirements in SP 800-53 does not imply that these systems are subject to other Federal Information Security Management Act (FISMA) processes.

[4] For the purpose of identifying SP 800-53 security requirements, the Root Zone system can be considered a HIGH IMPACT system with regards to integrity and availability as defined in FIPS 199.

[5] For this document, the roles in the Root Zone Signing process are those associated with the Key Signing Key holder, the Zone Signing Key holder, Public Key Distributor, and others to be conducted by the IANA Functions Operator and the Root Zone Maintainer.

SA1301-12-CN-0035

    i) Supplemental guidance on generating a Security Authorization Policy may be found in NIST SP 800-37.

b) These policies shall have a contingency plan component to account for disaster recovery (both man-made and natural disasters).[6]

    i) Supplemental guidance on contingency planning may be found in SP 800-34.

c) These policies shall address Incident Response detection, handling and reporting (see 4 below).

    i) Supplemental guidance on incident response handling may be found in NIST SP 800-61.

## 2) IT Access Control

a) There shall be an IT access control policy in place for each of the key management functions and it shall be enforced.

    i) This includes both access to hardware/software components and storage media as well as ability to perform process operations.
    ii) Supplemental guidance on access control policies may be found in NIST SP 800-12.

b) Users without authentication shall not perform any action in key management.

c) In the absence of a compelling operational requirement, remote access to any cryptographic component in the system (e.g. HSM) is not permitted.[7]

## 3) Security Training

a) All personnel participating in the Root Zone Signing process shall have adequate IT security training.

    i) Supplemental guidance on establishing a security awareness training program may be found in NIST SP 800-50.

## 4) Audit and Accountability Procedures

---

[6] For the IANA Functions Operator, the contingency plan must be consistent with and/or included in the "Contingency and Continuity of Operations Pan" as articulated in Section C.7 of the IANA functions contract.
[7] Remote access is any access where a user or information system communicates through a non-organization controlled network (e.g., the Internet).

SA1301-12-CN-0035

a) The organization associated with each role shall develop, disseminate, and periodically review/update:  (1) a formal, documented, audit and accountability policy that addresses purpose, scope, roles, responsibilities, management commitment, coordination among organizational entities, and compliance; and (2) formal, documented procedures to facilitate the implementation of the audit and accountability policy and associated audit and accountability controls.

   i)   Supplemental guidance on auditing and accountability policies may be found in NIST SP 800-12.
   ii)  Specific auditing events include the following:
        o   Generation of keys
        o   Generation of signatures
        o   Exporting of public key material
        o   Receipt and validation of public key material (i.e., from the ZSK holder or from TLDs)
        o   System configuration changes
        o   Maintenance and/or system updates
        o   Incident response handling
        o   Other events as appropriate

b) Incident handling for physical and exceptional cyber attacks[8] shall include reporting to the Department's National Telecommunications and Information Administration (NTIA) in a timeframe and format as mutually agreed by the Department, IANA Functions Operator, and Root Zone Maintainer.

c) The auditing procedures shall include monthly reporting to NTIA.[9]

d) The auditing system shall be capable of producing reports on an ad-hoc basis.

e) A version of these reports must be made publically available.

5) **Physical Protection Requirements**

a) There shall be physical access controls in place to only allow access to hardware components and media to authorized personnel.

   i)   Supplemental guidance on token based access may be found in NIST SP 800-73 and FIPS 201.
   ii)  Supplemental guidance on token based access biometric controls may be found in

---

[8] Non-exceptional events are to be included in monthly reporting as required in 4 c.
[9] For the IANA Functions Operator, audit reporting shall be incorporated into the audit report as articulated in C.5.2 of the IANA functions contract.

NIST SP 800-76.

b)  Physical access shall be monitored, logged, and registered for all users and visitors.

c)  All hardware components used to store keying material or generate signatures shall have short-term backup emergency power connections in case of site power outage. (*See,* SP 800-53r3)

d)  All organizations shall have appropriate protection measures in place to prevent physical damage to facilities as appropriate.

## 6)  All Components

a)  All commercial off the shelf hardware and software components must have an established maintenance and update procedure in place.

   i)  Supplemental guidance on establishing an upgrading policy for an organization may be found in NIST SP 800-40.

b)  All hardware and software components provide a means to detect and protect against unauthorized modifications/updates/patching.

**Role Specific Requirements**

## 7)  Root Zone Key Signing Key (KSK) Holder[10]

The Root Zone KSK Holder (RZ KSK) is responsible for:  (1) generating and protecting the private component of the RZ KSK(s); (2) securely exporting or importing any public key components, should this be required (3) authenticating and validating the public portion of the RZ Zone Signing Key (RZ ZSK); and (4) signing the Root Zone's DNSKEY record (ZSK/KSK).

   a)  **Cryptographic Requirements**

   i)  The RZ KSK key pair shall be an RSA key pair, with a modulus of at least 2048 bits.
   ii)  RSA key generation shall meet the requirements specified in FIPS 186-3.[11]  In particular, key pair generation shall meet the FIPS 186-3 requirements for exponent size and primality testing.
   iii)  The RZ KSK private key(s) shall be generated and stored on a FIPS 140-2 validated

---

[10] The Root Zone KSK Holder is a responsibility performed by the IANA Functions Operator.
[11] Note that FIPS 186-3 and FIPS 140-2 are referenced as requirements in sections a and b, rather than supplemental guidance.

hardware cryptographic module (HSM)[12], validated at Level 4 overall.[13]

iv)  RZ KSK Digital Signatures shall be generated using SHA-256.

v)  All cryptographic functions involving the private component of the KSK shall be performed within the HSM; that is, the private component shall only be exported from the HSM with the appropriate controls (FIPS 140-2) for purposes of key backup.

**b)  Multi-Party Control**

At least two persons shall be required to activate or access any cryptographic module that contains the complete RZ KSK private signing key.

i)  The RZ KSK private key(s) shall be backed up and stored under at least two-person control.  Backup copies shall be stored on FIPS 140-2 compliant HSM, validated at Level 4 overall, or shall be generated using m of n threshold scheme and distributed to organizationally separate parties.

ii)  Backup copies stored on HSMs shall be maintained in different physical locations[14], with physical and procedural controls commensurate to that of the operational system.

iii)  In the case of threshold secret sharing, key shares shall be physically secured by each of the parties.

iv)  In all cases, the names of the parties participating in multi-person control shall be maintained on a list that shall be made available for inspection during compliance audits.

**c)  Root Zone KSK Rollover**

i)  Scheduled rollover of the RZ KSK shall be performed.[15]  (See Contingency planning for unscheduled rollover.)

ii)  RZ KSK rollover procedures shall take into consideration the potential future need for algorithm rollover.

iii)  DNSSEC users shall be able to authenticate the source and integrity of the new RZ KSK using the previously trusted RZ KSK's public key.

**d)  Contingency Planning**

---

[12] FIPS 140 defines hardware cryptographic modules, but this specification will use the more common HSM (for hardware security module) as the abbreviation.

[13] Note that FIPS 186-3 and FIPS 140-2 are referenced as requirements in sections a and b, rather than supplemental guidance.

[14] Backup locations are to be within the United States.

[15] The Department envisions the timeline for scheduled rollover of the RZ KSK to be jointly developed and proposed by the IANA Functions Operator and Root Zone Maintainer, based on consultation and input from the affected parties (e.g. root server operators, large-scale resolver operators, etc).   Note that subsequent test plans may specify more or less frequent RZ KSK rollover to ensure adequate testing.

SA1301-12-CN-0035

    i)  Procedures for recovering from primary physical facility failures (e.g., fire or flood that renders the primary site inoperable) shall be designed to reconstitute capabilities within 48 hours.

    ii)  Procedures for emergency rollover of the RZ KSK shall be designed to achieve key rollover and publication within 48 hours.  These procedures, which are understood to address DNSSEC key provision only, should accommodate the following scenarios:

       (1)  The current RZ KSK has been compromised; and

       (2)  The current RZ KSK is unavailable, but is not believed to be compromised.

**e)  DNS Record Generation/Supporting RZ ZSK rollover**

    i)  The RZ KSK Holder shall authenticate the source and integrity of RZ ZSK public key material

       (1)  Mechanisms must support proof of possession and verify the parameters (i.e., the RSA exponent)

    ii)  The signature on the root zone's DNSKEY record shall be generated using SHA-256.

**f)  Audit Generation and Review Procedures**

    i)  Designated Audit personnel may not participate in the multi-person control for the RZ ZSK or RZ KSK.

    ii)  Audit logs shall be backed up offsite at least monthly.

    iii)  Audit logs (whether onsite or offsite) shall be protected from modification or deletion.

    iv)  Audit logs shall be made available upon request for Department review.

**8)  RZ KSK Public Key Distribution**

a)  The RZ KSK public key(s) shall be distributed in a secure fashion to preclude substitution attacks.

b)  Each mechanism used to distribute the RZ KSK public key(s) shall either

    i)  Establish proof of possession of the RZ KSK private key (for public key distribution); or

    ii)  Establish proof of possession of the previous RZ KSK private key (for Root zone key rollover).

**9)  RZ Zone Signing Key (RZ ZSK) Holder[16]**

---

[16] The RZ ZSK holder is a function performed by the Root Zone Maintainer, NOT the IANA Functions Operator.

SA1301-12-CN-0035

The Root Zone ZSK Holder (RZ ZSK) is responsible for (1) generating and protecting the private component of the RZ ZSK(s); (2) securely exporting or importing any public key components, should this be required and (3) generating and signing Zone File Data in accordance to the DNSSEC specifications.

### a) Cryptographic Requirements

i) The RZ ZSK key pair shall be an RSA key pair, with a modulus of at least 1024 bits.[17]

ii) RSA key generation shall meet the requirements specified in FIPS 186-3.[18] In particular, key pair generation shall meet the FIPS 186-3 requirements for exponent size and primality testing.

iii) RZ ZSK Digital Signatures shall be generated using SHA-256.

iv) The RZ ZSK private key(s) shall be generated and stored on a FIPS 140-2 compliant HSM. At a minimum, the HSM shall be validated at Level 4 overall.

v) All cryptographic functions involving the private component of the RZ ZSK shall be performed within the HSM; that is, the private component shall not be exported from the HSM except for purposes of key backup.

### b) Multi-Party Control

i) Activation of the RZ ZSK shall require at least two-person control. This requirement may be satisfied through a combination of physical and technical controls.

ii) If the RZ ZSK private key(s) are backed up, they shall be backed up and stored under at least two-person control. Backup copies shall be stored on FIPS 140-2 validated HSM, validated at Level 4 overall.[19]

(1) Backup copies shall be maintained both onsite and offsite[20], with physical and procedural controls commensurate to that of the operational system.

(2) The names of the parties participating in multi-person control shall be maintained on a list and made available for inspection during compliance audits.

### c) Contingency Planning

i) Procedures for recovery from failure of the operational HSM containing the RZ ZSK shall be designed to re-establish the capability to sign the zone within 2 hours.

ii) Procedures for emergency rollover of the RZ ZSK shall be designed to achieve key

---

[17] Note that these requirements correspond to those articulated in NIST SP 800-78 for authentication keys. Since there is no forward security requirement for the DNSSEC signed data, the more stringent requirements imposed on long term digital signatures do not apply.

[18] Note that FIPS 186-3 and FIPS 140-2 are referenced as requirements in sections 8a and 8 b, rather than as supplemental guidance.

[19] Note that FIPS 186-3 and FIPS 140-2 are referenced as requirements in sections 8a and 8 b, rather than as supplemental guidance.

[20] The Department expects backup locations to be within the United States.

rollover within a technically feasible timeframe as mutually agreed among the Department, Root Zone Maintainer, and the IANA functions operator.  These procedures must accommodate the following scenarios:

(1)  The current RZ ZSK has been compromised; and
(2)  The current RZ ZSK is unavailable (e.g. destroyed), but is not believed to be compromised.

**d)  Root Zone ZSK Rollover**

i)  The RZ ZSK shall be rolled over every six months at a minimum.[21]
ii)  DNSSEC users shall be able to authenticate the source and integrity of the new RZ ZSK using the previously trusted RZ ZSK's public key.
iii)  RZ KSK holder shall be able to authenticate the source and integrity of the new RZ ZSK.

**e)  Audit Generation and Review Procedures**

i)  Designated Audit personnel may not participate in the control for the RZ ZSK or RZ KSK.
ii)  Audit logs shall be backed up offsite at least monthly.
iii)  Audit logs (whether onsite or offsite) shall be protected from unauthorized access, modification, or deletion.
iv)  Audit logs shall be made available upon request for NTIA review.

**Other Requirements**

**10) Transition Planning**

a)  The IANA Functions Operator and Root Zone Maintainer shall have plans in place for transitioning the responsibilities for each role while maintaining continuity and security of operations.  In the event the IANA Functions Operator or Root Zone Maintainer are no longer capable of fulfilling their DNSSEC related roles and responsibilities (due to bankruptcy, permanent loss of facilities, etc.) or in the event the Department selects a successor, that party shall ensure an orderly transition of their DNSSEC roles and responsibilities in cooperation with the Department.[22]

**11) Personnel Security Requirements**

---

[21] The timelines specified in this document apply to the operational system.   Subsequent test plans may specify more or less frequent RZ ZSK rollover to ensure adequate testing.
[22] For the IANA Functions Operator, the transition plan shall be incorporated into that which is called for in section C.7.3 of the IANA functions contract.

SA1301-12-CN-0035

**a) Separation of Duties**

    i) Personnel holding a role in the multi-party access to the RZ KSK may not hold a role in the multi-party access to the RZ ZSK, or vice versa.

    ii) Designated Audit personnel may not participate in the multi-person control for the RZ ZSK or KSK.

    iii) Audit Personnel shall be assigned to audit the RZ KSK Holder or the RZ ZSK Holder, but not both.

**b) Security Training**

    i) All personnel with access to any cryptographic component used with the Root Zone Signing process shall have adequate training for all expected duties.

**12) Root Zone Maintainer Basic Requirements**

    a) Ability to receive NTIA authorized TLD Resource Record Set (RRset) updates from NTIA and IANA Functions Operator

    b) Ability to integrate TLD RRset updates into the final zone file

    c) Ability to accept NTIA authorized signed RZ keyset(s) and integrate those RRsets into the final zone file

**13) IANA Functions Operator Interface Basic Functionality**

    a) Ability to accept and process TLD DS records.  New functionality includes:

        i) Accept TLD DS RRs

            (1) Retrieve TLD DNSKEY record from the TLD, and perform parameter checking for the TLD keys, including verify that the DS RR has been correctly generated using the specified hash algorithm.

        ii) Develop with, and communicate to, TLD operators procedures for:

            (1)  Scheduled roll over for TLD key material

            (2) Supporting emergency key roll over for TLD key material.

            (3) Moving TLD from signed to unsigned in the root zone.

    b) Ability to submit TLD DS record updates to NTIA for authorization and  inclusion into the root zone by the Root Zone Maintainer.

    c) Ability to submit RZ keyset to NTIA for authorization and subsequent inclusion into the root zone by the Root Zone Maintainer.

**14)   Root Zone Management Requirements[23]**

---

[23] The Department envisions the IANA Functions Operator and Root Zone Maintainer jointly agree to utilizing pre-existing processes and/or deciding and proposing new methods by which each of these requirements are designed and implemented, subject to Department approval.

SA1301-12-CN-0035

a) Ability and process to store TLD delegations and DS RRs
b) Ability and process to store multiple keys for a delegation with possibly different algorithms
c) Ability and process to maintain a history of DS records used by each delegation
d) Procedures for managing scheduled roll over for TLD key material
e) Procedures for managing emergency key roll over for TLD key material.[24]
f) Procedures for managing the movement of TLD from signed to unsigned.[25]
g) Procedures for DNSSEC revocation at the root zone and returning the root zone to its pre-signed state.

---

[24] To the extent possible, on 24 hour notice under the existing manual system and on 12 hours notice once the automated system is utilized.
[25] To the extent possible, this must be within 48 hours.

SA1301-12-CN-0035

**SECTION D - PACKAGING AND MARKING**

**RESERVED**

SA1301-12-CN-0035

**SECTION E - INSPECTION AND ACCEPTANCE**

**E.1     INSPECTION AND ACCEPTANCE**

The Contracting Officer's Representative (COR) will perform final inspection and acceptance of all work performed, written communications regardless of form, reports, and other services and deliverables related to Section C prior to any publication/posting called for by this Contract. The CO reserves the right to designate other Government agents as authorized representatives upon unilateral written notice to the Contractor, which may be accomplished in the form of a transmittal of a copy of the authorization.  The Government reserves the right to inspect the premises, systems, and processes of all security and operational components used for the performance of all Contract requirements and obligations.

**E.2     INSPECTION -- TIME-AND-MATERIAL AND LABOR-HOUR (FAR 52.246-6) (MAY 2001)**

(a) *Definitions*. As used in this clause--

"Contractor's managerial personnel" means any of the Contractor's directors, officers, managers, superintendents, or equivalent representatives who have supervision or direction of --

(1) All or substantially all of the Contractor's business;

(2) All or substantially all of the Contractor's operation at any one plant or separate location where the contract is being performed; or

(3) A separate and complete major industrial operation connected with the performance of this contract.

"Materials" includes data when the contract does not include the Warranty of Data clause.

(b) The Contractor shall provide and maintain an inspection system acceptable to the Government covering the material, fabricating methods, work, and services under this contract. Complete records of all inspection work performed by the Contractor shall be maintained and made available to the Government during contract performance and for as long afterwards as the contract requires.

(c) The Government has the right to inspect and test all materials furnished and services performed under this contract, to the extent practicable at all places and times, including the period of performance, and in any event before acceptance. The Government may also inspect the plant or plants of the Contractor or any subcontractor engaged in contract performance.

SA1301-12-CN-0035

The Government shall perform inspections and tests in a manner that will not unduly delay the work.

(d) If the Government performs inspection or test on the premises of the Contractor or a subcontractor, the Contractor shall furnish and shall require subcontractors to furnish all reasonable facilities and assistance for the safe and convenient performance of these duties.

(e) Unless otherwise specified in the contract, the Government shall accept or reject services and materials at the place of delivery as promptly as practicable after delivery, and they shall be presumed accepted 60 days after the date of delivery, unless accepted earlier.

(f) At any time during contract performance, but not later than 6 months (or such other time as may be specified in the contract) after acceptance of the services or materials last delivered under this contract, the Government may require the Contractor to replace or correct services or materials that at time of delivery failed to meet contract requirements. Except as otherwise specified in paragraph (h) of this clause, the cost of replacement or correction shall be determined under the Payments Under Time-and-Materials and Labor-Hour Contracts clause, but the "hourly rate" for labor hours incurred in the replacement or correction shall be reduced to exclude that portion of the rate attributable to profit. The Contractor shall not tender for acceptance materials and services required to be replaced or corrected without disclosing the former requirement for replacement or correction, and, when required, shall disclose the corrective action taken.

(g)

(1) If the Contractor fails to proceed with reasonable promptness to perform required replacement or correction, and if the replacement or correction can be performed within the ceiling price (or the ceiling price as increased by the Government), the Government may --

(i) By contract or otherwise, perform the replacement or correction, charge to the Contractor any increased cost, or deduct such increased cost from any amounts paid or due under this contract; or

(ii) Terminate this contract for default.

(2) Failure to agree to the amount of increased cost to be charged to the Contractor shall be a dispute.

(h) Notwithstanding paragraphs (f) and (g) above, the Government may at any time require the Contractor to remedy by correction or replacement, without cost to the Government, any failure by the Contractor to comply with the requirements of this contract, if the failure is due to --

SA1301-12-CN-0035

(1) Fraud, lack of good faith, or willful misconduct on the part of the Contractor's managerial personnel; or

(2) The conduct of one or more of the Contractor's employees selected or retained by the Contractor after any of the Contractor's managerial personnel has reasonable grounds to believe that the employee is habitually careless or unqualified.

(i) This clause applies in the same manner and to the same extent to corrected or replacement materials or services as to materials and services originally delivered under this contract.

(j) The Contractor has no obligation or liability under this contract to correct or replace materials and services that at time of delivery do not meet contract requirements, except as provided in this clause or as may be otherwise specified in the contract.

(k) Unless otherwise specified in the contract, the Contractor's obligation to correct or replace Government-furnished property shall be governed by the clause pertaining to Government property.

SA1301-12-CN-0035

## SECTION F - DELIVERIES AND PERFORMANCE

### F.1    PERIOD OF PERFORMANCE

The period of performance of this contract is: October 1, 2012 – September 30, 2015.

### F.2    PLACE OF PERFORMANCE

The Contractor shall perform all work at the Contractor's facilities.

### F.3    DISTRIBUTION OF DELIVERABLES

The Contractor shall submit **one (1) copy** to the COR.

### F.4    DELIVERABLES

The listed below are the deliverables required by this contract.  Section C of this contract contains information about the deliverables.

| Clause No. | Clause | Deliverable | Due Date |
|---|---|---|---|
| C.2.6 | Transparency and Accountability | User instructional documentation including technical requirements | Six months after award |
| C.2.7 | Responsibility and Respect for Stakeholders | Documenting the source of the policies and procedures. | Six months after award |
| C.2.8 | Performance Standards | Performance Standards | Six months after award |
| C.2.9.2e | Root Zone Automation | Automated Root Zone | Nine months after award |
| C.2.9.2g | Customer Service Complaint Resolution Process (CSCRP) | Customer Compliant Process | Six months after award |
| C.3.4 | Security Plan | Documenting Practices and configuration of all systems | Annually |
| C.4.1 | Monthly Performance Progress Report includes DNSSEC | Report based on C.2 | Monthly |
| C.4.2 | Root Zone Management | Root Zone Management | Nine months |

SA1301-12-CN-0035

| Clause No. | Clause | Deliverable | Due Date |
|---|---|---|---|
| | Dashboard | Dashboard | after award |
| C.4.3 | Performance Standards Reports | Performance Standards Report | Six months after award and monthly thereafter |
| C.4.4 | Customer Service Survey | Customer Service Survey | Annual Report of Customer Survey |
| C.4.5 | Final Report | Final Report | Expiration of Contract |
| C.5.1 | Audit Data | Audit Report | Annually |
| C.5.2 | Root Zone Management Audit Data | Root Zone Management Audit Report | Nine Months after award and Monthly  Report thereafter |
| C.5.3 | External Auditor | External Audit Report | Annually |
| C.6.2.4 | Conflict of Interest Enforcement and Compliance Report | Enforcement and Compliance Report | Annually |
| C.7.2 | Contingency and Continuity of Operations Plan (The CCOP) | Contingency and Continuity of Operations for the continuation of the IANA Functions in case of an emergency. | Annually |
| C.7.3 | Transition to Successor | Transition plan in case of successor contractor. | Eighteen (18) months after date of contract award |

## F.5     GOVERNMENT RIGHTS TO DELIVERABLES

All deliverables provided under this contract become the property of the U.S. Government.

## F.6     GOVERNMENT REVIEW OF DELIVERABLES

The Government shall review all deliverables and determine acceptability.  Any deficiencies shall be corrected by the Contractor and resubmitted to the Government within ten (10) workdays after notification.

## F.7     REQUIRED DELIVERABLES

SA1301-12-CN-0035

The Contractor shall transmit all deliverables so the deliverables are received by the parties listed above on or before the indicated due dates.

**F.8     MEETINGS**

Program reviews will be scheduled monthly and site visits will occur annually.

SA1301-12-CN-0035

**SECTION G - CONTRACT ADMINISTRATION DATA**

Notwithstanding the Contractor's responsibility for total management during the performance of the contract, the administration of the contract will require maximum coordination between the Department of Commerce and the Contractor. The following individuals will be the Department of Commerce points of contact during the performance of the contract.

**G.1     CONTRACTING OFFICER'S AUTHORITY**

**CONTRACTING OFFICER'S AUTHORITY (CAR 1352.201-70) (APR 2010)**

The Contracting Officer is the only person authorized to make or approve any changes in any of the requirements of this contract, and, notwithstanding any provisions contained elsewhere in this contract, the said authority remains solely in the Contracting Officer. In the event the contractor makes any changes at the direction of any person other than the Contracting Officer, the change will be considered to have been made without authority and no adjustment will be made in the contract terms and conditions, including price.

**CONTRACTING OFFICER'S REPRESENTATIVE (COR) (CAR 1352.201-72) (APR 2010)**

(a)     **Vernita D. Harris, Deputy Associate Administrator** is hereby designated as the Contracting Officer's Representative (COR). The COR may be changed at any time by the Government without prior notice to the contractor by a unilateral modification to the contract.

> The COR is located at:
> 1401 Constitution Avenue, N.W., Room 4701, Washington, DC 20230
> PHONE NO:  202.482.4686
> Email: vharris@ntia.doc.gov

 (b)     The responsibilities and limitations of the COR are as follows:

(1) The COR is responsible for the technical aspects of the contract and serves as technical liaison with the contractor. The COR is also responsible for the final inspection and acceptance of all deliverables and such other responsibilities as may be specified in the contract.

(2) The COR is not authorized to make any commitments or otherwise obligate the Government or authorize any changes which affect the contract price, terms or conditions. Any contractor request for changes shall be referred to the Contracting Officer directly or through the COR. No such changes shall be made without the express written prior authorization of the Contracting Officer.  The Contracting Officer may designate assistant or alternate COR(s) to act for the COR by naming such

33

SA1301-12-CN-0035

assistant/alternate(s) in writing and transmitting a copy of such designation to the contractor.

SA1301-12-CN-0035

## SECTION H - SPECIAL CONTRACT REQUIREMENTS

## H.1     AUDIT AND RECORDS – NEGOTIATION (FAR 52.215-2) (OCT 2010)

(a) As used in this clause, "records" includes books, documents, accounting procedures and practices, and other data, regardless of type and regardless of whether such items are in written form, in the form of computer data, or in any other form.

(b) *Examination of costs.* If this is a cost-reimbursement, incentive, time-and-materials, labor-hour, or price redeterminable contract, or any combination of these, the Contractor shall maintain and the Contracting Officer, or an authorized representative of the Contracting Officer, shall have the right to examine and audit all records and other evidence sufficient to reflect properly all costs claimed to have been incurred or anticipated to be incurred directly or indirectly in performance of this contract. This right of examination shall include inspection at all reasonable times of the Contractor's plants, or parts of them, engaged in performing the contract.

(c) *Certified cost or pricing data.* If the Contractor has been required to submit certified cost or pricing data in connection with any pricing action relating to this contract, the Contracting Officer, or an authorized representative of the Contracting Officer, in order to evaluate the accuracy, completeness, and currency of the cost or pricing data, shall have the right to examine and audit all of the Contractor's records, including computations and projections, related to --

   (1) The proposal for the contract, subcontract, or modification;
   (2) The discussions conducted on the proposal(s), including those related to negotiating;
   (3) Pricing of the contract, subcontract, or modification; or
   (4) Performance of the contract, subcontract or modification.

(d) *Comptroller General—*

   (1) The Comptroller General of the United States, or an authorized representative, shall have access to and the right to examine any of the Contractor's directly pertinent records involving transactions related to this contract or a subcontract hereunder and to interview any current employee regarding such transactions.

   (2) This paragraph may not be construed to require the Contractor or subcontractor to create or maintain any record that the Contractor or subcontractor does not maintain in the ordinary course of business or pursuant to a provision of law.

(e) *Reports.* If the Contractor is required to furnish cost, funding, or performance reports, the Contracting Officer or an authorized representative of the Contracting Officer shall have the

SA1301-12-CN-0035

right to examine and audit the supporting records and materials, for the purpose of evaluating --

    (1) The effectiveness of the Contractor's policies and procedures to produce data compatible with the objectives of these reports; and

    (2) The data reported.

(f) *Availability*. The Contractor shall make available at its office at all reasonable times the records, materials, and other evidence described in paragraphs (a), (b), (c), (d), and (e) of this clause, for examination, audit, or reproduction, until 3 years after final payment under this contract or for any shorter period specified in Subpart 4.7, Contractor Records Retention, of the Federal Acquisition Regulation (FAR), or for any longer period required by statute or by other clauses of this contract. In addition --

    (1) If this contract is completely or partially terminated, the Contractor shall make available the records relating to the work terminated until 3 years after any resulting final termination settlement; and

    (2) The Contractor shall make available records relating to appeals under the Disputes clause or to litigation or the settlement of claims arising under or relating to this contract until such appeals, litigation, or claims are finally resolved.

(g) The Contractor shall insert a clause containing all the terms of this clause, including this paragraph (g), in all subcontracts under this contract that exceed the simplified acquisition threshold, and --

    (1) That are cost-reimbursement, incentive, time-and-materials, labor-hour, or price-redeterminable type or any combination of these;

    (2) For which certified cost or pricing data are required; or

    (3) That require the subcontractor to furnish reports as discussed in paragraph (e) of this clause.

    The clause may be altered only as necessary to identify properly the contracting parties and the Contracting Officer under the Government prime contract.

*Alternate I (Mar 2009).* As prescribed in 15.209 (b)(2), substitute the following paragraphs (d)(1) and (g) for paragraphs (d)(1) and (g) of the basic clause:

(d) *Comptroller General or Inspector General*.

SA1301-12-CN-0035

(1) The Comptroller General of the United States, an appropriate Inspector General appointed under section 3 or 8G of the Inspector General Act of 1978 (5 U.S.C. App.), or an authorized representative of either of the foregoing officials, shall have access to and the right to—

(i) Examine any of the Contractor's or any subcontractor's records that pertain to and involve transactions relating to this contract or a subcontract hereunder; and

(ii) Interview any officer or employee regarding such transactions.

(g)(1) Except as provided in paragraph (g)(2) of this clause, the Contractor shall insert a clause containing all the terms of this clause, including this paragraph (g), in all subcontracts under this contract. The clause may be altered only as necessary to identify properly the contracting parties and the Contracting Officer under the Government prime contract.

(2) The authority of the Inspector General under paragraph (d)(1)(ii) of this clause does not flow down to subcontracts.

*Alternate II (Apr 1998).* As prescribed in 15.209(b)(3), add the following paragraph (h) to the basic clause:

(h) The provisions of OMB Circular No.A-133, "Audits of States, Local Governments, and Nonprofit Organizations," apply to this contract.

*Alternate III (Jun 1999).* As prescribed in 15.209(b)(4), delete paragraph (d) of the basic clause and redesignate the remaining paragraphs accordingly, and substitute the following paragraph (e) for the redesignated paragraph (e) of the basic clause:

(e) Availability. The Contractor shall make available at its office at all reasonable times the records, materials, and other evidence described in paragraphs (a), (b), (c), and (d) of this clause, for examination, audit, or reproduction, until 3 years after final payment under this contract or for any shorter period specified in Subpart 4.7, Contractor Records Retention, of the Federal Acquisition Regulation (FAR), or for any longer period required by statute or by other clauses of this contract. In addition—

(1) If this contract is completely or partially terminated, the Contractor shall make available the records relating to the work terminated until 3 years after any resulting final termination settlement; and

(2) The Contractor shall make available records relating to appeals under the Disputes clause or to litigation or the settlement of claims arising under or relating to this contract until such appeals, litigation, or claims are finally resolved.

SA1301-12-CN-0035

**H.2     PATENT RIGHTS -- OWNERSHIP BY THE CONTRACTOR (FAR 52.227-11) (DEC 2007)**

(a) As used in this clause—

"Invention" means any invention or discovery that is or may be patentable or otherwise protectable under title 35 of the U.S. Code, or any variety of plant that is or may be protectable under the Plant Variety Protection Act (7 U.S.C. 2321, *et seq*.)

"Made" means—

> (1) When used in relation to any invention other than a plant variety, the conception or first actual reduction to practice of the invention; or

> (2) When used in relation to a plant variety, that the Contractor has at least tentatively determined that the variety has been reproduced with recognized characteristics.

"Nonprofit organization" means a university or other institution of higher education or an organization of the type described in section 501(c)(3) of the Internal Revenue Code of 1954 (26 U.S.C. 501(c)) and exempt from taxation under section 501(a) of the Internal Revenue Code (26 U.S.C. 501(a)) or any nonprofit scientific or educational organization qualified under a state nonprofit organization statute.

"Practical application" means to manufacture, in the case of a composition of product; to practice, in the case of a process or method, or to operate, in the case of a machine or system; and, in each case, under such conditions as to establish that the invention is being utilized and that is benefits are, to the extent permitted by law or Government regulations, available to the public on reasonable terms.

"Subject invention" means any invention of the Contractor made in the performance of work under this contract.

(b) *Contractor's rights.*

> (1) *Ownership.* The Contractor may retain ownership of each subject invention throughout the world in accordance with the provisions of this clause.

> (2) *License.*

>> (i) The Contractor shall retain a nonexclusive royalty-free license throughout the world in each subject invention to which the Government obtains title, unless the Contractor fails to disclose the invention within the times specified in paragraph (c) of this clause. The Contractor's license extends to any domestic subsidiaries and affiliates within the corporate structure of which the Contractor

38

is a part, and includes the right to grant sublicenses to the extent the Contractor was legally obligated to do so at contract award. The license is transferable only with the written approval of the agency, except when transferred to the successor of that part of the Contractor's business to which the invention pertains.

(ii) The Contractor's license may be revoked or modified by the agency to the extent necessary to achieve expeditious practical application of the subject invention in a particular country in accordance with the procedures in FAR 27.302(i)2() and 27.(304(f).

(c) *Contractor's obligations.*

(1) The Contractor shall disclose in writing each subject invention to the Contracting Officer within 2 months after the inventor discloses it in writing to Contractor personnel responsible for patent matters. The disclosure shall identify the inventor(s) and this contract under which the subject invention was made. It shall be sufficiently complete in technical detail to convey a clear understanding of the subject invention. The disclosure shall also identify any publication, on sale (*i.e.*, sale or offer for sale), or public use of the subject invention, or whether a manuscript describing the subject invention has been submitted for publication and, if so, whether it has been accepted for publication. In addition, after disclosure to the agency, the Contractor shall promptly notify the Contracting Officer of the acceptance of any manuscript describing the subject invention for publication and any on sale or public use.

(2) The Contractor shall elect in writing whether or not to retain ownership of any subject invention by notifying the Contracting Officer within 2 years of disclosure to the agency. However, in any case where publication, on sale, or public use has initiated the 1-year statutory period during which valid patent protection can be obtained in the United States, the period for election of title may be shortened by the agency to a date that is no more than 60 days prior to the end of the statutory period.

(3) The Contractor shall file either a provisional or a nonprovisional patent application or a Plant Variety Protection Application on an elected subject invention within 1 year after election. However, in any case where a publication, on sale, or public use has initiated the 1-year statutory period during which valid patent protection can be obtained in the United States, the Contractor shall file the application prior to the end of that statutory period. If the Contractor files a provisional application, it shall file a nonprovisional application within 10 months of the filing of the provisional application. The Contractor shall file patent applications in additional countries or international patent offices within either 10 months of the first filed patent application (whether provisional or nonprovisional) or 6 months from the date permission is granted by the Commissioner

SA1301-12-CN-0035

of Patents to file foreign patent applications where such filing has been prohibited by a Secrecy Order.

(4) The Contractor may request extensions of time for disclosure, election, or filing under paragraphs (c)(1), (c)(2), and (c)(3) of this clause.

(d) *Government's rights*—

(1) *Ownership*. The Contractor shall assign to the agency, on written request, title to any subject invention—

(i) If the Contractor fails to disclose or elect ownership to the subject invention within the times specified in paragraph (c) of this clause, or elects not to retain ownership; provided, that the agency may request title only within 60 days after learning of the Contractor's failure to disclose or elect within the specified times.

(ii) In those countries in which the Contractor fails to file patent applications within the times specified in paragraph (c) of this clause; provided, however, that if the Contractor has filed a patent application in a country after the times specified in paragraph (c) of this clause, but prior to its receipt of the written request of the agency, the Contractor shall continue to retain ownership in that country.

(iii) In any country in which the Contractor decides not to continue the prosecution of any application for, to pay the maintenance fees on, or defend in reexamination or opposition proceeding on, a patent on a subject invention.

(2) *License*. If the Contractor retains ownership of any subject invention, the Government shall have a nonexclusive, nontransferable, irrevocable, paid-up license to practice, or have practiced for or on its behalf, the subject invention throughout the world.

(e) *Contractor action to protect the Government's interest*.

(1) The Contractor shall execute or have executed and promptly deliver to the agency all instruments necessary to—

(i) Establish or confirm the rights the Government has throughout the world in those subject inventions in which the Contractor elects to retain ownership; and

(ii) Assign title to the agency when requested under paragraph (d) of this clause and to enable the Government to obtain patent protection and plant variety protection for that subject invention in any country.

40

SA1301-12-CN-0035

(2) The Contractor shall require, by written agreement, its employees, other than clerical and nontechnical employees, to disclose promptly in writing to personnel identified as responsible for the administration of patent matters and in the Contractor's format, each subject invention in order that the Contractor can comply with the disclosure provisions of paragraph (c) of this clause, and to execute all papers necessary to file patent applications on subject inventions and to establish the Government's rights in the subject inventions. The disclosure format should require, as a minimum, the information required by paragraph (c)(1) of this clause. The Contractor shall instruct such employees, through employee agreements or other suitable educational programs, as to the importance of reporting inventions in sufficient time to permit the filing of patent applications prior to U.S. or foreign statutory bars.

(3) The Contractor shall notify the Contracting Officer of any decisions not to file a nonprovisional patent application, continue the prosecution of a patent application, pay maintenance fees, or defend in a reexamination or opposition proceeding on a patent, in any country, not less than 30 days before the expiration of the response or filing period required by the relevant patent office.

(4) The Contractor shall include, within the specification of any United States nonprovisional patent or plant variety protection application and any patent or plant variety protection certificate issuing thereon covering a subject invention, the following statement, "This invention was made with Government support under (identify the contract) awarded by (identify the agency). The Government has certain rights in the invention."

(f) *Reporting on utilization of subject inventions.* The Contractor shall submit, on request, periodic reports no more frequently than annually on the utilization of a subject invention or on efforts at obtaining utilization of the subject invention that are being made by the Contractor or its licensees or assignees. The reports shall include information regarding the status of development, date of first commercial sale or use, gross royalties received by the Contractor, and other data and information as the agency may reasonably specify. The Contractor also shall provide additional reports as may be requested by the agency in connection with any march-in proceeding undertaken by the agency in accordance with paragraph (h) of this clause. The Contractor also shall mark any utilization report as confidential/proprietary to help prevent inadvertent release outside the Government. As required by 35 U.S.C. 202(c)(5), the agency will not disclose that information to persons outside the Government without the Contractor's permission.

(g) *Preference for United States industry*. Notwithstanding any other provision of this clause, neither the Contractor nor any assignee shall grant to any person the exclusive right to use or sell any subject invention in the United States unless the person agrees that any products embodying the subject invention or produced through the use of the subject invention will be manufactured substantially in the United States. However, in individual cases, the requirement

SA1301-12-CN-0035

for an agreement may be waived by the agency upon a showing by the Contractor or its assignee that reasonable but unsuccessful efforts have been made to grant licenses on similar terms to potential licensees that would be likely to manufacture substantially in the United States, or that under the circumstances domestic manufacture is not commercially feasible.

(h) *March-in rights*. The Contractor acknowledges that, with respect to any subject invention in which it has retained ownership, the agency has the right to require licensing pursuant to 35 U.S.C. 203 and 210(c), and in accordance with the procedures in 37 CFR 401.6 and any supplemental regulations of the agency in effect on the date of contract award.

(i) Special provisions for contracts with nonprofit organizations. If the Contractor is a nonprofit organization, it shall—

(1) Not assign rights to a subject invention in the United States without the written approval of the agency, except where an assignment is made to an organization that has as one of its primary functions the management of inventions, provided, that the assignee shall be subject to the same provisions as the Contractor;

(2) Share royalties collected on a subject invention with the inventor, including Federal employee co-inventors (but through their agency if the agency deems it appropriate) when the subject invention is assigned in accordance with 35 U.S.C. 202(e) and 37 CFR 401.10;

(3) Use the balance of any royalties or income earned by the Contractor with respect to subject inventions, after payment of expenses (including payments to inventors) incidental to the administration of subject inventions for the support of scientific research or education; and

(4) Make efforts that are reasonable under the circumstances to attract licensees of subject inventions that are small business concerns, and give a preference to a small business concern when licensing a subject invention if the Contractor determines that the small business concern has a plan or proposal for marketing the invention which, if executed, is equally as likely to bring the invention to practical application as any plans or proposals from applicants that are not small business concerns; provided, that the Contractor is also satisfied that the small business concern has the capability and resources to carry out its plan or proposal. The decision whether to give a preference in any specific case will be at the discretion of the Contractor.

(5) Allow the Secretary of Commerce to review the Contractor's licensing program and decisions regarding small business applicants, and negotiate changes to its licensing policies, procedures, or practices with the Secretary of Commerce when the Secretary's review discloses that the Contractor could take reasonable steps to more effectively implement the requirements of paragraph (i)(4) of this clause.

(j) *Communications*. [*Complete according to agency instructions*.]

(k) *Subcontracts*.

    (1) The Contractor shall include the substance of this clause, including this paragraph (k), in all subcontracts for experimental, developmental, or research work to be performed by a small business concern or nonprofit organization.

    (2) The Contractor shall include in all other subcontracts for experimental, developmental, or research work the substance of the patent rights clause required by FAR Subpart 27.3.

    (3) At all tiers, the patent rights clause must be modified to identify the parties as follows: references to the Government are not changed, and the subcontractor has all rights and obligations of the Contractor in the clause. The Contractor shall not, as part of the consideration for awarding the subcontract, obtain rights in the subcontractor's subject inventions.

    (4) In subcontracts, at any tier, the agency, the subcontractor, and the Contractor agree that the mutual obligations of the parties created by this clause constitute a contract between the subcontractor and the agency with respect to the matters covered by the clause; provided, however, that nothing in this paragraph is intended to confer any jurisdiction under the Contract Disputes Act in connection with proceedings under paragraph (h) of this clause.

**H.3    RESERVED**

**H.4    RIGHTS IN DATA – SPECIAL WORKS (FAR 52.227-17) (DEC 2007)**

(a) *Definitions*. As used in this clause--

"Data" means recorded information, regardless of form or the medium on which it may be recorded. The term includes technical data and computer software. The term does not include information incidental to contract administration, such as financial, administrative, cost or pricing, or management information.

"Unlimited rights" means the rights of the Government to use, disclose, reproduce, prepare derivative works, distribute copies to the public, and perform publicly and display publicly, in any manner and for any purpose, and to have or permit others to do so.

(b) *Allocation of Rights.*

    (1) The Government shall have—

SA1301-12-CN-0035

(i) Unlimited rights in all data delivered under this contract, and in all data first produced in the performance of this contract, except as provided in paragraph (c) of this clause for copyright.

(ii) The right to limit assertion of copyright in data first produced in the performance of this contract, and to obtain assignment of copyright in that data, in accordance with paragraph (c)(1) of this clause.

(iii) The right to limit the release and use of certain data in accordance with paragraph (d) of this clause.

(2) The Contractor shall have, to the extent permission is granted in accordance with paragraph (c)(1) of this clause, the right to assert claim to copyright subsisting in data first produced in the performance of this contract.

(c) *Copyright*—

(1) *Data first produced in the performance of this contract.*

(i) The Contractor shall not assert or authorize others to assert any claim to copyright subsisting in any data first produced in the performance of this contract without prior written permission of the Contracting Officer. When copyright is asserted, the Contractor shall affix the appropriate copyright notice of 17 U.S.C. 401 or 402 and acknowledgment of Government sponsorship (including contract number) to the data when delivered to the Government, as well as when the data are published or deposited for registration as a published work in the U.S. Copyright Office. The Contractor grants to the Government, and others acting on its behalf, a paid-up, nonexclusive, irrevocable, worldwide license for all delivered data to reproduce, prepare derivative works, distribute copies to the public, and perform publicly and display publicly, by or on behalf of the Government.

(ii) If the Government desires to obtain copyright in data first produced in the performance of this contract and permission has not been granted as set forth in paragraph (c)(1)(i) of this clause, the Contracting Officer shall direct the Contractor to assign (with or without registration), or obtain the assignment of, the copyright to the Government or its designated assignee.

(2) *Data not first produced in the performance of this contract.* The Contractor shall not, without prior written permission of the Contracting Officer, incorporate in data delivered under this contract any data not first produced in the performance of this contract and which contain the copyright notice of 17 U.S.C. 401 or 402, unless the

44

SA1301-12-CN-0035

Contractor identifies such data and grants to the Government, or acquires on its behalf, a license of the same scope as set forth in subparagraph (c)(1) of this clause.

(d) *Release and use restrictions.* Except as otherwise specifically provided for in this contract, the Contractor shall not use, release, reproduce, distribute, or publish any data first produced in the performance of this contract, nor authorize others to do so, without written permission of the Contracting Officer.

(e) *Indemnity*. The Contractor shall indemnify the Government and its officers, agents, and employees acting for the Government against any liability, including costs and expenses, incurred as the result of the violation of trade secrets, copyrights, or right of privacy or publicity, arising out of the creation, delivery, publication, or use of any data furnished under this contract; or any libelous or other unlawful matter contained in such data. The provisions of this paragraph do not apply unless the Government provides notice to the Contractor as soon as practicable of any claim or suit, affords the Contractor an opportunity under applicable laws, rules, or regulations to participate in the defense of the claim or suit, and obtains the Contractor's consent to the settlement of any claim or suit other than as required by final decree of a court of competent jurisdiction; and these provisions do not apply to material furnished to the Contractor by the Government and incorporated in data to which this clause applies.

## H.5    RIGHTS IN DATA -- EXISTING WORKS (FAR 52.227-18) (DEC 2007)

(a) Except as otherwise provided in this contract, the Contractor grants to the Government, and others acting on its behalf, a paid-up nonexclusive, irrevocable, worldwide license to reproduce, prepare derivative works, and perform publicly and display publicly, by or on behalf of the Government, for all the material or subject matter called for under this contract, or for which this clause is specifically made applicable.

(b) The Contractor shall indemnify the Government and its officers, agents, and employees acting for the Government against any liability, including costs and expenses, incurred as the result of (1) the violation of trade secrets, copyrights, or right of privacy or publicity, arising out of the creation, delivery, publication or use of any data furnished under this contract; or (2) any libelous or other unlawful matter contained in such data. The provisions of this paragraph do not apply unless the Government provides notice to the Contractor as soon as practicable of any claim or suit, affords the Contractor an opportunity under applicable laws, rules, or regulations to participate in the defense of the claim or suit, and obtains the Contractor's consent to the settlement of any claim or suit other than as required by final decree of a court of competent jurisdiction; and do not apply to material furnished to the Contractor by the Government and incorporated in data to which this clause applies.

## H.6    BANKRUPTCY (FAR 52.242-13) (JUL 1995)

SA1301-12-CN-0035

In the event the Contractor enters into proceedings relating to bankruptcy, whether voluntary or involuntary, the Contractor agrees to furnish, by certified mail or electronic commerce method authorized by the contract, written notification of the bankruptcy to the Contracting Officer responsible for administering the contract. This notification shall be furnished within five days of the initiation of the proceedings relating to bankruptcy filing. This notification shall include the date on which the bankruptcy petition was filed, the identity of the court in which the bankruptcy petition was filed, and a listing of Government contract numbers and contracting offices for all Government contracts against which final payment has not been made. This obligation remains in effect until final payment under this contract.

## H.7   PRINTING   (CAR 1352.208-70) (APR 2010)

(a) The contractor is authorized to duplicate or copy production units provided the requirement does not exceed 5,000 production units of any one page or 25,000 production units in the aggregate of multiple pages. Such pages may not exceed a maximum image size of 103/4by 141/4inches.  A "production unit" is one sheet, size 81/2x 11 inches (215 x 280 mm), one side only, and one color ink.  Production unit requirements are outlined in the Government Printing and Binding Regulations.

(b) This clause does not preclude writing, editing, preparation of manuscript copy, or preparation of related illustrative material as a part of this contract, or administrative duplicating/copying (for example, necessary forms and instructional materials used by the contractor to respond to the terms of the contract).

(c) Costs associated with printing, duplicating, or copying in excess of the limits in paragraph (a) of this clause are unallowable without prior written approval of the Contracting Officer. If the contractor has reason to believe that any activity required in fulfillment of the contract will necessitate any printing or substantial duplicating or copying, it shall immediately provide written notice to the Contracting Officer and request approval prior to proceeding with the activity. Requests will be processed by the Contracting Officer in accordance with FAR 8.802.

(d) The contractor shall include in each subcontract which may involve a requirement for any printing, duplicating, and copying in excess of the limits specified in paragraph (a) of this clause, a provision substantially the same as this clause, including this paragraph (d).

## H.8   KEY PERSONNEL (CAR 1352.237-75) (APR 2010)

(a) The contractor shall assign to this contract the following key personnel:

NAME                        POSITION

**Elise Gerich**            IANA Functions Program Manager

SA1301-12-CN-0035

| | |
|---|---|
| **Michelle Cotton** | IANA Function Liaison for Technical Protocol Parameters Assignment |
| **Kim Davies** | IANA Function Liaison for Root Zone Management |
| **Leo Vegoda** | IANA Function Liaison for Internet Number Resource Allocation |
| **Tomofumi Okubo** | Security Director |
| **Steve Antonoff** | Conflict of Interest Officer |

(b) The contractor shall obtain the consent of the Contracting Officer prior to making key personnel substitutions.  Replacements for key personnel must possess qualifications equal to or exceeding the qualifications of the personnel being replaced, unless an exception is approved by the Contracting Officer.

(c) Requests for changes in key personnel shall be submitted to the Contracting Officer at least 15 working days prior to making any permanent substitutions. The request should contain a detailed explanation of the circumstances necessitating the proposed substitutions, complete resumes for the proposed substitutes, and any additional information requested by the Contracting Officer. The Contracting Officer will notify the contractor within 10 working days after receipt of all required information of the decision on substitutions. The contract will be modified to reflect any approved changes.

## H.9    ORGANIZATIONAL CONFLICT OF INTEREST (CAR 1352.209-74) (APR 2010)

(a) Purpose. The purpose of this clause is to ensure that the contractor and its subcontractors:

(1) Are not biased because of their financial, contractual, organizational, or other interests which relate to the work under this contract, and

(2) Do not obtain any unfair competitive advantage over other parties by virtue of their performance of this contract.

(b) Scope. The restrictions described herein shall apply to performance or participation by the contractor, its parents, affiliates, divisions and subsidiaries, and successors in interest (hereinafter collectively referred to as "contractor") in the activities covered by this clause as a prime contractor, subcontractor, co-sponsor, joint venturer, consultant, or in any similar capacity. For the purpose of this clause, affiliation occurs when a business concern is controlled by or has the power to control another or when a third party has the power to control both.

(c) Warrant and Disclosure. The warrant and disclosure requirements of this paragraph apply with full force to both the contractor and all subcontractors. The contractor warrants that, to the best of the contractor's knowledge and belief, there are no relevant facts or circumstances which would give rise to an organizational conflict of interest, as defined in FAR Subpart 9.5, and that the contractor has disclosed all relevant information regarding any actual or potential conflict. The contractor agrees it shall make an immediate and full disclosure, in writing, to the

47

SA1301-12-CN-0035

Contracting Officer of any potential or actual organizational conflict of interest or the existence of any facts that may cause a reasonably prudent person to question the contractor's impartiality because of the appearance or existence of bias or an unfair competitive advantage. Such disclosure shall include a description of the actions the contractor has taken or proposes to take in order to avoid, neutralize, or mitigate any resulting conflict of interest.

(d) Remedies. The Contracting Officer may terminate this contract for convenience, in whole or in part, if the Contracting Officer deems such termination necessary to avoid, neutralize or mitigate an actual or apparent organizational conflict of interest. If the contractor fails to disclose facts pertaining to the existence of a potential or actual organizational conflict of interest or misrepresents relevant information to the Contracting Officer, the Government may terminate the contract for default, suspend or debar the contractor from Government contracting, or pursue such other remedies as may be permitted by law or this contract.

(e) Subcontracts. The contractor shall include a clause substantially similar to this clause, including paragraphs (f) and (g), in any subcontract or consultant agreement at any tier expected to exceed the simplified acquisition threshold. The terms "contract," "contractor," and "Contracting Officer" shall be appropriately modified to preserve the Government's rights.

(f) Prime Contractor Responsibilities. The contractor shall obtain from its subcontractors or consultants the disclosure required in FAR Part 9.507–1, and shall determine in writing whether the interests disclosed present an actual, or significant potential for, an organizational conflict of interest. The contractor shall identify and avoid, neutralize, or mitigate any subcontractor organizational conflict prior to award of the contract to the satisfaction of the Contracting Officer. If the subcontractor's organizational conflict cannot be avoided, neutralized, or mitigated, the contractor must obtain the written approval of the Contracting Officer prior to entering into the subcontract. If the contractor becomes aware of a subcontractor's potential or actual organizational conflict of interest after contract award, the contractor agrees that the Contractor may be required to eliminate the subcontractor from its team, at the contractor's own risk.

(g) Waiver. The parties recognize that this clause has potential effects which will survive the performance of this contract and that it is impossible to foresee each circumstance to which it might be applied in the future. Accordingly, the contractor may at any time seek a waiver from the Head of the Contracting Activity by submitting such waiver request to the Contracting Officer, including a full written description of the requested waiver and the reasons in support thereof.

## H.10   RESTRICTIONS AGAINST DISCLOSURE (CAR 1352.209-72) (APR 2010)

(a) The contractor agrees, in the performance of this contract, to keep the information furnished by the Government or acquired/developed by the contractor in performance of the contract and designated by the Contracting Officer or Contracting Officer's Representative, in

48

SA1301-12-CN-0035

the strictest confidence. The contractor also agrees not to publish or otherwise divulge such information, in whole or in part, in any manner or form, nor to authorize or permit others to do so, taking such reasonable measures as are necessary to restrict access to such information while in the contractor's possession, to those employees needing such information to perform the work described herein, *i.e.,* on a "need to know" basis. The contractor agrees to immediately notify the Contracting Officer in writing in the event that the contractor determines or has reason to suspect a breach of this requirement has occurred.

(b) The contractor agrees that it will not disclose any information described in subsection (a) to any person unless prior written approval is obtained from the Contracting Officer. The contractor agrees to insert the substance of this clause in any consultant agreement or subcontract hereunder.

## H.11   COMPLIANCE WITH LAWS (CAR 1352.209-73) (APR 2010)

The contractor shall comply with all applicable laws, rules and regulations which deal with or relate to performance in accord with the terms of the contract.

## H.12   DUPLICATION OF EFFORT (CAR 1352.231-71) (APR 2010)

The contractor hereby certifies that costs for work to be performed under this contract and any subcontracts hereunder are not duplicative of any costs charged against any other Government contract, subcontract, or other Government source. The contractor agrees to advise the Contracting Officer, in writing, of any other Government contract or subcontract it has performed or is performing which involves work directly related to the purpose of this contract. The contractor also certifies and agrees that any and all work performed under this contract shall be directly and exclusively for the use and benefit of the Government, and not incidental to any other work, pursuit, research, or purpose of the contractor, whose responsibility it will be to account for it accordingly.

## H.13   HARMLESS FROM LIABILITY

The Contractor shall hold and save the Government, its officers, agents, and employees harmless from liability of any nature or kind, including costs and expenses to which they may be subject, for or on account of any or all suits or damages of any character whatsoever resulting from injuries or damages sustained by any person or persons or property by virtue of performance of this contract, arising or resulting in whole or in part from the fault, negligence, wrongful act or wrongful omission of the Contractor, or any subcontractor, their employees, and agents.

## H.14   CONTRACTOR IDENTIFICATION RESPONSIBILITIES

SA1301-12-CN-0035

(a) All Contractor personnel attending meetings, answering Government telephones, and working in other situations where their Contractor status is not obvious to third parties, are required to identify themselves as such to avoid creating an impression in the minds of the public that they are Government officials.

(b) All documents or reports produced by the Contractor shall be suitably marked as Contractor products or that Contractor participation is appropriately identified.

## H.15   NOTICE REQUIREMENT

The Contractor agrees that it will immediately inform the Contracting Officer and the Contracting Officer's Representative in the event that the Contractor's Chairman of the Board of Directors initiates any investigation by an independent auditor of potential corporate insolvency.

## H.16   CERTIFICATION REGARDING TERRORIST FINANCING IMPLEMENTING EXECUTIVE ORDER 13224

(a) By signing and submitting this application, the prospective Contractor provides the certification set out below:

> (1) The Contractor, to the best of its current knowledge, did not provide, within the previous ten years, and will take all reasonable steps to ensure that it does not and will not knowingly provide, material support or resources to any individual or entity that commits, attempts to commit, advocates, facilitates or participates in terrorist acts, or has committed, attempted to commit, facilitated or participated in terrorist acts, as that term is defined in Executive Order 13224.

> (2) Before providing any material support or resources to an individual or entity, the Contractor will consider all information about that individual or entity of which it is aware and all public information that is reasonably available to it or of which it must be aware.

> (3) The Contractor also will implement reasonable monitoring and oversight procedures to safeguard against assistance being diverted to support terrorist activity.

(b) For the purposes of this certification, the Contractor's obligations under paragraph "a" are not applicable to the procurement of goods and/or services by the Contractor that are acquired in the ordinary course of business through contract or purchase, e.g., utilities, rents, office supplies, gasoline, unless the Contractor has reason to believe that a vendor or supplier of such goods and services commits, attempts to commit, advocates, facilitates or participates in terrorist acts, or has committed, attempted to commit, facilitated or participated in terrorist acts.

SA1301-12-CN-0035

(c) This certification is an express term and condition of any agreement issued as a result of this application, and any violation of it shall be grounds for unilateral termination of the agreement by DoC prior to the end of its term.

SA1301-12-CN-0035

## SECTION I - CONTRACT CLAUSES

**FEDERAL ACQUISITION REGULATION (FAR)**

**I.1     52.252-2 CLAUSES INCORPORATED BY REFERENCE (FEB 1998)**

This contract incorporates one or more clauses by reference, with the same force and effect as if they were given in full text. Upon request, the Contracting Officer will make their full text available. Also, the full text of a clause may be accessed electronically at this address: **https://www.acquisition.gov/far/**

**I.2     52.202-1 DEFINITIONS (JUL 2004)**

**I.3     52.203-3 GRATUTIES (APR 1984)**

**I.4     52.203-5 COVENANT AGAINST CONTINGENT FEES (APR 1984)**

**I.5     52.203-6 RESTRICTIONS ON SUBCONTRACTOR SALES TO THE GOVERNMENT (JUL 1995)**

**I.6     52.203-7 ANTI-KICKBACK PROCEDURES (JUL 1995)**

**I.7     52.203-8 CANCELLATION, RESCISSION, AND RECOVERY OF FUNDS FOR ILLEGAL OR IMPROPER ACTIVITY (JAN 1997)**

**I.8     52.203-12 LIMITATION ON PAYMENTS TO INFLUENCE CERTAIN FEDERAL TRANSACTIONS (SEPT 2007)**

**I.9     52.203-13 CONTRACTOR CODE OF BUSINESS ETHICS AND CONDUCT (APR 2010)**

**I.10     52.204-2 SECURITY REQUIREMENTS (AUG 2000)**

**I.11     52.204-4 PRINTED OR COPIED DOUBLE-SIDED ON RECYCLED PAPER (AUG 2000)**

**I.12     52.214-34 SUBMISSION OF OFFERS IN THE ENGLISH LANGUAGE (APR 1991)**

**I.13     52.215-8 ORDER OF PRECEDENCE—UNIFORM CONTRACT FORMAT (OCT 1997)**

**I.14     52.216-7 ALLOWABLE COST AND PAYMENT (JUN 2011)**

**I.15     RESERVED**

**I.16     52.222-21 PROHIBITION OF SEGREGATED FACILITIES (FEB 1999)**

**I.17     52.222-26 EQUAL OPPORTUNITY (MAR 2007)**

SA1301-12-CN-0035

**I.18**   **52.222.35 EQUAL OPPORTUNITY FOR SPECIAL DISABLED VETERANS, VETERANS OF THE VIETNAM ERA, AND OTHER ELIGIBLE VETERANS (SEP 2006)**

**I.19**   **52.222-36 AFFIRMATIVE ACTION FOR WORKERS WITH DISABILITIES (JUN 1998)**

**I.20**   **52.222-37 EMPLOYMENT REPORTS ON SPECIAL DISABLED VETERANS, VETERANS OF THE VIETNAM ERA, AND OTHER ELIGIBLE VETERANS (SEP 2006)**

**I.21**   **52.222-50 COMBATTING TRAFFICKING IN PERSONS (FEB 2009)**

**I.22**   **52.222-54 EMPLOYMENT ELIGIBILITY VERIFICATION (JAN 2009)**

**I.23**   **52.223-6 DRUG-FREE WORKPLACE (MAY 2001)**

**I.24**   **52.223-18 ENCOURAGING CONTRACTOR POLICIES TO BAN TEXT MESSAGING WHILE DRIVING (AUG 2011)**

**I.25**   **52.225-13 RESTRICTIONS ON CERTAIN FOREIGN PURCHASES (JUN 2008)**

**I.26**   **52.227-1 AUTHORIZATION AND CONSENT (DEC 2007)**

**I.27**   **52.227-2 NOTICE OF ASSISTANCE REGARDING PATENT AND COPYRIGHT INFRINGEMENT (DEC 2007)**

**I.28**   **52.227-3 PATENT INDEMNITY (APR 1984)**

**I.29**   **52.227-14 RIGHTS IN DATA—GENERAL, ALTERNATES I, II, III, IV (DEC 2007)**

**I.30**   **52.229-3 FEDERAL, STATE AND LOCAL TAXES (APR 2003)**

**I.31**   **52.232-20 LIMITATION OF COST (APR 1984)**

**I.32**   **52.232-23 ASSIGNMENT OF CLAIMS (JAN 1986)**

**I.33**   **52.232-25 PROMPT PAYMENT (OCT 2008)**

**I.34**   **52.232-33 PAYMENT BY ELECTRONIC FUNDS TRANSFER—CENTRAL CONTRACTOR REGISTRATION (OCT 2003)**

**I.35**   **52.233-1 DISPUTES (JUL 2002), ALTERNATE I (DEC 1991)**

**I.36**   **52.233-3 PROTEST AFTER AWARD (AUG 1996)**

SA1301-12-CN-0035

I.37     52.233-4 APPLICABLE LAW FOR BREACH OF CONTRACT CLAIM (OCT 2004)

I.38     52.239-1 PRIVACY OR SECURITY SAFEGUARDS (AUG 1996)

I.39     52.242-1 NOTICE OF INTENT TO DISALLOW COSTS (APR 1984)

I.40     52.242-4 CERTIFICATION OF FINAL INDIRECT COSTS (JAN 1997)

I.41     52.242-13 BANKRUPTCY (JUL 1995)

I.42     52.242-14 SUSPENSION OF WORK (APR 1984)

I.43     52.242-15 STOP-WORK ORDER (AUG 1989)

I.44     52.243-1 CHANGES-FIXED PRICE (AUG 1987) Alternate I (APR 1984)

I.45     52.243-2 CHANGES--COST-REIMBURSEMENT (AUG 1987), ALTERNATE I (APR 1984)

I.46     52.244-2 SUBCONTRACTS (OCT 2010)

I.47     52.244-6 SUBCONTRACTS FOR COMMERCIAL ITEMS (DEC 2010)

I.48     52.245-1 GOVERNMENT PROPERTY (APR 2012)

I.49     52.246-20 WARRANTY OF SERVICES (MAY 2001)
         [The Contracting Officer shall give written notice of any defect or nonconformance to
         the Contractor within 120 days from the date of acceptance by the Government.]

I.50     52.246-25 LIMITATION OF LIABILITY—SERVICES (FEB 1997)

I.51     52.249-2 TERMINATION FOR CONVENIENCE OF THE GOVERNMENT (MAY 2004) ALT II
         (SEP 1996)

I.52      52.249-5 TERMINATION FOR CONVENIENCE OF THE GOVERNMENT
         (EDUCATIONAL AND OTHER NONPROFIT INSTITUTIONS) (SEP 1996)

I.53      52.249-6 TERMINATION (COST REIMBURSEMENT) (MAY 2004) (ALT V) (SEP 1996)

I.54     52.249-14 EXCUSABLE DELAYS (APR 1984)

I.55     52.253-1 COMPUTER GENERATED FORMS (JAN 1991)

SA1301-12-CN-0035

**CLAUSES INCORPORATED IN FULL TEXT**

**I.56    52.204-7 CENTRAL CONTRACTOR REGISTRATION (FEB 2012)**

(a) Definitions. As used in this clause—

*"Central Contractor Registration (CCR) database"* means the primary Government repository for Contractor information required for the conduct of business with the Government.

*"Data Universal Numbering System (DUNS) number"* means the 9-digit number assigned by Dun and Bradstreet, Inc. (D&B) to identify unique business entities.

*"Data Universal Numbering System+4 (DUNS+4) number"* means the DUNS number means the number assigned by D&B plus a 4-character suffix that may be assigned by a business concern. (D&B has no affiliation with this 4-character suffix.) This 4-character suffix may be assigned at the discretion of the business concern to establish additional CCR records for identifying alternative Electronic Funds Transfer (EFT) accounts (see the FAR at Subpart 32.11) for the same concern.

*"Registered in the CCR database"* means that—

> (1) The Contractor has entered all mandatory information, including the DUNS number or the DUNS+4 number, into the CCR database; and

> (2) The Government has validated all mandatory data fields, to include validation of the Taxpayer Identification Number (TIN) with the Internal Revenue Service (IRS), and has marked the record "Active". The Contractor will be required to provide consent for TIN validation to the Government as a part of the CCR registration process.

(b)

> (1) By submission of an offer, the offeror acknowledges the requirement that a prospective awardee shall be registered in the CCR database prior to award, during performance, and through final payment of any contract, basic agreement, basic ordering agreement, or blanket purchasing agreement resulting from this solicitation.

> (2) The offeror shall enter, in the block with its name and address on the cover page of its offer, the annotation "DUNS" or "DUNS+4" followed by the DUNS or DUNS+4 number that identifies the offeror's name and address exactly as stated in the offer. The DUNS number will be used by the Contracting Officer to verify that the offeror is registered in the CCR database.

SA1301-12-CN-0035

(c) If the offeror does not have a DUNS number, it should contact Dun and Bradstreet directly to obtain one.

(1) An offeror may obtain a DUNS number—

(i) Via the internet at http://fedgov.dnb.com/webform or if the offeror does not have internet access, it may call Dun and Bradstreet at 1-866-705-5711 if located within the United States; or

(ii) If located outside the United States, by contacting the local Dun and Bradstreet office. The offeror should indicate that it is an offeror for a U.S. Government contract when contacting the local Dun and Bradstreet office.

(2) The offeror should be prepared to provide the following information:

(i) Company legal business name.

(ii) Tradestyle, doing business, or other name by which your entity is commonly recognized.

(iii) Company physical street address, city, state and Zip Code.

(iv) Company mailing address, city, state and Zip Code (if separate from physical).

(v) Company telephone number.

(vi) Date the company was started.

(vii) Number of employees at your location.

(viii) Chief executive officer/key manager.

(ix) Line of business (industry).

(x) Company Headquarters name and address (reporting relationship within your entity).

(d) If the Offeror does not become registered in the CCR database in the time prescribed by the Contracting Officer, the Contracting Officer will proceed to award to the next otherwise successful registered Offeror.

SA1301-12-CN-0035

(e) Processing time, which normally takes 48 hours, should be taken into consideration when registering. Offerors who are not registered should consider applying for registration immediately upon receipt of this solicitation.

(f) The Contractor is responsible for the accuracy and completeness of the data within the CCR database, and for any liability resulting from the Government's reliance on inaccurate or incomplete data. To remain registered in the CCR database after the initial registration, the Contractor is required to review and update on an annual basis from the date of initial registration or subsequent updates its information in the CCR database to ensure it is current, accurate and complete. Updating information in the CCR does not alter the terms and conditions of this contract and is not a substitute for a properly executed contractual document.

(g)

(1)

(i) If a Contractor has legally changed its business name, "doing business as" name, or division name (whichever is shown on the contract), or has transferred the assets used in performing the contract, but has not completed the necessary requirements regarding novation and change-of-name agreements in Subpart 42.12, the Contractor shall provide the responsible Contracting Officer a minimum of one business day's written notification of its intention to:

(A) Change the name in the CCR database;

(B) Comply with the requirements of Subpart 42.12 of the FAR;

(C) Agree in writing to the timeline and procedures specified by the responsible Contracting Officer. The Contractor must provide with the notification sufficient documentation to support the legally changed name.

(ii) If the Contractor fails to comply with the requirements of paragraph (g)(1)(i) of this clause, or fails to perform the agreement at paragraph (g)(1)(i)(C) of this clause, and, in the absence of a properly executed novation or change-of-name agreement, the CCR information that shows the Contractor to be other than the Contractor indicated in the contract will be considered to be incorrect information within the meaning of the "Suspension of Payment" paragraph of the electronic funds transfer (EFT) clause of this contract.

(2) The Contractor shall not change the name or address for EFT payments or manual payments, as appropriate, in the CCR record to reflect an assignee for the purpose of

57

SA1301-12-CN-0035

assignment of claims (see FAR Subpart 32.8, Assignment of Claims). Assignees shall be separately registered in the CCR database. Information provided to the Contractor's CCR record that indicates payments, including those made by EFT, to an ultimate recipient other than that Contractor will be considered to be incorrect information within the meaning of the "Suspension of payment" paragraph of the EFT clause of this contract.

(h) Offerors and Contractors may obtain information on registration and annual confirmation requirements via the CCR accessed through https://www.acquisition.gov or by calling 1-888-227-2423, or 269-961-5757.

### I.57    52.216-11 COST CONTRACT – NO FEE (APR 1984)

(a) The Government shall not pay the Contractor a fee for performing this contract.

### I.58    52.217-8 OPTION TO EXTEND SERVICES (NOV 1999)

The Government may require continued performance of any services within the limits and at the rates specified in the contract. The option provision may be exercised more than once, but the total extension of performance hereunder shall not exceed 6 months. The Contracting Officer may exercise the option by written notice to the Contractor within 15 calendar days of expiration of the contract.

### I.59   52.217-9 OPTION TO EXTEND THE TERM OF THE CONTRACT (MAR 2000)

(a)    The Government may extend the term of this contract by written notice to the Contractor **within 15 calendar days before the expiration of the contract**; provided that the Government gives the Contractor a preliminary written notice of its intent to extend **at least 30 calendar days before the contract expires**. The preliminary notice does not commit the Government to an extension.

(b)    If the Government exercises this option, the extended contract shall be considered to include this option clause.

(c)    The total duration of this contract, including the exercise of any options under this clause, shall not exceed seven years.

### I.60   52.233-2 SERVICE OF PROTEST (SEP 2006)

(a) Protests, as defined in section 31.101 of the Federal Acquisition Regulation, that are filed directly with an agency, and copies of any protests that are filed with the Government Accountability Office (GAO), shall be served on the Contracting Officer addressed as follows: Mona-Lisa Dunn, Contracting Officer, 1401 Constitution Avenue, NW, Room 6521, Washington, DC  20230 by obtaining written and dated acknowledgment of receipt from Mona-Lisa Dunn.

SA1301-12-CN-0035

(b) The copy of any protest shall be received in the office designated above within one day of filing a protest with the GAO.

**I.61   52.237-3 CONTINUITY OF SERVICES (JAN 1991)**

(a) The Contractor recognizes that the services under this contract are vital to the Government and must be continued without interruption and that, upon contract expiration, a successor, either the Government or another contractor, may continue them. The Contractor agrees to --

    (1) Furnish phase-in training; and

    (2) Exercise its best efforts and cooperation to effect an orderly and efficient transition to a successor.

(b) The Contractor shall, upon the Contracting Officer's written notice,

    (1) furnish phase-in, phase-out services for up to 90 days after this contract expires and

    (2) negotiate in good faith a plan with a successor to determine the nature and extent of phase-in, phase-out services required.

The plan shall specify a training program and a date for transferring responsibilities for each division of work described in the plan, and shall be subject to the Contracting Officer's approval. The Contractor shall provide sufficient experienced personnel during the phase-in, phase-out period to ensure that the services called for by this contract are maintained at the required level of proficiency.

(c) The Contractor shall allow as many personnel as practicable to remain on the job to help the successor maintain the continuity and consistency of the services required by this contract. The Contractor also shall disclose necessary personnel records and allow the successor to conduct on-site interviews with these employees. If selected employees are agreeable to the change, the Contractor shall release them at a mutually agreeable date and negotiate transfer of their earned fringe benefits to the successor.

(d) The Contractor shall be reimbursed for all reasonable phase-in, phase-out costs (i.e., costs incurred within the agreed period after contract expiration that result from phase-in, phase-out operations) and a fee (profit) not to exceed a pro rata portion of the fee (profit) under this contract.

**COMMERCE ACQUISITION REGULATION (CAR) CLAUSES INCORPORATED IN FULL TEXT**

**I.62   1352.208-70 RESTRICTIONS ON PRINTING AND DUPLICATING (APR 2010)**

SA1301-12-CN-0035

(a)  The contractor is authorized to duplicate or copy production units provided the requirement does not exceed 5,000 production units of any one page or 25,000 production units in the aggregate of multiple pages.  Such pages may not exceed a maximum image size of 10-3/4 by 14-1/4 inches.  A "production unit" is one sheet, size 8-1/2 x 11 inches (215 x 280 mm), one side only, and one color ink.  Production unit requirements are outlined in the Government Printing and Binding Regulations.

(b)  This clause does not preclude writing, editing, preparation of manuscript copy, or preparation of related illustrative material as a part of this contract, or administrative duplicating/copying (for example, necessary forms and instructional materials used by the contractor to respond to the terms of the contract).

(c)  Costs associated with printing, duplicating, or copying in excess of the limits in paragraph (a) of this clause are unallowable without prior written approval of the Contracting Officer.  If the contractor has reason to believe that any activity required in fulfillment of the contract will necessitate any printing or substantial duplicating or copying, it shall immediately provide written notice to the Contracting Officer and request approval prior to proceeding with the activity.  Requests will be processed by the Contracting Officer in accordance with FAR 8.802.

(d)  The contractor shall include in each subcontract which may involve a requirement for any printing, duplicating, and copying in excess of the limits specified in paragraph (a) of this clause, a provision substantially the same as this clause, including this paragraph (d).

**I.63   1352.209-72 RESTRICTIONS AGAINST DISCLOSURE (APR 2010)**

(a)  The contractor agrees, in the performance of this contract, to keep the information furnished by the Government or acquired/developed by the contractor in performance of the contract and designated by the Contracting Officer or Contracting Officer's Representative, in the strictest confidence.  The contractor also agrees not to publish or otherwise divulge such information, in whole or in part, in any manner or form, nor to authorize or permit others to do so, taking such reasonable measures as are necessary to restrict access to such information while in the contractor's possession, to those employees needing such information to perform the work described herein, *i.e.*, on a "need to know" basis.  The contractor agrees to immediately notify the Contracting Officer in writing in the event that the contractor determines or has reason to suspect a breach of this requirement has occurred.

(b)  The contractor agrees that it will not disclose any information described in subsection (a) to any person unless prior written approval is obtained from the Contracting Officer.  The contractor agrees to insert the substance of this clause in any consultant agreement or subcontract hereunder.

### I.64   1352.209-73 COMPLIANCE WITH THE LAWS (APR 2010)

The contractor shall comply with all applicable laws, rules and regulations which deal with or relate to performance in accord with the terms of the contract.

### I.65   1352.233-70 AGENCY PROTESTS (APR 2010)

(a) An agency protest may be filed with either: (1) The Contracting Officer, or (2) at a level above the Contracting Officer, with the appropriate agency Protest Decision Authority. *See* 64 FR 16,651 (April 6, 1999).

(b) Agency protests filed with the Contracting Officer shall be sent to the following address:

> **Ms. Mona-Lisa Dunn, Contracting Officer**
> U.S. Department of Commerce
> Office of Acquisition Management
> Commerce Acquisition Solutions, Room 6521
> 14th and Constitution Avenue, NW
> Washington, D.C. 20230
> Fax: 202-482-1470
> Email:  mdunn@doc.gov

(c) Agency protests filed with the agency Protest Decision Authority shall be sent to the following address:

> **Mr. Mark Langstein, Esquire**
> U.S. Department of Commerce
> Office of the General Counsel
> Contract Law Division--Room 5893
> Herbert C. Hoover Building
> 14th Street and Constitution Avenue, NW
> Washington, D.C. 20230.
> FAX: (202) 482-5858

(d) A complete copy of all agency protests, including all attachments, shall be served upon the Contract Law Division of the Office of the General Counsel within one day of filing a protest with either the Contracting Officer or the Protest Decision Authority.

(e) Service upon the Contract Law Division shall be made as follows: U.S. Department of Commerce, Office of the General Counsel, Chief, Contract Law Division, Room 5893, Herbert C. Hoover Building, 14th Street and Constitution Avenue, NW., Washington, DC 20230. FAX: (202) 482–5858.

**I.66   1352.233-71 GAO AND COURT OF FEDERAL CLAIMS PROTESTS (APR 2010)**

(a) A protest may be filed with either the Government Accountability Office (GAO) or the Court of Federal Claims unless an agency protest has been filed.

(b) A complete copy of all GAO or Court of Federal Claims protests, including all attachments, shall be served upon (i) the Contracting Officer, and (ii) the Contract Law Division of the Office of the General Counsel, within one day of filing a protest with either GAO or the Court of Federal Claims.

(c) Service upon the Contract Law Division shall be made as follows: U.S. Department of Commerce, Office of the General Counsel, Chief, Contract Law Division, Room 5893, Herbert C. Hoover Building, 14th Street and Constitution Avenue, NW., Washington, DC 20230. FAX: (202) 482–5858.

**I.67   1352.237-71  SECURITY PROCESSING REQUIREMENTS - LOW RISK CONTRACTS (APR 2010)**

(a)  Investigative Requirements for Low Risk Contracts.  All contractor (and subcontractor) personnel proposed to be employed under a Low Risk contract shall undergo security processing by the Department's Office of Security before being eligible to work on the premises of any Department of Commerce owned, leased, or controlled facility in the United States or overseas, or to obtain access to a Department of Commerce IT system. All Department of Commerce security processing pertinent to this contract will be conducted at no cost to the contractor.

(b) Investigative requirements for Non-IT Service Contracts are:

(1)  Contracts more than 180 days – National Agency Check and Inquiries (NACI)

(2)       Contracts less than 180 days – Special Agency Check (SAC)

(c)  Investigative requirements for IT Service Contracts are:

(1)  Contracts more than 180 days – National Agency Check and Inquiries (NACI)

(2)  Contracts less than 180 days – National Agency Check and Inquiries (NACI)

(d) In addition to the investigations noted above, non-U.S. citizens must have a background check that includes an Immigration and Customs Enforcement agency check.

(e)  Additional Requirements for Foreign Nationals (Non-U.S. Citizens).  Non-U.S. citizens (lawful permanent residents) to be employed under this contract within the United States must have:

SA1301-12-CN-0035

    (1)  Official legal status in the United States;

    (2)  Continuously resided in the United States for the last two years; and

    (3)  Obtained advance approval from the servicing Security Officer in consultation with the Office of Security headquarters.

(f) DoC Security Processing Requirements for Low Risk Non-IT Service Contracts.  Processing requirements for Low Risk non-IT Service Contracts are as follows:

    (1)  Processing of a NACI is required for all contract employees employed in Low Risk non-IT service contracts for more than 180 days. The Contracting Officer's Representative (COR) will invite the prospective contractor into e-QIP to complete the SF-85.  The contract employee must also complete fingerprinting.

    (2)  Contract employees employed in Low Risk non-IT service contracts for less than 180 days require processing of Form OFI-86C Special Agreement Check (SAC), to be processed. The Sponsor will forward a completed Form OFI-86C, FD-258, Fingerprint Chart, and Credit Release Authorization to the servicing Security Officer, who will send the investigative packet to the Office of Personnel Management for processing.

    (3)  Any contract employee with a favorable SAC who remains on the contract over 180 days will be required to have a NACI conducted to continue working on the job site.

    (4)  For Low Risk non-IT service contracts, the scope of the SAC will include checks of the Security/Suitability Investigations Index (SII), other agency files (INVA), Defense Clearance Investigations Index (DCII), FBI Fingerprint (FBIF), and the FBI Information Management Division (FBIN).

    (5)  In addition, for those individuals who are not U.S. citizens (lawful permanent residents), the Sponsor may request a Customs Enforcement SAC on Form OFI-86C, by checking Block #7, Item I.  In Block 13, the Sponsor should enter the employee's Alien Registration Receipt Card number to aid in verification.

    (6)  Copies of the appropriate forms can be obtained from the Sponsor or the Office of Security. Upon receipt of the required forms, the Sponsor will forward the forms to the servicing Security Officer. The Security Officer will process the forms and advise the Sponsor and the Contracting Officer whether the contract employee can commence work prior to completion of the suitability determination based on the type of work and risk to the facility (i.e., adequate controls and restrictions are in place).  The Sponsor will notify the contractor of favorable or unfavorable findings of

SA1301-12-CN-0035

the suitability determinations.  The Contracting Officer will notify the contractor of an approved contract start date.

(g)  Security Processing Requirements for Low Risk IT Service Contracts.  Processing of a NACI is required for all contract employees employed under Low Risk IT service contracts.

   (1)  Contract employees employed in all Low Risk IT service contracts will require a National Agency Check and Inquiries (NACI) to be processed. The Contracting Officer's Representative (COR) will invite the prospective contractor into e-QIP to complete the SF-85.  Fingerprints and a Credit Release Authorization must be completed within three working days from start of work, and provided to the Servicing Security Officer, who will forward the investigative package to OPM.

   (2)  For Low Risk IT service contracts, individuals who are not U.S. citizens (lawful permanent residents) must undergo a NACI that includes an agency check conducted by the Immigration and Customs Enforcement Service.  The Sponsor must request the ICE check as a part of the NAC.

(h)  Notification of Disqualifying Information.  If the Office of Security receives disqualifying information on a contract employee, the Sponsor and Contracting Officer will be notified.  The Sponsor shall coordinate with the Contracting Officer for the immediate removal of the employee from duty requiring access to Departmental facilities or IT systems. Contract employees may be barred from working on the premises of a facility for any of the following reasons:

   (1)  Conviction of a felony crime of violence or of a misdemeanor involving moral turpitude.

   (2)  Falsification of information entered on security screening forms or of other documents submitted to the Department.

   (3)  Improper conduct once performing on the contract, including criminal, infamous, dishonest, immoral, or notoriously disgraceful conduct or other conduct prejudicial to the Government regardless of whether the conduct was directly related to the contract.

   (4)  Any behavior judged to pose a potential threat to Departmental information systems, personnel, property, or other assets.

(i) Failure to comply with security processing requirements may result in termination of the contract or removal of contract employees from Department of Commerce facilities or denial of access to IT systems.

SA1301-12-CN-0035

(j)  Access to National Security Information.  Compliance with these requirements shall not be construed as providing a contract employee clearance to have access to national security information.

(k)  The contractor shall include the substance of this clause, including this paragraph, in all subcontracts.

**I.68   1352.242-70 POSTAWARD CONFERENCE (APR 2010)**

A post award conference with the successful Offeror may be required. If required, the Contracting Officer will contact the contractor within 10 days of contract award to arrange the conference.

**I.69   1352.246-70 PLACE OF ACCEPTANCE (APR 2010)**

(a) The Contracting Officer or the duly authorized representative will accept supplies and services to be provided under this contract.

(b) The place of acceptance will be:
      U.S Department of Commerce – NTIA
      Office of International Affairs
      1401 Constitution Avenue, NW,
      Room 4701
      Washington, DC 20230

**I.70   1352.270-70 PERIOD OF PERFORMANCE (APR 2010)**

(a)  The base period of performance of this contract is from October 1, 2012 through September 30, 2015.  If an option is exercised, the period of performance shall be extended through the end of that option period.

(b)  The option periods that may be exercised are as follows:

| Period | Start Date | End Date |
|--------|-----------|----------|
| Option I | October 1, 2015 | September 30, 2017 |
| Option II | October 1, 2017 | September 30, 2019 |

(c)  The notice requirements for unilateral exercise of option periods are set out in FAR 52.217-9 (see Paragraph I.59 above).

# Exhibit C

Haim v. The Islamic Republic of Iran,
Civil Action No. 02-1811-RCL

>

```
Network Working Group                                        J. Postel
Request for Comments: 1591                                         ISI
Category: Informational                                    March 1994
```

                    Domain Name System Structure and Delegation


Status of this Memo

   This memo provides information for the Internet community.  This memo
   does not specify an Internet standard of any kind.  Distribution of
   this memo is unlimited.

1.  Introduction

   This memo provides some information on the structure of the names in
   the Domain Name System (DNS), specifically the top-level domain
   names; and on the administration of domains.  The Internet Assigned
   Numbers Authority (IANA) is the overall authority for the IP
   Addresses, the Domain Names, and many other parameters, used in the
   Internet.  The day-to-day responsibility for the assignment of IP
   Addresses, Autonomous System Numbers, and most top and second level
   Domain Names are handled by the Internet Registry (IR) and regional
   registries.

2.  The Top Level Structure of the Domain Names

   In the Domain Name System (DNS) naming of computers there is a
   hierarchy of names.  The root of system is unnamed.  There are a set
   of what are called "top-level domain names" (TLDs).  These are the
   generic TLDs (EDU, COM, NET, ORG, GOV, MIL, and INT), and the two
   letter country codes from ISO-3166.  It is extremely unlikely that
   any other TLDs will be created.

   Under each TLD may be created a hierarchy of names.  Generally, under
   the generic TLDs the structure is very flat.  That is, many
   organizations are registered directly under the TLD, and any further
   structure is up to the individual organizations.

   In the country TLDs, there is a wide variation in the structure, in
   some countries the structure is very flat, in others there is
   substantial structural organization.  In some country domains the
   second levels are generic categories (such as, AC, CO, GO, and RE),
   in others they are based on political geography, and in still others,
   organization names are listed directly under the country code.  The
   organization for the US country domain is described in RFC 1480 [1].


Postel                                                        [Page 1]

RFC 1591      Domain Name System Structure and Delegation      March 1994

   Each of the generic TLDs was created for a general category of
   organizations.  The country code domains (for example, FR, NL, KR,
   US) are each organized by an administrator for that country.  These
   administrators may further delegate the management of portions of the
   naming tree.  These administrators are performing a public service on
   behalf of the Internet community.  Descriptions of the generic
   domains and the US country domain follow.

   Of these generic domains, five are international in nature, and two
   are restricted to use by entities in the United States.

   World Wide Generic Domains:

   COM - This domain is intended for commercial entities, that is
         companies.  This domain has grown very large and there is
         concern about the administrative load and system performance if
         the current growth pattern is continued.  Consideration is
         being taken to subdivide the COM domain and only allow future
         commercial registrations in the subdomains.

   EDU - This domain was originally intended for all educational
         institutions.  Many Universities, colleges, schools,
         educational service organizations, and educational consortia
         have registered here.  More recently a decision has been taken
         to limit further registrations to 4 year colleges and
         universities.  Schools and 2-year colleges will be registered
         in the country domains (see US Domain, especially K12 and CC,
         below).

   NET - This domain is intended to hold only the computers of network
         providers, that is the NIC and NOC computers, the
         administrative computers, and the network node computers.  The
         customers of the network provider would have domain names of
         their own (not in the NET TLD).

   ORG - This domain is intended as the miscellaneous TLD for
         organizations that didn't fit anywhere else.  Some non-
         government organizations may fit here.

   INT - This domain is for organizations established by international
         treaties, or international databases.

   United States Only Generic Domains:

   GOV - This domain was originally intended for any kind of government
         office or agency.  More recently a decision was taken to
         register only agencies of the US Federal government in this
         domain.  State and local agencies are registered in the country

Postel                                                          [Page 2]

RFC 1591      Domain Name System Structure and Delegation      March 1994

         domains (see US Domain, below).

MIL - This domain is used by the US military.

Example country code Domain:

US - As an example of a country domain, the US domain provides for
     the registration of all kinds of entities in the United States
     on the basis of political geography, that is, a hierarchy of
     <entity-name>.<locality>.<state-code>.US.  For example,
     "IBM.Armonk.NY.US".  In addition, branches of the US domain are
     provided within each state for schools (K12), community colleges
     (CC), technical schools (TEC), state government agencies
     (STATE), councils of governments (COG),libraries (LIB), museums
     (MUS), and several other generic types of entities (see RFC 1480
     for details [1]).

To find a contact for a TLD use the "whois" program to access the
database on the host rs.internic.net.  Append "-dom" to the name of
TLD you are interested in.  For example:

                    whois -h rs.internic.net us-dom
     or
                    whois -h rs.internic.net edu-dom

3.  The Administration of Delegated Domains

The Internet Assigned Numbers Authority (IANA) is responsible for the
overall coordination and management of the Domain Name System (DNS),
and especially the delegation of portions of the name space called
top-level domains.  Most of these top-level domains are two-letter
country codes taken from the ISO standard 3166.

A central Internet Registry (IR) has been selected and designated to
handled the bulk of the day-to-day administration of the Domain Name
System.  Applications for new top-level domains (for example, country
code domains) are handled by the IR with consultation with the IANA.
The central IR is INTERNIC.NET.  Second level domains in COM, EDU,
ORG, NET, and GOV are registered by the Internet Registry at the
InterNIC.  The second level domains in the MIL are registered by the
DDN registry at NIC.DDN.MIL.  Second level names in INT are
registered by the PVM at ISI.EDU.

While all requests for new top-level domains must be sent to the
Internic (at hostmaster@internic.net), the regional registries are
often enlisted to assist in the administration of the DNS, especially
in solving problems with a country administration.  Currently, the
RIPE NCC is the regional registry for Europe and the APNIC is the

Postel                                                       [Page 3]

RFC 1591     Domain Name System Structure and Delegation     March 1994

regional registry for the Asia-Pacific region, while the INTERNIC
administers the North America region, and all the as yet undelegated
regions.

    The contact mailboxes for these regional registries are:

```
        INTERNIC         hostmaster@internic.net
        APNIC            hostmaster@apnic.net
        RIPE NCC         ncc@ripe.net
```

The policy concerns involved when a new top-level domain is
established are described in the following.  Also mentioned are
concerns raised when it is necessary to change the delegation of an
established domain from one party to another.

A new top-level domain is usually created and its management
delegated to a "designated manager" all at once.

Most of these same concerns are relevant when a sub-domain is
delegated and in general the principles described here apply
recursively to all delegations of the Internet DNS name space.

The major concern in selecting a designated manager for a domain is
that it be able to carry out the necessary responsibilities, and have
the ability to do a equitable, just, honest, and competent job.

1) The key requirement is that for each domain there be a designated
   manager for supervising that domain's name space.  In the case of
   top-level domains that are country codes this means that there is
   a manager that supervises the domain names and operates the domain
   name system in that country.

   The manager must, of course, be on the Internet.  There must be
   Internet Protocol (IP) connectivity to the nameservers and email
   connectivity to the management and staff of the manager.

   There must be an administrative contact and a technical contact
   for each domain.  For top-level domains that are country codes at
   least the administrative contact must reside in the country
   involved.

2) These designated authorities are trustees for the delegated
   domain, and have a duty to serve the community.

   The designated manager is the trustee of the top-level domain for
   both the nation, in the case of a country code, and the global
   Internet community.

Postel                                                      [Page 4]

RFC 1591      Domain Name System Structure and Delegation    March 1994

   Concerns about "rights" and "ownership" of domains are
   inappropriate.  It is appropriate to be concerned about
   "responsibilities" and "service" to the community.

3) The designated manager must be equitable to all groups in the
   domain that request domain names.

   This means that the same rules are applied to all requests, all
   requests must be processed in a non-discriminatory fashion, and

academic and commercial (and other) users are treated on an equal
basis.  No bias shall be shown regarding requests that may come
from customers of some other business related to the manager --
e.g., no preferential service for customers of a particular data
network provider.  There can be no requirement that a particular
mail system (or other application), protocol, or product be used.

There are no requirements on subdomains of top-level domains
beyond the requirements on higher-level domains themselves.  That
is, the requirements in this memo are applied recursively.  In
particular, all subdomains shall be allowed to operate their own
domain name servers, providing in them whatever information the
subdomain manager sees fit (as long as it is true and correct).

4) Significantly interested parties in the domain should agree that
   the designated manager is the appropriate party.

   The IANA tries to have any contending parties reach agreement
   among themselves, and generally takes no action to change things
   unless all the contending parties agree; only in cases where the
   designated manager has substantially mis-behaved would the IANA
   step in.

   However, it is also appropriate for interested parties to have
   some voice in selecting the designated manager.

   There are two cases where the IANA and the central IR may
   establish a new top-level domain and delegate only a portion of
   it: (1) there are contending parties that cannot agree, or (2) the
   applying party may not be able to represent or serve the whole
   country.  The later case sometimes arises when a party outside a
   country is trying to be helpful in getting networking started in a
   country -- this is sometimes called a "proxy" DNS service.

   The Internet DNS Names Review Board (IDNB), a committee
   established by the IANA, will act as a review panel for cases in
   which the parties can not reach agreement among themselves.  The
   IDNB's decisions will be binding.


Postel                                                      [Page 5]

RFC 1591      Domain Name System Structure and Delegation    March 1994

5) The designated manager must do a satisfactory job of operating the
   DNS service for the domain.

   That is, the actual management of the assigning of domain names,
   delegating subdomains and operating nameservers must be done with
   technical competence.  This includes keeping the central IR (in
   the case of top-level domains) or other higher-level domain
   manager advised of the status of the domain, responding to
   requests in a timely manner, and operating the database with
   accuracy, robustness, and resilience.

   There must be a primary and a secondary nameserver that have IP
   connectivity to the Internet and can be easily checked for

operational status and database accuracy by the IR and the IANA.

In cases when there are persistent problems with the proper operation of a domain, the delegation may be revoked, and possibly delegated to another designated manager.

6) For any transfer of the designated manager trusteeship from one organization to another, the higher-level domain manager (the IANA in the case of top-level domains) must receive communications from both the old organization and the new organization that assure the IANA that the transfer in mutually agreed, and that the new organization understands its responsibilities.

It is also very helpful for the IANA to receive communications from other parties that may be concerned or affected by the transfer.

4. Rights to Names

1) Names and Trademarks

In case of a dispute between domain name registrants as to the rights to a particular name, the registration authority shall have no role or responsibility other than to provide the contact information to both parties.

The registration of a domain name does not have any Trademark status.  It is up to the requestor to be sure he is not violating anyone else's Trademark.

2) Country Codes

The IANA is not in the business of deciding what is and what is not a country.


Postel                                                          [Page 6]

RFC 1591      Domain Name System Structure and Delegation      March 1994


The selection of the ISO 3166 list as a basis for country code top-level domain names was made with the knowledge that ISO has a procedure for determining which entities should be and should not be on that list.

5. Security Considerations

Security issues are not discussed in this memo.

6. Acknowledgements

Many people have made comments on draft version of these descriptions and procedures.  Steve Goldstein and John Klensin have been particularly helpful.

7. Author's Address

Jon Postel
USC/Information Sciences Institute
4676 Admiralty Way
Marina del Rey, CA  90292

Phone: 310-822-1511
Fax:   310-823-6714
EMail: Postel@ISI.EDU

7. References

[1] Cooper, A., and J. Postel, "The US Domain", RFC 1480,
    USC/Information Sciences Institute, June 1993.

[2] Reynolds, J., and J. Postel, "Assigned Numbers", STD 2, RFC 1340,
    USC/Information Sciences Institute, July 1992.

[3] Mockapetris, P., "Domain Names - Concepts and Facilities", STD
    13, RFC 1034, USC/Information Sciences Institute, November 1987.

[4] Mockapetris, P., "Domain Names - Implementation and
    Specification", STD 13, RFC 1035, USC/Information Sciences
    Institute, November 1987.

[6] Partridge, C., "Mail Routing and the Domain System", STD 14, RFC
    974, CSNET CIC BBN, January 1986.

[7] Braden, R., Editor, "Requirements for Internet Hosts --
    Application and Support", STD 3, RFC 1123, Internet Engineering
    Task Force, October 1989.

# Exhibit D

Haim v. The Islamic Republic of Iran,
Civil Action No. 02-1811-RCL



Internet Assigned Numbers Authority

## Delegating or redelegating a country-code top-level domain (ccTLD)

This document provides an overall guide to the country-code top-level domain (ccTLD) delegation and redelegation process, and is designed to assist requestors in determining their eligibility, and in preparing formal requests.

### Background on the process

The delegation and redelegation process is designed to assign or re-assign a ccTLD to a manager, taking into account a number of technical and public interest criteria. These criteria relate to the basic principles that the manager be a responsible and technically competent trustee of the domain on behalf of the national and global Internet communities.

The process is initiated when a formal request is submitted to the IANA Root Zone Management staff at ICANN. The request and all required documentation is then reviewed and verified by these ICANN staff members. After the review and authorisations are completed, the request is implemented as a change to the Root Zone and Root Zone Database.

Upon successful completion of the process, the new country-code domain is established, or a transfer takes place in the case of redelegation of an existing ccTLD.

### Who is involved?

The delegation and redelegation process involves a number of different organisations and individuals. For example:

- The **requestor**, usually the proposed manager, initiates the process by submitting a formal delegation or redelegation request. The requestor is the main party ICANN interacts with throughout the request, and is responsible for collecting much of the materials required to process the request.
- The **proposed manager** is an organisation to which delegated responsibility for the ccTLD is sought. This organisation must demonstrate it understands and can meet its obligations as a trustee for the domain on behalf of the national and global Internet communities. The term manager is synonymous with other terms, such as Sponsoring Organization and operator, which have been used in other documentation. In this document, we have standardized on manager.
- **Significant stakeholders** are those parties that benefit from the operation of the ccTLD, and their opinions are important in assessing the public interest aspects of a request.
- The **respective government** is consulted to indicate either support or non-objection for the delegation or redelegation request. As a country-code represents the name of either a country or territory, the government is an important stakeholder in how the domain should be managed.
- **ICANN**, as the IANA Functions Operator, is responsible for the receipt, verification and processing of the request. IANA Root Zone Management staff performs these activities.
- The **U.S. Department of Commerce**, as the Root Zone Administrator, is responsible for verifying that processing procedures have been followed, and authorising any related changes to the DNS root zone and root zone database.
- **Verisign**, as the Root Zone Maintainer, is responsible for receiving requests that have been processed by ICANN and authorised by the US Department of Commerce, implementing those changes in the root zone, and distributing the revised root zone to the root name servers.

While many parties are involved in processing a delegation or redelegation, the Root Zone Management staff at ICANN are the primary interface for those requesting a delegation or a redelegation of a ccTLD.

### Preparing a request

A delegation or redelegation request involves the development and submission of documentation that describes the nature of the request, and how the proposed new manager satisfies the criteria used to assess the request.

#### Completing a delegation request form

The delegation request form which describes the basic details of the request, must be completed. The details include the identity of the proposed manager, the contact persons to be listed in the Root Zone Database, the technical delegation details for the domain, and a checklist relating to the assessment criteria for the delegation or redelegation request.

Please see Technical requirements for authoritative name servers for more information about the technical delegation details for the domain.

#### Demonstrating string eligibility

To delegate or redelegate a ccTLD, it must be shown that the string is eligible to be delegated.

The primary method of eligibility for country-code top-level domains is its listing as an "alpha-2" (two-letter ASCII) code listed in the ISO 3166-1 standard. Another method of eligibility is the string may have been deemed eligible as a country-code through the IDN Fast Track process.

Complete details on which country-codes are considered eligible are available in Qualifying top-level domain strings.

#### Demonstrating technical and administrative competency

The delegation request must include documentation that demonstrates the technical and administrative ability of the proposed manager to operate the domain competently and that they will not jeopardize nor compromise the stability and security of the DNS.

The proposed manager decides whom to list as the administrative and technical contacts. Both the administrative contact and the technical contact must cross-verify all root zone changes and be responsive to communications about root zone changes.

For more information on preparing documentation to demonstrate technical and administrative ability, please go to Preparing an Operational and Technical Plan.

### Providing information on the Proposed Manager

It is a requirement that the requestor provides the legal name of the organisation (as officially registered in its principal place of business), along with its physical address, telephone and fax numbers. In support of this, the requestor must provide a certified copy or extract of the business registration, certification, or law that demonstrates the organisation's legal status.

### Providing geographical location

As country-codes represent specific countries or territories, the proposed manager will be resident or incorporated in, the territory and/or jurisdiction of the relevant government or public authority of the country associated with the ccTLD, unless formally decided otherwise by the relevant government or public authority.

It is a requirement that the requestor indicate the geographic locations of the proposed manager, the administrative contact person for the domain, and the location(s) where the principal operations will be conducted.

### Demonstrating consent

It is a requirement that the requestor provides documentation that shows that directly involved parties consent to the request to delegate or redelegate. For a new delegation, this includes the proposed new organisation and contact persons. For an existing delegation, this also includes documented consent from the existing management of the domain.

### Demonstrating that the request serves the local Internet community's interest

The delegation or redelegation request must demonstrate that the proposed manager recognises its responsibility to fairly and equitably serve the local Internet community's interests with respect to management of the domain. In support of this, it is a requirement that the requestor document the mechanisms that will be utilised to inform and seek input from the local community on ccTLD management issues.

It is a requirement that the requestor provide documentation indicating local Internet community support for the proposed manager in operating the ccTLD, such as letters of support from interested and/or impacted parties, and the results of public consultations that led to the request.

### Demonstrating government review and consideration

It is a requirement that the requestor provide documentation indicating the relevant governments have been informed about the request. It is a requirement that the documentation includes a statement of support or non-objection from an authorised representative of the government.

### Demonstrating a stable transfer plan

For the redelegation of an existing operational ccTLD, it is a requirement that the requestor provide information on how existing operations will be transferred to the proposed new manager in a safe manner. It must explain how the stability of the domain will be preserved and how existing registrants will be impacted by the change. If the request is in relation to a transfer from a retired ccTLD to another ccTLD, it must also describe the decommissioning process for the retired domain.

## Submitting the request

Once the request has been prepared, submit it to ICANN's Root Zone Management staff to commence processing.

### Initial email submission

To start the request, send an email with the delegation/redelegation form attached to root-mgmt@iana.org.

Supporting documentation must be provided with the Delegation Request Form. Files should be in PDF format where possible.

Once the email is sent to root-mgmt@iana.org, ICANN's ticketing system will reply automatically with a confirmation of receipt and a unique reference number within 1 day. This number will be used to track progress and correspondence relating to the request. Please ensure the number, just as it appears in the confirmation receipt, is included in the subject of all future communications related to the request.

### Original documentation

In addition to the electronic submissions, it is a requirement that the requestor submit originals, or certified copies, of all official documents and testimony used in the request for which its authenticity is material to the evaluation. This includes the following:

- Registration certifications
- Letters of support or consent
- Legal documents that are a basis of the application

The documents should be couriered or posted to ICANN's Root Zone Management staff at the following address. It is important that the documents cite the reference number that appeared in the email confirmation receipt.

Root Zone Management
ICANN
12025 Waterfront Drive #300
Los Angeles CA 90094
USA

Please submit all requests, templates, and documentation in English. Where accuracy is essential, English documentation and/or English translations of key documents (such as governmental decrees relating to the request) must be notarised or certified official translations.

## After the request is received

Once we receive the request and issue a confirmation receipt, a process of analysis and verification begins. The amount of time this process takes varies depending upon the information provided in the supporting documentation, and the complexity of the individual case.

In the event that further documentation or clarification is needed, we will contact the requestor. The delegation or redelegation request will not proceed until we have received satisfactory documentation and information.

If we are unable to process the request due to significant lack of detail, the inability to confirm information, and/or unresponsiveness by the requestor, we will administratively close the request. In such cases, the requestor is welcome to resubmit the request at a later date to restart the review process once the additional material is available.

### Requesting confirmation from contacts

In addition to verification and analysis of the material supplied in the request, for redelegation requests, we will ask the current administrative and technical contacts, and the current ccTLD manager, whether they agree to the request.

In the case of a delegation, ICANN confirms with the proposed contacts as listed in the request, to ensure they consent to the responsibilities of being listed as a contact for the domain.

In those cases where confirmation is not received from one or more parties, further consultation will be necessary. This may delay processing of the request. Please see Obtaining consent for a root zone change.

### Posting the status of the pending request

ICANN will publicly post requests for delegations and redelegations. This public disclosure will at a minimum include the domain name being requested, the party that will manage the domain, and the current status of the request.

If there are specific stability or security reasons why information should not be disclosed, the requestor should explain that in the Delegation Request Form.

### Analysing the request

After all materials are received, and the positions of the contacts have been ascertained, ICANN staff performs an analysis of the request.

The result of this analysis is a report that describes how the application meets the various criteria. This report will be reviewed by the ICANN Board of Directors to confirm proper procedures were followed.

### Implementing the request

After the review by the ICANN Board, ICANN, as the IANA Functions Operator will forward the completed request to the Root Zone Administrator. The Root Zone Administrator will then authorize changes to the DNS root zone and root zone database. Upon authorization, the Root Zone Maintainer will implement the changes to the DNS root zone. The IANA Functions Operator will implement the data changes in the WHOIS database.

After the request has been implemented, we will notify the requestor, and the requestor will verify that the changes were made correctly. In the event any problems arise, immediately notify us at root-mgmt@iana.org and include the reference number of the change request.

# Exhibit E

Haim v. The Islamic Republic of Iran,
Civil Action No. 02-1811-RCL



DOMAINS    NUMBERS    PROTOCOLS    ABOUT IANA

**Domain Names**

Overview

**Root Zone Management**

   Overview

   Root Database

   Hint and Zone Files

   Change Requests

   **Instructions & Guides**

   Root Servers

.INT Registry

.ARPA Registry

IDN Practices Repository

Root Key Signing Key (DNSSEC)

Reserved Domains

# Common Questions on delegating and redelegating country-code top-level domains (ccTLDs)

### How long does a delegation/redelegation request take?

Every delegation or redelegation request is different. With many organisations participating in any particular request, the processing can be affected by delays in coordinating and communicating among the parties, obtaining the necessary approvals, and verifying the information provided. The process is further complicated when not all parties agree to the request.

Because of this, it is not possible to predict an accurate timetable for the process from receipt of the request through to completion. Fully-formed requests that clearly meet all relevant criteria can take as little as 1-2 months. In some extreme and complicated cases, requests have sometimes taken a number of years.

## When in the process should a redelegation request be submitted?

The request to redelegate a ccTLD should be submitted once the requestor knows the proposed new manager of the ccTLD, and has plans on how the ccTLD will be operated, but prior to any transfer taking place. The transfer of operations to the new manager happens once a redelegation request has been approved.

It is OK to contact ICANN prior to submitting a formal request to better understand the procedure, or to give ICANN early notice of work being done in the country on a redelegation. It is better if ICANN is able to assist the requestor early on to understand the redelegation process to avoid misunderstandings that could delay transition later.

## If a company runs an existing ccTLD, can it provide less documentation for a delegation or redelegation request?

Generally, the documentary requirements are the same for a new request, regardless of whether the proposed manager operates an existing ccTLD or not. In particular, the requirements of the process are more formalised than they were in the 1980s and 1990s when the bulk of existing ccTLDs were first delegated. A successful request for delegation in the 1980s does not imply that a request would necessarily be successful again under contemporary criteria. As such, ICANN will review new requests under the existing procedures without any assumptions about why a delegation qualified at an earlier time.

It should be noted that a successful history in operating existing TLDs may form an important part of documenting the operational and technical skills of the proposed manager.

## If a company simply changes its name, does it need to complete a full redelegation request?

There are some special cases where a change to the manager may be deemed to not be a material change to the organisation. In such cases, the change can be considered an "administrative redelegation", which means that it can be considered a routine update rather than requiring an evaluation of the new manager.

ICANN will check if a change request to a manager reflects a change of administrative responsibility to a new organisation that is essentially the same as the previous organisation. These situations are typically where ccTLD management has shifted as the result of an internal restructuring, internal governmental restructuring, or the organisation has simply changed its name.

In such cases, to be considered non-material, day-to-day operations must remain unaltered. For example, there would normally need to be continuity of staff, policy, policy setting structure, levels of service, legal character and so on.

When a request is deemed non-material, ICANN will process the request as a regular root zone change request, rather than as a delegation request. If there is any doubt, the full redelegation process will be used

to fully investigate the nature of the change.

If ICANN considers a request to be eligible an administrative redelegation, it will advise the requestor.

## If a registry's technical operations are outsourced to a company, what organisation should be the Manager?

If an organisation that sets and administers policy for the ccTLD outsources the back-end technical operation of the ccTLD to another company, typically it is the policy organisation that is listed as the Manager. If the technical outsource operator is the right party to contact for technical enquiries for the domain, that party could be listed as a Technical Contact.

## Does the government need to be consulted on a request?

As an important part of the local Internet community, it is expected that relevant local governments are consulted regarding a delegation or redelegation. It is not a requirement they consent, but if they do not have an opinion, a statement of non-objection can be useful.

If the government is non-responsive, the requestor should provide clear evidence they made reasonable attempts to discuss the request with relevant government representatives.

## What are the local presence requirements?

For each ccTLD, at a minimum both the manager and the administrative contact must be resident in the country to which the domain is designated. This means they are accountable to the local community and subject to local law.

For sub-national territories, it is considered acceptable (with the consent of the local Internet community) if the manager and the administrative contact are located elsewhere in the country so long as they are still subject to applicable law.

## What should be in a letter of endorsement from a government?

When communicating support for a delegation or redelegation by a government representative, there are no strict formatting requirements, but ICANN recommends the letter reference the following points:

- An explanation why the agency or author is the appropriate representative of the government to be providing support.
- If the support reflects formal decision-making made under the powers granted by a specific law or regulation that covers the ccTLD, that law or regulation should be cited. It should be clear that the decision is made under the powers of the specific law or regulation.
- Clearly express the position — whether it is approving of the proposed request, not approving of the proposed request, or expressing non-objection to the request.
- Refer to the IANA-assigned ticket number (if available) and identify clearly the specific organisation and circumstances under which the position is being supplied. This is to avoid a scenario where it is unclear which organisation or which request the communication is referring to.

## Is it appropriate for a regulator to be the Manager?

The relevant frameworks, including the delegation assessment procedures, call for the Manager to actively be responsible for the operation of a ccTLD. If a regulator runs the domain registry itself, and all other criteria are satisfied, then it would be appropriate for the regulator to be the Manager for the ccTLD.

## Does the government or regulator have to be the manager to have involvement in deciding how the domain is operated?

It is not necessary for a government or regulator to be a manager for a ccTLD as a mechanism for them to have a say in how the domain is operated. Governments are consulted for all redelegation requests for the domain regardless of whether they are listed in the record (see the GAC Principles). Furthermore, the manager is required to be located within the country and to comply with local laws.

## How does a requestor demonstrate local Internet community support?

The Manager for a ccTLD is considered a trustee on behalf of the local community in the country. Some of the elements that could show support for the request are:

- **Community consultation.** It is typically an important aspect of selecting the proper manager for a ccTLD to consult with the local Internet community. Providing documentation that shows which

consultations were performed, who was able to participate in them, and that participation was broadly representative of the community is one good way to show a bottom-up process was used to arrive at the proposal for the new manager. Relevant documentation might include timelines, minutes of meetings, pointers to online consultations and compilations of feedback received.

- **Describe the options considered.** It is rare there is a uniform agreement that a particular approach is the best approach. It is helpful to document what alternatives have been considered regarding management of the ccTLD, what the pros and cons of the options were, and how those considerations were factored into the final decision. If there is opposition to the request, it is useful to document that.

- **Statements of support.** Expressions of support from representatives of the local Internet community can also be helpful in describing local support for the application. (See *What should be in a statement of support or objection from an interested party?*)

## What should be in a statement of support or objection from an interested party?

When communicating support for a delegation or redelegation by an interested party, there are no strict formatting requirements, but ICANN recommends the letters reference the following points:

- Explain the person or organisation providing the statement, and what their role is in the local Internet community. If the organisation is a representative organisation, explain the membership or community sector the organisation is representing.

- Clearly express the position — whether it is approving of the proposed request, not approving of the proposed request, or expressing non-objection to the request.

- Articulate the reasons why the organisation is considered appropriate or not appropriate for managing the ccTLD on behalf of the local Internet community.

- Provide an explanation of the alternatives that have been considered, and why this proposal is their preferred or non-preferred option.

- It is less useful if the statements are merely "form letters", where multiple organisations provide letters that are comprised of the same language that has been drafted for them by the requestor. Each communication should uniquely represent the views of that specific party.

## Must originals of all documents be submitted?

ICANN only needs originals (or copies that have been properly certified as accurate) for documents where the authenticity is important to the validity of the request. This means items such as certifications, extracts of relevant laws and decrees, and letters of support. ICANN needs to independently verify these kinds of documents as authentic with third parties.

ICANN does not need copies of documents such as operational or technical plans. They can be provided as PDF files electronically to us, but the requestor does not need to send them to ICANN by post.

## Do all documents need to be provided in English?

Generally, ICANN needs all documentation to be provided in English, or be certified translations into English. For complex or long documents (such as complete legislative acts), it is generally OK to only translate the relevant portions.

In some cases, if there are particular difficulties in providing translations, a requestor should talk with ICANN's Root Management staff, who will help find a workable approach. While ICANN does have capacity to translate certain types of documents, the process of getting certified translations can introduce significant delay in processing a request.

## What is the process for retiring a country-code top-level domain?

When a ccTLD is no longer eligible, typically due to the country or code's removal from the ISO 3166-1 standard, the operator is expected to develop a transition plan to the successor ccTLD(s) and ultimately retire the domain. Consistent with the general approach that ccTLDs are to be managed within the country, the manager is expected to design and execute a locally-appropriate method of notifying impacted registrants that the domain is to be retired, and develop a timeline to transition to new ccTLDs.

This transition and retirement plan is reviewed in a similar fashion to a delegation or redelegation request. As countries are typically replaced with new successor countries, this process is usually performed in conjunction with delegation of new ccTLDs. Usually there is a transition period of several years so that there is plenty of time for registrants to transition to the new domain(s).

ICANN works with the manager to provide guidance and assistance throughout the whole process based on ICANN's experience from other countries that have had to perform a retirement transition.

**Domain Names**    Root Zone Registry   .INT Registry   .ARPA Registry   IDN Repository

**Number Resources**    Abuse Information

**Protocols**    Protocol Registries   Time Zone Database

**About IANA**    Presentations   Reports   Performance   Reviews   Excellence   Contact IANA

IANA is responsible for coordinating the Internet's globally unique identifiers, and is operated by the **Internet Corporation for Assigned Names and Numbers** (ICANN).

# Exhibit F

Haim v. The Islamic Republic of Iran,
Civil Action No. 02-1811-RCL



Log In | Sign Up

ICANN

Resources 

# ICP-1: Internet Domain Name System Structure and Delegation (ccTLD Administration and Delegation)

IMPORTANT NOTICE. The following Internet Coordination Policy is being posted for the information of the Internet community. It contains a statement of the current policies being followed by the Internet Assigned Numbers Authority (IANA) in administering delegations of Top Level Domain Names of the Internet Domain Names System (DNS). At a future date, the ICANN Board may consider changes to these policies and will, at such time, notice proposed changes for public comment in accordance with the ICANN Bylaws.

Comments on this document are welcome and should be directed to comments@icann.org.

---

**INTERNET CORPORATION FOR ASSIGNED NAMES AND NUMBERS**
**INTERNET ASSIGNED NUMBERS AUTHORITY**
**Internet Domain Name System Structure and Delegation (ccTLD Administration and Delegation)**
(May 1999)

### Abstract

This document is a summary of current practices of the Internet Assigned Numbers Authority (IANA) in administering RFC 1591, which includes the guidance contained in ccTLD News Memo #1 dated October 23, 1997. It DOES NOT reflect any changes in policy affecting the administration of DNS delegations. It is intended to serve as the basis for possible future discussions of policy in this area. Changes in ICANN/IANA policy will be made following public notice and comment in accordance with the ICANN Bylaws.

### Introduction

The IANA is the overall authority for day-to-day administration of the Internet Domain Name System (DNS). IANA staff carry out administrative responsibilities for the assignment of IP Addresses, Autonomous System Numbers, Top Level Domains (TLDs), and other unique parameters of the DNS and its protocols. This document provides general information on IANA policy for administering the DNS. Instructions on procedures to be followed in requesting TLD delegations or changes are available on the website at iana.org.

### Top Level Structure of the DNS

The DNS structure contains a hierarchy of names. The root, or highest level, of the system is unnamed.

Top Level Domains (TLDs) are divided into classes based on rules that have evolved over time. Most TLDs have been delegated to individual country managers, whose codes are assigned from a table known as ISO-3166-1, which is maintained by an agency of the United Nations. These are called country-code Top Level Domains, or ccTLDs. In addition, there are a limited number of "generic" Top Level Domains (gTLDs), which do not have a geographic or country designation. Responsibility for adoption of procedures and policies for the assignment of Second Level Domain Names (SLDs), and lower level hierarchies of names, has been delegated to TLD managers, subject to the policy guidance contained in this document. Country code domains are each organized by a manager for that country. These managers are performing a public service on behalf of the Internet community. A list of current TLD assignments and names of the delegated managers can be accessed at http://www.iana.org/domains/root/.

## The Management of Delegated Domains

As part of its responsibility for the overall coordination and management of the DNS, the IANA receives and processes all requests for new TLDs and for changes to existing TLDs. The following policies are applicable to management of TLDs. In general, the principles described here apply recursively to all delegations of the Internet DNS name space.

(a) Delegation of a New Top Level Domain. Delegation of a new top level domain requires the completion of a number of procedures, including the identification of a TLD manager with the requisite skills and authority to operate the TLD appropriately. The desires of the government of a country with regard to delegation of a ccTLD are taken very seriously. The IANA will make them a major consideration in any TLD delegation/transfer discussions. Significantly interested parties in the domain should agree that the proposed TLD manager is the appropriate party. The key requirement is that for each domain there be a designated manager for supervising that domain's name space. In the case of ccTLDs, this means that there is a manager that supervises the domain names and operates the domain name system in that country. There must be Internet Protocol (IP) connectivity to the nameservers and electronic mail connectivity to the entire management, staff, and contacts of the manager. There must be an administrative contact and a technical contact for each domain. The administrative contact must reside in the country involved for ccTLDs. The IANA may choose to make partial delegations of a TLD when circumstances, such as those in a developing country, so dictate. It may also authorize a "proxy" DNS service outside of a developing country as a temporary form of assistance to the creation of Internet connectivity in new areas. [N.B. The IANA continues to receive inquiries about delegation of new gTLDs. This is a significant policy issue on which ICANN will conduct a careful study and review based on the established decision making procedures. Information about this study will be disseminated on the website at icann.org.]

(b) TLD Manager Responsibility. TLD managers are trustees for the delegated domain, and have a duty to serve the community. The designated manager is the trustee of the TLD for both the nation, in the case of ccTLDs, and the global Internet community. Concerns about "rights" and "ownership" of domains are inappropriate. It is appropriate, however, to be concerned about "responsibilities" and "service" to the community.

(c) Fair Treatment. The designated manager must be equitable and fair to all groups in the domain that request domain names. Specifically, the same rules must be applied to all requests and they must be processed in a non-discriminatory fashion. The policies and procedures for the use of each TLD must be available for public inspection. Generally these are posted on web pages or made available for file transfer. While variations in policies and procedures from country to country are expected due to local customs and cultural values, they must be documented and available to interested parties. Requests from for-profit and non-profit companies and organizations are to be treated on an equal basis. No bias shall be shown regarding requests that may come from customers of some other business related to the TLD

manager. For example, no preferential service for customers of a particular data network provider. There can be no stipulation that a particular application, protocol, or product be used.

(d) Operational Capability. The TLD manager must do a satisfactory job of operating the DNS service for the domain. Duties such as the assignment of domain names, delegation of subdomains and operation of nameservers must be done with technical competence. This includes keeping the IANA or other higher-level domain manager advised of the status of the domain, responding to requests in a timely manner, and operating the database with accuracy, robustness, and resilience. Because of its responsibilities for the DNS, the IANA must be granted access to all TLD zones on a continuing basis. There must be a primary and a secondary nameserver that have IP connectivity to the Internet and can be easily checked via access to zones for operational status and database accuracy by the IANA.

(e) Transfers and Disputes over Delegations. For transfer of TLD management from one organization to another, the higher-level domain manager (the IANA in the case of TLDs), must receive communications from both the old organization and the new organization that assure the IANA that the transfer is mutually agreed, and that the proposed new manager understands its responsibilities. It is also very helpful for the IANA to receive communications from other parties that may be concerned or affected by the transfer. In the event of a conflict over designation of a TLD manager, the IANA tries to have conflicting parties reach agreement among themselves and generally takes no action unless all contending parties agree. On a few occasions, the parties involved in proposed delegations or transfers have not been able to reach an agreement and the IANA has been required to resolve the matter. This is usually a long drawn out process, leaving at least one party unhappy, so it is far better when the parties can reach an agreement among themselves. It is appropriate for interested parties to have a voice in the selection of the designated manager.

(f) Revocation of TLD Delegation. In cases where there is misconduct, or violation of the policies set forth in this document and RFC 1591, or persistent, recurring problems with the proper operation of a domain, the IANA reserves the right to revoke and to redelegate a Top Level Domain to another manager.

(g) Subdelegations of Top Level Domains. There are no requirements for management of subdomains of TLDs, including subdelegations, beyond the requirements for TLDs stated in this document and RFC 1591. In particular, all subdomains shall be allowed to operate their own domain nameservers, providing in them whatever information the subdomain manager sees fit, as long as it is true and correct.

(h) Rights to Domain Names. The IANA has no special requirement for policies to be followed by TLD managers in connection with disputes over rights to domain names other than those stated generally in this document and RFC 1591. Please note, however, that use of a particular domain name may be subject to applicable laws, including those concerning trademarks and other types of intellectual property.

(i) Uses of ISO 3166-1 Table. The IANA is not in the business of deciding what is and what is not a country. The selection of the ISO-3166-1 list as a basis for country code top-level domain names was made with the knowledge that ISO has a procedure for determining which entities should be and should not be on that list. For more information about the ISO 3166 Maintenance Agency, please see the following webpage: http://www.iso.org/iso/en/prods-services/iso3166ma/index.html.

(j) Maintenance Procedure for Root Zone File. The primary root zone file is currently located on the A root server, which is operated by Network Solutions, Inc.(NSI), under a cooperative agreement with the U.S. Government. Changes to the root zone file are made by NSI according to procedures established under Amendment 11 of that cooperative agreement.

You Tube          Twitter          LinkedIn          Flickr

Facebook          RSS Feeds          Community Wiki          ICANN Blog

Who We Are

Contact Us

Accountability & Transparency

Help

© 2014 Internet Corporation For Assigned Names and Numbers.          Privacy Policy          Terms of Service
Cookie Policy

# Exhibit G

Haim v. The Islamic Republic of Iran,
Civil Action No. 02-1811-RCL



DOMAINS    NUMBERS    PROTOCOLS    ABOUT IANA

About IANA

Introduction to IANA
Performance Reporting
Procedures
Presentations
**Public Reports**
Reviews
Glossary of terms
Excellence & Quality
Contact us

# Report on the Delegation of the . ("Iran") domain representing the Islamic Republic of Iran in Arabic

13 September 2013

This report is being provided under the contract for performance of the Internet Assigned Numbers Authority (IANA) function between the United States Government and the Internet Corporation for Assigned Names and Numbers (ICANN). Under that contract, ICANN performs the "IANA functions", which include receiving delegation and redelegation requests concerning TLDs, investigating the circumstances pertinent to those requests, making its recommendations, and reporting actions undertaken in connection with processing such requests.

## Factual Information

### Country

The "IR" ISO 3166-1 code is designated for use to represent the Islamic Republic of Iran.

### String

The domain under consideration for delegation at the DNS root level is "".This is represented in ASCII-compatible encoding according to the IDNA specification as "xn--mgba3a4f16a". The individual Unicode code points that comprise this string are U+0627 U+06CC U+0631 U+0627 U+0646.

In Persian language, the string has a meaning and transliteration equivalent to "Iran" in English. The string is expressed using the Arabic script.

### Chronology of events

In 1989, the Institute for Studies in Theoretical Physics and Mathematics (IPM) was established initially "with the aim of supporting research in the fields of mathematics and theoretical physics." The entity later expanded its responsibilities and was renamed to "the Institute for Research in Fundamental Sciences." It functions under the auspice of the Ministry of Science, Research, and Technology in the country.

In 2000, IPM established a semi-autonomous department "IRNIC" within IPM to be responsible for the DNS-related tasks.

In March 2005, a public test of second-level internationalised domain names was conducted to determine which domain name should be selected to represent the country in Arabic script. As a result, string "" received the highest number of registrations.

On 25 November 2009, IPM applied for selection of the domain to represent Iran through the IDN ccTLD Fast Track process.

On 4 October 2010, review by the IDN Fast Track DNS Stability Panel found that "the applied-for strings ... present none of the threats to the stability or security of the DNS identified in [the IDN Fast Track implementation plan] ... and present an acceptably low risk of user confusion". The request for the string to represent the Islamic Republic of Iran was subsequently approved.

On 8 July 2013, IPM initiated a request to ICANN for delegation of "" as a country-code top-level domain for the Islamic Republic of Iran.

### Proposed Sponsoring Organization and Contacts

The proposed sponsoring organisation is the Institute for Research in Fundamental Sciences. The entity was established in 1989 initially "with the aim of supporting research in the fields of mathematics and theoretical physics." These responsibilities were later expanded to include communication and connectivity, as well as the management of the .IR top-level domain for the Islamic Republic of Iran.

The proposed administrative contact is Alireza Saleh, Chief Executive Officer of IRNIC. The administrative contact is understood to be based in the Islamic Republic of Iran.

The proposed technical contact is Farzin Azaripour, Chief Technical Officer of IPM.

## Evaluation of the Request

### String Eligibility

The top-level domain is eligible for delegation under ICANN policy, as the string has been deemed an appropriate representation of the Islamic Republic of Iran through the ICANN Fast Track String Selection process, and Iran is presently listed in the ISO 3166-1 standard.

### Public Interest

The government support for the application was provided in a letter from the Ministry of Information and Communication Technology.

Additional support was provided in a letter from the Iranian ICT Guild Organization.

The proposed sponsoring organisation undertakes to operate the domain in a fair and equitable manner.

### Based in country

The proposed sponsoring organisation is constituted in the Islamic Republic of Iran. The proposed administrative contact is understood to be resident in the Islamic Republic of Iran. The registry is to be operated in the country.

### Stability

The application does not involve a transfer of domain operations from an existing domain registry, and therefore stability aspects relating to registry transfer have not been evaluated.

The application is not known to be contested.

### Competency

The application has provided satisfactory details on the technical and operational infrastructure and expertise that will be used to operate the proposed new domain. The proposed operator is the current manager of .IR ASCII country code top-level domain for the Islamic Republic of Iran.

Proposed policies for management of the domain have also been tendered.

## Evaluation Procedure

ICANN is tasked with coordinating the Domain Name System root zone as part of a set of functions governed by a contract with the U.S. Government. This includes accepting and evaluating requests for delegation and redelegation of top-level domains.

A subset of top-level domains are designated for the local Internet communities in countries to operate in a way that best suits their local needs. These are known as country-code top-level domains (ccTLDs), and are assigned by ICANN to responsible trustees (known as "Sponsoring Organisations") that meet a number of public-interest criteria for eligibility. These criteria largely relate to the level of support the trustee has from its local Internet community, its capacity to ensure stable operation of the domain, and its applicability under any relevant laws.

Through ICANN's IANA department, requests are received for delegating new ccTLDs, and redelegating or revoking existing ccTLDs. An investigation is performed on the circumstances pertinent to those requests, and, when appropriate, the requests are implemented and a recommendation for delegation or redelegation is made to the U.S. National Telecommunications and Information Administration (NTIA).

### Purpose of evaluations

The evaluation of eligibility for ccTLDs, and of evaluating responsible trustees charged with operating them, is guided by a number of principles. The objective of the assessment is that the action enhances the secure and stable operation of the Internet's unique identifier systems.

In considering requests to delegate or redelegate ccTLDs, input is sought regarding the proposed new Sponsoring Organisation, as well as from persons and organisations that may be significantly affected by the change, particularly those within the nation or territory to which the ccTLD is designated.

The assessment is focussed on the capacity for the proposed sponsoring organisation to meet the following criteria:

- The domain should be operated within the country, including having its sponsoring organisation and administrative contact based in the country.
- The domain should be operated in a way that is fair and equitable to all groups in the local Internet community.

- Significantly interested parties in the domain should agree that the prospective trustee is the appropriate party to be responsible for the domain, with the desires of the national government taken very seriously.

- The domain must be operated competently, both technically and operationally. Management of the domain should adhere to relevant technical standards and community best practices.

- Risks to the stability of the Internet addressing system must be adequately considered and addressed, particularly with regard to how existing identifiers will continue to function.

**Method of evaluation**

To assess these criteria, information is requested from the applicant regarding the proposed sponsoring organisation and method of operation. In summary, a request template is sought specifying the exact details of the delegation being sought in the root zone. In addition, various documentation is sought describing: the views of the local internet community on the application; the competencies and skills of the trustee to operate the domain; the legal authenticity, status and character of the proposed trustee; and the nature of government support fort he proposal. The view of any current trustee is obtained, and in the event of a redelegation, the transfer plan from the previous sponsoring organisation to the new sponsoring organisation is also assessed with a view to ensuring ongoing stable operation of the domain.

After receiving this documentation and input, it is analysed in relation to existing root zone management procedures, seeking input from parties both related to as well as independent of the proposed sponsoring organisation should the information provided in the original application be deficient. The applicant is given the opportunity to cure any deficiencies before a final assessment is made.

Once all the documentation has been received, various technical checks are performed on the proposed sponsoring organisation's DNS infrastructure to ensure name servers are properly configured and are able to respond to queries correctly. Should any anomalies be detected, ICANN staff will work with the applicant to address the issues.

Assuming all issues are resolved, an assessment is compiled providing all relevant details regarding the proposed sponsoring organisation and its suitability to operate the relevant top-level domain.

| | | | |
|---|---|---|---|
| **Domain Names** | Root Zone Registry | .INT Registry | .ARPA Registry | IDN Repository |
| **Number Resources** | Abuse Information | | |
| **Protocols** | Protocol Registries | Time Zone Database | |
| **About IANA** | Presentations | Reports | Performance | Reviews | Excellence | Contact IANA |

 IANA is responsible for coordinating the Internet's globally unique identifiers, and is operated by the **Internet Corporation for Assigned Names and Numbers** (ICANN).

# **Exhibit H**

Haim v. The Islamic Republic of Iran,
Civil Action No. 02-1811-RCL



Domain Names

Overview
**Root Zone Management**
   Overview
   **Root Database**
   Hint and Zone Files
   Change Requests
   Instructions & Guides
   Root Servers
.INT Registry
.ARPA Registry
IDN Practices Repository
Root Key Signing Key (DNSSEC)
Reserved Domains

# Delegation Record for .IR

ISO link for decoding the two-letter codes

## Sponsoring Organisation

**Institute for Research in Fundamental Sciences**
Shahid Bahonar (Niavaran) Square
Tehran 1954851167
Iran, Islamic Republic Of

## Administrative Contact

**Siavash Shahshahani**
Institute for Research in Fundamental Sciences
Shahid Bahonar (Niavaran) Square
Tehran 1954851167
Iran, Islamic Republic Of
**Email:** siavash.shahshahani@irnic.ir
**Voice:** +98 21 22 82 80 81, ext.113
**Fax:** +98 21 22 29 57 00

## Technical Contact

**Alireza Saleh**
Institute for Research in Fundamental Sciences
Shahid Bahonar (Niavaran) Square
Tehran 1954851167
Iran, Islamic Republic Of
**Email:** alireza.saleh@irnic.ir
**Voice:** +98 21 22 82 80 80
**Fax:** +98 21 22 29 57 00

## Name Servers

| Host Name | IP Address(es) |
| --- | --- |
| ns5.univie.ac.at | 193.171.255.77 |
|  | 2001:628:453:4305:0:0:0:53 |
| ns.irnic.ir | 193.189.122.83 |
| a.nic.ir | 193.189.123.2 |

## Registry Information

**URL for registration services:** http://www.nic.ir
**WHOIS Server:** whois.nic.ir

*Record last updated 2012-11-09. Registration date 1994-04-06.*

**About IANA**        Presentations    Reports    Performance    Reviews    Excellence    Contact IANA

IANA is responsible for coordinating the Internet's globally unique identifiers, and is operated by the
**Internet Corporation for Assigned Names and Numbers** (ICANN).

# Exhibit I

Haim v. The Islamic Republic of Iran,
Civil Action No. 02-1811-RCL

Log In  |  Sign Up


ICANN

Resources ☐

# IDN ccTLD Fast Track String Evaluation Completion

The IDN ccTLD Fast Track Process was launched on 16 November 2009. As of that date eligible countries and territories were able to request their respective IDN ccTLD(s) through the process.

The process entails three steps: (i) Preparations in country/territory (ii) String Evaluation, and (iii) String Delegation.

All steps are described in detail in the Final Implementation Plan [PDF, 879 KB].

The IDN ccTLDs and associated details listed in the below table represent those IDN ccTLD requests that have successfully completed Step 2: String Evaluation.

- The primary string(s) represent the string that the requester now may seek for IDN ccTLD delegation.
- The desired variant string(s) are strings allocated to the requester. This does not mean that they will be delegated in the DNS root zone. They will be allocated to the requester in order to be reserved to the entitled manager for potential future delegation in the DNS root zone.

The corresponding countries and territories are hence free to enter Step 3: String Delegation, for the listed primary string(s).

An RSS feed of this data is available.

A | B | C | E | G | H | I | J | K | M | O | P | Q | R | S | T | U | Y

| ccTLD Reference | Country / Territory | Primary String | Desired Variant String(s) | String in English | Language | Script | Requester Contact Details | Status |
|---|---|---|---|---|---|---|---|---|
| DZ | Algeria | xn--lgbbat1ad8j | | Algeria / Al Jazair | Arabic | Arabic | Centre de Recherche sur l'Information Scientifique et Technique NIC DZ | Delegated |

A note about tracking cookies:

This site is using "tracking cookies" on your computer to deliver the best experience possible. Read more to see how they are being used.

This notice is intended to appear only the first time you visit the site on any computer.   ☐ Dismiss

| | | | | | | | Ben-Aknoun Algiers 16000 Algeria  Existing ccTLD manager | |
| BD | Bangladesh | xn--54b7fta0cc | | Bangla | Bangla | Bangla | Bangladesh Telecommunication | Pending Delegation |

| | | | | | | | | |
|---|---|---|---|---|---|---|---|---|
| | | | | | | | Regulatory Commission<br><br>Md. Rezaul Quader<br>Director General<br>(Systems & Services)<br><br>IEB Bhaban,<br>Ramna, Dhaka 1000<br>Bangladesh<br><br>Government entity | |
| CN | China | xn--fiqs8S , 中国<br>xn--fiqz9S , 中國 | | China | Chinese | Simplified Chinese, Traditional Chinese | China Internet Network Information Center (CNNIC)<br><br>Guanghao Li<br>Deputy Director, International Business Development, CNNIC<br><br>4, South 4th Street, Zhongguancun, Haidian District<br>Beijing 100190<br>China<br><br>Existing ccTLD manager<br><br>---<br><br>Completed consistent with ICANN Board 22 April 2010 resolution. The CNNIC implementation plan. | Delegated |
| EG | Egypt | xn--wgbh1c | | Egypt | Arabic | Arabic | National Telecom Regulatory Authority (NTRA)<br><br>Manal Ismail<br>Director, International Technical Coordination<br><br>Smart Village,<br>B4 K28, Cairo-Alex Desert Rd.,<br>6th October 12577<br>Egypt<br><br>Government Entity | Delegated |

| GE | Georgia | xn--node | ge | Georgian | Georgian (Mkhedruli) | Information Technologies Development Center (ITDC) | Pending Delegation |
|----|---------|----------|-----|----------|---------------------|--------------------------------------------------|--------------------|
| | | | | | | Giorgi Garsveanishvili Founder | |
| | | | | | | 46 R. Tabukashvili St. 0108, Tbilisi Georgia | |
| | | | | | | On behalf of Government Entity | |
| HK | Hong Kong | xn--j6w193g 香港 | Hong Kong | Chinese | Han (Simplified, Traditional) | Hong Kong Internet Registration Corporation Ltd. | Delegated |
| | | | | | | Jonathan Shea Chief Executive Officer | |
| | | | | | | Unit 2002-2005, 20/F, ING Tower 308 Des Voeux Road Central Sheung Wan Hong Kong Hong Kong | |
| | | | | | | Existing ccTLD manager | |
| IN | India | xn--h2brj9c | Bharat | Hindi | Devanagari | Ministry of Communications and Information Technology, Department of Information Technology | Delegated |
| | | xn--mgbbh1a71e | Bharat | Urdu | Arabic | | |
| | | xn--fpcrj9c3d | Bharat | Telugu | Telugu | Dr. Govind Senior Director, Head of Department, Internet Governance Division, Department of Information Technology, Government of India | |
| | | xn--gecrj9c | Bharat | Gujarati | Gujarati | | |
| | | xn--s9brj9c | Bharat | Punjabi | Gurmukhi | | |
| | | xn--45brj9c | Bharat | Bengali | Bengali | 6, CGO Complex, Electronics Niketan, Lodhi Road New Delhi 110 003 India | |
| | | xn--xkc2dl3a5ee0h | India | Tamil | Tamil | | |

| | | | | | | | | |
|---|---|---|---|---|---|---|---|---|
| | | | | | | | Government Entity | |
| IR | Iran, Islamic Republic of | xn--mgba3a4f16a | xn--mgba3a4fra | Iran | Persian | Arabic | Institute For Studies in Theo Phys and Math (IPM)<br><br>M.J.A Larijani Director<br><br>Shahid Bahonar Square Tehran 19548-51167 Iran, Islamic Republic of<br><br>Existing ccTLD Manager | Delegated |
| JO | Jordan | xn--mgbayh7gpa | | Al-Ordon | Arabic | Arabic | National Information Technology Center (NITC)<br><br>Fahd A. Batayneh Systems Engineer<br><br>Royal Scientific Society, Al-Jubeiha P.O.Box: 259 Amman 11941 Jordan<br><br>Government Entity | Delegated |
| KZ | Kazakhstan | xn--80ao21a қаз | | kaz | Kazakh | Cyrillic | KazNIC Organization<br><br>Pavel Gussev Director<br><br>Momyshuly, 22 Semey Kazakhstan<br><br>Existing ccTLD manager | Delegated |
| KR | Korea, Republic of | xn--3e0b707e 한국 | | Republic of Korea | Korean | Hangul | KISA<br><br>Minjung Park Manager<br><br>78 Garak-dong Songpa-gu<br><br>Seoul 138-950 Republic of Korea<br><br>Existing ccTLD manager | Delegated |

| | | | | | | | |
|---|---|---|---|---|---|---|---|
| MK | Macedonia, The Former Yugoslav Republic of | xn--d1alf мкд | | mkd | Macedonian | Cyrillic | MARnet, Macedonian Academic and Research Network<br><br>Saso Dimitrijoski Director<br><br>MARnet Blvd. Partizanski Odredi 17 Skopje 1000 Macedonia, The Former Yugoslav Republic of<br><br>Government Entity | Pending Delegation |
| MY | Malaysia | xn--mgbx4cd0ab | | Malaysia | Malay | Arabic | .my DOMAIN REGISTRY (MYNIC Berhad)<br><br>Tengku Intan Narqiah Binti Tengku Othman Chief Executive Officer<br><br>MYNIC Berhad (Co.No. 735031-H) Level 3, Block C Mines Waterfront Business Park No.3, Jalan Tasik Mines Resort City 43300 Seri Kembangan Selangor Darul Ehsan Malaysia<br><br>Existing ccTLD manager | Delegated |
| MN | Mongolia | xn--l1acc мон | | mon | Mongolian | Cyrillic | Datacom Co.,Ltd<br><br>ENKHBOLD Gombo Chief Executive Officer<br><br>San Business Center, 1st floor Amaryn street, Sukhbaatar 8th khoroo Ulaanbaatar 210646 Mongolia<br><br>Existing ccTLD manager | Delegated |

| MA | Morocco | xn--mgbc0a9azcg | | Morocco / Arabic al-Maghrib | Arabic | Arabic | National Telecommunication Regulatory Authority<br><br>Azdine El Mountassir Billah General Director<br><br>Agence Nationale de Réglementation des Télécommunications (ANRT) Centre d'Affaires, Boulevard Ar-Ryad, Hay Ryad BP 2939 RABAT 10100 Morocco<br><br>Government entity | Delegated |
| OM | Oman | xn--mgb9awbf | | Oman | Arabic | Arabic | Telecommunications Regulatory Authority<br><br>Mohammed H. AlKindy Senior Manager Technical Affairs Unit<br><br>P.O. Box 579, Ruwi P.C. 112 Muscat Sultanate of Oman<br><br>Government entity | Delegated |
| PK | Pakistan | xn--mgbai9azgqp6j | xn--mgbai9a5eva00b | Pakistan | Urdu | Arabic | Ministry of Information Technology Government of Pakistan<br><br>Syed Iftikhar Hussainn Anaylst<br><br>4th Floor, ETC Building, Sector F-5/1 Islamabad 44000 Pakistan<br><br>Government Entity | Pending Delegation |
| PS | Palestinian Territory, Occupied | xn--ygbi2ammx | | Palestine | Arabic | Arabic | The Palestinian National Internet Naming Authority (PNINA) | Delegated |

| | | | | | | | | |
|---|---|---|---|---|---|---|---|---|
| | | | | | | | Marwan Mohammed Radwan General manager PNINA, 4th Floor, Al-Amal Building Al-Wehda Street Gaza 1215 Palestinian Territory Existing ccTLD manager | |
| QA | Qatar | xn--wgbl6a | | Qatar | Arabic | Arabic | Supreme Council for Communications and Information Technology "ictQATAR" The State of Qatar Saleh Al-Kuwari Chief Technical Manager Al Nasr Tower B., Corniche Road Doha Qatar Government Entity | Delegated |
| RU | Russian Federation | xn--p1ai рф | | rf | Russian | Cyrillic | Coordination Center for TLD RU Andrei Kolesnikov Director Bolshoy Golovin pereulok, 23 Moscow 107045 Russian Federation Existing ccTLD manager | Delegated |
| SA | Saudi Arabia | xn--mgberp4a5d4ar | xn--mgberp4a5d4a87g xn--mgbqly7c0a67fbc xn--mgbqly7cvafr | AlSaudiah | Arabic | Arabic | Saudi Network Information Center (SaudiNIC), General directorate of Internet services, Communication and Information Technology Commission (CITC), Kingdom of Saudi Arabia Raed Ibrahim AL-Fayez Technical Manager | Delegated |

| | | | | | | |
|---|---|---|---|---|---|---|
| | | | | | | P. O. Box 75606<br>SauidNIC - CITC<br>Riyadh 11588<br>Saudi Arabia<br><br>Existing ccTLD<br>manager |
| RS | Serbia | xn--90a3ac<br>срб | srb | Serbian | Cyrillic | Delegated<br><br>Register of National<br>Internet Domain<br>Names of Serbia<br><br>Žorža Klemansoa<br>18a/I<br>Belgrade<br>11108<br>Serbia |
| SG | Singapore | xn--yfro4i67o<br>新加坡<br>xn--<br>clchc0ea0b2g2a9gcd | Singapore | Chinese<br>Tamil | Han<br>Tamil | Delegated<br><br>Lim Choon Sai<br>General Manager<br><br>Singapore Network<br>Information Centre<br>(SGNIC) Pte Ltd<br>8 Temasek<br>Boulevard<br>Suntec Tower Three<br>#14-00<br>Singapore 038988<br>singapore<br><br>Existing ccTLD<br>manager |
| LK | Sri Lanka | xn--fzc2c9e2c<br><br>xn--xkc2al3hye2a | Lanka<br>Ilangai | Sinhalese<br>Tamil | Sinhala<br>Tamil | Delegated<br><br>LK Domain Registry<br><br>Gihan Dias<br>Domain Registrar<br>and CEO<br><br>c/o Dept. of CSE,<br>University of<br>Moratuwa<br>Moratuwa 10400<br>Sri Lanka<br><br>Existing ccTLD<br>manager |
| SD | Sudan | xn--mgbpl2fh | sudan | Arabic | Arabic | Pending<br>Delegation<br><br>Sudan Internet<br>Society<br><br>Dr. Nadir Gaylani<br>President of Sudan<br>Internet Society<br><br>Al Fayha Buld, 4th<br>Floor<br>P.O.Box 13713 |

| | | | | | | | | |
|---|---|---|---|---|---|---|---|---|
| | | | | | | | Khartoum 11111 Sudan<br><br>Existing ccTLD manager | |
| SY | Syrian Arab Republic | xn--ogbpf8fl | xn--mgbtf8fl | Syria | Arabic | Arabic | Maher Suleiman Director General<br><br>National Agency for Network Services (NANS) Al-Abed Street, Ministry of Communication and Technology Damascus Syrian Arab Republic<br><br>Government entity | Delegated |
| TW | Taiwan | xn--kpry57d 台灣<br><br>xn--kprw13d 台湾 | xn--nnx388a 臺灣 | Taiwan | Chinese | Simplified Chinese, Traditional Chinese | Taiwan Network Information Center (TWNIC)<br><br>Ai-Chin Lu Vice CEO<br><br>4F-2, No. 9, Section 2, Roosevelt Road Taipei 100 Taiwan<br><br>Existing ccTLD manager<br><br>Completed consistent with ICANN Board 22 April 2010 resolution. The TWNIC implementation plan. | Delegated |
| TH | Thailand | xn--o3cw4h | | Thai | Thai | Thai | Thai Network Information Center Foundation<br><br>Kanchana Kanchanasut Professor<br><br>159 Thanon Phichai, Khwaeng Thanon Nakhon Chaisi, Khet Dusit Bangkok 10300 Thailand | Delegated |

| | | | | | | | | Existing ccTLD manager |
|---|---|---|---|---|---|---|---|---|
| TN | Tunisia | xn--pgbs0dh | | Tunis | Arabic | Arabic | Tunsian Internet Agency<br><br>Kamel SAADAOUI CEO<br><br>13, rue Jugurtha Mutuelle-ville Tunis 1002 Tunisia<br><br>Government Entity & Exisiting ccTLD manager | Delegated |
| UA | Ukraine | xn--j1amh<br>укр | | ukr | Ukrainian | Cyrillic | Ukrainian Network Information Centre (UANIC), Inc.<br><br>Yuriy Honcharuk CEO<br><br>10, Volodymyrska str.<br>Kyiv 01025 Ukraine<br><br>On behalf of: Government entity | Delegated |
| AE | United Arab Emirates | xn--mgbaam7a8h | | Emarat | Arabic | Arabic | Telecommunications Regulatory Authority of United Arab Emirates (UAE)<br><br>Mohammed Gheyath Executive Director / Technology Development Affairs<br><br>Address:<br>P.O.BOX : 116688 Emaar Square Dubai United Arab Emirates<br><br>Government Entity | Delegated |
| YE | Yemen | xn--mgb2ddes | | AlYemen | Arabic | Arabic | Yemen Net<br><br>Amer Mohammed Haza GM Data Network & Internet | Pending Delegation |

Al-Graf street
Sana'a
Yemen

Government Entity

| | | | |
|---|---|---|---|
| You Tube | Twitter | LinkedIn | Flickr |
| Facebook | RSS Feeds | Community Wiki | ICANN Blog |

Who We Are

Contact Us

Accountability & Transparency

Help

© 2014 Internet Corporation For Assigned Names and Numbers.        Privacy Policy      Terms of Service      Cookie Policy

# Exhibit J

Haim v. The Islamic Republic of Iran,
Civil Action No. 02-1811-RCL



DOMAINS    NUMBERS    PROTOCOLS    ABOUT IANA

**Domain Names**

Overview

**Root Zone Management**

    Overview

    **Root Database**

    Hint and Zone Files

    Change Requests

    Instructions & Guides

    Root Servers

.INT Registry

.ARPA Registry

IDN Practices Repository

Root Key Signing Key (DNSSEC)

Reserved Domains

# Delegation Record for .SY

ISO link for decoding the two-letter codes

## Sponsoring Organisation

**National Agency for Network Services (NANS)**
Sahara-Sabboura crossroads
P.O. Box 47/Kudsaya
Damascus
Syrian Arab Republic

## Administrative Contact

**NANS DNS Department**
National Agency for Network Services (NANS)
Sahara-Sabboura crossroads
P.O. Box 47/Kudsaya
Damascus
Syrian Arab Republic
**Email:** dns@tld.sy
**Voice:** +963 11 3937047
**Fax:** +963 11 3937079

## Technical Contact

**NANS DNS Technical Department**
National Agency for Network Services (NANS)
Sahara-Sabboura crossroads
P.O. Box 47/Kudsaya
Damascus
Syrian Arab Republic
**Email:** dns@tld.sy
**Voice:** +963 11 3937047
**Fax:** +963 11 3937079

## Name Servers

| Host Name | IP Address(es) |
| --- | --- |
| ns1.tld.sy | 82.137.200.85 |
| ns2.tld.sy | 82.137.192.145 |
| sy.cctld.authdns.ripe.net | 193.0.9.113<br>2001:67c:e0:0:0:0:0:113 |
| pch.anycast.tld.sy | 204.61.216.71<br>2001:500:14:6071:ad:0:0:1 |

## Registry Information

**URL for registration services:** http://tld.sy
**WHOIS Server:** whois.tld.sy

## IANA Reports

- Redelegation of the .SY domain representing the Syrian Arab Republic to the National Agency for Network Services (2011-01-07)

*Record last updated 2013-06-05. Registration date 1996-02-20.*

**Domain Names**      Root Zone Registry   .INT Registry   .ARPA Registry   IDN Repository

**Number Resources**   Abuse Information

**Protocols**         Protocol Registries   Time Zone Database

**About IANA**        Presentations   Reports   Performance   Reviews   Excellence   Contact IANA

IANA is responsible for coordinating the Internet's globally unique identifiers, and is operated by the
**Internet Corporation for Assigned Names and Numbers** (ICANN).

# Exhibit K

Haim v. The Islamic Republic of Iran,
Civil Action No. 02-1811-RCL



DOMAINS    NUMBERS    PROTOCOLS    ABOUT IANA

**Domain Names**

Overview
**Root Zone Management**
   Overview
   **Root Database**
     Hint and Zone Files
     Change Requests
     Instructions & Guides
     Root Servers
.INT Registry
.ARPA Registry
IDN Practices Repository
Root Key Signing Key (DNSSEC)
Reserved Domains

# Delegation Record for .KP

ISO link for decoding the two-letter codes

## Sponsoring Organisation

**Star Joint Venture Company**
Potonggang2-dong, Potonggang District
Pyongyang
Korea, Democratic People's Republic Of

## Administrative Contact

**President**
Star Joint Venture Company
Potonggang2-dong, Potonggang District
Pyongyang
Korea, Democratic People's Republic Of
**Email:** mptird@star-co.net.kp
**Voice:** +8502 381 3180
**Fax:** +8502 381 4418

## Technical Contact

**President**
Star Joint Venture Company
Potonggang2-dong, Potonggang District
Pyongyang
Korea, Democratic People's Republic Of
**Email:** mptird@star-co.net.kp
**Voice:** +8502 381 3180
**Fax:** +8502 381 4418

## Name Servers

| Host Name | IP Address(es) |
| --- | --- |
| ns1.kptc.kp | 175.45.176.15 |
| ns2.kptc.kp | 175.45.176.16 |

## Registry Information

**URL for registration services:** http://www.star.co.kp

## IANA Reports

- Report on Delegation of the .KP Top-Level Domain to "Korea Computer Center" (2007-09-11)
- Report on the Redelegation of the .KP domain representing the Democratic People's Republic of Korea to Star Joint Venture Company (2011-04-01)

*Record last updated 2011-07-18. Registration date 2007-09-24.*

| Number Resources | Abuse Information |
| --- | --- |
| Protocols | Protocol Registries   Time Zone Database |
| About IANA | Presentations   Reports   Performance   Reviews   Excellence   Contact IANA |

IANA is responsible for coordinating the Internet's globally unique identifiers, and is operated by the **Internet Corporation for Assigned Names and Numbers** (ICANN).

# **Exhibit L**

Haim v. The Islamic Republic of Iran,
Civil Action No. 02-1811-RCL



# Principles for Delegation and Administration of ccTLDs Presented by Governmental Advisory Committee

(23 February 2000)

## PRINCIPLES FOR THE DELEGATION AND ADMINISTRATION OF COUNTRY CODE TOP LEVEL DOMAINS

### 1. PREAMBLE

In the five years since the issuance of RFC 1591, the Internet has evolved from a tool reserved for computer and networking research, to a global medium for commerce, education, and communication. The new realities of the Internet, including its increased importance as a vehicle for national economic growth, and the expanding and more diverse nature of the Internet community necessitated evolution in the traditional means of managing and administering Internet technical functions.

As a result, DNS functions, including the administration of the DNS root server system, the development of policies for the registration and allocation of domain names, the coordination of Internet Protocols, and the delegation of Internet Protocol numbers are becoming more clearly delineated and formalised through the ICANN process. Similarly, the procedures and framework of accountability for delegation and administration of ccTLDs need to evolve into a more robust, certain, and reliable system as well.

While evolution is needed, the principle of RFC 1591 remains sound: the manager of a ccTLD performs a public service on behalf of the relevant local community and as such the designated manager has a duty to serve this community. The designated manager also has a responsibility to the global Internet community. By 'global Internet community' we do not mean any specific legal or international entity, but rather we interpret the term to refer to all of those who are affected by, now or in the future, the operation of the relevant TLD, because such operation may impinge on more than one jurisdiction and affect the interests of individuals and entities from both within the relevant country or territory and elsewhere. This is our interpretation of the meaning of 'global Internet community' as it is used in RFC 1591.

### 2. OBJECTIVE OF THIS DOCUMENT

The objective of this document is to suggest principles that will assist in the development of best practice for the delegation and administration of ccTLDs. These principles are intended to contribute to the development of models of:

- a communication between the relevant government or public authority and ICANN;
- a communication between ICANN and the delegee; and
- a communication between the relevant government or public authority and the delegee.

### 3. DEFINITIONS

For the purposes of this document, the following definitions apply:

3.1 'Alternative Dispute Resolution' (or 'ADR') means any system of resolving a dispute other than by court litigation, and includes arbitration, mediation, conciliation and processes of administrative dispute resolution.

3.2 'Communication' should include a law, regulation, agreement, document, contract, memorandum of understanding, or any other written instrument, as appropriate.

3.3 'Country code top level domain' or 'ccTLD' means a domain in the top level of the global domain name system assigned according to the two-letter codes in the ISO 3166-1 standard, 'Codes for the Representation of Names of Countries and Their Subdivisions.'

3.4 'Delegation' means delegation by ICANN/IANA of responsibility for administration of a TLD in the DNS root.

3.5 'Delegee' means the organisation, enterprise or individual designated by the relevant government or public authority to exercise the public trust function of a ccTLD and consequently recognised through a communication between ICANN and the designated entity for that purpose. The delegee for a ccTLD may be the relevant government or public authority itself or an oversight body designated by the relevant government or public authority, inasmuch as the administrative and management functions for a ccTLD may be contracted out by the delegee to another party and hence not performed by the delegee itself.

3.6 'Designation' means designation by the relevant government or public authority of the delegee.

3.7 'DNS' means domain name system.

3.8 'ICANN' means the Internet Corporation for Assigned Names and Numbers.

3.9 'Relevant government or public authority' means relevant national government or public authority of a distinct economy as recognised in international fora as those terms are used in the ICANN Bylaws and GAC Operating Principles.

3.10 'Relevant local community' means the local community in the context of the ISO 3166-1 code. This definition is specific to the purposes identified in this document and not broader.

3.11 'Top Level Domain' or 'TLD' means a domain in the top level of the global domain name system.

## 4. ROLE OF DELEGEE

4.1 The delegee of a ccTLD is a trustee for the delegated domain, and has a duty to serve the residents of the relevant country or territory in the context of ISO 3166-1, as well as the global Internet community (as that term is interpreted in the Preamble to this document). Its policy role should be distinguished from the management, administration and marketing of the ccTLD. These functions may be performed by the same or different entities. However the delegation itself cannot be sub-contracted, sub-licensed or otherwise traded without the agreement of the relevant government or public authority and ICANN.

4.2 No private intellectual or other property rights should inhere in the ccTLD itself, nor accrue to the delegee as the result of delegation or to any entity as a result of the management, administration or marketing of the ccTLD.

4.3 Tradable goods and services may arise in the performance of other management and administrative functions attached to the ccTLD.

4.4 The delegee should recognise that ultimate public policy authority over the relevant ccTLD rests with the relevant government or public authority.

4.5 The delegee should work cooperatively with the relevant government or public authority of the country or territory for which the ccTLD has been established, within the framework and public policy objectives of such relevant government or public authority.

4.6 The delegee, and the delegee's administrative contact, should be resident or incorporated in the territory and/or jurisdiction of the relevant government or public authority. Where the delegee, administrative contact or technical contact are not resident or incorporated in the territory and/or jurisdiction of the relevant government or public authority, it should nevertheless operate in a way that is consistent with the laws and public policy of that relevant government or public authority.

## 5. ROLE OF GOVERNMENT OR PUBLIC AUTHORITY

5.1 The relevant government or public authority ultimately represents the interests of the people of the country or territory for which the ccTLD has been delegated. Accordingly, the role of the relevant government or public authority is to ensure that the ccTLD is being administered in the public interest, whilst taking into consideration issues of public policy and relevant law and regulation.

5.2 Governments or public authorities have responsibility for public policy objectives such as: transparency and non-discriminatory practices; greater choice, lower prices and better services for all categories of users; respect for personal privacy; and consumer protection issues. Considering their responsibility to protect these interests, governments or public authorities maintain ultimate policy authority over their respective ccTLDs and should ensure that they are operated in conformity with domestic public policy objectives, laws and regulations, and international law and applicable international conventions.

5.3 It is recalled that the Governmental Advisory Committee (GAC) to ICANN has previously adopted the general principle that the Internet naming system is a public resource in the sense that its functions must be administered in the public or common interest.

5.4 The relevant government or public authority should ensure that DNS registration in the ccTLD benefits from effective and fair condition of competition, at appropriate levels and scale of activity.

5.5 To give effect to governments' or public authorities' public policy interests, governments or public authorities should ensure that the terms outlined in Clause 9 are included in their communications with delegees.

5.6 In making a designation for a delegee, the government or public authority should take into consideration the importance of long term stability in the administration and management of the ccTLD and in the DNS. In most cases, such stability may be best served through the designation of an organisation or an enterprise rather than a specific individual.

## 6. ROLE OF ICANN

6.1 A primary function of ICANN is to establish, disseminate, and oversee implementation of the technical standards and practices that relate to the operation of the global DNS. In this capacity, ICANN administers a range of technical Internet management functions, including:

- establishment of policy for IP number block allocation;
- administration of the authoritative root server system;

- creation of policy for determining the circumstances under which new TLDs would be added to the root system;
- coordination of the assignment of other Internet technical parameters as needed to maintain universal connectivity on the Internet; and
- other activities necessary to coordinate specified DNS administration functions.

6.2 Specifically in relation to the administration and operation of ccTLDs, ICANN's role is to develop and implement policies that fulfil the provisions of Clause 10 below.

## 7. PRINCIPLES RELATING TO DELEGATIONS

7.1 Where a communication between the relevant government or public authority and the delegee is in place, when ICANN is notified by the relevant government or public authority that the delegee has contravened the terms of the communication, or the term of the designation has expired, ICANN should act with the utmost promptness to reassign the delegation in coordination with the relevant government or public authority.

7.2 Notwithstanding the urgent need for a communication-based regime for ccTLD designation, delegation and administration, in the absence of such communication between the relevant government or public authority and the administrator of the ccTLD, ICANN should, upon the tendering of evidence by such government or public authority that the administrator does not have the support of the relevant local community and of the relevant government or public authority, or has breached and failed to remedy other material provisions of RFC 1591, act with the utmost promptness to reassign the delegation in coordination with the relevant government or public authority.

7.3 When ICANN notifies the relevant government or public authority that the ccTLD is being operated in a manner that threatens the stability of the DNS or of the Internet, or has otherwise breached and failed to remedy other material provisions of the communication between ICANN and the delegee, as outlined in Clause 10, the relevant government or public authority should cooperate with ICANN to remedy this situation or effect the reassignment of the delegation for the ccTLD.

7.4 With respect to future delegations or reassignment of delegations, ICANN should delegate the administration of a ccTLD only to an organisation, enterprise or individual that has been designated by the relevant government or public authority.

7.5 Delegees should enjoy, in the execution of their responsibilities, the appropriate rights under applicable law, and should not be subject to discriminatory or arbitrary practices, policies or procedures from ICANN or the relevant government or public authority. In the event of a reassignment of delegation, registrants in the ccTLD should be afforded continued name resolution, or a reasonable period in which to transfer to another TLD.

## 8. PRINCIPLES CONCERNING THE COMMUNICATION BETWEEN THE RELEVANT GOVERNMENT OR PUBLIC AUTHORITY AND ICANN

8.1 The communication between the relevant government or public authority and ICANN, as outlined in Clause 2, should include a designated point of contact within the relevant government or public authority, as well as the name and contact details of the recognised delegee and duration of this recognition. Either as part of this communication, or through a subsequent communication, the relevant government or public authority should copy to ICANN any communication established between it and the delegee, setting forth the terms and conditions of the designation and/or concerning the execution of the delegee's role and the management of the delegation.

8.2 The relevant government or public authority should communicate to ICANN how it will require the delegee to abide by the terms and conditions outlined in Clause 9 below.

8.3 Recognising ICANN's responsibilities to achieve consensus in the creation of any new generic TLDs, ICANN should avoid, in the creation of new generic TLDs, well known and famous country, territory or place names; well known and famous country, territory or regional language or people descriptions; or ISO 639 Codes for representation of languages unless in agreement with the relevant governments or public authorities.

## 9. PRINCIPLES CONCERNING THE COMMUNICATION BETWEEN THE RELEVANT GOVERNMENT OR PUBLIC AUTHORITY AND THE DELEGEE

9.1 The communication between the relevant government or public authority and the delegee should include the following provisions, a copy or summary of which should be forwarded to ICANN:

9.1.1 Term, performance clauses, opportunity for review and process for revocation.

9.1.2 A commitment by the delegee to operate the ccTLD in the interest of the relevant local community and the global Internet community.

9.1.3 A recognition by the delegee that the management and administration of the ccTLD are subject to the ultimate authority of the relevant government or public authority, and must conform with relevant domestic laws and regulations, and international law and international conventions.

9.1.4 Confirmation that the ccTLD is operated in trust in the public interest and that the delegee does not acquire property rights to the ccTLD itself.

9.1.5 Conditions to ensure the transfer of all relevant DNS data to a nominated replacement, if, for any reason, a reassignment to a new delegee is necessary.

9.1.6 Conditions for the efficient and effective resolution of disputes arising from domain name registration. In so far as ccTLD registration policies allow or encourage registrations from entities or individuals resident outside the relevant territory, then the delegee concerned should implement dispute resolution policies that ensure that the interests of all registrants, and of third parties, including those outside their territory and in other jurisdictions, are taken into account. Dispute resolution policies should, to the greatest extent possible, follow common principles, including due regard for internationally recognised intellectual property, consumer protection and other relevant law, and be implemented by all delegees. The delegee should, so far as possible, implement alternative dispute resolution procedures conducted online, without precluding access to court litigation.

9.1.7 The delegee's commitment to abide by ICANN developed policies as set forth in Clause 10.

9.1.8 Where ccTLD registration policies allow or encourage registrations from entities or individuals resident outside the relevant territory, the delegee commits to observe all ICANN policies applicable to such ccTLDs, not otherwise provided for in Clause 10, except where the delegee is prohibited by law from, or instructed in writing by the relevant government or public authority to refrain from, implementing such other ICANN policies.

9.1.9 The above terms and conditions shall apply to delegees, including delegees who are

resident and/or incorporated outside the territory of the relevant local community.

9.2 A delegee should not sub-contract part or all of the technical operations of the ccTLD registry without ensuring that the sub-contractor has the technical qualifications required by ICANN, and informing ICANN.

9.3 In any sub-contracting of the technical operations of the ccTLD registry or administrative and management functions of the ccTLD, the sub-contract must state that the delegation itself is an exercise of a public right, not an item of property, and cannot be reassigned to a new delegee except in accordance with the provisions of Clause 7.

## 10. PRINCIPLES CONCERNING THE COMMUNICATION BETWEEN ICANN AND THE DELEGEE

10.1 The communication between ICANN and the delegee should contain ICANN's commitment to:

10.1.1 maintain, or cause to be maintained, a stable, secure, authoritative and publicly available database of relevant information for each ccTLD (see below);

10.1.2 ensure that authoritative and accurate root zone information is generated from such database and ensure that the root servers are operated in stable and secure manner;

10.1.3 maintain, or cause to be maintained, authoritative records and an audit trail regarding ccTLD delegations and records related to these delegations; and

10.1.4 inform the delegee in a timely manner of any changes to ICANN's contact information.

10.2 The communication between ICANN and the delegee should contain the delegee's commitment to:

10.2.1 cause to be operated and maintained in a stable and secure manner the authoritative primary and secondary nameservers for the ccTLD, adequate to resolve names within the ccTLD for users throughout the Internet, and any sub-domains over which they retain administrative authority, and ensure that the zone file and accurate and up-to-date registration data is continuously available to ICANN for purposes of verifying and ensuring the operational stability of the ccTLD only;

10.2.2 inform ICANN in a timely manner of any changes to the ccTLD's contact information held by ICANN;

10.2.3 ensure the safety and integrity of the registry database, including the establishment of a data escrow or mirror site policy for the registry data managed by the delegate. The escrow agent or mirror site should be mutually approved by the relevant government or public authority and the delegee and should not be under the control of the delegee;

10.2.4 ensure the transfer of all relevant DNS data to a nominated replacement, if, for any reason, a reassignment to a new delegee is necessary;

10.2.5 abide by ICANN developed policies concerning: interoperability of the ccTLD with other parts of the DNS and Internet; operational capabilities and performance of the ccTLD operator; and the obtaining and maintenance of, and public access to, accurate and up-to-date contact information for domain name registrants; and

10.2.6 ensure the payment of its contribution to ICANN's cost of operation in accordance with an equitable scale, based on ICANN's total funding requirements (including reserves), developed by ICANN on the basis of consensus.

---

Comments concerning the layout, construction and functionality of this site should be sent to webmaster@icann.org.

Page Updated 23-February-00

(c) 2000  The Internet Corporation for Assigned Names and Numbers.  All rights reserved.

# Exhibit M

Haim v. The Islamic Republic of Iran,
Civil Action No. 02-1811-RCL

ICANN | Archives | Committees | Governmental Advisory Committee

Site Map    Search



**Internet Corporation for Assigned Names and Numbers**

ARCHIVES

**Please note:** You are viewing archival ICANN material. Links and information may be outdated or incorrect. Visit **ICANN's main website** for current information.

# PRINCIPLES AND GUIDELINES FOR THE DELEGATION AND ADMINISTRATION OF COUNTRY CODE TOP LEVEL DOMAINS

Presented by the Governmental Advisory Committee

## 1. PREAMBLE

1.1. The purpose of this document is to set out a general framework of principles and guidelines for the relationship between national governments, the Registry of the country code associated with that country, and the Internet Corporation for Assigned Names and Numbers (ICANN). However, the situation varies significantly between countries. This framework is intended to help establish, not constrain or dictate, the development of the three-way relationship. Governments, country code Top Level Domain (ccTLD) Registries and ICANN share the responsibility for ensuring a Domain Name System that is stable, secure, open, and easily accessible.

> 1.2. The main principle is the principle of subsidiarity. ccTLD policy should be set locally, unless it can be shown that the issue has global impact and needs to be resolved in an international framework. Most of the ccTLD policy issues are local in nature and should therefore be addressed by the local Internet Community, according to national law.

1.3. These principles are intended as a guide to the relationships between Governments, their ccTLD and ICANN. They are not intended to be binding and need both Governments and Registries voluntarily to agree to apply them within their legal framework. If either the Government or the Registry decide not to adopt the principles, this cannot be held against the Registry, and the Registry still has a valid existence.

1.4. The Internet has evolved from a tool primarily reserved for computer and networking research, to a global medium for commerce, education, and communication since ccTLDs were first established and, in particular, since RFC 1591 was issued. Advances in the global information infrastructure, especially the Internet, are of crucial importance for national and global economic growth. Top Level Domains (i.e. domains in the top level of the global domain name system) play a significant role in this respect. ccTLDs have acquired an increasing part in the domain names market and are seen by many as part of the Internet identities of their country or geopolitical territory.

1.5. The initial selection for the management of ccTLDs was by " selecting a designated manager for a domain that was able to do an equitable, just, honest, and competent job " . This was a mutual recognition of rights and duties and this should remain the fundamental basis for any future selection of ccTLD Registries. There is currently a variety of legacy ccTLD situations with different legal or contractual frameworks.

1.6. It is recalled that the Governmental Advisory Committee (GAC) to ICANN has previously adopted the general principle that the Internet naming system is a public resource in the sense that its functions must be administered in the public or common interest. The WSIS Declaration of December 2003 states that "*policy authority for Internet-related public policy issues is the sovereign right of States. They have rights and responsibilities for international Internet-related public policy issues.*" This is in the context that, "*Governments, as well as private sector, civil society and the United Nations and other international organizations have an important role and responsibility in the development of the Information Society and, as appropriate, in decision-making processes. Building a people-centred Information Society is a joint effort which requires cooperation and partnership among all stakeholders.*"

1.7. It is recalled that the WSIS Plan of action of December 2003 invites "*Governments to manage or supervise, as appropriate, their respective country code top-level domain name*". Any such involvement should be based on appropriate national laws and policies. It is recommended that governments should work with their local Internet community in deciding on how to work with the ccTLD Registry.

## 2. OBJECTIVE OF THIS DOCUMENT

2.1. This document updates the principles set out in February 2000. It takes account of experience and best practice for the delegation and administration of ccTLDs. It is intended as a framework which the different parties can use to help define the way they work together. How these principles and guidelines may be used depends on local/national laws and traditions.They may contribute to clarifying the bilateral relationship between these parties. They could also contribute to the development of:

- a communication between the relevant government or public authority and ICANN about their respective roles;
- a communication between the relevant government or public authority and the ccTLD Registry where this is deemed appropriate by the government and Registry concerned or provided for by national laws; and
- an appropriate communication between ICANN and the ccTLD Registry.

2.2. From a GAC perspective, the first two of these types of communications are of primary importance, since governments are directly involved. The third type often involves two private parties and is of interest to governments to the extent it affects public policy interests.

## 3. DEFINITIONS

For the purposes of this document, the following definitions apply:

3.1 " Communication " might include a law, regulation, agreement, document, contract, memorandum of understanding or any other form of relationship as appropriate.

3.2 'Country code top level domain' or 'ccTLD' means a domain in the top level of the global domain name system assigned according to a two-letter code based on the ISO 3166-1 standard 'Codes for the Representation of Names of Countries and Their Subdivisions.'

3.3 ' Delegation' means the procedures that need to be taken by ICANN/IANA for the inclusion of a ccTLD in the DNS root upon receipt of an authoritative request.

3.4 ' Re-delegation ' means the change of the person or body responsible for the administration of a ccTLD Registry effected by ICANN/IANA upon receipt of an authoritative request.

3.5 ' Authoritative request ' for the purposes of this document is the request for the delegation or re-delegation concerning a ccTLD Registry addressed to ICANN/IANA by the appropriate body, according to national law, showing that the request is correctly made, authoritative and is in line with applicable law or, in the absence of such law, RFC 1591.

3.6 ' ccTLD Registry' means the entity (whether an organisation, enterprise or individual) responsible for managing and administering a ccTLD.

3.7 ' Designation' means decision by the relevant government or public authority or any other body foreseen by the national law of the country concerned on the person or body that will be the manager of the relevant ccTLD Registry according to national law.

3.8 ' Relevant government or public authority' means the national government or public authority of a distinct economy as recognised in international fora, as those terms are used in the ICANN bylaws and the GAC Operating Principles, associated with the country code.

3.9 ' Local Internet community' means the local community in the country associated with the country code, and includes the national government. This definition is specific to the purposes identified in this document and not broader.

## 4. ROLE OF GOVERNMENT OR PUBLIC AUTHORITY

### 4.1 Principles

4.1.1. Ultimate public policy authority over the relevant ccTLD rests with the relevant government or public authority; how this authority is exercised is determined by applicable law.

4.1.2. Every country or distinct economy with a government or public authority recognised in accordance with article 3.8 above should be able to ask for its appropriate country code to be represented as a ccTLD in the DNS and to designate the Registry for the ccTLD concerned.

### 4.2 Guidelines

4.2.1. The relevant government or public authority is strongly encouraged to ensure that the ccTLD is being administered in the public interest, within the framework of its national public policy and relevant laws and regulations.

4.2.2. The relevant government or public authority should be able to ensure that domain name registration in the ccTLD by Registrars benefits from effective and fair conditions of competition, at appropriate levels and scale of activity.

4.2.3. To give effect to their public policy interests, governments or public authorities may wish to base any communication with ccTLD Registries on the terms outlined in Clause 9.

4.2.4. In making a designation or acceptance for a ccTLD Registry, the government or public authority should take into consideration the importance of long-term stability in the administration and management of the ccTLD and in the DNS. In most cases, such stability may be best served through the designation of an organisation or an enterprise rather than a specific individual.

## 5. ROLE OF ccTLD REGISTRY

### 5.1 Principles

5.1.1. The ccTLD Registry is a trustee for the delegated ccTLD, and has a duty to serve the local Internet community as well as the global Internet community. Some governments or public authorities may require their agreement before any sub-contracting or sub-licensing of the delegation. Where this agreement is given, the government or public authority should notify ICANN.

5.1.2. In performing their functions ccTLD Registries are subject to applicable law.

5.1.3. Any claim of intellectual property right in the two-letter code in itself shall not impede a change of Registry.

### 5.2 Guidelines

5.2.1. Any intellectual property rights that the ccTLD Registry may have acquired as the result of delegation or which any entity may have acquired as a result of the management, administration or marketing of the ccTLD shall be taken into account and dealt with in accordance with applicable law in the case of a re-delegation. Such rights should not be exercised in a way that unnecessarily impedes re-delegation of a ccTLD Registry decided according to national law or under the circumstances described under clause 7 below.

5.2.2. The ccTLD Registry should work cooperatively with the relevant government or public authority of the country or territory for which the ccTLD has been established, within the legal framework, and in line with appropriate public policy objectives of the government of the country or distinct economy concerned.

5.2.3. The ccTLD Registry, and the Registry's administrative contact, shouldbe resident or incorporated in the territory and/or jurisdiction of the relevant government or public authority unless formally decided otherwise by the relevant government or public authority. In any event the ccTLD should operate in a way that is consistent with the laws and public policy of the relevant government or public authority.

5.2.4. The ccTLD Registries have the opportunity to participate in the ICANN Policy Development Processes through the Country Code Names Supporting Organisation (ccNSO). The GAC encourages the ongoing extension of the ccNSO ' s membership.

5.2.5. In any sub-contracting of the technical operations of the ccTLD Registry or administrative and management functions of the ccTLD, the sub-contract should state that the delegation itself is not reassigned to the sub-contractor. Any re-assignment would have to be in accordance with the provisions of Clause 7.

## 6. ROLE OF ICANN

### Principle

6.1 ICANN ' s mission with respect to ccTLD Registries is to co-ordinate the Internet's systems of top-level domain unique identifiers, and to ensure their stable and secure operation, in particular: the allocation and assignment of the sets of unique Internet identifiers; the operation and evolution of the root name server system; and the policy development related to these technical functions as defined in the ICANN Bylaws.

## 7. PRINCIPLES RELATING TO DELEGATIONS AND RE-DELEGATIONS

### 7.1. Principle

Delegation and re-delegation is a national issue and should be resolved nationally and in accordance with national laws, taking into account the views of

all local stakeholders and the rights of the existing ccTLD Registry. Once a final formal decision has been reached, ICANN should act promptly to initiate the process of delegation or re-delegation in line with authoritative instructions showing the basis for the decision.

**7.2. Guidelines**

7.2.1. Where the Registry operating the country code TLD does not have a formal communication with its national government and its core functions are operated under a different jurisdiction, any action to re-delegate needs to take account of the legal framework in the country where the Registry is based. In the event of a re-delegation, registrants in the ccTLD should be afforded continued name resolution or, if necessary, a mutually agreed period in which to transfer to another TLD.

7.2.2. In the case of a disputed re-delegation request where the relevant country code TLD Registry is based in another country and where there is not a contract specifying which national law should apply, the government and ccTLD should seek to find a mutually acceptable solution. Where there is evidence that local stakeholders and the Internet community support the government proposal for re-delegation, but where there is no legal basis for imposing the re-delegation, ICANN may contribute to identifying alternative solutions to resolve the problem.

7.2.3. It is strongly recommended that, in the case of new delegations or re-delegations, particularly where a Registry is based out of country, national governments and Registry managers should agree on the legal framework and specific contract conditions to be used to judge any subsequent disputes or re-delegation requests.

## 8. GUIDELINES FOR A COMMUNICATION BETWEEN THE RELEVANT GOVERNMENT OR PUBLIC AUTHORITY AND ICANN

8.1. In cases in which there is a communication between the relevant government or public authority and ICANN/IANA, it should include the nominated, designated point of contact for communications with the relevant government or public authority.

8.2. In the absence of a communication, or where there are reasons for doubt, ICANN/IANA should consult with the diplomatic authorities or the Governmental Advisory Committee members for the government or distinct economy concerned on the competent authority and appropriate point of contact with their administration for communications.

8.3. Recognising ICANN ' s responsibilities to achieve consensus in the creation of any new generic TLDs, ICANN should avoid, in the creation of new generic TLDs, well known and famous country, territory or place names; well known and famous country, territory or regional language or people descriptions; or ISO 639 Codes for representation of languages unless in agreement with the relevant governments or public authorities.

## 9. GUIDELINES FOR A COMMUNICATION BETWEEN THE RELEVANT GOVERNMENT OR PUBLIC AUTHORITY AND THE ccTLD REGISTRY

9.1 Depending on the needs in individual national circumstances, it may be appropriate for the relevant government or public authority to establish a communication with its newly designated Registry. Any such communication could include the following provisions:

9.1.1 Term, performance clauses, applicable law, opportunity for review and process for revocation.

9.1.2 A commitment by the Registry to operate the ccTLD in the interest of the relevant local Internet community and the global Internet community.

9.1.3 Confirmation that the ccTLD is operated in trust in the public interest and that any claim of intellectual property rights in the two-letter code in itself shall not impede any possible future change of Registry.

9.1.4 Conditions to ensure the transfer of all relevant DNS data to the new Registry, if, for any reason, a reassignment of delegation to a new Registry is necessary, taking all interests into account.

9.1.5 References to ensure the safety and integrity of the Registry databases.

9.1.6 Conditions for the efficient and effective resolution of disputes arising from domain name registration.

## 10. COMMUNICATION BETWEEN ICANN AND THE ccTLD REGISTRY

### 10.1 Principle

A Registry should not sub-contract part or all of the technical operations of the ccTLD Registry affecting the global stability of the DNS without ensuring that the sub-contractor has the appropriate technical capability, and informing ICANN accordingly.

### 10.2 Guidelines

10.2.1. The communication between ICANN and the Registry should as a minimum contain ICANN's commitment to:

10.2.1.1 Maintain, or cause to be maintained, a stable, secure, authoritative and publicly available database of relevant information for each ccTLD (see below);

10.2.1.2 Ensure that authoritative and accurate root zone information is generated in a timely manner from such database and contribute to the root servers ' operating in stable and secure manner. Also, ensure that changes to the root zone database are made on the basis of reliable authentication procedures confirming the authority and identity of the requesting party;

10.2.1.3 Maintain, or cause to be maintained, authoritative records and an audit trail regarding ccTLD delegations and records related to these delegations; and

10.2.1.4 Inform the Registry in a timely manner of any changes to ICANN's contact information.

10.2.2 The communication between ICANN and the Registry should contain the Registry ' s commitment to:

10.2.2.1. Cause to be operated and maintained in a stable and secure manner the authoritative primary and secondary name servers for the ccTLD, adequate to resolve names within the ccTLD for users throughout the Internet, and any sub-domains over which they retain administrative authority;

10.2.2.2. Inform ICANN in a timely manner of any changes to the ccTLD's contact information held by ICANN;

10.2.2.3. Set out clear conditions and parameters for any payment by the ccTLD. ♦

Mar del Plata, 5 April 2005

© Internet Corporation for Assigned Names and Numbers

# **Exhibit N**

Haim v. The Islamic Republic of Iran,
Civil Action No. 02-1811-RCL



Site Map   Search

### Internet Corporation for Assigned Names and Numbers

**ARCHIVES**

**Please note:** You are viewing archival ICANN material. Links and information may be outdated or incorrect. Visit **ICANN's main website** for current information.

## Letter from Drafting Committee, Alternate ccTLD Best Practices Draft

(3 March 2000)

March 3, 2000

Ms Esther Dyson
Chairman
The Internet Corporation for Assigned Names and Numbers
4676 Admiralty Way, Suite 330
Marina del Rey, CA 90292
United States of America

Dear Ms Dyson;

Based on the strong and continuing support for RFC 1591 among ccTLDs as the primary and best set of principles for assigning and managing ccTLDs, we have drafted and hereby submit to ICANN for its consideration what we consider to be the most appropriate set of Draft Best Practices for delegating and managing ccTLDs.

It is the purpose of this Alternative Best Practices Draft to use RFC 1591, the current basis of delegations and activities of ccTLDs, as the foundation for more completely defining the obligations of ccTLD Managers in the management of domains, and to clarify the role of IANA/ICANN in supervising the management of ccTLDs.

It is important to note that the two other draft best practices documents submitted to ICANN do not preserve this basic foundation of RFC 1591, and give little or no role to IANA/ICANN as a result. In addition, the CENTR proposal includes no mechanism for enforcement for its Best Practices, and appears to depend upon the GAC draft for that purpose.

Our intent is to lay out objective standards for the qualification as ccTLD Managers and for the performance of the function, including a fair and supportive enforcement mechanism. We believe the Alternative Best Practices Draft does just that.

The Alternative Best Practices Draft, based on RFC 1591, further clarifies the obligations of the ccTLD Managers to the global Internet and to their respective local communities, along with details concerning the regulatory regime established by ICANN, based on ICP-1, to guarantee not simply that ccTLD Managers will comply with the requirements, but that the ccTLD Managers will be able to operate their respective domains with vigor and reliability, free from arbitrary governmental intervention, and relying on a set of procedural principles founded on the concept of due process of law and fair, predictable, and open regulation.

We look forward to presenting the Alternative Best Practices Draft based on RFC 1591 to the ICANN Board and to the wider Internet Community in Cairo and during the next several weeks. Please distribute the attached copy to members of the ICANN Board of Directors as well as to any other interested parties.

Best wishes,

Drafting Committee, the Alternative Best Practices Draft based on RFC 1591

Nii Quaynor, .GH, AFTLD founding member
Antony Van Couvering, President, IATLD
Peter DeBlanc, .VI, NATLD founding member
Oscar Robles, .MX, LACTLD founding member
J. William Semich, .NU, APTLD executive committee member

The following ccTLDs indicated they support continuation of RFC 1591 when queried in May, 1999:

**.AI - Anguilla; .AG - Antigua and Barbuda; .AM - Armenia ; .BI - Republic of Burundi; .BM (Bermuda); .BO - Bolivia; .BR - Brazil; .BY- Belarus; .CC - Cocos & Keeling Islands; .CD - Democratic Republic of the Congo; .CG - Republic of the Congo; .CL - Chile; .CN - China; .CR - Costa Rica; .CV - Cape Verde Islands; .DO - Dominican Republic; .DZ - Algeria; .EC - Ecuador; .EG - Egypt; .ER - Eritrea; .FK - Falkland Islands (Malvinas); .GD - Grenada; .GF - French Guiana; .GG - Guernsey; .GH - Ghana; .GM - The Gambia, West Africa; .GP - Guadeloupe; .GS - South Georgia and Sandwich Islands; .GT - Guatemala; .HM - Heard and McDonald Islands; .HN - Honduras; .ID - Indonesia; .JE - Jersey; .JO - Jordan; .KW - Kuwait; .KY - Cayman Islands; .KZ - Kazakhstan; .LA - Lao People's Democratic Republic; .LB - Lebanon; .LC - Saint Lucia; .LR - Liberia; .LS - Lesotho; .LY - Libya; .ML - Republic of Mali; .MM - Myanmar; .MN - Mongolia; .MP - Northern Mariana Islands; .MS - Montserrat; .MT - Malta; .MU - Mauritius; .MW - Malawi; .MX - Mexico; .MY - Malaysia; .NA - Namibia; .NU - Niue; .NZ - New Zealand; .PE - Peru; .PG - Papua New Guinea; .PH - Philippines; .QA - Qatar; .RW - Republic of Rwanda; .SB - Solomon Islands; .SC - Seychelles; .SG - Singapore; .SV - El Salvador; .SZ - Swaziland; .TC - Turks and Caicos Islands; .TF - French Southern Territories; .TJ - Tajikistan; .TO - Tonga; .TT - Trinidad and Tobago; .UA - Ukraine; .UG - Uganda; .UY - Uruguay; .UZ - Uzbekistan; .VE - Venezuela; .VI - US Virgin Islands; .VU - Vanuatu; .VG - Virgin Islands (British); .YU - Yugoslavia; .ZW - Zimbabwe**

Attachment: Alternate Best Practices Draft, v2.0 (5 March 2000)

© Internet Corporation for Assigned Names and Numbers